**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| IN RE:<br><br>APPLICATION OF THE COMMITTEE ON THE JUDICIARY, U.S. HOUSE OF REPRESENTATIVES, FOR AN ORDER AUTHORIZING THE RELEASE OF CERTAIN GRAND JURY MATERIALS | Misc. No. 19-_____<br><br>**Oral Argument Requested** |

**APPLICATION OF THE COMMITTEE ON THE JUDICIARY,
U.S. HOUSE OF REPRESENTATIVES, FOR AN ORDER AUTHORIZING
THE RELEASE OF CERTAIN GRAND JURY MATERIALS**

Pursuant to Local Rule 57.6, the United States House of Representatives, Committee on the Judiciary (the Committee), through undersigned counsel, respectfully requests that this Court issue an order pursuant to Federal Rule of Criminal Procedure 6(e) authorizing the release to the Committee of: (1) all portions of Special Counsel Robert S. Mueller III's *Report on the Investigation Into Russian Interference In The 2016 Presidential Election* (the Mueller Report) that were redacted pursuant to Federal Rule of Criminal Procedure 6(e); (2) any underlying transcripts or exhibits referenced in the portions of the Mueller Report that were redacted pursuant to Rule 6(e); and (3) transcripts of any underlying grand jury testimony and any grand jury exhibits that relate directly to (A) President Trump's knowledge of efforts by Russia to interfere in the 2016 U.S. Presidential election; (B) President Trump's knowledge of any direct or indirect links or contacts between individuals associated with his Presidential campaign and Russia, including with respect to Russia's election interference efforts; (C) President Trump's knowledge of any potential criminal acts by him or any members of his administration, his campaign, his personal associates, or anyone associated with his administration or campaign; or (D) actions taken by former White

House Counsel Donald F. McGahn II during the campaign, the transition, or McGahn's period of service as White House Counsel.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT AND INTEREST OF THE APPLICANT ................................. 1

BACKGROUND ............................................................................................................. 3

    A.  Findings by Special Counsel Mueller ................................................................ 3

        1.  Russia's Attack on the 2016 U.S. Presidential Election................................. 3

        2.  The Trump Campaign's Efforts To Benefit from Russia's Attack ............................. 4

        3.  President Trump's Efforts To Undermine Special Counsel Mueller's Investigation... 6

    B.  The Judiciary Committee's Investigation ..................................................... 12

        1.  The Committee's Jurisdiction.................................................................. 12

        2.  The Committee's Investigation and Accommodation Efforts.................................. 13

    C.  Procedural Background and Requested Relief................................................. 22

ARGUMENT .............................................................................................................. 26

    I.    THE COURT SHOULD AUTHORIZE DISCLOSURE OF THE REQUESTED
MATERIALS PURSUANT TO RULE 6(e)'S "JUDICIAL PROCEEDING" EXCEPTION . 26

    A.  The Committee Seeks To Use Grand Jury Materials "Preliminarily to" a "Judicial
Proceeding" ........................................................................................... 26

        1.  An Investigation Regarding Impeachment Is Preliminary to a "Judicial Proceeding"
27

        2.  The Judiciary Committee Is Investigating Whether To Recommend Articles of
Impeachment......................................................................................... 30

    B.  The Judiciary Committee Has a Particularized Need for the Requested Grand Jury
Materials ............................................................................................... 34

        1.  The Requested Materials Are Needed To "Avoid an Injustice" ............................... 34

        2.  The Need for Disclosure Outweighs the Need for Continued Secrecy ..................... 38

        3.  The Committee's Request Covers Only Critical Materials ....................................... 39

    II.    THE COURT SHOULD AUTHORIZE DISCLOSURE OF THE REQUESTED
MATERIALS PURSUANT TO ITS INHERENT AUTHORITY ........................................... 40

PRAYER FOR RELIEF ............................................................................................... 41

ORAL ARGUMENT REQUESTED.................................................................................. 42

# TABLE OF AUTHORITIES

**Cases**

*Carlson v. United States*,
 837 F.3d 753 (7th Cir. 2016) ..............................................................................40

*Doe v. Rosenberry*,
 255 F.2d 118 (2d Cir. 1958)................................................................................27

*Douglas Oil Co. of Cal. v. Petrol Stops Nw.*,
 441 U.S. 211 (1979).............................................................................................26

*Haldeman v. Sirica*,
 501 F.2d 714 (1974)......................................................................27, 28, 29, 31

*In re App. to Unseal Dockets Related to the Independent Counsel's 1998 Investigation of President Clinton*,
 308 F. Supp. 3d 315 (D.D.C. 2018) (*Independent Counsel Dockets*)..............................39, 41

*In re Cisneros*,
 426 F.3d 409 (D.C. Cir. Spec. Div. 2005) ...............................................................20

*In re Craig*,
 131 F.3d 99 (2d Cir. 1997)...................................................................................40

*In re Espy*,
 259 F.3d 725 (D.C. Cir. Spec. Div. 2001) ....................................................... 20-21

*In re Grand Jury Proceedings of Grand Jury No. 81-1 (Miami)*,
 669 F. Supp. 1072 (S.D. Fla. 1987) (*Hastings*) ...........................................28, 32, 40

*In re Grand Jury Proceedings of Grand Jury No. 81-1 (Miami)*,
 833 F.2d 1438 (11th Cir. 1987) .....................................................................21, 29

*In re Madison Guaranty Savings & Loan Assoc.*,
 Div. No. 94-1 (D.C. Cir. Spec. Div. July 7, 1998)...................................................20

*In re North*,
 16 F.3d 1234 (D.C. Cir. Spec. Div. 1994) ...............................................................21

*In re Sealed Case*,
 801 F.2d 1379 (D.C. Cir. 1986)............................................................................26

*Jachimowski v. Conlisk*,
 490 F.2d 895 (7th Cir. 1973) ...............................................................................27

*Kilbourn v. Thompson*,
   103 U.S. (13 Otto) 168 (1880) .............................................................28

*McKeever v. Barr*,
   920 F.3d 842 (D.C. Cir. 2019),
   *pet. for reh'g denied*, No. 17-5149 (July 22, 2019) ..................................26, 27, 28, 29, 40, 41

*Nat'l Labor Relations Bd. v. Noel Canning*,
   573 U.S. 513 (2014) .............................................................30

*Nixon v. United States*,
   506 U.S. 224 (1993) .............................................................30

*Nixon v. United States*,
   Civ. No. H88-0052(G) (S.D. Miss.) .............................................................33

*Pitch v. United States*,
   915 F.3d 704 (11th Cir. 2019) .............................................................40

*United States v. Baggot*,
   463 U.S. 476 (1983) .............................................................29, 30

**Constitutional Provisions**

U.S. Const. Art. I, § 2, cl. 5 .............................................................30

U.S. Const. Art. I, § 5, cl. 2 .............................................................12, 30

U.S. Const. Art. III, § 3 .............................................................28

**Statutes**

50 U.S.C. § 3092 .............................................................22

50 U.S.C. § 3003 .............................................................22

**Rules of the United States House of Representatives (116th Cong.)**

House Rule X.1 .............................................................12

House Rule X.2 .............................................................12

House Rule X.11 .............................................................14

House Rule XII.2(a) .............................................................13

**Legislative Authorities**

133 Cong. Rec. 6522 (1987) ................................................................................13, 32

135 Cong. Rec. 2553 (1989) ......................................................................................13

162 Cong. Rec. H4926 (daily ed. July 13, 2016) ......................................................13

163 Cong. Rec. H5759 (daily ed. July 12, 2017) ......................................................13

163 Cong. Rec. H9375 (daily ed. Nov. 15, 2017) .....................................................13

165 Cong. Rec. H208 ..................................................................................................12

165 Cong. Rec. H211 (daily ed. Jan. 3, 2019) ..........................................................13

165 Cong. Rec. H2731-32 (daily ed. Mar. 14, 2019) ...............................................15

*Deschler's Precedents of the United States House of Representatives*,
  H. Doc. 94-661 Ch. 14 § 5 (1977) ....................................................................33, 34

H. Con. Res. 24, 116th Cong. (2019) ........................................................................15

H. Doc. 114-192 (2017) .............................................................................................13

H. Res. 6, 116th Cong. (2019) ...................................................................................12

H. Res. 128, 100th Cong. (1987) ...............................................................................32

H. Res. 134, 100th Cong. (Mar. 30, 1987) ...............................................................32

H. Res. 320, 100th Cong. (Dec. 2, 1987) ..................................................................32

H. Res. 388, 100th Cong. (Mar. 16, 1988) ...............................................................32

H. Res. 430, 116th Cong. (2019) .........................................................................22, 31

H. Res. 581, 105th Cong. (1998) ...............................................................................13

H. Res. 803, 93d Cong. (1974) ..................................................................................13

H.R. Rep. No. 91-1549 (1970) ...................................................................................12

H.R. Rep. No. 93-1305 (1974) ...................................................................................34

H.R. Rep. No. 99-688 (1986) .....................................................................................33

H.R. Rep. No. 100-810 (1988) ................................................................................32

H.R. Rep. No. 101-66 (1988) ..................................................................................33

H.R. Rep. No. 103-224 (1993) ................................................................................12

H.R. Rep. No. 111-427 (2010) ................................................................................21

H.R. Rep. No. 116-105 (2019) (Contempt Report) ..........................................18, 23, 30

H.R. Rep. No. 116-108 (2019) (Rules Committee Report) ......................... 23, 30-31, 31

*Former Special Counsel Robert S. Mueller, III on the Investigation into Russian Interference in the 2016 Presidential Election: Hearing before the H. Permanent Select Comm. on Intelligence (July 24, 2019)* ....................................................................................24

*Impeachment Articles Referred on John Koskinen (Part III):*
    *Hearing Before the H. Comm. on the Judiciary*, 114th Cong. (1998) ....................33

*Jefferson's Manual*, H. Doc. 114-192 § 605, at 321 (2017) .....................................12, 33

Jerrold Nadler, Chair, H. Comm. on the Judiciary, *Memorandum Re: Hearing on "Lessons from the Mueller Report, Part II: Bipartisan Perspectives"* (June 19, 2019).................... 23-24

Jerrold Nadler, Chair, H. Comm. on the Judiciary, *Memorandum Re: Hearing on "Lessons from the Mueller Report, Part III: 'Constitutional Processes for Addressing Presidential Misconduct'"*
    (July 11, 2019) (July 11 Memorandum) .................................................2, 23, 26, 31

Jerrold Nadler, Chairman, H. Comm. on the Judiciary, *Memorandum Re: House Judiciary Committee Procedures for Handling Grand Jury Information*
    (Grand Jury Handling Procedures) (July 26, 2019) ....................................24, 25, 38

*Lessons from the Mueller Report, Part III:*
    *"Constitutional Processes for Addressing Presidential Misconduct": Hearing Before the H. Comm. on the Judiciary (July 12, 2019)* ..............................................23, 31

*Lessons from the Mueller Report: Presidential Obstruction and Other Crimes:*
    *Hearing Before the H. Comm. on the Judiciary (June 10, 2019)* .....................23, 31

*Oversight of the Report on the Investigation Into Russian Interference in the 2016 Presidential Election: Former Special Counsel Robert S. Mueller, III:*
    *Hearing before the H. Comm. on the Judiciary (July 24, 2019)* ...........................24

## Other

Charlie Savage, *Trump Vows Stonewall of 'All' House Subpoenas,
   Setting Up Fight Over Powers*, N.Y. TIMES (Apr. 24, 2019) ...................................17

Charles W. Johnson et al., *House Practice: A Guide to the Rules, Precedents,
   and Practice of the House* (2017) .........................................................................13

Donald J. Trump (@realDonaldTrump) (May 11, 2019, 6:39 PM) ............................37

George Stephanopoulos, Interview of President Donald J. Trump (June 12, 2019) ....................39

House Committee on the Judiciary, *House Judiciary Committee Unveils Investigation
   Into Threats Against the Rule of Law* (Mar. 4, 2019 press release).........................14

Jeff Pegues, *Jerome Corsi: "They may come in right here and indict me,"*
   CBS News, Dec. 11, 2018 .....................................................................................39

John Wagner & Felicia Sonmez, *Trump Disavows Past Enthusiasm for WikiLeaks
   After Assange's Arrest*, WASH. POST (Apr. 11, 2019) ..............................................5

Josh Gerstein & Darren Samuelsohn, *Nunberg Arrives at Mueller Grand Jury*,
   Politico, Mar. 9, 2018 ..........................................................................................39

Laurence Tribe & Joshua Matz, TO END A PRESIDENCY:
   THE POWER OF IMPEACHMENT (2018)................................................................ 28-29

Mem. from Robert G. Dixon, Jr., Assistant Attorney General, Office of Legal Counsel, *Re:
   Amenability of the President, Vice President and other Civil Officers to Federal Criminal
   Prosecution While in Office* (Sept. 24, 1973); *A Sitting President's Amenability to
   Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222 (2000) .........................31

Office of the Deputy Attorney General, Order No. 3915-2017, *Appointment of Special Counsel
   to Investigate Russian Interference with the 2016 Presidential Election and
   Related Matters* (May 17, 2017) ...........................................................................8

*Report on the Investigation Into Russian Interference In The 2016 Presidential Election*.............1
   Mueller Report, Vol. I.....................................................................3, 4, 5, 6, 21, 35
   Mueller Report, Vol. II ...........................................6, 7, 8, 9, 10, 11, 12, 21, 31, 35, 36, 37, 38

Robert Costa et al., *Trump Says He Is Opposed to White House Aides Testifying to
   Congress, Deepening Power Struggle with Hill*, WASH. POST (Apr. 23, 2019).....................17

Subpoena to Attorney General Barr (Apr. 19, 2019)....................................................16

Subpoena to Donald F. McGahn II (Apr. 22, 2019) .......................................................17

*The Beat with Ari Melber*, MSNBC, Jan. 23, 2019 ...................................................39

**Letters**

Letter to Jerrold Nadler, Chairman, H. Comm. on the Judiciary, from Pat Cipollone,
    Counsel to the President (May 20, 2019)..............................................................17

Letter to Jerrold Nadler, Chairman, H. Comm. on the Judiciary, from Pat Cipollone,
    Counsel to the President (June 18, 2019) ..............................................................17

Letter to Jerrold Nadler, Chairman, H. Comm. on the Judiciary, from Stephen E. Boyd,
    Assistant Attorney General, U.S. Department of Justice (May 1, 2019)...........17, 21

Letter to Jerrold Nadler, Chairman, H. Comm. on the Judiciary, from Stephen E. Boyd,
    Assistant Attorney General, U.S. Department of Justice (May 6, 2019)................21

Letter to Jerrold Nadler, Chairman, H. Comm. on the Judiciary, from Stephen E. Boyd,
    Assistant Attorney General, U.S. Department of Justice (May 7, 2019)................18

Letter to Attorney General Barr et al., from Chairman Schiff and Devin Nunes, Ranking
    Member, H. Permanent Select Comm. on Intelligence (Mar. 27, 2019) ................16

Letter to Attorney General Barr from Chairman Schiff and Ranking Member Nunes
    (April 25, 2019) ....................................................................................................16

Letter to Attorney General Barr from Chairman Schiff (May 8, 2019)..........................19

Letter to Hon. William Barr, Attorney General, from Jerrold Nadler, Chairman, H. Comm. on the
    Judiciary; Adam Schiff, Chairman, H. Permanent Select Comm. on Intelligence; Elijah
    Cummings, Chairman, H. Comm. on Oversight and Reform; Elliot Engel, Chairman, H.
    Comm. on Foreign Affairs; Maxine Waters, Chairwoman, H. Comm. on Financial Servs.;
    and Richard Neal, Chairman, H. Comm. on Ways and Means (Feb. 22, 2019)....................14

Letter to Hon. William Barr, Attorney General, and Pat Cipollone, Counsel to the President,
    from Jerrold Nadler, Chairman, H. Comm. on the Judiciary (May 24, 2019)........................19

Letter to Hon. William P. Barr, Attorney General, from Jerrold Nadler, Chairman,
    H. Comm. on the Judiciary, et al. (Mar. 25, 2019) .................................................15

Letter to Hon. William Barr, Attorney General, from Jerrold Nadler, Chairman,
    H. Comm. on the Judiciary, et al. (Apr. 1, 2019).....................................................21

Letter to Hon. William Barr, Attorney General, from Jerrold Nadler, Chairman,

H. Comm. on the Judiciary (Apr. 11, 2019) .............................................................................21

Letter to Hon. William P. Barr, Attorney General, from Jerrold Nadler,
  Chair, H. Comm. on the Judiciary (May 3, 2019) ...........................................................18, 21

March 8, 1974 letter from Peter W. Rodino, Chairman, H. Comm. on the Judiciary)
  (Rodino Letter).................................................................................................................32, 34

**Court Documents**

Order, *Pitch v. United States*, No. 17-15016 (11th Cir. June 4, 2019) ..........................................40

Mem. for the United States on Behalf of the Grand Jury, *In re Report & Rec. of June 5, 1972*
  *Grand Jury Concerning Transmission of Evidence to the House of Reps.*, Misc. No. 74-21,
  370 F. Supp. 1219 (Mar. 5, 1974) (*Haldeman* Brief) ...................................................20, 32, 38

**PRELIMINARY STATEMENT AND INTEREST OF THE APPLICANT**

Special Counsel Robert S. Mueller III's *Report On The Investigation Into Russian Interference In The 2016 Presidential Election* (the Mueller Report) provided Members of Congress with substantial evidence that the President of the United States repeatedly attempted to undermine and derail a criminal investigation of the utmost importance to the nation.  That investigation sought to uncover Russia's actions to interfere with the integrity of an American presidential election.  Russia engaged in these acts in order to benefit then-candidate Donald J. Trump.  President Trump repeatedly denied Russia's actions and fired the director of the Federal Bureau of Investigation (FBI), resulting in the appointment of Mr. Mueller as Special Counsel. The Mueller Report describes detailed evidence that President Trump then sought to terminate Special Counsel Mueller and to interfere with his investigation.

Because Department of Justice policies will not allow prosecution of a sitting President, the United States House of Representatives is the only institution of the Federal Government that can now hold President Trump accountable for these actions.  To do so, the House must have access to all the relevant facts and consider whether to exercise its full Article I powers, including a constitutional power of the utmost gravity—approval of articles of impeachment.

That duty falls in the first instance to the House Committee on the Judiciary (the Judiciary Committee or the Committee).  As Chairman Nadler recently wrote in a Memorandum issued to all Members of the Committee, "[w]ith regard to the Committee's responsibility to determine whether to recommend articles of impeachment against the President, articles of impeachment have already been introduced in this Congress and referred to the Judiciary Committee.  They are under consideration as part of the Committee's investigation, although no final determination has been made.  In addition, the Committee has the authority to recommend its own articles of

impeachment for consideration by the full House of Representatives." Jerrold Nadler, Chairman, H. Comm. on the Judiciary, *Memorandum Re: Hearing on "Lessons from the Mueller Report, Part III: 'Constitutional Processes for Addressing Presidential Misconduct,'"* at 3 (July 11, 2019) (July 11 Memorandum) (attached as Ex. A to Declaration of Perry H. Apelbaum). As Chairman Nadler further explained, "[t]he Committee seeks key documentary evidence and intends to conduct hearings with [former White House Counsel Don] McGahn and other critical witnesses testifying to determine whether the Committee should recommend articles of impeachment against the President or any other Article I remedies, and if so, in what form." *Id.*

To meaningfully consider whether to exercise this authority—as well as to exercise its other pressing legislative and oversight responsibilities—the Committee must obtain evidence and testimony in a timely manner. In particular, the Committee has sought access to the full contents of the Mueller Report, and it now seeks this Court's permission to access those portions that the Department of Justice has redacted pursuant to Federal Rule of Criminal Procedure 6(e).

The Committee's request is consistent with numerous prior instances in which it has sought and obtained grand jury materials when evaluating allegations of misconduct by government officials, including allegations against a sitting President. The full Mueller Report provides an essential roadmap for the Committee's efforts to uncover all facts relevant to Russia's attack on the 2016 Presidential election and to any attempts by the President to prevent Congress from learning the truth about those attacks along with their aftermath.

Furthermore, the Committee requires access to all underlying grand jury materials that bear directly on President Trump's knowledge of any potential misconduct during the 2016 election campaign and afterward—and, thus, bear directly on the President's state of mind at the time of relevant events. These materials are essential to the Committee's ongoing investigation, including

its ability to effectively question one of its most critical witnesses, Mr. McGahn.

This Court is authorized to disclose these materials pursuant to Rule 6(e)(3)(E) because the Committee seeks to use them "preliminarily to or in connection with a judicial proceeding." The D.C. Circuit has construed that provision to apply where, as here, this Committee is conducting an investigation to determine whether to recommend articles of impeachment. The Committee has a compelling need for the requested materials: the Committee must be permitted to assess the full facts as described in the Mueller Report, particularly those redacted passages that relate to interactions between Trump Campaign officials and agents of the Russian government. The Committee must also be permitted to review any grand jury materials that bear directly on the President's knowledge of potential misconduct and on actions taken by McGahn. The Committee has targeted its request to include only those grand jury materials that are referenced or included in—but redacted from—the Mueller Report itself, and any underlying grand jury materials that would directly shed light on the President's state of mind at the time of relevant events or that relate to actions taken by the Committee's key witness. The Committee's interest in obtaining a limited disclosure of these materials far outweighs any interests in secrecy.

## BACKGROUND

### A.  Findings by Special Counsel Mueller

#### 1.  Russia's Attack on the 2016 U.S. Presidential Election

The Special Counsel's Report concludes that the "Russian government interfered in the 2016 presidential election in sweeping and systematic fashion." Mueller Report, Vol. I at 1. That interference occurred principally through two operations. First, the Russian-funded Internet Research Agency (IRA) used "information warfare" to sow political and social discord intended to benefit then-candidate Trump's campaign (the Trump Campaign) and to harm former Secretary

of State Hillary Rodham Clinton's campaign (the Clinton Campaign). *Id.* Vol. I at 4, 25. The IRA created fake social media accounts across various platforms, impersonating American voters and organizations and illegally purchasing political advertisements. *Id.* Vol. I at 15-32. "Collectively, the IRA's social media accounts reached tens of millions of U.S. persons." *Id.* Vol. I at 26.

Second, Russia's Main Intelligence Directorate of the General Staff of the Russian Army, known as the GRU, "conducted computer-intrusion operations against entities, employees, and volunteers working on the Clinton Campaign and then released stolen documents." *Id.* Vol. I at 1. The entities that the GRU successfully hacked and stole from included the Democratic National Committee, the Democratic Congressional Campaign Committee, and the Clinton Campaign (including campaign chairman John Podesta). *Id.* Vol. I at 38, 49-50. Through these operations, the GRU stole hundreds of thousands of documents, which it then disseminated in a targeted fashion though fictitious online personas and through WikiLeaks. *Id.* Vol. I at 36, 41-48, 58.

Additionally, the GRU targeted "individuals and entities involved in the administration of [] elections. Victims included U.S. state and local entities, such as state boards of elections . . . , secretaries of state, and county governments, as well as individuals who worked for those entities." *Id.* Vol. I at 50. For example, in the summer of 2016 the GRU successfully breached the Illinois State Board of Elections, "gained access to a database containing information on millions of registered Illinois voters," and stole "data related to thousands of U.S. voters." *Id.*

### 2.   The Trump Campaign's Efforts To Benefit from Russia's Attack

The Mueller Report provides detailed evidence that the Trump Campaign welcomed Russia's election interference operations. According to the Report, the Campaign "expected it would benefit electorally from information stolen and released through Russian efforts." *Id.* Vol. I at 1-2. In particular, the Trump Campaign "showed interest in WikiLeaks's releases of

documents and welcomed their potential to damage candidate Clinton," and by the late summer of 2016 it was even "planning a press strategy, a communications campaign, and messaging based on the possible release of Clinton emails by WikiLeaks." *Id.* Vol. I at 5, 54.  Candidate Trump cited WikiLeaks in public statements more than 140 times throughout the campaign and publicly praised its actions, even declaring, "I love WikiLeaks."[1]  In at least one instance, the Mueller Report suggests that he had advance knowledge of upcoming releases by WikiLeaks:  the report details a phone call that Trump took on his way to an airport while he was with former deputy campaign manager Rick Gates, and it states that "shortly after the call candidate Trump told Gates that more releases of damaging information would be coming." *Id.* Vol. I at 54.

Senior Trump Campaign officials also engaged directly with agents of the Russian government in the hopes of receiving damaging information about Secretary Clinton.  On June 3, 2016, publicist Robert Goldstone emailed Donald Trump, Jr. to convey that a Russian prosecutor was offering to provide the Trump Campaign "'with some official documents and information that would incriminate Hillary and her dealings with Russia.'" *Id.* Vol. I at 110.  Goldstone explained that this was "'part of Russia and its government's support for Mr. Trump.'" *Id.*  Trump Jr. "immediately responded that 'if it's what you say I love it,'" and arranged a meeting on June 9, 2016 between himself, campaign chairman Paul Manafort, senior adviser Jared Kushner, and the Russian prosecutor and her associates.  *Id.* Vol. I at 110, 117.

More broadly, the Mueller Report details approximately 170 contacts between individuals associated with the Trump Campaign or Presidential transition and individuals associated with the

---

[1] John Wagner & Felicia Sonmez, *Trump Disavows Past Enthusiasm for WikiLeaks After Assange's Arrest*, WASH. POST (Apr. 11, 2019), online at https://www.washingtonpost.com/politics/trump-disavows-past-enthusiasm-for-wikileaks-after-assanges-arrest/2019/04/11/ec1785e2-5c74-11e9-9625-01d48d50ef75_story.html?utm_term=.12fead2b24a3.

Russian government.  Senior campaign officials participating in these interactions included Trump Jr., Kushner, Manafort, Gates, and Lieutenant General Michael Flynn.  *Id.* Vol. I at 110-23 (Trump Jr. and June 9 Trump Tower meeting), 129-44 (Manafort and Gates), 159-63 (Kushner), 167-74 (Flynn).  These contacts also included interactions between the Trump Organization, via the President's former personal attorney, Michael Cohen, and Russian real estate developers and government officials concerning the potential development of a Trump Tower building in Moscow.  *See, e.g.*, *id.* Vol. I at 69-80.

### 3. President Trump's Efforts To Undermine Special Counsel Mueller's Investigation

The Mueller Report describes "multiple acts by the President that were capable of exerting undue influence over law enforcement investigations, including the Russian-interference and obstruction investigations."  *Id.* Vol. II at 157.  These acts "ranged from efforts to remove the Special Counsel and to reverse the effect of the Attorney General's recusal; to the attempted use of official power to limit the scope of the investigation; to direct and indirect contacts with witnesses with the potential to influence their testimony" and to "encourage witnesses not to cooperate with the investigation."  *Id.* Vol. II at 157, 7.  In total, the Report analyzed at least ten separate episodes of potentially obstructive conduct by President Trump.

The FBI opened an investigation of "potential coordination between Russia and the Trump Campaign" in late July or early August of 2016.  *Id.* Vol. I at 89 n.465.  The Mueller Report documents that President Trump began taking actions to undermine that investigation soon after his inauguration.  Less than a week after President Trump took his oath of office, McGahn was informed by Acting Attorney General Sally Yates that National Security Advisor Flynn was not being truthful when he claimed never to have discussed the United States's pending imposition of sanctions with Russia's ambassador, Sergey Kislyak, in December 2016.  *Id.* Vol. II at 31.  Yates

disclosed to McGahn that Flynn had been interviewed by the FBI about this matter, and Yates indicated that Flynn may have lied.  *Id.*  The next day, after McGahn told President Trump about this conversation, the President invited FBI Director James Comey to a private dinner at the White House and repeatedly stated, "'I need loyalty.'"  *Id.* Vol. II at 33-36 (quoting Comey's statements). After news about Flynn's lies became public and Flynn was forced to resign, President Trump arranged to speak with Comey alone in the Oval Office and stated, "'I hope you can see your way clear to letting this go, to letting Flynn go. . . .  I hope you can let this go.'"  *Id.* Vol. II at 39-40 (quoting Comey's statements).

On Friday, May 5, 2017, President Trump told several aides that he planned to fire Comey. Over the ensuing weekend, the President had senior adviser Stephen Miller draft a letter explaining his reasons for the termination.  *Id.* Vol. II at 64-65.  On Monday, May 8, the President met with McGahn, Attorney General Jeff Sessions, and Deputy Attorney General Rod Rosenstein and informed them that he planned to have Comey removed.  Sessions and Rosenstein agreed to craft their own separate explanation for Comey's removal, and White House officials agreed that President Trump's draft termination letter would "'not see the light of day.'"  *Id.* Vol. II at 66-68 (quoting notes from McGahn's chief of staff) (brackets omitted).

Director Comey was fired the next day, and the White House gave a series of conflicting explanations for his removal.  *Id.* Vol. II at 70-74.  The Mueller Report states that President Trump was motivated at least in part by a desire to "protect himself from an investigation into his campaign."  *Id.* Vol. II at 76.  Although the Mueller investigation did not establish that the Trump Campaign had actively conspired with Russia in its election interference activities, the Special Counsel concluded that "the evidence does indicate that a thorough FBI investigation would uncover facts about the campaign and the President personally that the President could have

7

understood to be crimes or that would give rise to personal and political concerns." *Id.*

On May 17, 2017, soon after Comey's firing, Rosenstein appointed Mueller as Special Counsel. Special Counsel Mueller was given authority to investigate "the Russian government's efforts to interfere in the 2016 presidential election, . . . any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump," and any other matters that might arise "directly from the investigation."[2]   Special Counsel Mueller's investigation came to include an investigation of "whether the President had obstructed justice in connection with Russia-related investigations" and of "potentially obstructive acts related to the Special Counsel's investigation itself." *Id.* Vol. II at 1. When Sessions informed President Trump of Mueller's appointment, the President "slumped back in his chair and said, 'Oh my God.  This is terrible.  This is the end of my Presidency.  I'm f**ked.'" *Id.* Vol. II at 78 (quoting notes from Sessions's chief of staff, Joseph Hunt).  With McGahn and Hunt present, President Trump "'became angry and lambasted the Attorney General for his decision to recuse himself from the investigation'" and for failing to "'protect[]'" him. *Id.* (quoting Hunt's notes and Sessions's interview statement).

On Saturday, June 17, 2017, shortly after President Trump learned that he was personally under investigation for obstruction of justice, he called McGahn twice and ordered him to "'Call Rod [Rosenstein]'" and tell him that "'Mueller has to go.'" *Id.* Vol. II at 85-86 (quoting McGahn's statement).  The Mueller Report states that "[s]ubstantial evidence indicates that the President's

---

[2] Office of the Deputy Attorney General, Order No. 3915-2017, *Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters* (May 17, 2017).  The Special Counsel's jurisdiction also included "any other matters within the scope of 28 C.F.R. § 600.4(a)." *Id.* Section 600.4(a) states that "[t]he jurisdiction of a Special Counsel shall also include the authority to investigate and prosecute federal crimes committed in the course of, and with intent to interfere with, the Special Counsel's investigation, such as perjury, obstruction of justice, destruction of evidence, and intimidation of witnesses."

attempts to remove the Special Counsel were linked to the Special Counsel's oversight of investigations that involved the President's conduct—and, most immediately, to reports that the President was being investigated for potential obstruction of justice." *Id.* Vol. II at 89.  McGahn prepared to resign rather than carry out the order. *Id.* Vol. II at 86-87.

When the press reported this episode in January 2018, President Trump—first through his private counsel, then through Staff Secretary Rob Porter, and then in person at a meeting in the Oval Office—directed McGahn to deny the reports, including by asking McGahn to create a written record stating the President never asked him to fire Mueller. *Id.* Vol. II at 114-17.  Even when McGahn expressed that he "did not want to issue a statement or create a written record denying facts that [he] believed to be true," the "President nevertheless persisted and asked McGahn to repudiate facts that McGahn had repeatedly said were accurate." *Id.* Vol. II at 119.

Meanwhile, throughout 2017 and for much of 2018, President Trump sought to have Sessions "unrecuse" himself from the Special Counsel's investigation and interfere in the investigation by curtailing its scope.  The President first enlisted McGahn in March 2017 to try to prevent Sessions from recusing himself. *Id.* Vol. II at 49.  When that failed, President Trump chastised McGahn and on several occasions personally asked Sessions to reverse his decision. *Id.* Vol. II at 50-51, 107, 109.  On two separate occasions during the summer of 2017, President Trump directed his former campaign manager, Corey Lewandowski, to deliver a message to Sessions. First, two days after the President tried to have Mueller fired, President Trump met alone with Lewandowski in the Oval Office. *Id.* Vol. II at 91.  According to Lewandowski's notes, "'[t]he President directed that Sessions should give a speech publicly announcing'" that Sessions was curtailing Special Counsel Mueller's investigation to "'"election meddling for future elections."'" *Id.*  President Trump followed up with Lewandowski a month later in another one-on-one Oval

Office meeting.  *Id.* Vol. II at 92-93.  President Trump again requested that Sessions "unrecuse" himself in December 2017, *id.* Vol. II at 109, and he lamented his decision to appoint Sessions as Attorney General in multiple interviews up through August 2018, *id.* Vol. II at 93-94, 110-11.

The Mueller Report further documents actions taken by President Trump that were "directed at possible witnesses in the Special Counsel's investigation," including Flynn, Manafort, and Cohen.  *Id.* Vol. II at 120.  The President passed messages to Flynn encouraging him to "stay strong," and, after Flynn's counsel informed the President's personal counsel that Flynn had decided to cooperate with the investigation, the President's counsel left a voicemail with Flynn's counsel asking for "'some kind of heads up'" if Flynn planned to reveal "'information that implicates the President.'"  *Id.* Vol. II at 121 (quoting voicemail transcript).

After Manafort and Gates were charged with various criminal offenses, Manafort told Gates that "he had talked to the President's counsel and they were 'going to take care of us.'"  *Id.* Vol. II at 123 (quoting Gates's interview statement).  President Trump publicly expressed support for Manafort before Manafort decided to cooperate with the government, including by describing the Special Counsel's investigation as a "rigged witch hunt" while jury deliberations were ongoing. *Id.* Vol. II at 125-26.  At the same time, the President's personal attorney, Rudolph Giuliani, publicly speculated on multiple occasions about the possibility of a pardon for Manafort.  *Id.* Vol. II at 124, 127.  The Special Counsel's office found evidence that these actions could have influenced decisions by both Flynn and Manafort about whether to cooperate with the investigation, and that the President specifically "intended to encourage Manafort to not cooperate."  *Id.* Vol. II at 131-32.

The Special Counsel's office also investigated whether President Trump engaged in witness tampering with respect to Cohen.  Cohen admitted to providing false statements to

Congress about the timing of the Trump Tower-Moscow project to make his statements consistent with the President's public narrative.  *Id.* Vol. II at 142.  In a separate case that was referred to prosecutors in New York, Cohen admitted to orchestrating hush money payments to women alleging affairs with then-candidate Trump in violation of campaign finance laws.  *Id.* Vol. II at 144-45.  Before Cohen chose to cooperate in either investigation, "the President publicly and privately urged Cohen to stay on message and not 'flip.'"  *Id.* Vol. II at 154.  He sent private messages to Cohen to "'stay strong,'" *id.* (quoting Cohen's interview statement), and an attorney with close connections to Giuliani told Cohen in an email that the President's legal team was "'in our corner,'" *id.* Vol. II at 147.  Cohen "recalled discussing the possibility of a pardon with the President's personal counsel," and President Trump "indicated in his public statements that a pardon had not been ruled out."  *Id.* Vol. II at 154.  After Cohen began cooperating, however, the President accused Cohen of fabricating events, called him a "'rat,'" and "on multiple occasions publicly suggested that Cohen's family members had committed crimes."  *Id.*  The Special Counsel found evidence that "the President intended to discourage Cohen from cooperating with the government because Cohen's information would shed adverse light on the President's campaign-period conduct and statements."  *Id.* Vol. II at 155.

President Trump refused to agree to an interview with the Special Counsel's office despite a year's worth of overtures and despite being advised that an interview was "vital to [the] investigation."  *Id.* App. C-1.  He agreed only to provide written responses to questions about Russia-related topics, but not about potential acts of obstruction.  The Special Counsel's office thereafter informed the President's counsel that his limited responses were "insufficien[t] . . . in several respects," including because the President stated on more than 30 occasions that he could not recall various events and gave other answers that were "incomplete or imprecise."  *Id.*  The

President nonetheless refused again to sit for an interview.  *Id.* App. C-1 – C-2.

## B.  The Judiciary Committee's Investigation

### 1.  The Committee's Jurisdiction

The Constitution assigns each House of Congress the authority to "determine the Rules of its Proceedings."  U.S. Const. Art. I, § 5, cl. 2.  Pursuant to this authority, the 116th Congress adopted the Rules of the House of Representatives (House Rules), which govern the House during its two-year term.  *See* H. Res. 6, 116th Cong. (2019) (adopting House Rules).

House Rule X establishes the "standing committees" of the House, including the Committee on the Judiciary, and assigns each committee "jurisdiction and related functions" regarding legislation and oversight within their respective subject areas.  House Rule X.1, X.2. The Judiciary Committee's jurisdiction includes "[t]he judiciary and judicial proceedings, civil and criminal"; "[c]riminal law enforcement and criminalization"; "[p]residential succession"; and "[s]ubversive activities affecting the internal security of the United States."  *Id.* X.1(*l*)(1), (7), (15), (19).  Among other legislative subjects, the Committee exercises jurisdiction regarding the criminal laws of the United States.[3]  Additionally, the Committee exercises jurisdiction regarding the structure and functions of the Department of Justice, including legislation regarding independent counsels and special counsels.[4]

The Committee's jurisdiction also includes consideration of articles of impeachment. *Jefferson's Manual* explains that "resolutions . . . that directly call for the impeachment of an

---

[3] *See, e.g.*, H.R. Rep. No. 91-1549 (1970) (discussing the Committee's consideration of the Organized Crime Control Act, Pub. L. No. 91-452 (1970)).

[4] *See, e.g.*, H.R. Rep. No. 103-224 (1993) (describing the Committee's consideration of legislation to reauthorize the independent counsel statute); 165 Cong. Rec. H208 (daily ed. Jan. 3, 2019) (referral of H.R. 197, the "Special Counsel Independence and Integrity Act," 116th Cong., to the Committee).

officer have been referred to the Committee on the Judiciary."  H. Doc. 114-192 § 605, at 321 (2017).   Upon their introduction, resolutions of impeachment are referred directly to the Committee by the Speaker of the House just as proposed legislation is referred by the Speaker to committees of appropriate jurisdiction.  *See* House Rule XII.2(a) ("The Speaker shall refer each bill, resolution, or other matter that relates to a subject listed under a standing committee named in clause 1 of rule X in accordance with the provisions of this clause.").[5]  This long-standing House practice was followed in the 116th Congress when, on January 3, 2019, a resolution calling for the impeachment of President Trump was referred to the Committee for its consideration.[6]  The House may also choose to direct a particular manner for investigating grounds for impeachment, and in such instances it has voted to refer such investigations to the Committee.[7]  Whether by direct referral to the Committee or referral following a vote, "[a]ll impeachments to reach the Senate since 1900 have been based on resolutions reported by the Committee on the Judiciary."  Charles W. Johnson et al., *House Practice: A Guide to the Rules, Precedents, and Practice of the House*, Ch. 27 § 6, at 615 (2017).

### 2.  The Committee's Investigation and Accommodation Efforts

Beginning in February 2019, Chairman Nadler, Chairman Schiff of the House Permanent

---

[5] *See, e.g.*, 163 Cong. Rec. H9375 (daily ed. Nov. 15, 2017) (referral to the Committee of H. Res. 621, 115th Cong., impeaching President Trump);163 Cong. Rec. H5759 (daily ed. July 12, 2017) (referral to the Committee of H. Res. 438, 115th Cong., impeaching President Trump); 162 Cong. Rec. H4926 (daily ed. July 13, 2016) (referral to the Committee of H. Res. 828, 114th Cong., impeaching John Koskinen, Commissioner of the Internal Revenue Service); 135 Cong. Rec. 2553 (1989) (referral to the Committee of H. Res. 87, 106th Cong., impeaching Judge Walter Nixon); 133 Cong. Rec. 6522 (1987) (referral to the Committee of H. Res. 138, 105th Cong., impeaching Judge Alcee Hastings).

[6] 165 Cong. Rec. H211 (daily ed. Jan. 3, 2019) (referral to the Committee of H. Res. 13, 116th Cong.).

[7] *See, e.g.*, H. Res. 581, 105th Cong. (1998) (instructing the Committee to investigate grounds for impeachment against President Clinton); H. Res. 803, 93d Cong. (1974) (instructing the Committee to investigate grounds for impeachment against President Nixon).

Select Committee on Intelligence (HPSCI),[8] and the chairs of other committees of relevant jurisdiction alerted Attorney General Barr of the House's need to review the full Mueller Report, once completed, and the underlying evidence and investigative materials produced or obtained by the Special Counsel's office.  As the chairs explained, "because the Department has taken the position that a sitting President is immune from indictment and prosecution, Congress could be the only institution currently situated to act on evidence of the President's misconduct."[9]  On March 4, 2019, as evidence of the President's potential misconduct continued to be unveiled, the Committee announced it was investigating "threats to the rule of law," with a focus on "alleged obstruction of justice, public corruption, and other abuses of power by President Trump, his associates, and members of his Administration."[10]  Chairman Nadler emphasized the urgency of this inquiry given that "senior Justice Department officials have suggested that they may conceal

---

[8] HPSCI is investigating the counterintelligence risks arising from efforts by Russia and other foreign powers to influence the U.S. political process during and since the 2016 election, including links and contacts between individuals associated with the Trump Campaign and the Russian government.  HPSCI's jurisdiction includes, among other things, "matters relating to" "[t]he Central Intelligence Agency, the Director of National Intelligence, and the National Intelligence Program," and "[i]ntelligence and intelligence-related activities of all other departments and agencies of the Government, including the tactical intelligence and intelligence-related activities of the Department of Defense."  House Rule X.11(b)(1).  HPSCI is directed to make "regular and periodic reports to the House on the nature and extent of the intelligence and intelligence-related activities of the various departments and agencies of the United States."  House Rule X.11(c)(1).  Evidence obtained through HPSCI's investigation will further inform the Judiciary Committee's consideration of whether to recommend articles of impeachment against the President.

[9] Letter to Hon. William P. Barr, Attorney General (Attorney General Barr), from Jerrold Nadler, Chairman, H. Comm. on the Judiciary (Chairman Nadler); Adam Schiff, Chairman, H. Permanent Select Comm. on Intelligence (Chairman Schiff); Elijah Cummings, Chairman, H. Comm. on Oversight and Reform; Elliot Engel, Chairman, H. Comm. on Foreign Affairs; Maxine Waters, Chairwoman, H. Comm. on Financial Servs.; and Richard Neal, Chairman, H. Comm. on Ways and Means, at 2 (Feb. 22, 2019) (Apelbaum Decl. Ex. B).

[10] Press Release, House Committee on the Judiciary, *House Judiciary Committee Unveils Investigation Into Threats Against the Rule of Law* (Mar. 4, 2019), online at https://judiciary.house.gov/news/press-releases/house-judiciary-committee-unveils-investigation-threats-against-rule-law.

the work of the Special Counsel's investigation from the public."[11]  As part of these investigative efforts, the Committee issued 81 requests for documents from individuals and entities it believed possessed relevant evidence.[12]  On March 14, the House unanimously adopted a resolution calling for the "full release" of the Mueller Report to Congress.  H. Con. Res. 24, 116th Cong. (2019).[13] The resolution noted that "the allegations at the center of Special Counsel Mueller's investigation strike at the core of our democracy" and that "the need for transparency is most pronounced with regard to investigations that involve the President."  *Id.*

The Committee, along with HPSCI and other committees of relevant jurisdiction, persisted in their efforts to obtain access to the full Mueller Report and underlying materials after Special Counsel Mueller delivered the Report to Attorney General Barr on March 22, 2019.  On March 25, for example, Chairman Nadler, Chairman Schiff, and the chairs of other committees wrote to Attorney General Barr that "[t]he release of the full report and the underlying evidence and documents is urgently needed by our committees to perform their duties under the Constitution."[14] Among other things, the chairs noted that "Congress must be permitted to make an independent assessment of the evidence regarding obstruction of justice."[15]  The chairs further urged the Attorney General "to begin the process of consultation with us immediately" to the extent he believed "applicable law limit[ed] [his] ability to comply."[16]

---

[11] *Id.*

[12] *See id.*

[13] *See* 165 Cong. Rec. H2731-32 (daily ed. Mar. 14, 2019) (recording votes).

[14] Letter to Attorney General Barr from Chairman Nadler, et al. at 1 (Mar. 25, 2019) (March 25 Letter) (Apelbaum Decl. Ex. C); *see also* Letter to Attorney General Barr from Chairman Nadler et al. (Apr. 1, 2019) (April 1 Letter) (Apelbaum Decl. Ex. D) (reiterating the urgency of the House's request for these materials and describing legal bases supporting the House's right to access them).

[15] March 25 Letter at 2.

[16] *Id.* at 3.

On March 27, 2019, Chairman Schiff and Ranking Member Nunes of HPSCI separately wrote to Attorney General Barr, Deputy Attorney General Rosenstein, and FBI Director Christopher Wray requesting that the Department and the FBI provide "all materials, regardless of form and classification, obtained or produced by the Special Counsel's Office in the course of the investigation," including those relating to "intelligence or counterintelligence-related information."[17]  Chairman Schiff and Ranking Member Nunes noted that "[a]s the congressional committee of the House of Representatives charged with oversight of intelligence and counterintelligence matters, the Committee has an independent constitutional duty and express statutory right to examine the intelligence and counterintelligence information gathered by the Special Counsel's Office, assess the counterintelligence and national security implications, and formulate appropriate remedies in response."[18]

On April 18, 2019, Attorney General Barr publicly released a redacted version of the Mueller Report.  On April 19, Chairman Nadler issued a subpoena to Attorney General Barr for an unredacted version of the Report, the documents cited therein, and other evidence and investigative materials produced or obtained by the Special Counsel's office.[19]

Concurrently, the Committee endeavored to obtain live testimony from key witnesses cited in the Mueller Report.  On April 22, Chairman Nadler issued a subpoena to McGahn, whom the

---

[17] Letter to Attorney General Barr, et al., from Chairman Schiff and Devin Nunes, Ranking Member, H. Permanent Select Comm. on Intelligence (Ranking Member Nunes), at 2 (Mar. 27, 2019) (Apelbaum Decl. Ex. E).  On April 25, 2019, Chairman Schiff and Ranking Member Nunes wrote to Attorney General Barr, Deputy Attorney General Rosenstein, and Director Wray reiterating this request for "all classified and unclassified evidence and information obtained or generated by the Special Counsel's Office that may relate to foreign intelligence or counterintelligence matters," including those gathered "through grand jury process."  Letter to Attorney General Barr from Chairman Schiff and Ranking Member Nunes at 2 (April 25, 2019) (Apelbaum Decl. Ex. F).

[18] *Id.* at 1-2.

[19] Subpoena to Attorney General Barr (Apr. 19, 2019) (Apelbaum Decl. Ex. G).

Report revealed to be the most critical fact witness to the Special Counsel's investigation of obstruction of justice by President Trump.  The subpoena required production of 36 categories of documents as well as McGahn's testimony before the Committee.[20]   In the ensuing days, in response to questions about this and other efforts by congressional committees to conduct oversight, President Trump declared, "We're fighting all the subpoenas,"[21] and "I don't want people testifying."[22]  Several weeks later, the President "directed" McGahn not to comply with the Committee's subpoena for testimony on the ground that he is "absolutely immune" from having to do so.[23]  The President subsequently made a similar claim of "absolute immunity" with regard to former White House communications director Hope Hicks.[24]

On May 1, the Department indicated that it did not intend to comply with the Committee's subpoena for the full Mueller Report and underlying materials, including because it did not believe Federal Rule of Criminal Procedure 6(e) permits disclosure of grand jury materials in these circumstances and because the request for underlying materials included a large volume of documents.[25]  The Committee initiated contempt proceedings against Attorney General Barr, but Chairman Nadler also informed the Department that the Committee remained "willing to negotiate

---

[20] Subpoena to Donald F. McGahn II (Apr. 22, 2019) (Apelbaum Decl. Ex. H).

[21] Charlie Savage, *Trump Vows Stonewall of 'All' House Subpoenas, Setting Up Fight Over Powers*, N.Y. TIMES (Apr. 24, 2019), online at https://www.nytimes.com/2019/04/24/us/politics/donald-trump-subpoenas.html.

[22] Robert Costa et al., *Trump Says He Is Opposed to White House Aides Testifying to Congress, Deepening Power Struggle with Hill*, WASH. POST (Apr. 23, 2019), online at https://www.washingtonpost.com/politics/trump-says-he-is-opposed-to-white-house-aides-testifying-to-congress-deepening-power-struggle-with-hill/2019/04/23/0c7bd8dc-65e0-11e9-8985-4cf30147bdca_story.html?utm_term=.a8cb1389537b

[23] Letter to Chairman Nadler from Pat Cipollone, Counsel to the President, at 1 (May 20, 2019) (Apelbaum Decl. Ex. I).

[24] *See* Letter to Chairman Nadler from Pat Cipollone, Counsel to the President, at 1 (June 18, 2019) (Apelbaum Decl. Ex. J).

[25] *See* Letter to Chairman Nadler from Stephen E. Boyd, Assistant Attorney General, U.S. Department of Justice (AAG Boyd) (May 1, 2019) (May 1 Letter) (Apelbaum Decl. Ex. K).

a reasonable accommodation," including by ensuring safe storage of any unredacted portions of the Mueller Report and by "prioritize[ing] a specific, defined set of underlying investigative and evidentiary materials for immediate production."[26]  With respect to Rule 6(e) materials, Chairman Nadler requested that the Department work with the Committee to obtain a court order permitting disclosure of relevant materials and noted that courts have permitted such disclosures to Congress in the past.[27]  However, on the evening before the Committee's scheduled contempt vote, the Department effectively broke off those negotiations by notifying the Committee that the Attorney General planned to "request that the President invoke executive privilege with respect to the materials subject to the subpoena."[28]

On May 8, 2019, the Committee voted to approve a resolution recommending that Attorney General Barr be held in contempt of Congress.  *See* H.R. Rep. No. 116-105 (2019) (Contempt Report).   The  Contempt Report explains that the purposes of the Committee's ongoing investigation include: "(1) investigating and exposing any possible malfeasance, abuse of power, corruption, obstruction of justice, or other misconduct on the part of the President or other members of his Administration; (2) considering whether the conduct uncovered may warrant amending or creating new federal authorities, including among other things, relating to election security, campaign finance, misuse of electronic data, and the types of obstructive conduct that the Mueller Report describes; and (3) considering whether any of the conduct described in the Special Counsel's Report warrants the Committee in taking any further steps under Congress' Article I powers," including approval of "articles of impeachment."  *Id.* at 13.

---

[26] Letter to Attorney General Barr from Chairman Nadler at 1-2 (May 3, 2019) ("May 3 Letter") (Apelbaum Decl. Ex. L).
[27] *Id.*
[28] Letter to Chairman Nadler from AAG Boyd at 2 (May 7, 2019) (Apelbaum Decl. Ex. M).

Also on May 8, 2019, Chairman Schiff issued a subpoena to Attorney General Barr for (1) an unredacted version of the Mueller Report; (2) all documents and materials referenced in the unredacted Report, including grand jury materials; and (3) all documents and materials obtained or generated by the Special Counsel's office during its investigation referring or relating to (a) any foreign individuals or entities of any type, (b) any persons or entities associated with or acting in any capacity as a representative, agent, or proxy for any such foreign individuals or entities, (c) any communications, interactions, or links between or about U.S. persons and such foreign individuals or entities, and (d) any effort to influence, impede, or obstruct congressional investigations.[29]

After the Judiciary Committee's May 8 contempt vote, the Committee continued to engage in repeated efforts to accommodate Attorney General Barr's stated concerns, including by substantially narrowing its requests for underlying materials to a specific list of critical documents that are cited in the Mueller Report and are not subject to Rule 6(e).[30]  HPSCI engaged in a similar accommodation process with the Department to focus its request for underlying materials relating to intelligence and counterintelligence information.  After much negotiation, the Department began producing some of those underlying documents to HPSCI on May 24, 2019, and to the Judiciary Committee on June 10, 2019.  The Judiciary Committee and HPSCI continue to engage in accommodation efforts with the Department regarding the scope and terms of their respective access to these documents.  Additionally, although the Department has allowed Judiciary Committee Members to review on a confidential basis portions of Volume II of the Mueller Report

---

[29] *See* Letter to Attorney General Barr from Chairman Schiff at 3 (May 8, 2019) (Apelbaum Decl. Ex. N).

[30] *See* Letter to Attorney General Barr and Pat Cipollone, Counsel to the President, from Chairman Nadler (May 24, 2019) (Apelbaum Decl. Ex. O).

that were redacted for reasons other than Rule 6(e), including where information relates to ongoing law enforcement matters, it has not done so with respect to Volume I.  Conversely, the Department has allowed HPSCI Members to review on a confidential basis portions of Volume I of the Mueller Report that were redacted for reasons other than Rule 6(e), but it has not done so with respect to Volume II.  The Judiciary Committee and HPSCI continue to seek access to these portions of the Mueller Report, with the aim that the Department permit all Judiciary Committee and HPSCI Members and certain staff to review the full Mueller Report except for those portions redacted pursuant to Rule 6(e).

With respect to Rule 6(e) materials, the Department on numerous prior occasions has cooperated with the Judiciary Committee and with the House of Representatives to seek permission from courts for disclosure of grand jury materials, including in several matters involving allegations of Presidential misconduct.  For example, the Department zealously advocated for disclosure of the Watergate grand jury's report to this Committee, informing the court that "[t]he 'need' for the House to be able to make its profoundly important judgment on the basis of all available information is as compelling as any that could be conceived."  Mem. for the United States on Behalf of the Grand Jury at 16, *In re Report & Rec. of June 5, 1972 Grand Jury Concerning Transmission of Evidence to the House of Reps.* (*Haldeman* Brief), Misc. No. 74-21, 370 F. Supp. 1219 (D.D.C. Mar. 5, 1974) (Apelbaum Decl. Ex. P).  The Department also advocated for disclosure of grand jury materials in the context of numerous independent counsel investigations,[31] as well as in circumstances involving other investigations of official

---

[31] *In re Madison Guaranty Savings & Loan Assoc.*, Div. No. 94-1 (D.C. Cir. Spec. Div. July 7, 1998) (Apelbaum Decl. Ex. Q) (granting Independent Counsel Kenneth Starr's request to disclose report and underlying grand jury materials to the House); *In re Cisneros*, 426 F.3d 409, 415 (D.C. Cir. Spec. Div. 2005) (granting Independent Counsel's request to disclose report to Congress, including grand jury information); *In re Espy*, 259 F.3d 725 (D.C. Cir. Spec. Div.

misconduct.[32]

Chairman Nadler has repeatedly asked Attorney General Barr to follow that practice and "join with the House Judiciary Committee in seeking expedited disclosure of any Rule 6(e) material to Congress."[33]  Nevertheless, the Department has taken the position in this instance that "Rule 6(e) contains no exception that would permit the Department to provide grand-jury information to the Committee in connection with its oversight role,"[34] and it has not accepted the Committee's request to jointly seek the Court's permission for disclosure of Rule 6(e) materials.[35] As a result, the Committee currently lacks access to all portions of the Mueller Report that the Department redacted based on Rule 6(e).  Those portions include passages describing the June 9, 2016 meeting at Trump Tower between senior Trump Campaign officials and representatives of the Russian government, Mueller Report Vol. I at 111-12, 117, 120; Manafort's efforts to share internal campaign polling data with a person whom the FBI assesses has ties to Russian intelligence, *id.* Vol. I at 136-37, 140; and a possible attempt by the Special Counsel's office to obtain testimony from Donald Trump, Jr. during the midst of the President's various efforts to remove or limit the Special Counsel's investigation, *id.* Vol. II at 105.  The Committee also lacks

---

2001) (granting Independent Counsel's request to release report to the public, including grand jury materials); *In re North*, 16 F.3d 1234 (D.C. Cir. Spec. Div. 1994) (same, with respect to report regarding the Iran-Contra affair).

[32] *See, e.g.*, H.R. Rep. No. 111-427 at 10 (2010) (the Department "filed a memorandum in support of" the Committee's petition to access grand jury material for its investigation regarding Judge G. Thomas Porteous); *In re Request for Access to Grand Jury Materials*, 833 F.2d 1438, 1441-42 (11th Cir. 1987) (the Department "stated that it has 'no objection'" to disclosure of grand jury materials to the Committee for its investigation regarding Judge Alcee Hastings).

[33] April 1 Letter App. 7; *see also, e.g.*, Letter to Attorney General Barr from Chairman Nadler at 1 (Apr. 11, 2019) (Apelbaum Decl. Ex. R); May 3 Letter at 2.

[34] May 1 Letter, at 4.

[35] *See* Letter to Chairman Nadler from AAG Boyd at 1 (May 6, 2019) (Apelbaum Decl. Ex. S).

access to any underlying grand jury materials obtained by the Special Counsel's office, including materials cited in the Report and any other materials that may shed light on the President's knowledge about any links between his campaign and Russia's election interference activities, or that relate to McGahn's role in the Trump Campaign or in the President's efforts to undermine the investigation.[36]

## C. Procedural Background and Requested Relief

On June 11, 2019, the House voted to approve House Resolution 430, which authorizes the Committee to initiate civil litigation seeking, *inter alia*, McGahn's compliance with his subpoena for testimony and documents, and disclosure of any grand jury material related to the Mueller Report, including "pursuant to . . . Rule 6(e)(3)(E)."   The Resolution also authorizes the Committee to initiate litigation compelling compliance with the subpoena issued to Attorney General Barr for the full contents of the Mueller Report and for underlying evidence and materials, should that become necessary.

H. Res. 430 confirms this Committee's investigatory authority, stating that the Committee "has any and all necessary authority under Article I of the Constitution" in connection with these proceedings.   The accompanying report by the House Committee on Rules explains that this authority is intended to facilitate the Committee's ongoing investigation, whose purpose includes

---

[36] Despite repeated requests by Chairman Schiff, the Department has also refused to provide HPSCI with access to any grand jury materials obtained by the Special Counsel's office, including those relating to foreign intelligence or counterintelligence information to which HPSCI has a statutory right of access.  *See* 50 U.S.C. § 3092 (requiring, among other things, that the heads of all departments, agencies, or entities of the United States government involved in intelligence activities keep the Congressional intelligence committees fully and currently informed of all intelligence activities, and to furnish to the Congressional intelligence committees any information or material concerning intelligence activities which is within the custody or control of the departments, agencies, or entities of the United States government); *see also id.* § 3003 (defining "intelligence" to include "foreign intelligence" and "counterintelligence").

assessing "whether to recommend 'articles of impeachment with respect to the President or any other Administration official.'"  H.R. Rep. No. 116-108, at 21 (2019) (Rules Committee Report) (quoting Contempt Report at 13).  The report further notes that the authorities granted by H. Res. 430 are necessary in light of "widespread and credible allegations of misconduct and abuse of power by President Trump as well as the President's extreme if not unprecedented actions seeking to cover up and obstruct committee investigations."  *Id.* at 20.

Concurrently, the Committee began holding a series of hearings regarding the Mueller Report's findings, including a hearing in which former prosecutors testified about the significance of the President's actions and evidence that they constituted obstruction of justice.[37]  On July 11, 2019, Chairman Nadler issued a memorandum in connection with a hearing the following day stating that "[t]he Committee seeks key documentary evidence and intends to conduct hearings with Mr. McGahn and other critical witnesses testifying to determine whether the Committee should recommend articles of impeachment against the President or any other Article I remedies, and if so in what form."  July 11 Memorandum at 3.  At the hearing, Chairman Nadler stated in his opening remarks that that it was the Committee's "responsibility to determine whether to recommend articles of impeachment against the President" and that "articles of impeachment are under consideration as part of the Committee's investigation."[38]  Chairman Nadler has reiterated the purposes of the Committee's investigation in other Committee memoranda and statements as well, including the Committee's aim of assessing "whether to approve articles of impeachment." *See, e.g.*, Jerrold Nadler, Chair, H. Comm. on the Judiciary, *Memorandum Re: Hearing on*

---

[37] *See Lessons from the Mueller Report: Presidential Obstruction and Other Crimes: Hearing Before the H. Comm. on the Judiciary* (June 10, 2019).

[38] *Lessons from the Mueller Report, Part III: "Constitutional Processes for Addressing Presidential Misconduct": Hearing Before the H. Comm. on the Judiciary* (July 12, 2019), Tr. at 4 (July 12 Hearing Transcript) (Apelbaum Decl. Ex. T).

"*Lessons from the Mueller Report, Part II: Bipartisan Perspectives,*" at 3 (June 19, 2019) (Apelbaum Decl. Ex. U).

On July 24, 2019, Special Counsel Mueller appeared before the Committee and reaffirmed the central evidence of obstruction of justice documented in Volume II of the Report.[39]   He emphasized that "[o]bstruction of justice strikes at the core of the government's effort to find the truth and to hold wrongdoers accountable," and he agreed that the Report did not exonerate the President of those potential crimes.[40]   Later the same day, Special Counsel Mueller appeared before HPSCI and testified about the "Russian Government's efforts to interfere in our election," which Special Counsel Mueller described as among the "most serious" of the challenges to our democracy that he had ever encountered during the course of his long career.[41]   Special Counsel Mueller further testified about efforts by President Trump and his associates to obstruct the Special Counsel's investigation, and he expressed his agreement that the President's written responses to questions posed by the Special Counsel's Office were "generally" not only "inadequate and incomplete," but also "showed that he wasn't always being truthful."[42]

On July 26, Chairman Nadler issued protocols to protect the confidentiality of any grand jury materials disclosed to the Committee.   *See* Jerrold Nadler, Chairman, H. Comm. on the Judiciary, "House Judiciary Committee Procedures for Handling Grand Jury Information" (Grand

---

[39] *Oversight of the Report on the Investigation Into Russian Interference in the 2016 Presidential Election: Former Special Counsel Robert S. Mueller, III: Hearing before the H. Comm. on the Judiciary* (July 24, 2019), Tr. at 14 (Apelbaum Decl. Ex. V) ("In writing the report, we stated the results of our investigation with precision. . . .  [T]he report is my testimony[.]")

[40] *Id.* at 13, 16.

[41] *Former Special Counsel Robert S. Mueller, III on the Investigation into Russian Interference in the 2016 Presidential Election: Hearing before the H. Permanent Select Comm. on Intelligence* (July 24, 2019), Tr. at 13 (Apelbaum Decl. Ex. W).

[42] *Id.* at 82-84.

Jury Handling Procedures) (Apelbaum Decl. Ex. X).  The Grand Jury Handling Procedures require any grand jury materials obtained by the Committee to be stored in a secure area with access limited to Members of the Committee, certain designated staff, and Members of HPSCI and their designated staff.  Grand jury materials cannot be publicly disclosed absent a majority vote by the Judiciary Committee.  In light of the nature of the Special Counsel's investigation and HPSCI's jurisdiction over intelligence and counterintelligence-related matters, the Judiciary Committee will seek HPSCI's assistance in reviewing grand jury materials and other evidence and in assessing whether to recommend articles of impeachment against the President.  Given HPSCI's ability to handle the most sensitive classified information, it is well-equipped to protect the confidentiality of grand jury materials.

In the instant application, the Committee seeks access to: (1) all portions of the Mueller Report that were redacted pursuant to Rule 6(e); (2) any underlying transcripts or exhibits referenced in the portions of the Mueller Report that were redacted pursuant to Rule 6(e); and (3) transcripts of any underlying grand jury testimony and any grand jury exhibits that relate directly to (A) President Trump's knowledge of efforts by Russia to interfere in the 2016 U.S. Presidential election; (B) President Trump's knowledge of any direct or indirect links or contacts between individuals associated with his Presidential campaign and Russia, including with respect to Russia's election interference efforts; (C) President Trump's knowledge of any potential criminal acts by him or any members of his administration, his campaign, his personal associates, or anyone associated with his administration or campaign; or (D) actions taken by McGahn during the campaign, the transition, or McGahn's period of service as White House Counsel.

## ARGUMENT

### I.   THE COURT SHOULD AUTHORIZE DISCLOSURE OF THE REQUESTED MATERIALS PURSUANT TO RULE 6(e)'S "JUDICIAL PROCEEDING" EXCEPTION

Rule 6(e)(3)(E)(i) gives the court charged with overseeing a grand jury the ability to permit disclosure of grand jury materials "preliminarily to or in connection with a judicial proceeding." The party seeking access to grand jury materials must show a "particularized need" for those materials, meaning: "(1) '[the] material sought is needed to avoid a possible injustice in another judicial proceeding'; (2) 'the need for disclosure is greater than the need for continued secrecy'; and (3) 'the request is structured to cover only material so needed.'" *In re Sealed Case*, 801 F.2d 1379, 1381 (D.C. Cir. 1986) (quoting, *inter alia*, *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 222 (1979)) (brackets omitted).   The Committee's ongoing investigation is "preliminar[y] to" a judicial proceeding because the Committee is considering whether to recommend articles of impeachment.   The Committee's request readily satisfies each of the requirements needed to demonstrate particularized need.

### A.  The Committee Seeks To Use Grand Jury Materials "Preliminarily to" a "Judicial Proceeding"

The D.C. Circuit has squarely held that when this Committee is conducting an investigation regarding impeachment, a request for Rule 6(e) materials for use in that investigation "fit[s] within the Rule 6 exception for 'judicial proceedings.'" *McKeever v. Barr*, 920 F.3d 842, 847 n.3 (D.C. Cir. 2019), *pet. for reh'g denied*, No. 17-5149 (July 22, 2019).   Because the Committee now seeks grand jury materials "to determine whether [it] should recommend articles of impeachment against the President," July 11 Memorandum at 3, the "judicial proceeding" exception applies as a matter of binding Circuit precedent.

### 1. An Investigation Regarding Impeachment Is Preliminary to a "Judicial Proceeding"

In *McKeever*, the court addressed its prior en banc decision in *Haldeman v. Sirica*, 501 F.2d 714 (1974), in which the court stated its "general agreement with [Judge Sirica's] handling" of this Committee's request for the Watergate grand jury's report and underlying evidence, and accordingly denied a petition for mandamus. *Haldeman*, 501 F.2d at 715. In his decision below, Judge Sirica authorized disclosure of the Watergate grand jury's report and accompanying evidence to this Committee for use in its investigation regarding the potential impeachment of President Nixon. *Haldeman*, 370 F. Supp. 1219. Judge Sirica discussed Rule 6(e)'s "judicial proceeding" exception, noting that the exception has been applied in instances such as disbarment proceedings and police disciplinary investigations, and observing that "it seems incredible that grand jury matters should lawfully be available" in those contexts "and yet be unavailable to the House of Representatives in a proceeding of so great import as an impeachment investigation." *Id.* at 1230; *see id.* at 1228-29 & nn. 39, 41 (citing *Jachimowski v. Conlisk*, 490 F.2d 895 (7th Cir. 1973) and *Doe v. Rosenberry*, 255 F.2d 118, 120 (2d Cir. 1958)). Judge Sirica further noted that "[i]t would be difficult to conceive of a more compelling need than that of this country for an unswervingly fair inquiry based on all the pertinent information." *Id.* at 1230.

The D.C. Circuit, sitting en banc, denied the Watergate defendants' petition for mandamus. *Haldeman*, 501 F.2d 714. Although the majority did not specify upon which Rule 6(e) exception it relied, Judge MacKinnon noted in a separate opinion that the prosecutor representing the Justice Department had stated at oral argument "that this disclosure of grand jury material to the House Judiciary Committee and eventually possibly to the House and Senate is being made 'preliminarily to (and) in connection with a judicial proceeding.'" *Id.* at 717. Judge MacKinnon wrote that his "concurrence . . . has taken this representation into consideration." *Id.* In *McKeever*, the court

27

resolved all doubt about the basis for the holding in *Haldeman*, concluding that it "read[s] *Haldeman* as did Judge MacKinnon . . . as fitting within the Rule 6 exception for 'judicial proceedings.'"  920 F.3d at 847 n.3.

Because the court in *McKeever* and *Haldeman* held that an impeachment investigation by this Committee qualifies as "preliminar[y] to or in connection with a judicial proceeding," it necessarily follows, at the least, that a Senate trial constitutes the requisite "judicial proceeding." As another court has explained, "[t]here can be little doubt that an impeachment trial by the Senate is a 'judicial proceeding' in every significant sense." *In re Grand Jury Proceedings of Grand Jury No. 81-1 (Miami)*, 669 F. Supp. 1072, 1075 (S.D. Fla. 1987) (*Hastings*).  In *Hastings*, this Committee sought grand jury material from a district court in the course of investigating and considering an impeachment resolution against then-Judge Alcee Hastings.  As the court explained, the text of the Constitution makes clear that a Senate impeachment trial is "judicial" in character:  Article III, Section 3 states that "'[t]he *trial* of all Crimes, except in *Cases* of Impeachment, shall be by Jury.'"  *Id.* at 1076 (emphases added).  Article I, Section 3 likewise refers to the power of the Senate "'to *try* all impeachments'" and refers to "'*[j]udgment* in cases of impeachment.'"  *Id.* (emphases added).

As the court further noted, "[t]he fact that senators rather than Article III judges decide the case does not make it any less judicial; it merely points to a jurisdictional choice made by the framers for political and historical reasons."  *Id.*  The court also observed that the Supreme Court has described the Senate as "exercis[ing] the judicial power of trying impeachments."  *Id.* at 1076 (quoting *Kilbourn v. Thompson*, 103 U.S. (13 Otto) 168, 191 (1880)).[43]  As such, the court held in

_____

[43] Indeed, years later during President Clinton's impeachment trial, Chief Justice Rehnquist stated that Senators should not be referred to as "jurors" because the Senate "is not simply a jury; it is a court in this case."  Laurence Tribe & Joshua Matz, TO END A PRESIDENCY:

*Hastings* that "a House investigation preliminary to impeachment is within the scope of the Rule." 669 F. Supp. at 1075.  On appeal, the parties agreed.  *In re Request for Access to Grand Jury Materials*, 833 F.2d 1438, 1440-41 (11th Cir. 1987).

When this Committee conducts an investigation with the purpose of determining whether to recommend articles of impeachment, that process is "preliminar[y] to" an impeachment trial under *McKeever* and *Haldeman*.[44]  The very purpose of such an investigation is to determine whether to recommend that the House vote to impeach the accused party, resulting in a trial in the Senate.  To be sure, the anticipated use of grand jury material must "relate[] fairly directly to" the anticipated judicial proceeding, as it does here.  *United States v. Baggot*, 463 U.S. 476, 480 (1983).  In *Baggot*, the Supreme Court held that a tax auditing procedure conducted by the Internal Revenue Service (IRS) does not qualify as "preliminar[y] to or in connection with a judicial proceeding" under Rule 6(e), noting that "it is not enough to show that some litigation may emerge from the matter in which the material is to be used."  *Id.*  *McKeever*, however, postdates *Baggot*; as such, the D.C. Circuit has necessarily concluded that an impeachment investigation by this Committee meets *Baggot*'s standard for a "fairly direct[]" relation to a judicial proceeding.  Otherwise, the court could not have "read *Haldeman . . .* as fitting within the Rule 6 exception for 'judicial proceedings.'"  *McKeever*, 920 F.3d at 847 n.3.

Additionally, the circumstances presented in *Baggot* are readily distinguishable.  As the Court explained, an IRS audit only results in litigation if (1) the IRS finds a deficiency and moves to collect the amount owed; *and* (2) the taxpayer chooses to initiate a judicial challenge to the

---

THE POWER OF IMPEACHMENT 80 (2018).

[44] The only alternative would be to construe *McKeever* and *Haldeman* to mean that the Committee's investigation is itself the requisite "judicial proceeding" and that its use of grand jury material would be "in connection with" that proceeding.  Under that framework, the Committee's present request for grand jury materials would plainly qualify as well.

IRS's actions. *Baggot*, 463 U.S. at 481. The Court further observed that the IRS's decision with regard to a deficiency "is largely self-executing," because the IRS has its own authority to collect payments without resort to a court. *Id.* By contrast, when the Judiciary Committee is assessing whether to recommend articles of impeachment, its recommendation, if subsequently ratified by the full House, would necessarily trigger an impeachment trial in the Senate. Thus, unlike in *Baggot*, the anticipated "judicial proceeding" is not merely a collateral possibility that could ensue if some other entity chooses to challenge the Committee's or the House's actions.

### 2. The Judiciary Committee Is Investigating Whether To Recommend Articles of Impeachment

The House is constitutionally empowered to determine the rules of its own proceedings, including any rules governing impeachment proceedings or any prerequisites for commencing such proceedings. U.S. Const. Art. I, § 5, cl. 2. In assessing the Committee's intended use of grand jury materials, this Court should afford great weight to the manner in which the House chooses to exercise its "sole power of impeachment." U.S. Const. Art. I, § 2, cl. 5. *Cf. Nixon v. United States*, 506 U.S. 224 (1993) (the question whether the Senate's rules for trying impeachments comport with the Constitution's Impeachment Trial Clause, Art. I, § 3, cl. 6, is non-justiciable); *Nat'l Labor Relations Bd. v. Noel Canning*, 573 U.S. 513, 552 (2014) (the Court must "give great weight to the Senate's own determination of when it is and it is not in session" for purposes of the Recess Appointments Clause). Where, as here, the Committee is conducting an investigation whose purposes include determining whether to recommend articles of impeachment, that is more than sufficient for purposes of Rule 6(e)'s "judicial proceeding" exception.

The Committee has repeatedly made clear that it is assessing "whether to approve articles of impeachment with respect to the President." Contempt Report at 13; *see* Rules Committee

Report at 21.  Articles of impeachment have been introduced and referred to the Committee during the present Congress, *see* H. Res. 13, and Chairman Nadler recently confirmed that they are "under consideration as part of the Committee's investigation."  July 11 Memorandum at 3.  Chairman Nadler has also reiterated the Committee's "responsibility to determine whether to recommend articles of impeachment against the President,"[45] and he has stated that the Committee seeks grand jury information to aid its determination of "whether the Committee should recommend articles of impeachment against the President."  July 11 Memorandum at 3.  Moreover, the full House has specifically authorized the Committee to seek disclosure of grand jury materials "pursuant to Federal Rule of Criminal Procedure 6(e), including Rule 6(e)(3)(E)."  H. Res. 430.  It has therefore expressly ratified this Committee's use of the "judicial proceeding" exception before this Court. *See* Rules Committee Report at 22 ("this resolution . . . authorizes the Judiciary Committee to assert in court that it is seeking information preliminary to a judicial proceeding").

Because the Committee seeks Rule 6(e) materials to further its ongoing investigation and assessment of whether to recommend articles of impeachment, it is in the same posture as the Judiciary Committee was in *Haldeman* when the court ordered disclosure of the requested records pursuant to Rule 6(e).  Here, as in *Haldeman*, a specially appointed prosecutor has produced extensive evidence of misconduct by a sitting President.  And here, as in *Haldeman*, the Department has adopted the view that a sitting President cannot be indicted[46]—while the specially appointed prosecutor has acknowledged the importance of Congress's own "constitutional processes for addressing presidential misconduct."  Mueller Report, Vol. II at 1 (citing

---

[45] July 12 Hearing Transcript at 4.

[46] *See* Mem. from Robert G. Dixon, Jr., Assistant Attorney General, Office of Legal Counsel, *Re: Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution While in Office* (Sept. 24, 1973); *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222 (2000).

Impeachment Clauses of the Constitution).   The Committee, just as it did in *Haldeman*, is investigating whether to recommend articles of impeachment and requires access to Rule 6(e) materials in furtherance of that investigation.   *See* 370 F. Supp. at 1221 & n.4 (citing March 8, 1974 letter from Peter W. Rodino, Chairman, H. Comm. on the Judiciary) (Rodino Letter) (Apelbaum Decl. Ex. Y).

Additionally, although the House has not considered a formal resolution structuring any particular proceedings by this Committee, as it had in *Haldeman*, such a resolution is not a necessary predicate to consideration of articles of impeachment.   Article I of the Constitution states no such requirement.   Where, as here, a Member has introduced articles of impeachment and those articles have been referred to the Committee, the Committee is fully empowered to conduct an investigation and exercise any other of its standing authorities.   *See supra* pp. 12-13 & n.5.

The Committee did precisely that in *Hastings*:   Following a referral by the Judicial Conference of the United States, a Member of the Committee introduced a resolution to impeach Judge Hastings, which was referred to the Committee.   *See* H. Res. 128, 100th Cong. (1987); 133 Cong. Rec. 6522 (1987).   The Committee then petitioned the court for access to grand jury materials, and the court determined that Rule 6(e)'s "judicial proceeding" exception authorized disclosure to the Committee.   *Hastings*, 669 F. Supp. at 1074-76.[47]   The Committee subsequently recommended articles of impeachment against Judge Hastings.   *See* H.R. Rep. No. 100-810 (1988).

---

[47] The Committee requested grand jury materials from the district court on July 15, 1987. *Hastings*, 669 F. Supp. at 1074.  Both before and after that date, the House authorized various allocations of funds and other authorities for the Committee to conduct its investigation. However, none of these resolutions expressly mentioned impeachment. *See, e.g.*, H. Res. 134, 100th Cong. (Mar. 30, 1987) (authorizing $300,000 in funds for investigations with respect to "the certificate of the Chief Justice"—*i.e.*, the referral by the Judicial Conference); H. Res. 320, 100th Cong. (Dec. 2, 1987) (authorizing Committee counsel to take affidavits and depositions); H. Res. 388 (Mar. 16, 1988) (authorizing further funds).

Similarly, following the referral of a resolution containing articles of impeachment against Judge Nixon, the Committee requested and received access to grand jury records from a federal district court and ultimately recommended articles of impeachment.  H.R. Rep. No. 101-66, at 13-16.[48]

As *Jefferson's Manual* explains, "[i]n the House various events have been credited with setting an impeachment in motion," including "charges made on the floor"; "a resolution introduced by a Member and referred to a committee"; or "facts developed and reported by an investigating committee of the House."  *Id.* § 603 at 319; *see also Deschler's Precedents of the United States House of Representatives*, H. Doc. 94-661 Ch. 14 § 5, at 2020 (1977) ("*Deschler*") ("impeachment proceedings in the House have been initiated" where resolutions of impeachment were "plac[ed] in the hopper"—*i.e.*, introduced by a Member—and "directly impeached federal civil officers").  Such resolutions are then "referred by the Speaker to the Committee on the Judiciary" for consideration.  *Id.*; *see also Jefferson's Manual* § 605, at 321.  Through this process in recent decades, the Committee has conducted investigations involving resolutions of impeachment against Judges Nixon and Hastings, as well as against Judge Harry E. Claiborne, Internal Revenue Service Commissioner John Koskinen, and Justice William O. Douglas.[49] Indeed, even in the context of the Watergate proceedings, the Committee began conducting proceedings regarding impeachment well before the House adopted a resolution formally

---

[48] The Committee's report cites a district court order dated December 5, 1988, *Nixon v. United States*, Civ. No. H88-0052(G) (S.D. Miss. 1988).  H.R. Rep. No. 101-66 at 15 n.46.  The order is unpublished and is not available in any online databases, and the Committee's report does not specify the basis for the court's actions under Rule 6(e).

[49] *See* H.R. Rep. No. 99-688, at 3-7 (1986) (describing proceedings with respect to Judge Claiborne); *Impeachment Articles Referred on John Koskinen (Part III): Hearing Before the H. Comm. on the Judiciary*, 114th Cong. (1998); *Deschler* Ch. 14 § 5, at 2020 (describing proceedings with respect to Justice Douglas); *see also id.* Ch. 14 § 3, at 1957 (Judiciary Committee created a "special subcommittee . . . to investigate and report on the charges of impeachment against Justice Douglas").

structuring the investigation.  *Deschler* Ch. 14 § 15, at 2171-72 (Parliamentarian's Note) (prior to adopting such a resolution, the Committee had already "been conducting an investigation into the charges of impeachment against President Nixon" and had "hired special counsel for the impeachment inquiry"); H.R. Rep. No. 93-1305, at 6 (1974) (prior "[r]esolutions to impeach President Richard M. Nixon were introduced by members of the House . . . and referred to the Committee on the Judiciary").

### B.  The Judiciary Committee Has a Particularized Need for the Requested Grand Jury Materials

#### 1.  The Requested Materials Are Needed To "Avoid an Injustice"

As already noted, the House of Representatives is the only government body that can now hold the President accountable for the conduct described in the Mueller Report—including extensive allegations of obstruction of justice.  As Chairman Rodino stated in his letter requesting grand jury materials regarding the Watergate burglary, "[o]ur Constitution intended that matters of such overwhelming national significance . . . should be decided on the basis of the best available evidence and the fullest possible understanding of the facts."  Rodino Letter at 2.  Judge Sirica agreed, concluding that "[i]t would be difficult to conceive of a more compelling need than that of this country for an unswervingly fair inquiry based on all pertinent information."  *Haldeman*, 370 F. Supp. at 1230.  Indeed, the Justice Department took this view as well, stating in its brief that "[t]he 'need' for the House to be able to make its profoundly important judgment on the basis of all available information is as compelling as any that could be conceived."  *Haldeman* Brief at 16.

Here, the requested grand jury information is necessary for the Committee to assess the meaning and implications of the Mueller Report, including with regard to the Trump Campaign's contacts with agents for the Russian government, President Trump's knowledge of those contacts, and the President's state of mind when he took various steps to undermine Special Counsel

Mueller's investigation.  Many portions of the Mueller Report describing contacts between Trump

Campaign officials and the Russian government contain extensive Rule 6(e) redactions.  These

redacted passages include descriptions of:

- Events surrounding the June 9, 2016 Trump Tower meeting, Mueller Report Vol. I at 111-12, 117, 120;

- An apparent assessment of whether former Trump Campaign adviser George Papadopoulos told other members of the Campaign about Russia having obtained "dirt" on Secretary Clinton, *id.* Vol. I at 93-94;

- Former Trump Campaign adviser Carter Page's July 2016 trip to Moscow in which he met with various Russian officials, *id.* Vol. I at 101;

- Manafort's sharing of internal Campaign polling data with Konstantin Kilimnik, an individual assessed by the FBI to have ties to Russian intelligence, and Manafort's discussion of a Russia-Ukraine "peace plan" with Kilimnik, *id.* Vol. I at 136-37, 140, 143; and

- A meeting in the Seychelles in January 2017, between Kirill Dmitriev, the director of Russia's sovereign wealth fund, and Erik Prince, a supporter of the Trump Campaign, in which the two discussed U.S.-Russia relations, *id.* Vol. I at 153-55.

In analyzing President Trump's actions and whether they constitute obstruction of justice,

the Mueller Report states that "the President had a motive to put the FBI's Russia investigation

behind him."  *Id*. Vol. II at 76.  Further information in the Report about the above contacts—and,

in particular, any information that President Trump knew about them at the time or obtained

knowledge about them later—would shed critical light on those motives.  Indeed, the Report notes

that the evidence "indicate[s] that a thorough FBI investigation would uncover facts about the

campaign and the President personally that the President could have understood to be crimes or

that would give rise to personal and political concerns."  *Id*.  Assessing the President's knowledge

and state of mind about the full scope of events that occurred during the Presidential campaign is

critical to the Committee's ability to determine whether he acted with corrupt intent when he took

actions to impede the Special Counsel's investigation.  *See* Mueller Report Vol. II at 9-10

(describing "corrupt intent" as an element of obstruction of justice).  As such, the Committee has a compelling interest in reviewing the redacted passages described and in assessing whether they demonstrate or provide any evidence of the President's awareness about these contacts.

Similarly, if any underlying grand jury testimony indicates that the President had direct knowledge about his campaign aides' contacts with the Russian government or its agents, that knowledge would shed critical light on the President's actions to curtail the investigation.  For example, one passage of the Mueller Report appears to describe President Trump instructing Manafort to "keep [him] updated" about potential upcoming document dumps by WikiLeaks, and it includes a citation to what may be Manafort's grand jury testimony.  Mueller Report Vol. II at 18 n.27.  If Manafort testified before the grand jury about the President asking to keep him "updated" about upcoming document releases by WikiLeaks, the Committee would have an obvious interest in reviewing that testimony.  Evidence that President Trump sought out advance knowledge of WikiLeaks' plans—or any evidence that he in fact *obtained* knowledge about those plans—would be particularly probative as to the President's motives for concealing his actions and those of others associated with his campaign.

In addition, after several paragraphs describing Donald Trump Jr.'s issuance of an inaccurate public statement on July 8, 2017 about the purpose of the June 9, 2016 Trump Tower meeting, the Mueller Report contains a short paragraph with Rule 6(e) redactions that appears to describe efforts by the Special Counsel's office to interview Trump Jr.  The Report states: "On July 12, 2017, the Special Counsel's Office [redacted] Trump Jr. [redacted] related to the June 9 meeting and those who attended the June 9 meeting."  Vol. II at 105.  The next sentence notes that President Trump had his "follow-up meeting with Lewandowski" five days later, in which he sought to have Lewandowski deliver a message to Attorney General Sessions instructing him to

curtail the Special Counsel's investigation.  *Id.*  If the Special Counsel's office attempted to compel Trump Jr.'s testimony through a grand jury subpoena shortly before this second meeting, that sequence of events would constitute evidence that when President Trump met with Lewandowski, he intended to curtail the Special Counsel's investigation in order to protect a member of his family.  *Cf.* Mueller Report Vol. II at 178 ("Direct or indirect action by the President to end a criminal investigation into his own or his family members' conduct to protect against personal embarrassment or legal liability would constitute a core example of corruptly motivated conduct.").

The Committee further requires access to these materials in order to examine McGahn effectively.  With regard to the Trump Campaign's contacts with agents for the Russian government, the Committee requires these materials to question McGahn about what he knew, whether in his prior capacity as outside counsel to the Trump Campaign or in his later capacity as White House Counsel, and how that knowledge informed his actions as White House Counsel. Securing the withheld information would enable the Committee to formulate questions probing McGahn's direct recollections; to refresh or challenge that testimony; to corroborate his veracity, which has been challenged by the President;[50] and to seek further leads for the Committee's overall investigation.

Furthermore, to the extent McGahn had knowledge of President Trump's potential legal exposure—or that of President Trump's son—that knowledge would shed light on McGahn's own awareness of whether the President's actions constituted obstruction of justice.  If McGahn knew

---

[50] *See, e.g.*, Donald J. Trump (@realDonaldTrump) (May 11, 2019, 6:39 PM), https://twitter.com/realdonaldtrump/status/1127342552745762816?l ("I was NOT going to fire Bob Mueller, and did not fire Bob Mueller. . . .  Actually, lawyer Don McGahn had a much better chance of being fired than Mueller.  Never a big fan!").

that the Special Counsel's investigation placed the President or his family in legal jeopardy, that would further explain the "[s]erious concerns about obstruction" described in his office's notes. *See id.* Vol. II at 50.  The Committee would use any materials shedding light on these subjects in order to question McGahn about his precise understanding of all relevant facts at the time the President engaged in various attempts to undermine the Special Counsel's investigation, including when he ordered McGahn to fire Special Counsel Mueller.

### 2.   The Need for Disclosure Outweighs the Need for Continued Secrecy

For the reasons just described, the Committee's need to consider all relevant evidence is "as compelling as any that could be conceived."  *Haldeman* Brief at 16.  Courts have frequently authorized limited disclosures of grand jury materials to this Committee where it is investigating allegations of official misconduct, *see supra* pp. 20-21 & nn. 31-32, and the Committee's need in this case far outweighs any marginal intrusion upon grand jury secrecy posed by the disclosure of the requested materials to a limited number of authorized individuals.

In the present circumstances, a high degree of "continued secrecy" could in fact be maintained because any grand jury materials disclosed to the Committee would remain confidential, absent further action by the Committee, pursuant to the procedures established by Chairman Nadler for safeguarding those materials.  *See* Grand Jury Handling Procedures.  Any such materials would be stored in a secure location, with access restricted to Committee Members, HPSCI Members, and a limited number of staff; and any release of these materials to other individuals or to the public would be prohibited absent further action by the Committee.  *Id.*; *cf. Haldeman*, 370 F. Supp. at 1230 (relevant factors "might well justify even a public disclosure of the [grand jury's] Report, but are certainly ample basis" for disclosure to the Committee where "[t]he Committee has taken elaborate precautions to insure against unnecessary and inappropriate

disclosure of these materials").

Additionally, at least some of the matters occurring before the grand jury have already been made public through the voluntary acts of grand jury witnesses. Multiple witnesses have spoken publicly about their grand jury appearances in television interviews or other press appearances, including former Trump Campaign aide Sam Nunberg;[51] author Jerome Corsi;[52] and former Trump Campaign adviser Carter Page.[53] More broadly, the President has commented extensively about the Special Counsel's underlying investigation, including by denying critical events described in the Mueller Report.[54] *Cf. In re App. to Unseal Dockets Related to the Independent Counsel's 1998 Investigation of President Clinton* (*Independent Counsel Dockets*), 308 F. Supp. 3d 315, 322 (D.D.C. 2018) ("grand jury secrecy is not unyielding when there is no secrecy left to protect" (internal quotations omitted)).

### 3. The Committee's Request Covers Only Critical Materials

As described above, the Committee has limited its request to only those grand jury materials it needs to materially advance its investigation. The Committee is solely requesting

---

[51] *See* Josh Gerstein & Darren Samuelsohn, *Nunberg Arrives at Mueller Grand Jury*, Politico, Mar. 9, 2018, online at https://www.politico.com/story/2018/03/09/sam-nunberg-mueller-grand-jury-449274 (Nunberg publicly announced that he would defy a grand jury subpoena from the Special Counsel's office, then was seen using the public entrance to the courthouse on the date he was required to testify).

[52] *See* Jeff Pegues, *Jerome Corsi: "They may come in right here and indict me,"* CBS News, Dec. 11, 2018, online at https://www.cbsnews.com/news/jerome-corsi-they-may-come-in-right-here-and-indict-me/ (discussing grand jury testimony).

[53] *See The Beat with Ari Melber*, MSNBC, Jan. 23, 2019, online at https://www.youtube.com/watch?v=lxktpvl5fjY (Page, along with Nunberg and Corsi, answers "yes" when asked if he has been "in front of Mueller's grand jury").

[54] *See supra* note 50; *see also, e.g.*, George Stephanopoulos, Interview of President Donald J. Trump (June 12, 2019) (stating that McGahn lied to Special Counsel Mueller about the President's attempt to have Mr. Mueller fired), online at https://abcnews.go.com/Politics/president-donald-trump-doesnt-matter-white-house-counsel/story?id=63697487.

information that the Special Counsel deemed sufficiently significant to be included or referenced

in the Report itself; any grand jury materials that bear directly on or provide context regarding the

President's state of mind; and grand jury materials that describe actions taken by the central

witness to the Committee's investigation, Don McGahn.  Indeed, the Committee's request is more

tailored than the request it made (and that the court granted) during its investigation of Judge

Hastings.  *Hastings*, 669 F. Supp. at 1074 (Committee requested "*all* the records, transcripts,

minutes and exhibits of the grand jury . . . which indicted Judge Hastings") (emphasis added).

## II.    THE COURT SHOULD AUTHORIZE DISCLOSURE OF THE REQUESTED MATERIALS PURSUANT TO ITS INHERENT AUTHORITY

In the alternative, the Committee preserves its arguments that this Court is authorized to

disclose the requested materials pursuant to its inherent authority, and that it should exercise that

discretion in the circumstances here.

In *McKeever*, a panel of the D.C. Circuit concluded that Rule 6(e) restricts the discretion

of district courts to disclose grand jury material to the enumerated exceptions contained in Rule

6(e)(3).  920 F.3d at 844-50.  The decision in *McKeever* currently forecloses the Committee from

prevailing before this Court on this argument.   However, the panel in *McKeever* recognized that

its decision created a circuit split with respect to the Second, Seventh, and Eleventh Circuits.  *See*

*McKeever*, 920 F.3d at 850; *In re Craig*, 131 F.3d 99, 102-03 (2d Cir. 1997); *Carlson v. United*

*States*, 837 F.3d 753, 762-67 (7th Cir. 2016); *Pitch v. United States*, 915 F.3d 704, 707 (11th Cir.

2019).[55]  In the event *McKeever* is subject to further review, the Committee respectfully preserves

its argument with respect to this Court's inherent authority to authorize disclosure of grand jury

---

[55] Subsequent to the issuance of the court's decision in *McKeever*, the Eleventh Circuit
ordered rehearing en banc in *Pitch* and vacated the decision of the panel.  *See* Order, *Pitch v.
United States*, No. 17-15016 (11th Cir. June 4, 2019).

materials.

Additionally, if *McKeever* is subject to further review such that this Court is able to exercise that inherent authority, the Committee preserves its argument that all relevant factors warrant disclosure of the requested materials to the Committee given the extraordinary circumstances presented in this case.  *See generally Independent Counsel Dockets*, 308 F. Supp. 3d at 326 (describing factors typically considered).  The party seeking disclosure is a coequal branch of government and requires access to these materials in order to carry out a core constitutional function—an investigation of a sitting President for misconduct while in office.  *See Haldeman*, 370 F. Supp. at 1230.  The grand jury information sought is limited to the specific materials contained or referenced in the Mueller Report and to those additional underlying materials that would shed light on the President's state of mind or on the actions taken by the Committee's most critical witness.  Additionally, at least some of these materials have already been made public.  *See supra* p. 39.  Finally, any impact on grand jury witnesses would be minimal, because the materials disclosed to the Committee would remain confidential pursuant to the rules established by the Committee for safeguarding those materials.  *See supra* p. 38.


## PRAYER FOR RELIEF

For the foregoing reasons, the Committee respectfully requests the following relief:

1. An order authorizing the release to the Committee of all portions of the Mueller Report that were redacted pursuant to Rule 6(e);

2. An order authorizing the release to the Committee of any underlying transcripts or exhibits referenced in the portions of the Mueller Report that were redacted pursuant to Rule 6(e); and

3. An order authorizing release to the Committee of all transcripts of any underlying grand jury testimony and any grand jury exhibits that relate directly to:

   a. President Trump's knowledge of efforts by Russia to interfere in the 2016 U.S. Presidential election;

   b. President Trump's knowledge of any direct or indirect links or contacts between individuals associated with his Presidential campaign and Russia, including with respect to Russia's election interference efforts;

   c. President Trump's knowledge of any potential criminal acts by him or any members of his administration, his campaign, his personal associates, or anyone associated with his administration or campaign; or

   d. Actions taken by former White House Counsel Donald F. McGahn II during the campaign, the transition, or McGahn's period of service as White House Counsel.

## ORAL ARGUMENT REQUESTED

The Committee respectfully requests oral argument on this application.

Respectfully submitted,

Douglas N. Letter (D.C. Bar No. 253492)
*General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
Telephone: (202) 225-9700
Douglas.Letter@mail.house.gov

*Counsel for the Committee on the Judiciary of the
United States House of Representatives*

July 26, 2019