# EXHIBIT A

JERROLD NADLER, New York
CHAIRMAN

DOUG COLLINS, Georgia
RANKING MINORITY MEMBER

# U.S. House of Representatives
## Committee on the Judiciary
### Washington, DC 20515–6216
#### One Hundred Sixteenth Congress
#### MEMORANDUM

| | |
|---|---|
| **To**: | Members of the Committee on the Judiciary |
| **From**: | Chairman Jerrold Nadler |
| **Date**: | July 11, 2019 |
| **Re**: | Lessons from the Mueller Report, Part III: "Constitutional Processes for Addressing Presidential Misconduct" |

---

The Committee on the Judiciary on Friday, July 12, 2019, at 9:00 a.m. in room 2141 of the Rayburn House Office Building will hold a hearing on "Lessons from the Mueller Report, Part III: 'Constitutional Processes for Addressing Presidential Misconduct.'" The Majority witnesses are Caroline Fredrickson, President, American Constitution Society; and Michael Gerhardt, Samuel Ashe Distinguished Professor in Constitutional Law, University of North Carolina School of Law. The Minority witness is Dr. John Eastman, Henry Salvatori Professor of Law and Community Service Director, Center for Constitutional Jurisprudence, Dale E. Fowler School of Law.

## I.    Congress' Article I Authorities

The purpose of this hearing is to examine the range of constitutional remedies for addressing presidential misconduct available to Congress under its Article I powers.

By way of background, the redacted version of the "Report On The Investigation Into Russian Interference In The 2016 Presidential Election" ("Mueller Report" or "the Report") finds that the Russian government attacked the 2016 U.S. presidential election in "sweeping and systematic fashion." The Mueller Report, released on April 18, 2019, also describes multiple instances of possible obstruction of justice by President Donald Trump that were investigated by Special Counsel Robert S. Mueller, III. As the Special Counsel states in the Mueller Report:

> [I]f we had confidence after a thorough investigation of the facts that the President clearly did not commit obstruction of justice, we would so state. Based on the facts and the applicable legal standards, however, we are unable to reach that judgment. The evidence we obtained about the President's actions and intent presents difficult issues that prevent us from conclusively determining that no criminal conduct occurred. Accordingly, while this report does not conclude that the President committed a crime, it also does not exonerate him.[1]

The Committee on the Judiciary has a constitutional duty to investigate credible allegations of misconduct by executive branch officials, including the President of the United States. The Mueller

---

[1] Mueller Report, Vol. II at 2.

Report explicitly acknowledged Congress's role in investigating and potentially rectifying presidential misconduct. In explaining why the Report did not reach a "traditional prosecution or declination decision" regarding the President's conduct outlined in Volume II, the Special Counsel "recognized that a federal criminal accusation against a sitting President would place burdens on the President's capacity to govern and potentially preempt **constitutional processes for addressing presidential misconduct.**"[2] That passage is the source for tomorrow's hearing title and reflects the Special Counsel's recognition that under our Nation's tripartite system of government each branch acts as a check on the power of the others. As the Mueller Report's frequent references to Congress make clear, Congress has a role in investigating the potential presidential misconduct he uncovered so that it may determine how best to exercise its Article I powers to act as a check on the abuse or misuse of Executive Branch power.

Accordingly, the Committee has sought to obtain the full version of the Mueller Report, in addition to key underlying evidentiary and investigative materials.[3] The Committee has also sought to obtain documents and testimony from former White House Counsel Donald McGahn[4] and others as part of its "investigation into the alleged obstruction of justice, public corruption, and other abuses of power by President Donald Trump, his associates, and members of his Administration and related concerns."[5] The Committee has previously specified that the purpose of this investigation is to independently ascertain the relevant facts in order to determine the appropriate steps to take pursuant to its Article I powers:

> The purposes of this investigation include: (1) investigating and exposing any possible malfeasance, abuse of power, corruption, obstruction of justice, or other misconduct on the part of the President or other members of his Administration; (2) considering whether the conduct uncovered may warrant amending or creating new federal authorities, including among other things, relating to election security, campaign finance, misuse of electronic data, and the types of obstructive conduct that the Mueller Report describes; and (3) considering whether any of the conduct described in the Special Counsel's Report warrants the Committee in taking any further steps under Congress' Article I powers. That includes whether to approve articles of impeachment with respect to the President or any other Administration official, as well as the consideration of other steps such as

---

[2] Mueller Report, Vol. II at 1 (citing U.S. CONST. Art. I § 2, cl. 5; § 3, cl. 6) (emphasis added).

[3] On April 19, 2019, the Committee issued a subpoena to Attorney General Barr seeking an unredacted copy of the Mueller Report and underlying materials. The Attorney General failed to comply with subpoena. The Committee voted to hold him in contempt on May 8, 2019. The specific factual circumstances surrounding the Barr subpoena are described in House Report 116-105, which was filed by the Judiciary Committee on June 6, 2019. On June 10, 2019, the Department of Justice agreed to begin complying with this subpoena by setting up a process by which all Members of the Committee are permitted to review key underlying documents referenced in the Mueller Report and to review a less-redacted version of Volume II of the Mueller Report, excluding grand jury information. The Department's production of underlying documents remains ongoing, and enforcement of the subpoena therefore remains pending. The Committee's effort to obtain these materials is consistent with the views expressed by the House in H. Con. Res. 24, which passed the House unanimously and called for "the full release to Congress of any report, including findings, Special Counsel Mueller provides to the Attorney General."

[4] The Mueller Report revealed that Mr. McGahn was a witness to multiple instances of potential obstruction of justice. As such, on April 22, 2019, Chairman Nadler issued a subpoena for testimony and documents from Mr. McGahn. The subpoena requested that Mr. McGahn produce documents shared with him or his counsel by the White House during the Special Counsel's investigation by May 7, 2019 and appear to testify before the Committee on May 21, 2019. On May 21, 2019 the Judiciary Committee held its scheduled hearing and Mr. McGahn did not appear. More specific details surrounding the McGahn subpoena are set forth in the relevant section of House Report 116-108.

[5] H. Rep. No. 116-105, at 13 (2019).

censure or issuing criminal, civil or administrative referrals. No determination has been made as to such further actions, and the Committee needs to review the unredacted report, the underlying evidence, and associated documents so that it can ascertain the facts and consider its next steps.[6]

H. Res. 430, authorizing the Committee on the Judiciary to initiate or intervene in judicial proceedings to enforce certain subpoenas and for other purposes, as passed by the House on June 11, 2019 affirmed "[t]hat in connection with any judicial proceeding brought under the first or second resolving clauses, the chair of any standing or permanent select committee exercising authority thereunder has any and all necessary authority under Article I of the Constitution."[7]

As described above, this Committee is currently investigating allegations of presidential misconduct described in the Mueller Report and other potential abuses of power. With regard to the Committee's responsibility to determine whether to recommend articles of impeachment against the President, articles of impeachment have already been introduced in this Congress and referred to the Judiciary Committee.[8] They are under consideration as part of the Committee's investigation, although no final determination has been made. In addition, the Committee has the authority to recommend its own articles of impeachment for consideration by the full House of Representatives. The Committee seeks key documentary evidence and intends to conduct hearings with Mr. McGahn and other critical witnesses testifying to determine whether the Committee should recommend articles of impeachment against the President or any other Article I remedies, and if so, in what form. With respect to the grand jury information included in the Mueller Report, because the Committee has not been provided access to any grand jury materials, H. Res. 430 also authorized the Committee to petition the federal court to provide it with access to that information.[9] As such, the hearing discussion may cover the question of how to best safeguard any grand jury materials the Committee receives.

While censure of the President is rare, Congress has previously passed measures expressing disagreement with specific presidential conduct.[10] Examples include an 1834 Senate resolution repudiating President Andrew Jackson for removing his Treasury Secretary because of his refusal to withdraw government deposits from the Bank of the United States, and an 1842 House committee report criticizing President John Tyler's use of the veto, accusing him of a "gross abuse of constitutional power."[11] There is also precedent for a more formal version of censure, in which a house of Congress adopts a resolution not only stating its disagreement with presidential conduct, but also announcing that it finds the conduct worthy of an explicit and official reprimand.[12] In 1860, for example, the House

---

[6] *Id.*

[7] As explained in House Report 116-108 accompanying H. Res. 430, "this clause confirms that each committee has the full authority of the House of Representatives to enforce its subpoenas" and that "Committees may, in connection with exercising their authority under this resolved clause, choose to specify the precise constitutional powers upon which they are relying, as well as the legitimate legislative purposes and details of their work within the full bounds of their authority under Article I, whether at or in connection with hearings, in Committee reports, memoranda, or through other means."

[8] H. Res. 13, 116th Cong. (2019).

[9] H. Res. 430, 116th Cong. (2019).

[10] Todd Garvey, *The Constitutionality of Censuring the President*, CRS Legal Side Bar LSB10096, at 2 (Mar. 12, 2018) (referred to as CRS Legal Side Bar LSB10096).

[11] *Id.*

[12] *Id.*

adopted a resolution stating that President James Buchanan deserved the "reproof of this House" for awarding federal contracts to party loyalists.[13]

With regard to a possible criminal, civil, or administrative referral, the Department of Justice has discretion as to whether to act upon a referral by Congress for prosecution or civil enforcement. Moreover, with regard to presidential misconduct, the Department's policy prohibiting the prosecution of a sitting president is an obstacle to DOJ holding him or her accountable for misconduct while in office.[14]  State authorities may be more willing to consider enforcing state laws against a president to the extent they deem appropriate under applicable law.  Nonetheless, the President is not immune from criminal prosecution after leaving office, and the Supreme Court has already held that a sitting President may be sued in his or her personal capacity for conduct that occurred before taking office.[15]  Thus, the congressional referral process serves the important purpose of creating a record and preserving and referring evidence for such time as prosecution, civil enforcement, or other administrative response is feasible.

In addition to these Article I authorities, the hearing is also expected to consider a range of legislative responses to allegations of presidential misconduct, including the operation of the special counsel regulations, and the Administration's efforts to use expansive theories of absolute immunity, executive privilege, and other legal theories to block and limit congressional investigations.  These matters raise important constitutional questions.

## II.     Possible Legislative Remedies Related to Presidential Misconduct

The following is a non-exclusive list of possible legislative responses that fall within the Judiciary Committee's jurisdiction.

### A.     Transparency With Regard to White House/DOJ Communications Concerning Law Enforcement Investigations

As described in Volume II of the Mueller Report, President Trump repeatedly attempted to curtail or impede the Special Counsel's investigation.  According to the Report, among other things, President Trump requested then-Attorney General Jeff Sessions to reverse his recusal from the Special Counsel investigation with an eye toward curtailing its scope.[16]  Once President Trump learned that he was under investigation for potential obstruction of justice, President Trump ordered White House Counsel Don McGahn to have Special Counsel Mueller removed altogether.[17]

---

[13] *Id.*

[14] *See A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222 (2000) ("2000 OLC Memo").

[15] Clinton v. Jones, 520 U.S. 681 (1997).

[16] Mueller Report, Vol II at 5.

[17] *Id.* Vol. II at 4.  In an exchange with Senator Kamala Harris (D-CA) at a May 1, 2019 hearing, Attorney General Barr struggled to answer whether "the President or anyone at the White House ever asked or suggested" that he "open an investigation of anyone," stating "I'm, I'm trying to grapple with the word 'suggest.' I mean, there have been discussions of, of matters out there that, uh—they have not asked me to open an investigation, but…" *The Department of Justice's Investigation of Russian Interference with the 2016 Presidential Election: hearing before the S. Comm. on the Judiciary*, 116th Cong. (2019).  Additionally, at a February 8, 2019 hearing before this Committee, Acting Attorney General Matthew Whitaker would not explicitly deny that he had any contacts with the President or the White House regarding ongoing Trump-related investigations in the Southern District of New York in response to direct questions posed by numerous

A number of legislative proposals would address this type of interference in law enforcement investigations. H.R. 3380, the "Security from Political Interference in Justice Act," introduced by Rep. Hakeem Jeffries (D-NY), would serve to deter further White House interference in law enforcement investigations through the imposition of transparency and recordkeeping requirements on the White House and the Justice Department related to certain communications between the two. The legislation would require the White House and the Department of Justice to log certain covered communications between their personnel relating to criminal and civil investigations, and to periodically share those logs with Congress, along with the Department's Inspector General and Office of Professional Responsibility. Additionally, the head of each of these investigative offices would be required to notify Congress if after reviewing the logs they determine that a covered communication is inappropriate from a law enforcement perspective or raises concerns about improper political interference.

## B.    Special Counsel Reform Legislation; Tolling of Statutes of Limitation

Various bills have been introduced that would impose additional safeguards designed to protect the integrity and independence of future special counsel investigations. Although, existing regulations governing the appointment and removal of a special counsel already provide some limitations on his or her removal, the Attorney General may ultimately rescind or modify these protections against unwarranted removal. H.R. 197, the "Special Counsel Independence and Integrity Act," introduced by Chairman Nadler (D-NY), would codify those protections by statute and would permit a special counsel who believes his or her removal was unlawful to contest that removal in court. Senator Lindsey Graham (R-SC), Chairman of the Senate Committee on the Judiciary, has proposed similar legislation that would also codify other aspects of existing special counsel regulations.[18] Another related bill, H.R. 47, the "TRUMP Special Counsel Act," introduced by Rep. Sheila Jackson Lee (D-TX), would also impose additional safeguards.

Attorney General Barr's oversight of the Special Counsel's investigation and his handling of the Mueller Report's release have also raised several additional policy concerns. Under current Department of Justice regulations, the Attorney General is not required to release the report of a special counsel to Congress or the public. While Attorney General Barr eventually publicly released a redacted version of the Report, he published a letter purportedly summarizing the Report's chief conclusions prior to its release. Additionally, immediately before he released the Report to the public and Congress, Attorney General Barr held a press conference at which he publicly characterized the Special Counsel's findings. Furthermore, Attorney General Barr initially only provided a redacted version of the Report to Congress. While the Committee eventually negotiated greater Member access to a less redacted version of Volume II of the Report, those efforts entailed months of negotiations and the threat of a criminal contempt referral. To date, no Member of Congress has seen the full unredacted Report.

To address these transparency concerns, Rep. Lloyd Doggett (D-TX) introduced H.R. 1356, the "Special Counsel Transparency Act," which requires a Special Counsel's report to be given directly to the Chair and Ranking Member of the House and Senate Judiciary Committees, while being made

---

Members of the Committee. *See, e.g.*, Aaron Blake, *Matthew Whitaker's testimony about Trump trying to influence the Cohen inquiry was cagey. Now we might know why*, WASH. POST, Feb. 20, 2019; Mark Mazzetti et al., *Intimidation, Pressure and Humiliation: Inside Trump's Two-Year War on the Investigations Encircling Him*, N.Y. TIMES, Feb. 19, 2019.
[18] S. 71, the "Special Counsel Independence and Integrity Act," 116th Cong. (2019).

available to the public in a manner consistent with the Freedom of Information Act. H.R. 1357, the "Special Counsel Reporting Act," also introduced by Rep. Doggett, would additionally require the Special Counsel to update certain Members of Congress during the course of an investigation, among other congressional reporting requirements.

In addition, Attorney General Barr's decision declining to charge the President has raised important public policy issues. The Department of Justice's Office of Legal Counsel (OLC) has concluded that a sitting President cannot be indicted or prosecuted.[19]   In his May 24, 2019 letter summarizing the principal conclusions of the Special Counsel's report, Attorney General Barr wrote "that the evidence developed during the Special Counsel's investigation is not sufficient to establish that the President committed an obstruction-of-justice offense," and that this "determination was made without regard to, and is not based on, the constitutional considerations that surround the indictment and criminal prosecution of a sitting president." The decision by Attorney General Barr, a political appointee of the President, to nonetheless make an express declination determination favoring the President raises significant policy issues. Moreover, the Special Counsel raised those very "constitutional considerations" in the Report to explain why he had declined to make a traditional prosecutorial judgment. There, he noted that Department policy forbids the prosecution of a sitting president and that "[f]airness concerns counseled against potentially reaching that judgment when no charges can be brought."[20]

The circumstances created by this policy also raise significant questions regarding Congress's ability under Article I to enact legislation to create accountability for presidential misconduct, as a president may be technically criminally liable for conduct in office yet remain effectively above the law. While potential legislation directly negating the policy raises potential constitutional concerns, there is little debate that the President may be prosecuted after leaving office. As such, Chairman Nadler has introduced H.R. 2678, the "No President is Above the Law Act," which would toll the statute of limitations on any offense committed by a president, whether before or during his or her term of office, to ensure that he or she is ultimately held accountable for any criminal wrongdoing.

### C.    Pardon Legislation

As part of the investigation into potential obstruction of justice, the Special Counsel also examined the President's conduct toward witnesses such as Paul Manafort and Michael Cohen. Volume II of the Mueller Report noted that the "President's acts directed at witnesses" included "discouragement of cooperation with the government and suggestions of possible pardons," many of which took place in plain view.[21] Additionally, in June 2018, in the midst of the Special Counsel investigation, President Trump implied that he may pardon himself in relation to the investigation, tweeting "As has been stated by numerous legal scholars, I have the absolute right to PARDON myself, but why would I do that when I have done nothing wrong? In the meantime, the never ending Witch Hunt, led by 13 very Angry and Conflicted Democrats (& others) . . . ."[22]

---

[19] 2000 OLC Memo; *see also* Memorandum from Robert G. Dixon, Jr., Assistant Attorney General, Office of Legal Counsel, *Re: Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution while in Office* (Sept. 24, 1973).

[20] Mueller Report, Vol. I at 2.

[21] Mueller Report, Vol. II at 5-6.

[22] Caroline Kenny, *Trump: 'I have the absolute right to pardon myself'*, CNN (Jun. 4, 2018) *available at* https://www.cnn.com/2018/06/04/politics/donald-trump-pardon-tweet/index.html.

Several Members of Congress have introduced legislation either proposing an amendment to the Constitution to limit the scope of executive clemency or to increase transparency regarding presidential pardons. Rep. Steve Cohen (D-TN) has introduced a proposed amendment to the Constitution that would prohibit the President from granting clemency to him or herself, certain specified close family members, or "to any current or former member of the President's administration, or to anyone who worked on the President's presidential campaign as a paid employee."[23] Rep. Al Green (D-TX) has introduced a similar proposed amendment that would only prohibit the President from granting clemency to him or herself.[24] Rep. Adam Schiff (D-CA) has introduced legislation to require the Department of Justice within 30 days after a pardon to produce to the appropriate Congressional committees all investigative materials related to an offense that arises from an investigation involving the President or a President's relative for whom a pardon is granted.[25] Rep. Raja Krishnamoorthi (D-IL) has introduced legislation to require the Attorney General within three days of a presidential reprieve or pardon to publish in the Federal Register and on the official website of the President the name of the person, the date on which the reprieve or pardon issued, and the full text of the reprieve or pardon.[26]

## D.   Foreign Contacts

Volume I of the Mueller Report, which begins by describing the Russian government's extensive attacks against the integrity of the 2016 presidential election, also describes certain conduct by the Trump Campaign and individuals associated with the Campaign that could constitute evidence of potential coordination between the Trump Campaign and the Russian government. The Mueller Report documents numerous Russian contacts, which "consisted of business connections, offers of assistance to the Campaign, invitations for candidate Trump and Putin to meet in person, invitations for Campaign officials and representatives of the Russian government to meet, and policy positions seeking improved U.S.-Russian relations."[27]

The Trump Campaign's conduct during the 2016 presidential election therefore presents significant concerns regarding the influence of foreign governments over candidates for federal office. As such, several Members of Congress have introduced legislation that would require campaigns to report their contacts with foreign governments. Rep. Eric Swalwell (D-CA) has introduced legislation that would impose on political committees, their agents, or the committee of a candidate for federal office an affirmative duty: 1) to report to the Federal Election Commission any offers of prohibited contributions, donations, expenditures, or disbursements may by a foreign national; and 2) to disclose the identity and purpose of any meeting with a foreign government or agent of a foreign power, with

---

[23] H.J. Res. 8, 116th Cong. (2019).

[24] H.J. Res. 13, 116th Cong. (2019).

[25] H.R. 1627, 116th Cong. (2019).

[26] H.R. 1348, 116th Cong. (2019).

[27] Mueller Report, Vol. 1 at 5. During a recent interview, in response to a question on whether his campaign would accept information damaging to his opponent from foreign governments or report such an offer to the FBI, President Trump said, "I think maybe you do both." He went on to say, "It's not an interference, they have information -- I think I'd take it...If I thought there was something wrong, I'd go maybe to the FBI -- if I thought there was something wrong. But when somebody comes up with oppo research, right, they come up with oppo research, 'oh let's call the FBI.' The FBI doesn't have enough agents to take care of it. When you go and talk, honestly, to congressman, they all do it, they always have, and that's the way it is. It's called oppo research." ABC News' Oval Office interview with President Trump, Jun. 13, 2019 *available at* https://abcnews.go.com/Politics/abc-news-oval-office-interview-president-donald-trump/story?id=63688943.

failure to comply with these reporting resulting in criminal penalties.[28]  Rep. Sheila Jackson Lee (R-TX) has introduced a similar bill, H.R. 2353, the "Duty to Refuse and Report Foreign Interference in American Elections Act of 2019."  Senator Mark Warner (D-VA) has also introduced S.1562, the "Foreign Influence Reporting in Elections Act."

### E.      Subpoena Enforcement

The Trump Administration's refusal to comply with many Congressional subpoenas also raises constitutional concerns.   In the 115th Congress, the Committee considered H.R. 4010, the "Congressional Subpoena Compliance and Enforcement Act of 2017," introduced by Rep. Darrell Issa (R-CA).[29]  This legislation provided expedited procedures for Congress to enforce a subpoena in court and would impose monetary penalties on the head of an agency that refused to comply with a subpoena. The Judiciary Committee reported H.R. 4010 unanimously, and it passed by voice vote on the House floor.   Representative Madeleine Dean (D-PA) plans to reintroduce the legislation in the 116th Congress.

## III.    Additional Legal and Constitutional Issues Presented

### A.      Presidential Immunity from Prosecution

The Special Counsel specifically cited the OLC opinion about whether a sitting President can be prosecuted as one of the principal grounds for his decision not to reach a traditional prosecutorial judgment regarding President Trump's conduct outlined in Volume II of the Report.  As noted previously, this policy gives rise to significant concerns about whether the President is effectively placed above the law while in office.  Because OLC's opinion is based on constitutional considerations, it also gives rise to significant concerns about Congress's own Article I abilities to enact legislation ensuring accountability for presidential misconduct.

In 1973, OLC issued a memorandum concluding that a sitting President cannot be indicted or prosecuted while in office.[30]  OLC's 1973 opinion acknowledged that no explicit textual provision of the Constitution precludes the prosecution of the President.  OLC also considered but did not ultimately accept the argument that the President's position as head of the executive branch precludes him or her from being prosecuted by officers who are, as a structural matter, the President's subordinates.  Instead, OLC based its reasoning on the notion that facing criminal charges would "unduly interfere in a direct or formal sense with the conduct of the Presidency."[31]  OLC assessed that having to face a criminal trial and possible prison sentence would essentially incapacitate the President, making it impossible to perform essential constitutional functions.  It also noted that "under our constitutional plan as outlined in Article I, sec. 3, only the Congress by the formal process of impeachment, and not a court by any process should be accorded the power to interrupt the Presidency or oust an incumbent."[32]

---

[28] H.R. 2424, 116th Cong. (2019).

[29] H.R. 4010, 115th Cong. (2017).

[30] Memorandum from Robert G. Dixon, Jr., Assistant Attorney General, Office of Legal Counsel, *Re: Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution while in Office* (Sept. 24, 1973).

[31] *Id.* at 27.

[32] *Id.* at 28.

In 2000, OLC reaffirmed its analysis and its conclusion.[33]  Its lengthy opinion first described the 1973 opinion in detail, followed by a description of a brief filed by then-Solicitor General Robert Bork (also in 1973) arguing that then-Vice President Spiro Agnew was amenable to prosecution while in office.  That brief, consistent with the 1973 OLC opinion, argued that only the President was immune from prosecution while in office.[34]  Next, OLC assessed whether any intervening case law warranted changing its conclusions, and it determined that three relevant decisions were "largely consistent" with its prior analysis.[35]

OLC examined three Supreme Court decisions: (1) *United States v. Nixon*,[36] in which the Court recognized the existence of executive privilege but held that the privilege was not absolute and affirmed a judgment ordering President Nixon to turn over various tape recordings to Special Prosecutor Jaworksi; (2) *Nixon v. Fitzgerald*,[37] in which the Court held that the President is absolutely immune from civil damages suits based upon his official acts while in office; and (3) *Clinton v. Jones*,[38] in which the Court held that the President can be sued for civil damages while in office over claims based on his personal conduct before he became President.  OLC described all three cases as having "balance[d] the constitutional interests underlying a claim of presidential immunity against the governmental interests in rejecting that immunity."[39]  In OLC's view, the same balancing analysis supports a conclusion that a President cannot be indicted or prosecuted while in office because of the unique burdens that such proceedings—and, potentially, an actual sentence of imprisonment—would impose.[40]

OLC acknowledged the "important national interest in ensuring that no person—including the President—is above the law."[41]  It also acknowledged the importance of avoiding the possibility that the statute of limitations could run out by the time the President leaves office.[42]  However, it noted that "a President suspected of the most serious criminal wrongdoing might well face impeachment and removal from office before his term expired, permitting criminal prosecution at that point."[43]  Additionally, it noted that the statute of limitations could be tolled by a court—or that Congress "could overcome any such obstacle by imposing its own tolling rule."[44]  As to the argument that impeachment itself might pose the same or similar types of burdens on the President's exercise of his or her constitutional duties, OLC stated that this risk is "expressly contemplated by the Constitution," and that "the Framers themselves specifically determined that the public interest in immediately removing a sitting President whose continuation in office poses a threat to the Nation's welfare outweighs the public interest in avoiding the Executive burdens incident thereto."[45]

Some scholars have criticized OLC's analysis and conclusions.  Professor Laurence Tribe, for example, has argued that it is untenable that a President could commit a crime in order to win an election, escape accountability while in office, and then benefit from a pardon from a hand-picked Vice

---

[33] 2000 OLC Memo.

[34] *See id.* at 232-36.

[35] *Id.* at 238.

[36] 418 U.S. 683 (1974).

[37] 457 U.S. 731 (1982).

[38] 520 U.S. 681 (1997).

[39] 2000 OLC Memo at 244.

[40] *Id.* at 246-58.

[41] *Id.* at 255.

[42] *Id.* at 256.

[43] *Id.*

[44] *Id.*

[45] *Id.* at 258.

President upon the President's resignation or impeachment.[46] Walter Dellinger, who served as the Assistant Attorney General in charge of OLC from 1993 to 1996, has argued that the President could potentially be *indicted* while in office even if not prosecuted.[47] Nonetheless, Special Counsel Mueller stated that his office accepted OLC's conclusions for purposes of their investigation.[48]

OLC opinions are generally considered to be binding upon the executive branch. On rare occasions, OLC has rescinded prior opinions if it later determines their reasoning to be fundamentally unsound. This occurred, for example, with respect to several opinions authored by former Deputy Assistant Attorney General John Yoo regarding the treatment of detainees, the Foreign Intelligence Surveillance Act, and other national security matters.[49] The Attorney General also has the authority to override OLC, and he or she could conceivably rescind prior OLC opinions. The President, as chief executive, could also conceivably instruct the Attorney General to take such actions, although it is unclear whether any President has done so previously.

**B.     White House Officials' Purported "Absolute Immunity" from Compelled Testimony and Excessive use of Executive Privilege**

**1.     Absolute Immunity**

In several recent instances, the Trump administration has asserted that various former White House officials are "absolutely immune" from having to comply with congressional subpoenas for testimony. On this basis, President Trump instructed former White House Counsel Don McGahn not to appear before this Committee in response to its subpoena. He also instructed former White House Communications Director Hope Hicks not to answer any questions in a transcribed interview that related to her service in the White House. Additionally, the Trump administration has indicated that the President may assert "absolute immunity" with respect to White House adviser Kellyanne Conway in response to a subpoena from the Committee on Oversight and Reform.[50]

On May 20, 2019, OLC issued an opinion (the "Engel Memorandum") supporting this position with respect to Mr. McGahn.[51] The Engel Memorandum correctly notes that administrations of both parties have claimed that White House officials are "absolutely immune" from having to provide compelled testimony before Congress. One well-known instance occurred when President George W. Bush took this position with respect to former White House Counsel Harriet Miers, who was subpoenaed by this Committee in the course of its investigation into the firings of several U.S. Attorneys. President Obama also took this position with respect to then-White House adviser David Simas, who was subpoenaed by the Committee on Oversight and Government Reform in the course of an investigation into possible Hatch Act violations.[52] The basis for such a claim was first described in a

---

[46] Laurence H. Tribe, *Constitution Rules Out Immunity for Sitting Presidents*, BOSTON GLOBE, Dec. 12, 2018.

[47] Walter Dellinger, *Indicting a Sitting President Is Not Foreclosed: The Complex History*, Lawfare Blog, June 18, 2018.

[48] Special Counsel Robert S. Mueller, III, *Report On The Investigation Into Russian Interference In The 2016 Presidential Election*, Vol. II at 3 (March 2019).

[49] *See* Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel, Memorandum *Re: Status of Certain OLC Opinions Issued in the Aftermath of the Terrorist Attacks of September 11, 2001* (Jan. 15, 2009).

[50] *See* Letter to Elijah E. Cummings, Chair, H. Comm. on Oversight & Reform, from Pat A. Cipollone, Counsel to the President (June 24, 2019) (stating that Ms. Conway would decline a voluntary invitation for testimony. In response, the committee voted to authorize a subpoena.).

[51] Memorandum from Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, *Re: Testimonial Immunity Before Congress of the Former Counsel to the President* (May 20, 2019) ("Engel Memorandum").

[52] *See Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. __ (July 15, 2014).

1971 memorandum written by William Rehnquist, who was then serving as the Assistant Attorney General in charge of OLC.[53]

The Engel Memorandum principally argues that requiring senior White House officials to testify before Congress would interfere in various ways with the separation of powers. It asserts that this would create an opportunity for Congress to try to "supervise the President's actions," because senior White House aides essentially serve as the President's "alter egos."[54] It also claims that having to testify in front of Congress could divert senior White House aides from their primary responsibilities to the President. Additionally, OLC claims that such compelled testimony would create an inherent risk of disclosing privileged material, notwithstanding the witness's ability to assert privilege on a question-by-question basis.[55]

However, the only court ever to consider these arguments has decisively rejected them. When this Committee sued to compel Ms. Miers's testimony, the U.S. District Court for the District of Columbia, in an opinion issued by Judge Bates, held that the "absolute immunity" doctrine had no basis in any case law.[56] To the contrary, Judge Bates pointed out that in the most closely analogous case, *Harlow v. Fitzgerald*,[57] the Supreme Court had concluded that senior White House aides are not absolutely immune from civil damages suits.[58] In doing so, the Court had rejected the idea that such advisers serve as "alter egos" to the President—a central underpinning of OLC's rationale for absolute immunity from compelled testimony. Judge Bates concluded that the rationales for excusing White House aides from congressional testimony are in fact weaker than those for excusing them from civil damages suits, noting that other senior administration officials, such as Cabinet officials in charge of various departments and agencies, testify before Congress on a regular basis.[59]

The Engel Memorandum also states that the administration's position is "the same answer that the Department of Justice has repeatedly provided for nearly five decades."[60] However, although the Department has maintained a position that senior White House aides are immune from compelled testimony, the record of the White House permitting senior aides to testify before Congress—whether on a voluntary basis or through some other accommodation reached with the relevant congressional committee—is decidedly more mixed. The Congressional Research Service, for example, has catalogued dozens of instances in recent decades in which senior White House aides have testified before various committees.[61] Thus, although the Department and OLC have maintained their position as a theoretical matter that a White House aide cannot be forced to testify over the President's objections, as a practical matter such objections have often been reserved or withdrawn in the face of congressional subpoenas or other pressures.

## 2.    Executive Privilege

---

[53] *See* Engel Memorandum at 2.

[54] *Id.* at 5; *see id.* at 13.

[55] *Id.* at 5-6.

[56] *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008).

[57] 457 U.S. 800 (1982).

[58] *Miers*, 558 F. Supp. at 100-01.

[59] *Id.* at 101.

[60] Engel Memorandum at 1.

[61] *See* Harold C. Relyea & Todd B. Tatelman, *Presidential Advisers' Testimony Before Congressional Committees: An Oversight*, Congressional Research Service, Apr. 10, 2007.

In addition to asserting dubious claims of "absolute immunity" as to certain witnesses, the White House has instructed several witnesses—including Mr. McGahn, Ms. Hicks, and former White House attorney Annie Donaldson—not to comply with the Committee's duly issued subpoenas for documents or (in Ms. Donaldson's case) written answers to questions on the basis that the documents and answers would "implicate constitutionally-based Executive Branch confidentiality interests."[62] The White House's legal assertions are untenable for several reasons. To begin, in the face of a congressional subpoena, the President must actually assert a claim of executive privilege with respect to any portion of a witness's testimony or specific documents. The bare assertion that a witness's response to a question a document might *implicate* "confidentiality interests" does not absolve the subpoenaed party of his or her duty to comply. To the contrary, the law is clear that a witness is "not excused from compliance with the Committee's subpoena by virtue of a claim of executive privilege that may ultimately be made."[63] Nor can a "blanket assertion of privilege" over a broad set of records suffice, without a "showing . . . that any of the individual records satisf[ies] the prerequisites for the application of the privilege."[64]

Moreover, the White House has no valid basis to assert executive privilege with respect to matters specifically described in the Mueller Report. The White House long ago made the strategic decision to not invoke executive privilege with respect to numerous witnesses' interviews with the Special Counsel's office, and then to the publication of the Report. The Mueller Report in fact includes numerous passages describing statements made by the witnesses in their interviews and citing to specific reports of those interviews. Often, the Report contains verbatim quotations of statements that witnesses made to the Special Counsel's office. The Report also describes and quotes from certain documents voluntarily provided to the Special Counsel's office, such as handwritten notes taken by Ms. Donaldson and others. The D.C. Circuit has expressly held that the White House "waive[s] its claims of privilege in regard to [] specific documents that it voluntarily reveal[s] to third parties outside the White House."[65] The court has also made clear that the release of a particular document "waives [] privileges for the document or information specifically released."[66] In that case, the White House had voluntarily disclosed a document to the private attorney for a former cabinet official.[67] Here, the White House has voluntarily authorized the release of the redacted Mueller Report to the public at large and has also shared numerous documents with private counsel for various witnesses. As a result, any executive privilege claims related to matters described in the Mueller Report or in documents shared with third parties has clearly been waived. Nevertheless, the White House has improperly prevented several witnesses from answering questions regarding that same information.

---

[62] *See* Letter to Jerrold Nadler, Chairman, H. Comm. on the Judiciary, from Sandra L. Moser, Quinn Emanuel, Jul. 5, 2019 (enclosing Annie Donaldson's written answers to Committee's interrogatories, and stating that the White House has objected on a question-by-question basis); *See also* Letter to Jerrold Nadler, Chairman, H. Comm. on the Judiciary, from Pat Cipollone, Counsel to the President, May 7, 2019 (directing Don McGahn not to comply with subpoena for documents on the grounds that "[t]he White House records remain legally protected from disclosure under longstanding constitutional principles, because they implicate significant Executive Branch confidentiality interests and executive privilege").

[63] *Comm. on the Judiciary, U.S. House of Reps. v. Miers*, 558 F. Supp. 2d 53, 106 (D.D.C. 2008).

[64] *Comm. on Oversight & Gov't Reform, U.S. House of Reps. v. Lynch*, 156 F. Supp. 3d 101, 104 (D.D.C. 2016).

[65] *In re Sealed Case*, 121 F.3d 729, 741-42 (D.C. Cir. 1997).

[66] *Id.* at 741.

[67] *See id.* at 740.