# EXHIBIT D

# Congress of the United States
## Washington, DC 20515

April 1, 2019

The Honorable William P. Barr
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Dear Attorney General Barr:

On March 25, 2019, we sent you a letter requesting that you produce to Congress the full report of Special Counsel Robert S. Mueller III and its underlying evidence by Tuesday, April 2, 2019. "To the extent you believe the applicable law limits your ability" to produce the entire report, we urged that you "begin the process of consultation with us immediately" to resolve those issues without delay.[1]  On Wednesday, April 3, 2019, the House Judiciary Committee plans to begin the process of authorizing subpoenas for the report and underlying evidence and materials. While we hope to avoid resort to compulsory process, if the Department is unwilling to produce the report to Congress in unredacted form, then we will have little choice but to take such action.

As Chairman Nadler explained in his phone conversation with you on March 27, Congress requires a complete and unedited copy of the Special Counsel's report, as well as access to the evidence and materials underlying that report. During your confirmation hearing in January, you stated that your "goal will be to provide as much transparency as I can consistent with the law." As such, if the Department believes it is unable to produce any of these materials in full due to rules governing grand jury secrecy, it should seek leave from the district court to produce those materials to Congress—as it has done in analogous situations in the past. To the extent you believe any other types of redactions are necessary, we again urge you to engage in an

---

[1] Letter from Chairpersons Jerrold Nadler, H Comm. on the Judiciary, Elijah Cummings H. Comm. on Oversight & Reform, Adam Schiff, H. Perm. Select. Comm. on Intelligence, Maxine Waters, H. Comm. on Fin. Servs., Richard Neal, House Comm. on Ways & Means, and Eliot Engel, H. Comm. on Foreign Affairs, to Att'y Gen. William P. Barr (Mar. 25, 2019). *See also* Letter from Chairpersons Jerrold Nadler, H Comm. on the Judiciary, Elijah Cummings H. Comm. on Oversight & Reform, Adam Schiff, H. Perm. Select. Comm. on Intelligence, Maxine Waters, H. Comm. on Fin. Servs., Richard Neal, House Comm. on Ways & Means, and Eliot Engel, H. Comm. on Foreign Affairs, to Att'y Gen. William P. Barr, informing him of their expectation that he will make Special Counsel Robert Mueller's report public "without delay and to the maximum extent permitted by law" (Feb. 22, 2019).

immediate consultation to address and alleviate any concerns you have about providing that information to Congress.[2]

We also reiterate our request that you appear before the Judiciary Committee as soon as possible—not in a month, as you have offered, but now, so that you can explain your decisions to first provide Congress with your characterization of the Mueller report as opposed to the report itself; to initiate a redaction process that withholds critical information from Congress; and to assume for yourself final authority over matters within Congress's constitutional purview. In addition, as Chairman Nadler also requested on his call with you, we ask for your commitment to refrain from interfering with Special Counsel Mueller testifying before the Judiciary Committee—and before any other relevant committees—after the report has been released regarding his investigation and findings.

Congress is, as a matter of law, entitled to each of the categories of information you proposed to redact from the Special Counsel's report in your March 29 letter.[3] In the attached appendix we provide a more complete legal analysis of each of the potential redaction categories your letter identified. We expect the Department will take all necessary steps without further delay—including seeking leave from the court to disclose the limited portions of the report that may involve grand jury materials—in order to satisfy your promise of transparency and to allow Congress to fulfill its own constitutional responsibilities.[4]

Full release of the report to Congress is consistent with both congressional intent and the interests of the American public. On March 14, 2019, by a vote of 420-0, the House unanimously passed H. Con. Res. 24, a resolution calling for "the full release" of the Special Counsel's report to Congress, as well as the public release of the Special Counsel's report except to the extent the disclosure of "any portion thereof is expressly prohibited by law." The American people have also consistently and overwhelmingly supported release of the full report. The President himself has likewise called for its release in full.

The allegations at the center of Special Counsel Mueller's investigation strike at the core of our democracy. Congress urgently needs his full, unredacted report and its underlying evidence in order to fulfill its constitutional role, including its legislative, appropriations, and

---

[2] Congress is authorized by law and equipped to receive and examine the U.S. government's most sensitive materials and information. The Department of Justice and the Federal Bureau of Investigation have long provided to relevant congressional committees sensitive law enforcement and investigatory information and records in complete and unredacted form, including those involving classified information, that are not provided to the general public.

[3] Letter from Att'y Gen. William P. Barr to Chairman Lindsey Graham, S. Comm. on the Judiciary, and Chairman Jerrold Nadler, H. Comm. on the Judiciary (Mar. 29, 2019).

[4] At a minimum, the Department should produce a detailed log of each redaction and the reasons supporting it in order to facilitate the accommodation process and to provide sufficient clarity for Congress to evaluate the Department's claims.

oversight responsibilities. Congress can and has historically been provided with sensitive, unredacted, and classified material that cannot be provided to the general public. In addition, the American people deserve to be fully informed about these issues of extraordinary public interest, and therefore need to see the report and findings in Special Counsel Mueller's own words to the fullest extent possible.

For all these reasons, we hope you will produce to Congress an unredacted report and underlying materials to avoid the need for compulsory process.

Sincerely,

Jerrold Nadler
Chairman
House Committee on the Judiciary

Maxine Waters
Chairwoman
House Committee on Financial Services

Elijah E. Cummings
Chairman
House Committee on Oversight and Reform

Richard E. Neal
Chairman
House Committee on Ways and Means

Adam Schiff
Chairman
House Permanent Select Committee on Intelligence

Eliot L. Engel
Chairman
House Committee on Foreign Affairs

## Appendix:
## The Department of Justice Must Produce the Full Mueller Report

Congress urgently needs the full Special Counsel's report and the underlying evidence in order to fulfill its Article I constitutional functions, including its legislative, appropriations, and oversight responsibilities. Moreover, there is no basis for withholding from Congress the four categories of information described by the Attorney General in his March 29 letter to the House and Senate Judiciary Committees.[1]

### 1. Congress Urgently Requires the Full Report and the Evidence

The Attorney General's March 24 letter indicates that the Special Counsel found that President Trump may have criminally obstructed the Department's investigation of Russia's interference in the 2016 election and related matters.[2] The Special Counsel pointedly stated that the evidence the investigation uncovered "does not exonerate" the President of obstruction, and includes potentially criminal acts not yet known to the public.[3] It is difficult to overstate the seriousness of those actions if, in the wake of an attack by a hostile nation against our democracy, President Trump's response was to seek to undermine the investigation rather than take action against the perpetrators.

The longer the delay in obtaining this information, the more harm will accrue to Congress's independent duty to investigate misconduct by the President and to assure public confidence in the integrity and independence of federal law enforcement operations. These are not only matters of addressing the harm that has occurred; they are urgent ongoing concerns. As has been publicly reported and referenced in the March 24 letter, multiple open investigations referred by the Special Counsel to other U.S. Attorneys' offices may implicate the President or his campaign, transition, inauguration, or businesses. These critically important inquiries could be compromised if the President is seeking to interfere with them. Among other things, Congress has considered and continues to consider legislation to protect the integrity of these type of investigations against precisely the sorts of interference in which the President appears to have engaged.[4]

---

[1] Letter from Att'y Gen. William P. Barr to Chairman Lindsey Graham, S. Comm. on the Judiciary, and Chairman Jerrold Nadler, H. Comm. on the Judiciary (Mar. 29, 2019).

[2] Letter from Att'y Gen. William P. Barr to Chairman Lindsey Graham and Ranking Member Dianne Feinstein, S. Comm. on the Judiciary, and Chairman Jerrold Nadler and Ranking Member Doug Collins, H. Comm. on the Judiciary (Mar. 24, 2019) (hereinafter "March 24 Letter").

[3] March 24 Letter at 3 (the report "addresses a number of actions by the President—*most of which* have been the subject of public reporting") (emphasis added).

[4] *See* H.R. 197 and S. 71, Special Counsel Independence and Integrity Act, 116th Cong (2019); *see also* H.R. 1357, Special Counsel Reporting Act, 116th Cong. (2019); H.R. 1627, Abuse of Pardon Prevention Act, 116th Cong. (2019); H.R. 1348, Presidential Pardon Transparency Act, 116th Cong. (2019).

Moreover, the Judiciary Committee is engaged in an ongoing investigation of whether the President has undermined the rule of law, including by compromising the integrity of the Justice Department. Other committees are engaged in investigations related to whether the President, his associates, or members of his administration have engaged in other corrupt or unethical activities or are subject to foreign influence or compromise by actors abroad. Congress's authority "to inquire into and publicize corruption, maladministration or inefficiency in agencies of the Government" has been unquestioned since "the earliest times in its history."[5] That interest is at its height when Congress's oversight activities pertain to potentially illegal acts by the President. As a court determined in another context involving the release of a report about potential obstruction of justice by a President, "[i]t would be difficult to conceive of a more compelling need than that of this country for an unswervingly fair inquiry based on all the pertinent information."[6]

The March 24 letter also claims that the Special Counsel's decision not to reach a definitive legal conclusion about obstruction "leaves it to the Attorney General to determine whether the conduct described in the report constitutes a crime."[7] That view is fundamentally flawed. As a coequal branch of government—indeed, as the only branch of government that is expressly empowered by the Constitution to hold the President accountable—Congress must be permitted to assess the President's conduct for itself. The Attorney General cannot unilaterally make himself judge and jury. That is particularly so where the Attorney General has already expressed the view—in arguing against a theory of obstruction in this very investigation—that "there is no legal prohibition . . . against the President's acting on a matter in which he has a personal stake."[8]

The Attorney General's pre-confirmation memorandum on this topic also stated that "the determination of whether the President is making decisions based on 'improper' motives or whether he is 'faithfully' discharging his responsibilities is left to the people, through the election process, and the Congress."[9] Neither the American people nor Congress, however, can make any such a determination without all of Special Counsel Mueller's evidence, analysis, and findings—unfiltered and in his own words.

---

[5] *Watkins v. United States*, 354 U.S. 178, 200 n.33 (1957) (internal quotations omitted)

[6] *In re Report & Rec. of June 5, 1972 Grand Jury Concerning Transmission of Evidence to House of Representatives*, 370 F. Supp. 1219, 1230 (D.D.C. 1974).

[7] March 24 Letter at 3.

[8] William P. Barr, *Memorandum Re: Mueller's "Obstruction" Theory* at 10, June 8, 2018 (emphasis omitted). Additionally, although the Attorney General's March 24 letter states that the absence of an underlying crime bears upon the President's intent, it is black-letter law that there need not be an underlying crime for obstruction of justice to occur. *See, e.g.*, *United States v. Hopper*, 177 F.3d 828, 831 (9th Cir. 1999).

[9] *Id.* at 11.

The Special Counsel's investigation also confirmed that Russia engaged in extensive efforts to interfere in the 2016 presidential election, and Congress's need for that information is no less urgent. The Special Counsel's report, according to the Attorney General, describes "crimes committed by persons associated with the Russian government in connection with these efforts," including "efforts to conduct computer hacking operations designed to gather and disseminate information to influence the election."[10]

These hostile acts are ongoing: The Department has indicated in at least one other case that Russian influence efforts continued into the 2018 midterm elections.[11] The Director of National Intelligence likewise testified last year in regard to the 2018 midterm elections that Russia would continue to use "persistent and disruptive cyber operations" and would target "elections as opportunities to undermine democracy" both here and against our allies in Europe.[12] More recently, Director Coats warned that Russia and other adversaries "probably are already looking to the 2020 U.S. election" to conduct malign influence operations and that "Moscow may employ additional influence toolkits—such as spreading disinformation, conducting hack-and-leak operations, or manipulating data—in a more targeted fashion to influence U.S. policy, actions, and elections."[13] It is imperative that Congress have access to the Special Counsel's full descriptions and evidence of these crimes and malign influence operations that the Russian government or associated actors perpetrated against our democracy.

Moreover, the Attorney General's March 24 letter acknowledges "multiple offers from Russian-affiliated individuals to assist the Trump campaign."[14] The facts and circumstances uncovered by the Special Counsel's Office surrounding these and any other overtures by foreign actors, as well as the individuals associated with them and how they responded to such offers, are of vital importance to Congress. The Foreign Affairs Committee, for example, requires access to these facts as it investigates whether the foreign and financial entanglements of the President and his associates may be improperly influencing foreign policy in ways that serve their private interests rather than the national security of the United States. Moreover, the House Permanent Select Committee on Intelligence must have access to the full facts as it evaluates counterintelligence threats and risks during and since the 2016 U.S. election, and as it considers

---

[10] March 24 Letter at 2.

[11] *See* Criminal Complaint ¶ 14, *United States v. Khusyaynova*, No. 1:18-mj-464 (E.D. Va. Sept. 28, 2018) (alleging Russian national participated in a conspiracy "to interfere with U.S. political and electoral processes, including the 2018 U.S. elections").

[12] Patricia Zengerle and Diona Chaicu, *U.S. 2018 Elections 'Under Attack' by Russia: U.S. Intelligence Chief*, Reuters, Feb. 13, 2018.

[13] Worldwide Threats: Hearing before the S. Select Comm. on Intelligence, 116th Cong. (Jan. 29, 2019) (Statement of Daniel R. Coats, Director of National Intelligence).

[14] March 24 Letter at 2.

remedies necessary to prevent, or mitigate to the greatest extent possible, the vulnerability of campaigns, or persons associated with them, to foreign influence or compromise operations.

Congressional committees have conducted multiple hearings regarding foreign influence operations and the security of our election systems and have proposed numerous legislative reforms to address vulnerabilities.[15] In an appropriations bill enacted into law last year, Congress allocated much-needed funding to support election security initiatives.[16] It is critical to legislation that has or will be introduced this year to understand foreign intelligence disinformation campaigns, risks to our election infrastructure security, evolving methods of voter targeting and suppression, and the manner in which foreign adversaries seek to exploit campaign vulnerabilities as well as the technology industry in our elections moving forward.

In addition, the House of Representatives' appropriations process for the next fiscal year is already underway—including for funding any election security, cybersecurity, and offensive or defensive counterintelligence operations needed to combat attacks during the 2020 election—with submission deadlines scheduled for April and appropriations packages expected to reach the House floor in June.[17] However, Congress cannot fully address the scope of these threats (whether through appropriations or other legislation) without a thorough accounting by the Special Counsel's Office of the attack that occurred in 2016. Indeed, it is difficult to envision any function of Congress more important than ensuring the integrity of our democratic elections, authorizing and appropriating funding for the relevant federal authorities, and authorizing critical national security programs.

2. The Application of Rule 6(e) is Limited and Does Not Bar Disclosures to Congress

The Attorney General has indicated that the Department is reviewing the Special Counsel's report to identify material whose disclosure may be limited by Federal Rule of Criminal Procedure 6(e), which prohibits certain disclosures of "matter[s] occurring before the grand jury." In a call with Chairman Nadler, the Attorney General suggested that redactions made in accordance with Rule 6(e) will be substantial. But even assuming Rule 6(e) applies with respect to disclosures to Congress,[18] the law clearly forbids the Department from making

---

[15] *See, e.g.*, Secure America from Russian Interference Act, H.R. 6437, 115th Cong. (2018); Defending Elections from Threats by Establishing Redlines Act, H.R. 4884, 115th Cong. (2018); Bot Disclosure Accountability Act, S. 3127, 115th Cong. (2018); H.R. 5011, Election Security Act, 115th Cong. (2018); For the People Act, H.R. 1, 116th Cong (2019).

[16] Pub. L. No. 115-141, Div. E, tit. V (2018).

[17] *See* Hearings, H. Comm. on Appropriations, 116th Cong. (2019); Paul M. Krawzak, *House appropriations may start markup in April*, RollCall, Mar. 19, 2019.

[18] *See, e.g.*, *In re Grand Jury Inv. of Ven-Fuel*, 441 F. Supp. 1299, 1302, 1304-08 (M.D. Fla. 1977) (holding that Congress has "an independent right" under the Constitution to obtain requested documents regardless of whether they are subject to Rule 6(e)); *In re Proceedings of Grand Jury No. 81-1 (Miami)*, 669 F. Supp. 1072, 1075 (S.D.

sweeping designations as to any evidence that happens to have been presented to a grand jury or was obtained through a grand jury subpoena.

Rule 6(e) "does not 'draw a veil of secrecy . . . over all matters occurring in the world that happen to be investigated by a grand jury.'"[19] "The mere fact that information has been presented to the grand jury does not" mean that the information is prohibited from disclosure.[20] Further, as the D.C. Circuit has made clear, the fact that evidence was obtained through a grand jury subpoena does not necessarily mean that it is barred from disclosure by Rule 6(e).[21] As a result, the Department cannot withhold documents or information simply because they were produced in response to a grand jury subpoena. Because a person receiving the documents would not know whether they were obtained through a grand jury subpoena or other means, "subpoenaed documents would not necessarily reveal a connection to a grand jury."[22] Just last year, the D.C. Circuit reaffirmed this principal in *Bartko v. Dep't of Justice*, where it made clear that "copies of specific records provided to a federal grand jury" were not covered by Rule 6(e) because "'the mere fact the documents were subpoenaed fails to justify withholding under Rule 6(e).'"[23]

For this reason, it is clear the Department cannot withhold portions of the Special Counsel's report merely because they discuss information that was presented to the grand jury or documents that were obtained through a grand jury subpoena. Likewise, the Department cannot withhold underlying evidence simply because it was presented to the grand jury or obtained through a grand jury subpoena. That is particularly so because the Special Counsel's Office obtained a great deal of evidence by other means. The Special Counsel's team interviewed numerous witnesses on a voluntary basis and acquired voluminous records without resorting to grand jury subpoenas.[24] Other evidence was obtained through different types of mandatory legal process, such as through the issuance of nearly 500 search warrants.[25] That evidence can of course be disclosed without implicating Rule 6(e). And because so much evidence was obtained

---

Fla. 1987) (similar). *But see In re Grand Jury Investigation of Uranium Indus.*, Misc. 78-173, 1979 WL 1661, at *4 (D.D.C. Aug. 16, 1979). No circuit court has squarely addressed this issue.

[19] *Labow v. Dep't of Justice*, 831 F.3d 523, 529 (D.C. Cir. 2016) (quoting *Senate of the Com. of Puerto Rico v. Dep't of Justice*, 823 F.2d 574, 582 (D.C. Cir. 1987) (R.B. Ginsburg, J.)).

[20] *Id.* at 529.

[21] *Id.* at 529-30.

[22] *Id.* at 529.

[23] 898 F.3d 51, 73 (D.C. Cir. 2018) (quoting *Labow*, 831 F.3d at 530).

[24] *See, e.g.,* Philip Rucker et al., *A Mueller Mystery: How Trump Dodged a Special Counsel Interview—and a Subpoena Fight*, WASH. POST, Mar. 28, 2019 (quoting the President's attorney, Rudolph Giuliani, who stated, "We allowed [the Special Counsel's office] to investigate everybody, and [the White House] turned over every document they were asked for: 1.4 million documents.").

[25] March 24 Letter at 1.

through these other means, the Department would have no basis to withhold materials or descriptions of materials that it happens to have gathered by issuing grand jury subpoenas. So long as those materials do not on their face "'reveal a connection to a grand jury,'" Rule 6(e) does not bar their disclosure.[26]

As to testimony or other grand jury materials that are genuinely subject to Rule 6(e), the Department can and should work with the House Judiciary Committee to obtain the permission of the district court overseeing the grand jury to make disclosures to Congress on a confidential basis, as it has done in the past in analogous circumstances. The Department took that precise path after the grand jury considering evidence in the Watergate affair issued a report describing potentially criminal acts by President Nixon. The Justice Department filed briefs fully supporting disclosure of the report to the House Judiciary Committee, and made the obvious point that "[t]he need for the House to be able to make its profoundly important judgment on the basis of all available information is as compelling as any that could be conceived."[27] Independent Counsel Kenneth Starr likewise sought the court's authorization to disclose grand jury material regarding President Clinton to the House of Representatives.[28]

The district court would have ample authority to permit disclosure of relevant materials to Congress. As Chief Judge Howell, the judge overseeing this grand jury, explained in a recent opinion, "numerous courts have recognized [that] a district court retains an inherent authority to unseal and disclose grand jury material not otherwise falling within the enumerated exceptions to Rule 6(e)."[29] Indeed, every federal court of appeals to have considered this question has reached that conclusion.[30] Congress's need for these materials is beyond compelling, and the public interest in Congress receiving these materials is at its height. President Trump, moreover, has

---

[26] *Barko*, 898 F.3d at 73 (quoting *Labow*, 831 F.3d at 529).

[27] Mem. for the United States on Behalf of the Grand Jury at 16, *In re Report & Rec. of June 5, 1972 Grand Jury*, Misc. No. 74-21 (D.D.C. Mar. 5, 1974).

[28] *See* Order, *In re Madison Guaranty Savings & Loan Assoc.*, Div. No. 94-1 (D.C. Cir. Special Div. July 7, 1998).

[29] *In re App. to Unseal Dockets Related to the Independent Counsel's 1998 Investigation of President Clinton*, 308 F. Supp. 3d 314, 323 (D.D.C. 2018).

[30] *Id.* at 323-24. *See Carlson v. United States*, 837 F.3d 753, 763 (7th Cir. 2016); *In re Craig*, 131 F.3d 99, 103 (2d Cir. 1997); *In re Pet. to Inspect & Copy Grand Jury Materials*, 735 F.2d 1261, 1268 (11th Cir. 1984); *see also Pitch v. United States*, 915 F.3d 704, 708-09 (11th Cir. 2019); *Haldeman v. Sirica*, 501 F.2d 714, 715 (D.C. Cir. 1974) (court was "in general agreement with" the district court's decision to release the Watergate grand jury's report to Congress). The D.C. Circuit heard argument last fall in a case involving a historian who seeks the release of grand jury material involving an incident that occurred in the 1950s pursuant to the court's inherent authority to release materials otherwise covered by Rule 6(e). *McKeever v. Barr*, No. 17-5149. The facts of that case are obviously distinct from those presented here. As the Department explained in its brief in *McKeever*, "[t]he question in this appeal is whether . . . a district court may order the disclosure of secret grand jury records solely for reasons of historical or academic interest."

6

expressed public support for the report's release.[31] As such, the Department should immediately request that these materials be released to Congress.

The Attorney General has refused thus far to work with Congress in that regard. At his confirmation hearing, however, the Attorney General stated: "I . . . believe it is very important that the public and Congress be informed of the results of the special counsel's work. My goal will be to provide as much transparency as I can consistent with the law."[32] The most efficacious way to honor that commitment would be to join with the House Judiciary Committee in seeking expedited disclosure of any Rule 6(e) material to Congress, and to refer any questions about the scope of Rule 6(e)'s application to independent court review.

### 3. Any Potential Claim of Executive Privilege Has Been Waived

Although the Attorney General's March 24 letter made no mention of executive privilege, his March 29 letter states that "there are no plans to submit the report to the White House for a privilege review," because the President "intends to defer" to the Attorney General on those issues. Whatever that may mean, it would be highly improper for the Department to conceal portions of the report based on claims of executive privilege on behalf of the President. As an initial matter, the Department's own long-standing policy is that executive privilege "should not be invoked to conceal evidence of wrongdoing or criminality on the part of executive officers."[33]

In any event, the President and the White House have waived any claims of executive privilege. The White House voluntarily disclosed millions of documents to the Special Counsel's office and permitted multiple senior officials to be interviewed by the Special Counsel's team, without asserting any type of privilege.[34] Having voluntarily disclosed this evidence, the President cannot now seek to invoke executive privilege to block its release. As the D.C. Circuit has held in an analogous context, regarding waiver of attorney-client privilege, "[t]he client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others."[35] Moreover, the White House has similarly shared information and documents with numerous former White House

---

[31] Liam Stack, *Trump Says Mueller Report Should Be Made Public: 'Let People See It,'* N.Y. TIMES, Mar. 20, 2019.

[32] *The Nomination of the Honorable William Pelham Barr to be Attorney General of the United States*, hearing before the S. Comm. on the Judiciary, Jan. 15, 2019 (statement of the Hon. William Barr).

[33] Robert B. Shanks, Office of Legal Counsel, *Congressional Subpoenas of Department of Justice Investigative Files*, 8 Op. O.L.C. 252, 267 (1984).

[34] *See* Rucker et al., *supra* note 24; Michael Schmidt and Maggie Haberman, *White House Counsel, Don McGahn, Has Cooperated Extensively in Mueller Inquiry*, N.Y. TIMES, Aug. 18, 2018 (noting that no privilege was asserted).

[35] *Permian Corp. v. United States*, 665 F.2d 1214, 1221 (D.C. Cir. 1981).

officials and their private counsel.[36] The D.C. Circuit has expressly held that the White House "waive[s] its claims of privilege in regard to [] specific documents that it voluntarily reveal[s] to third parties outside the White House."[37]

Lastly, in the unlikely event that the White House has preserved privilege as to any of the evidence underlying the Mueller report, the public interest in disclosure would still overwhelmingly outweigh the President's interest in secrecy. The privilege pertaining to presidential communications is not absolute. Just as the Supreme Court determined in *United States v. Nixon*, the public interest here in the "fair administration of justice" outweighs the President's "generalized interest in confidentiality."[38]

   4. Ongoing Investigations, Classified Information, and Privacy and Reputational Interests of Third Parties Should Not Prevent Release to Congress

The fact that certain investigations remain ongoing cannot justify the Department withholding critical evidence from Congress that pertains to Russia's interference in our federal elections or obstruction of justice by the President. Indeed, during the previous Congress, the Department produced to congressional committees thousands of pages of highly sensitive law enforcement and classified investigatory and deliberative records.[39] Many of these were related to *this very same investigation*—which of course was open and ongoing at the time.

Similarly, the mere presence of classified information in the Mueller report or in underlying evidence cannot justify withholding evidence from Congress, which is well equipped to handle classified information and does so on a daily basis. The Department can provide any classified materials to the appropriate committees for handling in secure facilities. It can also permit the Intelligence Community to review the report on an expedited basis in order to share with Congress whatever equities the Intelligence Community feels may be implicated by the release of specific information contained in the report or any underlying materials. Additionally, to the extent the Special Counsel's Office is in possession of underlying evidence that is particularly sensitive, the relevant committees are in a position to work with the Department to reach an accommodation to ensure appropriate handling as Congress has in the past on numerous occasions. However, the Department should not be able to simply invoke the same reasons for redacting the report from public view as a shield against disclosure to a coequal branch of government.

---

[36] *See, e.g.*, Schmidt and Haberman, *supra* note 34.

[37] *In re Sealed Case*, 121 F.3d 729, 741-42 (D.C. Cir. 1997).

[38] 418 U.S. 683, 713 (1974).

[39] *See, e.g.*, *DOJ hands over new classified documents on Russia probe to Congress*, Associated Press, June 23, 2018; Charlie Savage, *Carter Page FISA Released by Justice Department*, N.Y. TIMES, July 21, 2018

Finally, the Department also should not be able to keep from Congress information related to the "reputational interests of peripheral third parties" as referenced in the Attorney General's March 29 letter. To the extent the Special Counsel has developed information relative to President Trump's family members (including those employed by the White House) or his associates, campaign employees, consultants, advisers, and others within the scope of the investigation, that should not be withheld from Congress. It is precisely the type of information that the relevant committees need to perform their oversight, legislative, and other responsibilities. There is no constitutionally recognized privilege that would apply in such instances, and there is ample precedent for provision of such information, as recently as the last Congress.