# EXHIBIT T

RPTR JOHNSON

EDTR ZAMORA

LESSONS FROM THE MUELLER REPORT, PART III:

"CONSTITUTIONAL PROCESSES FOR ADDRESSING

PRESIDENTIAL MISCONDUCT"

Friday, July 12, 2019

House of Representatives,

Committee on the Judiciary,

Washington, D.C.

The committee met, pursuant to call, at 9:10 a.m., in Room 2141, Rayburn House Office Building, Hon. Jerrold Nadler [chairman of the committee] presiding.

Present:  Representatives Nadler, Lofgren, Jackson Lee, Cohen, Johnson of Georgia, Deutch, Bass, Cicilline, Swalwell, Lieu, Raskin, Jayapal, Demings, Scanlon, Garcia, Neguse, Stanton, Dean, Mucarsel-Powell, Escobar, Collins, Gohmert, Jordan, Gaetz, Johnson of Louisiana, Biggs, McClintock, Lesko, Cline, Armstrong, and Steube.

Staff Present:  Arya Hariharan, Deputy Chief Oversight Counsel; David Greengrass, Senior Counsel; Lisette Morton, Director Policy,

Planning and Member Services; Madeline Strasser, Chief Clerk; Moh

Sharma, Member Services and Outreach Advisor; Susan Jensen,

Parliamentarian/Senior Counsel; Sophie Brill, Counsel; Matt Morgan,

Counsel; Brendan Belair, Minority Staff Director; Bobby Parmiter,

Minority Deputy Staff Director/Chief Counsel; Jon Ferro, Minority

Parliamentarian/General Counsel; Paul Taylor, Minority Chief Counsel,

Constitution Subcommittee; and Andrea Woodard, Minority Professional

Staff Member.

Chairman <u>Nadler.</u>  The Judiciary Committee will please come to order.  Without objection, the chair is authorized to declare recesses of the committee at any time.

We welcome everyone to today's hearing on Lessons from the Mueller Report, Part III:  Constitutional Processes for Addressing Presidential Misconduct.

I will now recognize myself for an opening statement.

The title of today's hearing is Lessons from the Mueller Report, Part III:  Constitutional Processes for Addressing Presidential Misconduct.  As many of you may already know, the subtitle is a quote taken directly from Volume II of the Mueller report where the special counsel describes why he did not reach a, quote, prosecutorial judgment, close quote, regarding President Trump's conduct.

There the special counsel explained that as an attorney operating within the Department of Justice, he is bound by Department policy, including an Office of Legal Counsel opinion that asserts that a President is immune from prosecution while in office.

The special counsel, quote, recognized that a Federal criminal accusation against a sitting President would place burdens on the -- undue burdens on the -- or burdens on the President's capacity to govern, close quote.  Yet the Mueller report also acknowledged that such an accusation could, quote, potentially preempt constitutional processes for addressing Presidential misconduct, close quote.

The special counsel's mention of these constitutional processes

should not be taken lightly.  It goes to the heart of Congress' role in our constitutional system of checks and balances, and that is the subject of today's hearing.

As the Mueller report's frequent references to Congress make clear, Congress has a role in investigating the potential Presidential misconduct he uncovered so that it may determine how best to exercise its Article I authorities to act as check on the abuse or misuse of executive branch power.

In light of its jurisdiction and past precedent, this committee in particular has a constitutional duty to investigate allegations of misconduct by executive branch officials, including the President of the United States, and is currently investigating allegations of abuse of power, public corruption, and obstruction of justice within the Trump administration.

The purpose of this hearing is to examine the range of constitutional remedies available for addressing Presidential misconduct under its authority Article I authorities.  Today's discussion will aid the committee in determining the remedies available to it as the investigation unfolds.

Under its Article I authorities, Congress has a number of responses to Presidential misconduct available to it.  With regard to the committee's responsibility to determine whether to recommend Articles of Impeachment against the President, Articles of Impeachment are already -- I'm sorry -- Articles of Impeachment are under consideration as part of the committee's investigation, although no

final determination has made.

In addition, the committee has the authority to recommend its own Articles of Impeachment for consideration by the full House of Representatives.

The committee seeks documentary evidence and intends to conduct hearings with Mr. McGahn and other critical witnesses testifying before us.   That is necessary to determine whether the committee should recommend Articles of Impeachment or any other Article I remedies, and, if so, in what form.

The committee is also considering other responses to the conduct under investigation.   While censure of the President is rare, Congress has previously passed measures expressing disagreement with specific Presidential conduct.   The committee is considering several pieces of legislation that would address the allegations of misconduct uncovered by the special counsel's investigation and other serious policy concerns raised by the Mueller report.

Legislative proposals to determine misconduct described in the Mueller report include measures that would increase transparency with regard to White House communications concerning law enforcement investigations.   Those proposals also include measures to impose additional safeguards to protect the integrity and independence of future special counsel investigations.

The committee also has been referred proposals to amend the Constitution to limit the scope of executive clemency and legislation to increase transparency regarding Presidential pardons, which

responds to additional fact patterns described in the report.

Volume I of the Mueller report also documented numerous troubling contacts between the Trump campaign and individuals associated with the Russian Government.  As a result, several Members have introduced legislation that would impose a duty on campaigns to report their contacts with foreign governments.

With regard to possible criminal, civil, or administrative referrals, the Justice Department has discretion as to whether to act upon a referral by Congress for prosecution or civil enforcement.  As even DOJ policy acknowledges, a President is not immune from criminal prosecution after leaving office, and I have introduced legislation that would toll the statute of limitations on Federal offenses during a President's term in office.

State authorities may also enforce State laws against the President.  The congressional referral process serves the important purpose of creating a record and preserving evidence for such time as prosecution, civil enforcement, or other administrative response is feasible.

The committee cannot, however, determine which Article I remedies are appropriate without first ascertaining all of the relevant facts, and it cannot do so when the administration refuses to cooperate with legitimate congressional oversight.  That is why today's hearing will also give the committee the opportunity to consider the lawfulness of the administration's efforts to limit congressional oversight requests.

The Trump administration has asserted that several current and former government officials are, quote, absolutely immune, unquote, from having to comply with congressional subpoenas for testimony. However, the only court to ever consider such claims rejected them in a case involving this very committee's past effort to seek information about inappropriate White House involvement in the firing of several U.S. attorneys.

In addition to asserting claims of absolute immunity, in quotes, the White House has instructed several witnesses not to comply with the committee's duly issued subpoenas for documents or to answer questions on the basis that the documents and answers are subject to executive privilege or would otherwise, quote, implicate constitutionally based executive branch confidentiality interests, close quote.  Needless to say, these assertions raise a host of problematic legal and constitutional issues.

We have a distinguished panel of witnesses who can help us sort through the various constitutional processes implicated by the Mueller report, and I look forward to hearing their testimony.

It is now my pleasure to recognize the ranking member of the Judiciary Committee, the gentleman from Georgia, Mr. Collins, for his opening statement.

[The statement of Chairman Nadler follows:]


******** COMMITTEE INSERT ********

Mr. <u>Collins.</u>   Thank you, Mr. Chairman.

I was sorry I was -- for a moment, I was -- you ever have one of those dreams, and there have been movies about this.  You have a dream that you wake up and you're back in school, you're back in high school. For me, it was back in Ms. McCall's class in North Hall High School government, American Government class.  And it's the proper role of government and the different checks and balances and, you know, what is Congress' role and what's the President's role and what's the judiciary's role.

We can stop this hearing right now, because the chairman just laid out all of the congressional routes and avenues that Congress has to it.  And we're going to have a time -- and I'm glad the panel's here. Y'all are great folks.  You've got scholarly work.  We're going to hear some, you know, wonderful things.  But we've stopped right here.  The problem is we're just dragging this on.

It's not that you want to come to impeachment.  The chairman talked about impeachment.  If that's what you want to do, then that's the part -- we don't need to discuss is this a constitutional right of Congress to do impeachment.  That is exactly what Congress' right to do.  The constitutional processes are very well addressed in the Constitution and in our processes.

But instead, we come here today to have another almost impeachment hearing but not an impeachment hearing.  We want to get facts; we want to do this.  No, we're just waiting on and on.

I'm trapped back in 9th grade.  Ms. McCall was a wonderful teacher, but I don't want to go back through it again.  This is black and white.  We know this problem here.

So what are we not doing?  Instead of this morning at 9 o'clock on a Friday, on a fly-out day, when we are actually -- the chairman and I have a bill on the floor here in just a little bit that actually touches real people's lives in New York from the 9/11 fund, which is a very valid thing that we need to be doing.

Yesterday, we spent this entire committee time arguing over subpoenas and the discussion on the border, but yet why wouldn't we use this 9 o'clock time to actually have a markup of actual immigration bills such as mine that addresses border issues?  Now, you may discuss agree with what I propose, but that's what markups are for.  That's what actually is taking this time.  And you have a bill.  Put your bills up.  Let's actually get to actually solving real issues instead of having theoretical college discussions on what is Congress' power.  If we don't know what Congress' power is now, this hearing is not going to help us.  In fact, it's ridiculous.

Legislation.  I agree with the chairman.  The chairman talked about election -- which actually the Mueller report actually found election interference.  Why aren't we putting those bills forward instead of having our authority taken over by the House Admin Committee on election bills because they don't want to run it through here?  Let's solve problems.

Process.  Here's our biggest thing from yesterday.  And maybe

this is it, is what the process is.  We know what the process is.  The majority just can't find their way to figure out what they want to do with that process.

And so next week, we have Robert Mueller coming in here, and the whole bottom row is disenfranchised, for the most part.  I guess there is some more negotiations going on.  I've read that in the media.  Maybe I need to call Chairman Schiff and make sure that that was okay, because they were undoubtedly driving this ship, because they all get to talk next week.  My side doesn't and neither does the Democratic side get to talk.  It disenfranchises Florida, it disenfranchises North Dakota, it disenfranchises everyone.

But instead of that, we're doing this.  It just, frankly, boggles the mind.  But I will say this:  If there's anybody on this committee -- and there are very wonderful people on both sides of this committee who are very, very intelligent.  And you can ask your questions today, and we can talk about the constitutional process, and you have got some great folks here to talk to you about it.

But in all due respect, we know what the constitutional process is here.  We just want to dance around it so we can keep another round of stories going that the Judiciary Committee is pursuing harassment and doing what it needs to do to make sure this administration is held accountable because we don't like him.

The economy is good, life is going better, and we don't like it because we don't like the November 2016 election.  That's all this is about.  We found that out again yesterday.  We're going to find it out

again this morning.

So for everybody who didn't get to the wonderful ability to be in Ms. McCall's 9th grade American Government class at North Hall High School, this may be your opportunity.  Get your hornbooks out, get your study books out.  This is going to be a constitutional process of what we already know is our processes, but we're going to have some experts tell us what those processes are.

Mr. Chairman, there's a lot of things you could be calling today. This isn't one of them.  Why don't we actually take up real legislation to fix the border crisis, to fix the issues that we all talk up about here?  Instead, we have hearings.

Our body is to actually legislate.  You and I have legislated before.  Let's start legislating and stop the show.  But it is again -- the popcorn is cooking.  It's time, as I've always said, let the show begin.

I yield back.

[The statement of Mr. Collins follows:]


******** COMMITTEE INSERT ********

Chairman <u>Nadler.</u>   Thank you, Mr. Collins.

And I will now introduce today's witnesses.

Caroline Fredrickson is president of the American Constitutional Society for Law and Policy.   Previously, she was the director of the American Civil Liberty Union's Washington legislative office, held various positions in the Senate and served in the Clinton administration.

Ms. Fredrickson received her JD from Columbia Law School, in my district, and her BA from Yale University.

John Eastman is the Henry Salvatori Professor of Law and Community Service and the former dean at Chapman University's Dale Fowler School of Law.   He also serves as director of the Center for Constitutional Jurisprudence at the Claremont Institute.   Previously, Dr. Eastman served as a law clerk to Justice Clarence Thomas and to Judge J. Michael Luttig.

Dr. Eastman received his Ph.D. from Claremont Graduate School, his JD from the University of Chicago Law School, and his BA from the University of Dallas.

Michael Gerhardt is the Samuel Ashe Distinguished Professor in Constitutional Law at the University of North Carolina School of Law in Chapel Hill.   Professor Gerhardt served on then President-elect Bill Clinton's Justice Department transition team and drafted the administration's judicial selection policy.   He later served as special counsel to the Clinton administration and the Senate Judiciary

Committee.

Professor Gerhardt received his JD from the University of Chicago Law School, his MS from the London School of Economics, and his BA from Yale University.

We welcome our distinguished witnesses, and we thank you for participating in today's hearing.

Now if you would please rise, I'll begin by swearing you in.

Would you raise your right hands.

Do you swear or affirm under penalty of perjury the testimony you're about to give is true and correct, to the best of your knowledge, information, and belief, so help you God?

Thank you.

Let the record show the witnesses answered in the affirmative. And thank you and please be seated.

Please note that your written statements will be entered into the record in its entirety.  Accordingly, I ask that you summarize your testimony in 5 minutes.  To help you stay within that time, there's a timing light on your table.  When the light switches from green to yellow, you have 1 minute to conclude your testimony.  When the light turns red, it signals your 5 minutes have expired.

Mr. Fredrickson, you may begin -- Ms. Fredrickson -- I'm sorry -- you may begin.

**TESTIMONY OF CAROLINE FREDRICKSON, PRESIDENT, AMERICAN CONSTITUTION SOCIETY; JOHN EASTMAN, HENRY SALVATORI PROFESSOR OF LAW AND COMMUNITY SERVICE AND DIRECTOR, CENTER FOR CONSTITUTIONAL JURISPRUDENCE, CHAPMAN UNIVERSITY, FOWLER SCHOOL OF LAW; AND MICHAEL GERHARDT, SAMUEL ASHE DISTINGUISHED PROFESSOR IN CONSTITUTIONAL LAW, THE UNIVERSITY OF NORTH CAROLINA SCHOOL OF LAW**

TESTIMONY OF CAROLINE FREDRICKSON

Ms. <u>Fredrickson.</u>  Good morning.  Thank you, Mr. Chairman.

My name is Caroline Fredrickson.  I'm the president of the American Constitution Society.

ACS has worked to promote informed public evaluation of the investigations into Russian interference in the 2016 election.  It is with this background that I'm pleased to testify on the constitutional processes for addressing Presidential misconduct.

The final report issued by Special Counsel Robert Mueller on Russian interference in the 2016 election reached several chilling conclusions.  Russia conducted wide-ranging attacks on our Nation's election system.  The Trump campaign had multiple contacts with Russian nationals and did not report these interactions to U.S. authorities.  And there's substantial evidence that President Trump repeatedly attempted to thwart the investigation, including through his unheeded requests to the White House Counsel to fire the special

counsel, create a false paper trail, and make public misrepresentations regarding this incident.

To say these findings are troubling is an understatement.  It is Congress' constitutional duty to respond.  Close examination of how Russia executed these interference strategies is necessary to inform this committee and other committees of jurisdiction how to best tailor a wide range of legislative initiatives on subjects from electronic data protections to the provision of additional funding or resources for U.S. agencies responsible for monitoring and investigating foreign interference, to the integrity of special counsel inquiries, to ensuring limits on political interference with Department of Justice decisionmaking.

Although congressional oversight might eventually lead to impeachment, it does not have to do so.  The Supreme Court has long held that Congress' oversight authorities are inherent in the Article I legislative powers.  These authorities are broad and encompass matters including, quote, the administration of existing laws, proposed or possibly needed statutes, and probes to expose corruption, inefficiency, and waste.  Indeed, the Court has emphasized that oversight is essential to the conduct of government.

This committee has additional constitutional authorities to conduct oversight, under Article I, Section 2, stating that the House of Representatives has the sole power of impeachment.

Congressional investigations often lead to new laws, but some investigations have led Congress to conclude that enacting new laws

is not necessary to address issues identified in the inquiry. Sometimes congressional oversight has led to executive branch reforms. Other times, inquiries into alleged administration corruption have resulted in resignations, referrals, House or Senate resolutions memorializing disapproval of Presidential or other administration misconduct, or impeachment proceedings.

Congressional oversight history is replete with investigations into alleged White House misconduct that did not involve impeachment. Many involved testimony from top White House aides, including White House counsels, chiefs of staff to the President, National Security Advisors, and top advisors to the Vice President and First Lady. Impeachment proceedings have begun without any formal vote of the House.

In addition, for Presidential impeachments, the Judiciary Committee has conducted hearings to determine whether or not to recommend articles to the full House.   In the impeachment of President Nixon, the House Judiciary Committee had been considering Articles of Impeachment for close to a year before there was a full House vote in February 1974.

With respect to the Mueller report and related information, several key unanswered questions demand rigorous congressional review. For example, how can Congress best protect our elections from future attacks by Russia or other hostile nations?  Why did Trump campaign officials, associates, and then-candidate Trump continue to have contact with Russians after becoming aware of the hacking?  Why did

some lie to investigators about these contacts, and why did they suggest publicly that Trump, quote, had nothing to do with Russia?  Does the substantial evidence of obstruction of justice and other misconduct merit further congressional action, including legislation, censure, impeachment, or referrals?  And finally, does the content behind the Mueller report redactions and gaps in evidence suggest any additional wrongdoing by the President or others?

Congress' job has been made substantially harder by the administration's intransigence in resisting congressional oversight at every turn, instructing officials to disobey congressional subpoenas, and invoking broad claims of executive privilege.  And it has gone so far as to claim that this committee even lacks authority to investigate these matters in the first instance.

Given the gravity of the Mueller report conclusions and the related information that has emerged publicly to date, a failure by Congress to examine these issues would constitute an abdication of Congress' fundamental constitutional oversight responsibilities.

Thank you.

[The statement of Ms. Fredrickson follows:]

******** INSERT 1-1 ********

Chairman <u>Nadler.</u>   Thank you.

Dr. Eastman.

**TESTIMONY OF JOHN EASTMAN**

Mr. <u>Eastman.</u>   Thank you, Chairman Nadler and members of the committee.   I'm delighted to be here to participate in this hearing.

But before turning to the substance of my remarks and addressing the precise question you've posed, I think it's important to take issue with the underlying assumption of the hearing contained in the full title of this hearing.

By tying the question of Presidential misconduct to the Mueller report, you imply that the Mueller report identified Presidential misconduct that should trigger whatever constitutional processes might be available.   As a factual matter, I could not disagree more, for I do not find anything in that report even remotely rising to the level that would trigger the one constitutional path designed to address Presidential misconduct, and that's impeachment.

I should also note that this is not the first time the judiciary -- a congressional judiciary committee has considered this question.   In 1998, the Senate Judiciary Committee, Subcommittee on the Constitution, held a hearing on impeachment or indictment.   I commend the proceedings of that hearing to your attention, particularly the extremely persuasive testimony and submitted scholarly work of Yale

law professor, Akhil Amar.   The conclusion he reached then is the same one I reach now, and it is the same one that has been reached by the Office of Legal Counsel in both Democrat and Republican administrations spanning nearly a half a century.

Because of the unique role the Constitution assigns to the Office of President, a sitting President cannot be indicted.   That does not place the President above the law, as some have claimed, but it does recognize that the sole remedy envisioned by the Constitution for illegal conduct by a President, while he is President, is the impeachment process outlined in Article I, Section 3.

As Professor Amar so aptly put it, the grand jury in such a case is the House, the indictment is the Articles of Impeachment, and the Senate is the petit jury.

I won't go through the -- the conclusions of those two OLC reports, other than to very quickly summarize them.   The notion that the President can be himself a criminal defendant in a Federal prosecution would put him on both sides of the criminal prosecution. He is, after all, the Chief Executive of the Nation, responsible for the prosecutorial function of the Federal Government.

It's also true that he has unique official duties that no one else in the government has, most of which, as the OLC report in 2000 under the Clinton administration acknowledged, most of which cannot be exercised by anybody else.   That strongly counseled them, both OLCs, to conclude that the President could not -- not only not be tried or incarcerated if convicted, but not even indicted, because it would

amount to such a fundamental intrusion on his executive duties, and therefore, impact greatly the entire Nation.

But there's a third thing that the OLC report in 2000 offered that I think is even more dispositive:  The President's role as guardian and executor of the 4-year popular mandate expressed in the most recent balloting for the Presidency.  To allow a single prosecutor or a single grand jury regionally drawn in someplace in the country the ability to incapacitate a President who had been chosen through a national election by the people -- by the whole people of the United States is really contrary to our basic system of government.  That's why the OLC concluded the decision to terminate the mandate is more fittingly handled by the Congress than by a jury.

And I think I want to close by looking at those OLC reports.  They focus on the fact that the impeachment process is done by elected Members of Congress who are politically accountable.  And it's that piece that I want to focus on.  Because if there is indeed anything in the Mueller report that rises to the level of treason, bribery, or other high crimes and misdemeanors, then the Members of this body will likely be held accountable politically if the House does not initiate impeachment proceedings.

But the flip side of that coin is also true.  If, as I believe is clearly the case, nothing identified in the Mueller report remotely rises to that level, then the Members of this body who continue to pursue impeachment investigations and even formal impeachment proceedings that manifestly appear to the public to be an attempt to distract the

President from the performance of his constitutional duties, or worse, to negate the results of the 2000 election, then they too should be and likely will be held politically accountable.  That's why the Constitution assigns this awesome oversight authority to this body, but it comes with a political accountability that flows from that.

We can get into the question and answer about the specific instances, but I think that the various instances that are alleged for obstruction of justice or Russia collusion pale in comparison to some of the things we know occurred by the prior administration.  And it's that level of comparison that I think the American people will ultimately choose to make as the political accountability for this committee and every Member of the House of Representative if they continue to pursue these things.

Thank you for your attention.

[The statement of Mr. Eastman follows:]


******** INSERT 1-2 ********

Chairman <u>Nadler.</u>   Thank you.

Professor Gerhardt.

**TESTIMONY OF MICHAEL GERHARDT**

Mr. <u>Gerhardt.</u>   Thank you, Mr. Chairman.

It's an honor to be here today and an honor to participate in today's hearings and to be a part of an important discussion about constitutional processes for Presidential misconduct.

A good place to begin our discussion, I believe, is with the Supreme Court's decision in Nixon v. Fitzgerald, a 1982 decision by the Supreme Court that held that the President is immune to civil lawsuits seeking damages based on his official conduct.

Near the end of its opinion, the Supreme Court talks about -- recognizes a number of other ways in which the Constitution allows for the President to be held accountable for his misconduct.

There are formal mechanisms, for example, such as impeachment, such as congressional oversight, such as popular elections, that allows for considerable opportunity and, in fact, legitimacy for this committee and Congress to consider which, if any, possible ways it wants to consider for holding a President accountable for his misconduct.

There's long history here, but let me cut to the chase.   The first mechanism, congressional oversight, is, of course, a longstanding legitimacy.   The Constitution does not require that this house follow

any particular procedures in trying to determine whether or not and how it may hold a President accountable for his misconduct.  In fact, just the opposite.

Article I, Section 5 of the Constitution vests each body of Congress -- the House, the Senate -- with the authority to determine its own internal rules of governance.  The committee today is doing nothing more than following through in -- following through in accordance with the House rules.  That's all that's happening.  It's as simple as that.

Besides congressional oversight, there are, as we recognize, other mechanisms.  One of them, of course, is impeachment.  I won't dally on that right now, but one thing to recognize about the possibility of impeachment is that the House, and particularly this committee, is fully entitled to consider what evidence there may be on whether a President committed misconduct, but also, what other evidence needs to be determined in order to reach a decision about whether or not to proceed further on any particular process relating to Presidential misconduct.  It's that simple.

The Constitution does not require a series of hoops that this committee has to go through in order to make its determinations about what, if anything, to do with Presidential misconduct.  Just the opposite, as I said.  The Constitution vests considerable authority in each Chamber to determine its rules of governance, and here the committee's following through on that.

Another mechanism we haven't discussed but could is censure.  I

have longed believed that censure is a legitimate option for this committee to consider, if and when it encounters or finds that a President or any other official has engaged in misconduct.  The authority isn't just derived from the fact the Constitution doesn't disallow censure; the authority is established by longstanding traditions and exercise of power within this body.

For example, when Abraham Lincoln was a Member of the House of Representatives, he introduced a resolution criticizing President Polk's initiating, in his opinion, the illegal Mexican War.  His resolution didn't pass, but he did vote for a resolution that did pass 82-81 holding President Polk accountable for unnecessarily initiating an unlawful war.

That's good enough for me.  If President Lincoln thinks it's good enough for the House, I think it's longstanding authority we can follow.

Other mechanisms, of course, involve possible lawsuits.  Civil lawsuits based on unofficial misconduct have been recognized, in Clinton v. Jones, as legitimate and they may proceed.  In addition, of course, there may be the possibility of criminal trials.

One thing to understand about the possibility of criminal trials is, as Dr. Eastman just suggested, that there's a longstanding debate of whether or not a sitting President may be subject to criminal process.  I believe so.  I've set forth my arguments in my written statement.  I won't expound on them here, but I'm happy to answer questions about it.

And, of course, the -- a final thing I hope you'll allow me to

just finish with is something that Raoul Berger, long recognized as one of the great authorities on impeachment, said 30 years ago in The New York Times.  He said by refusing to comply with the subpoenas of the House Judiciary Committee, President Clinton is setting himself above the Constitution.  No President is above the law.  No President can use his authority or any of his powers to thwart the powers of this body and therefore to be above and beyond any accountability to the law.

Thank you very much for the opportunity to be here today.

[The statement of Mr. Gerhardt follows:]


******** INSERT 1-3 ********

Chairman Nadler.   The committee will now stand in recess for
5 minutes, and Democratic members will meet over here and the
Republican members on their side.

This will be a 5-minute recess.

[Recess.]

Ms. Scanlon.  [Presiding.]   The committee will now resume.

And we'll now proceed under the 5-minute rule with questions, and
I'll begin by recognizing Mr. Collins.

Mr. Collins.  And I thank the chairwoman for doing that.  We've
got to go to the floor and take up the 9/11 bill, so I appreciate that.
And I won't be long.

But, Mr. Eastman, let's talk just for a moment.  Do you think
there's any possibility that this group of attorneys and nonattorneys
on this Judiciary Committee have any -- or their staffs have any problem
understanding the constitutional role of Congress and oversight of the
administration, on any administration?

Mr. Eastman.  I don't know the background of every member, but
I think the usual member ought to know the answer to that.

Mr. Collins.  And that would come from just, if nothing else, life
growing up and taking, you know, government classes growing up,
correct?

One of the things I want to be interested in -- and there's a lot
of things that people will talk about today, and we'll get into a lot
of different things.  But one of the problems that I've had here -- and

we talk about constitutional process.  We also talk and the professor here talked about our internal processes and going on.  And one of the things that I've just been very disappointed in our committee for the last 6 months is our way we handle subpoenas and the way that we have went through contempt and how we have rushed through this process and how we've instead of -- you're familiar with subpoenas, correct?

Mr. Eastman.  Yes.

Mr. Collins.  And how they should operate.  Has a subpoena ever been -- and from a perception that you ever had, could a -- would a Black's Law Dictionary of a subpoena say that it is an opening to a dialogue?

Mr. Eastman.  No.

Mr. Collins.  Would it ever be said that a subpoena should be to enhance your standing in court?

Mr. Eastman.  No.

Mr. Collins.  Okay.  If that be true, then my question is, do you believe that it hurts us as an institution when we rush through these issues of contempt and subpoena?  And I would love for you to talk about that for a minute.

Mr. Eastman.  Well, look, you know, I want to take up -- I agree with most of what Professor Gerhardt said.  The one point of disagreement I have is I don't think he gave enough credit to the notion that these fights over congressional subpoenas and congressional testimonies by the executive are ones that arise out of a deliberate design function of the Constitution, which is a separation and a

counterbalance of powers.

Yes, the Congress has oversight authority, but there are limits to that authority, and those limits we typically classify generally as executive privilege.  And so most of the fights in our Nation's history over the issuance of subpoenas and the testimony of high-ranking executive officials deal with that counterbalancing authority that the executive has.  Congress cannot, in its oversight capacity, intrude on the executive functions, including the confidentiality of Presidential communications.  And I think that's well established as well.

And the fight, then, is over whether these current round of subpoenas and demands for testimony are really designed to intrude on the executive in an unconstitutional way.  And I think that's where the conversation has to focus.

Mr. Collins.  You talk about conversation and dialogue.  And this is one of the things that I've been in Congress, not my life, but the last 6-1/2 years, and I've noticed the battles that go between both Democrat and Republican administrations in the Hill.  This has been going on forever.

Do you believe it's good -- and I've got several questions.  Do you believe it's good for a committee just to lead, with no conversation with an individual, to lead with a subpoena?

Mr. Eastman.  I don't.  I think there's a lot of negotiation that has historically gone on on those issues.

Mr. Collins.  And we went to the floor for contempt on very

limited terms, especially with the Attorney General in a shortened time
here.

The question that I would have here is -- if you look at this from
a judge's perspective, when they say -- and we talk about -- and by
the way, this committee seems to be unique in this, because other
committees, such as the Intel Committee, actually negotiated and began
to get stuff in the proper way of back and forth and back and forth.
When we go to -- if we were to try and enforce one of these contempts
that we have done with lack of foundation, lack of background, do you
believe it hurts this committee and this institution as a whole?

Mr. Eastman.  I think it would certainly undermine the claims in
the court that the subpoenas or the efforts were made in good faith,
and that would certainly undermine any -- any court's plan on giving
enforcement effort to those things.

Mr. Collins.  I appreciate it.  I know in my home county  of Hall
County, my judges would look at me and say go back and do your job before
you bring it to me.

So with that, I do appreciate the chair's indulgence.  And with
that, I'll yield back.

Ms. Scanlon.  Okay.  Thank you.

The chair recognizes Representative Lofgren for 5 minutes.

Ms. Lofgren.  Thanks very much.

I think this is an important hearing.  I noted the ranking
member's comment that we should be taking up other subjects instead
of this one.  And I can't help but recall that the Democrats, in terms

of election security, as a first order of business, introduced H.R. 1 about election security and got no help from the minority party.  And my own bill, the SAFE Act, that we just passed 2 weeks ago to harden election systems got only one Republican vote.  So I think that's a bit disingenuous.

Let me talk about the OLC opinion.  I've been interested in that for some time, and I'm wondering whether, Ms. Fredrickson or Mr. Gerhardt, you believe that the OLC opinion would cover activities -- criminal activities for any President that occurred prior to that President assuming office.

For example, Spiro Agnew was -- left his position for bribery that was engaged in while he was in Maryland, before he was Vice President.

What is your view on that?

Ms. Fredrickson.  Well, I think -- just say two quick things, and then I think Professor Gerhardt probably has a more thorough answer.

It's a -- one thing is that I think the Vice President is not covered.

Ms. Lofgren.  No, I understand that.  I just meant that as an example.

Ms. Fredrickson.  But I think that's just one of the weaknesses of the OLC opinion, is it does seem to indicate that -- insulate a President from judicial process in a way that I think is not consistent with the rule of law as understood by the Founders.

Ms. Lofgren.  One of the questions I've had, if I can throw at you, in addition, Professor Gerhardt, is, is there any limit to this?

Let's say some day in the future, President A is annoyed with the Vice President, pulls out a gun, shoots the Vice President in the head in the Oval Office.   That would be a Federal crime.   Would that President A in the future be immune from prosecution?

Mr. Gerhardt.   I hope -- I hope not.   And I respectfully disagree with the OLC opinion.   Obviously, OLC does fantastic work.   They're not right about everything.   Everybody is subject to scrutiny.   And in this case, I think they got it wrong.

I've long thought that the President is not special.   Everybody in government is subject to criminal process.   And should anybody in government commit a crime, they're not entitled to any immunity.   I think that's the Constitution we have.

In fact, to go back to your earlier question about whether or not a President -- we can just -- let's keep it hypothetical -- commits a crime before he is elected and nobody knows about it.   If we find out about it later, it's -- it becomes almost absurd to imagine that the country has to somehow sit tight for 4 or 8 years until he leaves office before he is subject to a criminal trial.   If that crime has any relationship to his election, and it almost certainly does because it would have affected people's votes to know about it, then I think the Constitution gets turned on its head.

Ms. Lofgren.   Let me ask you this.   In terms of the OLC opinion, obviously they're just looking at Federal prosecutions.   We have 50 States.   If the President A shoots somebody who is not a Federal official, in a State, that would be a violation of State law.

Would -- do you believe that the Constitution prohibits a State prosecution of a President for a State law violation?

Mr. Gerhardt.  I don't believe it does, but I also should just point out, for the record, that this committee and this House of Representatives has confronted this issue already, to some extent, in the case of Thomas Porteous.

Ms. Lofgren.  Right.

Mr. Gerhardt.  Thomas Porteous was a Federal district judge who nobody knew --

Ms. Lofgren.  We were on the committee during the impeachment, so --

Mr. Gerhardt.  I won't go into details, if you don't want, but I think they're quite pertinent.  The point is he committed criminal misconduct before he entered his office as a Federal district judge. He didn't tell the Senate about it, and that turned out basically to be fraud against the Senate and was the basis for his impeachment.

Ms. Lofgren.  Let me just ask a final question.  If the DOJ opinion is correct, it seems a logical extension is that the Federal prosecutors could not be expected to actually investigate a President.

When you think back to the Nixon impeachment, Jaworski was -- you know, provided information to the Congress.  Certainly, Ken Starr provided us information.  I was on the committee at that time. Presumably, that would not be permitted if you could not prosecute a sitting President.

Is that -- what do you think of that?

Ms. <u>Scanlon.</u>   Time has expired, but you can answer.

Mr. <u>Gerhardt.</u>   Well, I think if a prosecutor finds evidence of obstruction, for example, then that may be an appropriate time to consider the propriety and legitimacy of criminal process.

I think that no one -- the very principle of no one being above the law means just what it says.   Nobody's above the law.   A President can't obstruct an impeachment, you know, a House committee looking into the possibility of whatever misconduct he has committed, because if he could do that, then he really is above the law.

Ms. <u>Lofgren.</u>   Thank you.   My time has expired.

Ms. <u>Scanlon.</u>   Thank you.

The chair recognizes the gentleman from Florida for 5 minutes.

Mr. <u>Gaetz.</u>   Thank you, Madam Chair.

Mr. Eastman, you've commented on the potential harms that can come with a special counsel that's unbridled.   Is there anything you'd like to add to that?

Mr. <u>Eastman.</u>   Well, I mean, you know, I want to pick up on something that Professor Gerhardt said, the notion that the President would be above the law.   One of the things that has troubled me about the OLC opinions, which I think are correct, is that potential criminal liability may not exist at all for a sitting President for conduct either -- criminal conduct either while in office or before, given the statute of limitations problems.

Both OLC memos recommended to Congress that they could address that issue, and I would encourage you to do so.   That would ensure that

no President is above the law at the end of the day.   But it would also ensure -- and I think this is what the OLC memos are both based on, and they would apply whether the criminal conduct occurred while in office or before -- the unique responsibilities of the President in our system of government and the ability of a single prosecutor or a single grand jury to interfere with that.   And I think that's why the OLC memos are correct.

But to remedy the one shortcoming from that, you could address the statute of limitations thing.   And I think Chairman Nadler in his opening statement mentioned that that was one of the things that might be worth considering.   And I would endorse that.

I do think, though, that the reasoning of the OLC memos, implicitly in the first one and explicitly in the second, also extends, although for different -- not separation of powers reasons, but for federalism reasons, to State authorities being able to indict the President.   And I think they're right about that as well.   That door is closed as well for the same reasons that a Federal indictment against the President, while he is sitting, is closed.

And I think that's right.   It's a balancing act.   But the balance, given the unique nature of the President's role and the unique nature of his election, the only one, save for the Vice President, who is elected nationally, those two things have contributed to this immunity that OLCs of both sides of the political aisle have recognized, like I said earlier, over a span of 50 years.

That doesn't keep the President off the hook, but it does shift

the discussion to a politically accountable body where people can be held to account if they abuse the investigative process.

Mr. Gaetz.   You made mention of the President's unique powers and how they interface with an analysis of proper versus improper conduct, and you also make reference to the dealing with Director Comey.   Is there anything you'd like to add on that front?

Mr. Eastman.   Well, you know, something that Chairman Nadler said in his opening that I disagree with, and I think is important to get out here, one of the pieces of legislation that is being considered is to expose White House communications with the Department of Justice to identify whether the President is having any role in prosecutorial decisions.   I think that idea fundamentally misunderstands the nature of Article II of the Constitution, which says the executive power, all of it, is vested in the President of the United States.

The Attorney General, in its prosecutorial functions at the Department of Justice, holds that power derivatively from the President.   The FBI, in its investigative power, holds that power derivatively from the President.   The notion that the President can't be the one to make the prosecutorial or the investigative decisions is to completely undermine that core aspect of Article II.   And so I think that idea is just simply misguided.

Now, if the President decided that Director Comey -- and I outline in my testimony why I think both sides of the political aisle in Congress were upset enough with Mr. Comey to have warranted removing him long before the President did, but the President had that authority himself.

And, you know, I don't think that -- exercising an authority that he constitutionally has rises to the level of obstruction of justice.

Mr. Gaetz.  Thank you, Madam Chair.  I yield back.

Ms. Scanlon.  The chair recognizes the gentlewoman from Texas for 5 minutes.

Ms. Jackson Lee.  I thank the chair very much.

I'm going to read partly a statement by the former -- by former Federal prosecutors.  And I would also like to add, having been here in 1998 and also for a number of impeachment proceedings regarding Federal judges, when Mr. Starr handed our friends on the other side of the aisle the Starr report, they immediately began impeachment proceedings.  That was the historical record that was created.  I don't know if they were concerned about any factual basis other than the Starr report.

In this instance, we are meticulously listening to scholars and interviewing individuals by way of subpoena and building -- the building blocks of the constitutional process and as well the building blocks of the understanding of the American people.

Each of us believes that the conduct of President Trump described in Special Counsel Robert Mueller's report would, in the case of any other person not covered by the Office of Legal Counsel policy against indicting a sitting President, result in multiple felony charges for obstruction of justice.  They recount the President's efforts to fire Mueller and to falsify evidence about that report, about that effort, the President's efforts to limit the scope of Mueller's investigation

to exclude his conduct, and the President's effort to prevent witnesses from cooperating with investigators probing him and his campaign.

Professor Fredrickson, do you find agreement with 1,025 prosecutors, the possibility of such?

Ms. Fredrickson.  Well, I have to say I've never been a prosecutor, but I think it's a very impressive list of some of our Nation's most illustrative prosecutors who have engaged in lengthy careers.  And I think -- I take what they say very seriously.  I think it is very important for this committee to go further and examine the allegations that were laid out in the Mueller report.

Ms. Jackson Lee.  Thank you.

And I ask the chairwoman to ask unanimous consent to place the statement by former Federal prosecutors, part of what I just read, 1,025 indicate that the President would be subject to felony charges if he was not the President of the United States.

Let me also make mention --

Ms. Scanlon.  Without objection.

[The information follows:]


******** COMMITTEE INSERT ********

Ms. Jackson Lee.  Thank you very much -- of H. Res. 396, Resolution of Investigation, Professor Gerhardt -- and welcome to all of you, by the way, thank you so very much for your presence.  It recounts -- it's under our rules 6 and 7 of House practices -- it is an instruction for the Judiciary Committee to investigate.  But included in the resolution, it indicates various elements of investigation, violation of the Foreign Emoluments Clause of the United States Constitution, violation of the Domestic Emoluments Clause of the United States Constitution, obstruction of justice, abuse of power, misfeasance in public office, malfeasance in public office, failure to protect the confidentiality of national secrets from enemies, foreign and domestic -- just a litany similar almost to one -- Articles of Impeachment.

But let me ask you this.  In your written testimony, you note that the theme that clearly emerges from early discussions of the scope of impeachable offenses are that they are not neatly delineated but depend on context and gravity, of which the responsibility of this is housed in the Judiciary Committee, and not all crimes are impeachable and not all impeachable offenses are crimes.

But I would ask you, is impeachment limited to criminal acts?

Mr. Gerhardt.  Not at all, Congresswoman.  In fact, it's important to understand that one of the most -- that a significant theme in the Constitutional Convention was that when the delegates thought of possible impeachable offenses, they were trying to figure out the

scope of them.  They never listed something that wasn't actually a crime; they listed things that were not crimes.  And, in fact, many impeachments have been based on things that are not crimes.

Ms. Jackson Lee.  I'm going to go on to another -- can a President be impeached for conduct related to improper exercise of his Article II powers, such as removing a subordinate Federal officer?  And let me add, would all communications between the President and, say, the Department of Justice always be protected, always be not subject to review or suggesting that they were inappropriate?

Mr. Gerhardt.  I think it's an overreach to suggest the President somehow can insulate all his communications with anybody from congressional inquiry.  That essentially makes the Presidency unaccountable.

Ms. Jackson Lee.  And so can he be impeached for the improper exercise of Article II?

Mr. Gerhardt.  Absolutely.

Ms. Jackson Lee.  And can the President be impeached at least partly on his conduct or her conduct before assuming office?

Mr. Gerhardt.  I believe if -- I've suggested both through my statement and other writings that I think a Presidency could be subject to impeachment for that.

Ms. Jackson Lee.  And, clearly, the Mueller report, in Volume I, has talked about a number of incidences dealing with the Russian intrusion into our elections that seemingly this administration and the Office of the President was involved in.

Mr. Gerhardt.  At the very least, this committee is entitled to look into things.  So you have got the Mueller report.  The Mueller report obviously contains a lot of different things, such as possible acts of obstruction of justice.  It's quite reasonable and legitimate for a committee -- for this particular committee to look at that and to ask whether or not more investigation is needed.

There is nothing in the Constitution that precludes the committee.  In fact, there's a lot in the Constitution that supports this committee looking at that material and deciding whether or not it does provide evidence of misconduct or whether or not it needs more evidence.

Ms. Jackson Lee.  I thank the chairwoman.  I yield back.

RPTR WARREN

EDTR ZAMORA

[10:16 a.m.]

Ms. Scanlon.  Okay.  Thank you.

The chair recognizes the gentleman from California.

Mr. McClintock.  I thank you, Madam Chairman.

Dr. Eastman, the more that comes out on the Mueller report, the more I become concerned that it appears to me that they couldn't make a legal case against the President.  So they decided instead to try to make a political case, and they did so by seriously misrepresenting the evidence that they had.  Give you a few examples.

The John Dowd conversation, the President's lawyer, calls Robert Kelner, Michael Flynn's lawyer.  The Mueller report quotes only a small portion of the conversation that leaves the impression that Dowd's trying to influence testimony.  It deliberately omitted a very large part of the conversation where Dowd made it absolutely crystal clear that it was not what he was suggesting.

Another example.  Konstantin Kilimnik is repeatedly referenced as a Russian Government operative in his interactions with Paul Manafort.  What Mueller knew but failed to mention in his report was that Kilimnik was, in fact, a U.S. intelligence asset.

There was an article just published in The Federalist.  It notes the recent developments in the Concord case that involves the Internet Research Agency, the internet troll farm at the center of the Russian

Government interference narrative.  The judge in that case asked
prosecutors to address also the specific tie to the Russian Government,
and the DOJ responded the report doesn't say that.  It was that next
day that Mueller held his press conference where he walked back the
linkage that he had made between the Russian Government and the internet
troll farms.

So I have to tell you, having reviewed some of the material behind
the report, I'm concerned this report seriously misrepresents the
supporting evidence that it's supposed to be based upon.  So I'd like
to hear your opinion of the nature of the report itself and what does
it say of the integrity of the report if exculpatory evidence was
deliberately omitted from that report.

Mr. Eastman.  Congressman McClintock, we've seen a number of
stories about the political biases of the members of Mr. Mueller's team
that have, you know, occupied our Nation's attention for some time now,
and I think one of the allegations that the President attempted to
obstruct judges was his alleged direction to White House Counsel Don
McGahn to notify Deputy Attorney General Rod Rosenstein to fire Mueller
because of his alleged conflict of interest.  And I think this is
critical and I think it may well full explain why we don't have in that
report some of the triggering events that led to the report that any
competent investigation would have explored.

And Department of Justice guidelines specifically say that people
ought not to be leading an investigation when they have
personal -- close, personal relationships with targets or key

witnesses of the investigation or with an organization of the investigation, and Mr. Mueller had both.  He had very close, personal relationships with FBI Director Comey who, of course, whose own leak of information to The New York Times is what triggered the appointment of Mr. Mueller in the first place and who was a key witness in one of the allegations against the President about, you know, can you see your way to letting the case drop against Mr. Flynn?  He suffered enough. He had a close relationship with Mr. Rosenstein who was a signer on one of the FISA warrants that triggered the whole Russia collusion story in the first place.

Those things alone ought to have forced Mr. Mueller to recuse himself because they are conflicts of interest that would have not led to his appointment under Department of Justice guidelines in the first place.  For the President as the top national executive to raise the question about those conflicts is not obstruction of justice; it's doing his job.  If he had said, because of that conflict, we're going to shut down the whole investigation because I don't like it going after me, then you might have had obstruction of justice, but that's not what we have here.

And the perpetuation of this myth is rising to the level of farce, and it is distracting, not only the President and the country domestically, but on the world stage.  In fact, we are perilously close to the ongoing proceedings here rising to this very same level that is why the Department of Justice has over a half a century twice concluded the President ought not to be indicted while he's in office.

They recognize that the impeachment proceeding is a necessary evil that would suffer those consequences but on things that are much more grave than we have at issue here.

Mr. McClintock.   Is it fair to say that this report was corrupted both by personal relationships and by political biases?

Mr. Eastman.   When you see the things that are omitted from it, that's the conclusion that one has to go.

Mr. McClintock.   And this is, so far, just the tip of the iceberg. They're dribbling out all the time and of grave concern.

Mr. Eastman.   And I think when Mr. Horowitz' full IG report comes out on the origins of this thing, I think we're going to be shocked to learn how much more there is.

Mr. McClintock.   Thank you.

Ms. Scanlon.   The chair recognizes the gentleman from Tennessee for 5 minutes.

Mr. Cohen.   Thank you, Madam Chair.

Firstly, I'd just like to comment the question about exculpatory evidence being put in and questioning Mr. Mueller's compliance. Mr. Mueller made clear that he did not suggest the President should be indicted or was indicted because of the OLC's opinion that he couldn't be indicted.   That's pretty much dealing -- taking exculpatory evidence when you put that in.   We're not indicting him because we can't do it, not because we didn't find evidence of criminal activity; and if we did, we would have said so.   So that's firstly.

And, secondly, the question about his closeness to Mr. Rosenstein

and Mr. Comey.  He was also close to Mr. Barr.  So maybe Mr. Barr shouldn't have taken the job.

Although existing regulations governing the appointment and removal of a special counsel already provides some limitations on the removal of the Attorney General, those can be rescinded or modified because they're the Attorney General's regulations.  They can modify those protections against unwarranted removal.

The chair has introduced a bill, H.R. 197, that's called the Special Counsel Independence and Integrity Act, which would codify those protections and would permit the special counsel who believes his or her removal was unlawful to contest that removal in court.

Ms. Fredrickson, what are the benefits of enacting the current protections that the Department has for unwarranted removal of a special counsel and make them statutory law?

Ms. Fredrickson.  Thank you so much for the question.  So, I mean, I think there are a number of benefits, and one is it's clear that the Attorney General could repeal the existing regulations, and there was quite a bit of worry that that might happen.  I know -- I believe Senator Graham on the Senate side has introduced a partner to this legislation for the very same reasons, that the regulations lay out some important protections for the independence of the special counsel but they're not enough because they're not actually insulated from action by an Attorney General who might himself want to see, or herself, want to see an investigation curtailed.  So I think it's an important piece of legislation to consider.

I did also just want to go back to the prior question regarding the factual disputes and the accusation that Special Counsel Mueller was biased and omitted important information.  You know, I don't want to speak to that, but I do want to say it seems to me that that's actually an extremely strong reason, if people believe that, to want to get as much of this information into the public hands as possible but certainly into for this committee to review.

Mr. Cohen.  I'm sure we'll do that.

How would providing a special counsel a private right of action to contest his or her unlawful removal deter some of the conduct described in the Mueller report?

Ms. Fredrickson.  Well, I mean, I think that, you know, to have some kind of a legal recourse to ensure that a special counsel isn't removed for less than good cause, I think, is an important mechanism to protect that authority and to protect the integrity of an investigation that might be necessary.

Mr. Cohen.  And then maybe some of the instances that were cited in the report that might amount to obstruction of justice wouldn't have occurred because they would have known that they could -- Mr. Mueller could have gone to court to contest those in an open hearing.

Ms. Fredrickson.  Absolutely.  And I think Mr. Mueller laid out numerous examples of where he was thwarted along the way and was threatened that if he had had some additional legal recourse --

Mr. Cohen.  And let me ask.  We're going to run out of time. You've read the Mueller report, have you not?

Ms. <u>Fredrickson.</u>  Yes.

Mr. <u>Cohen.</u>  All right.  How many instances of obstruction of justice do you believe were shown where all three elements of obstruction of justice were met?

Ms. <u>Fredrickson.</u>  Well, I think the report itself describes it in extremely good detail, but there are certainly several examples dealing with the efforts to get the White House Counsel to fire Mr. Mueller.

Mr. <u>Cohen.</u>  That's one.  And then telling Mr. McGahn to lie about it?

Ms. <u>Fredrickson.</u>  Telling him to lie about it and to tell him to create a fake paper trail.  I think all of those are --

Mr. <u>Cohen.</u>  What are some others?

Ms. <u>Fredrickson.</u>  The effort -- the removal of the FBI Director. There are --

Mr. <u>Cohen.</u>  Asking Mr. Sessions to unrecuse himself?

Ms. <u>Fredrickson.</u>  Exactly.  Or asking Corey Lewandowski to go to the Attorney General to tell him to resign, holding the resignation letter for future use.

Mr. <u>Cohen.</u>  So you don't have a specific number.  That's at least four or five.  Do you think there are seven or eight or four or five or 10, or how many do you think there are?

Ms. <u>Fredrickson.</u>  Well, you know, I think that is something for this committee to consider is --

Mr. <u>Cohen.</u>  Thank you.

Professor Gerhardt, do you have an opinion on how many there are?

Mr. Gerhardt.  I'm sorry.  I missed part of the --

Mr. Cohen.  How many cases of obstruction of justice were in the Mueller report that you think all elements were met?

Mr. Gerhardt.  While I've read it, I can't say off the top of my head how many instances there are, but I do think it's important to recognize that there is certainly evidence of possible obstruction in there.  There's no question about that.

The report doesn't exonerate the President.  Instead, it actually suggests at several moments that one of the processes that's important to consider, given the limitations the prosecutor felt that were imposed on him, was for Congress or this committee to look into possible evidence of misconduct.  That's perfectly within the power and legitimacy of this committee.

Mr. Cohen.  Thank you.

And I yield back the time I do not have.

Ms. Scanlon.  Thank you.

The chair recognizes the gentleman from Texas for 5 minutes.

Mr. Gohmert.  Thank you.  I appreciate y'all being here.

Dr. Eastman, in looking at page 2 -- well, it's page 2 because you had a cover sheet, but talks about you're not -- you implied -- you're talking about the title of this hearing, that the Mueller report identified Presidential misconduct that would trigger whatever constitutional process might have been available.  As a factual matter, I could not disagree more.  I don't find anything

remotely rising to the level that would trigger the one constitutional path designed to address Presidential misconduct, namely impeachment.

But I want to take you back to the prior administration, something that was called Fast and Furious.  We know crimes were committed.  We had people within our Justice Department who forced people to sell guns that we knew the sales constituted a crime because we knew they were going to end up in criminal hands, and they were required to do it and we know at least one Federal agent was killed as a result.  Somebody somewhere in the Justice Department had to say, we're not going to -- we're not going to prosecute that.  We're not going to investigate it.  We know what happened.  And, of course, some of us here that reviewed e-mails that were disclosed, made public thanks to Judicial Watch, there were crimes being committed and nobody prosecuted.

During the Clinton administration, my U.S. Attorney friends back in Texas were telling me they'd been given -- and I couldn't tell you, some of them -- I couldn't tell you whether they vote Democrat or Republican, but I know they cared about justice.  But they were saying they'd been directed, let's back off of the pursuit of drug crimes.  Let's start pursuing white-collar crime.  They got that directive.

Somebody within the Department of Justice who knew there were crimes, drug crimes being committed with regard to Fast and Furious, knew crimes were committed and at least one Federal agent died, had directed, we're not going to pursue those.  Just leave them alone.  This is where we want to concentrate, because obviously, no Department

of Justice can pursue every single crime.

In your opinion, just knowing what we know from the public information, would you say Eric Holder or President Obama, his boss, obstructed justice?

Mr. Eastman.  Congressman, I think there's an important distinction to be made here --

Mr. Gohmert.  Exactly.

Mr. Eastman.  -- between prosecutorial discretion and shielding high-ranking officials.  I've outlined in my testimony several other examples --

Mr. Gohmert.  But the drug -- shifting from drug prosecution to white-collar crime, that's prosecutorial discretion.

Mr. Eastman.  That's right.  But preventing an investigation in order to shield the person that committed the crime because he was a high-ranking official or to alter the FBI investigative report on the advent of the email personal server and Hillary Clinton's conduct, to remove the language of one of the elements of the crime, I think that rises to obstruction of justice rather than prosecutorial discretion.

Mr. Gohmert.  So you're talking about when James Comey eliminated the mental state necessary --

Mr. Eastman.  The -- he said mental state was an element; it was not.  The FBI original draft of the report called it gross negligence, which is an element of the crime.  He changed that language in order to avoid the element of the crime.  That's not prosecutorial discretion.  I think those things do rise and have an intent to obstruct

or interfere with the investigation.

Mr. <u>Gohmert.</u>  Well, that brings up another issue.  You know, Mueller was required to -- or we know -- I'm not supposed to really get into the scopes memos I've reviewed, but -- well, at least some of them.  But we know publicly he was allowed to pursue things that -- crimes that came to his attention during the investigation.

Hillary Clinton's emails, private server, disclosure of classified information, those surely came to his attention.  He would have been authorized, just from what you know publicly, to pursue and investigate Hillary Clinton, would he not?

Mr. <u>Eastman.</u>  Well, he would.  And even more directly, the use of campaign funds funneled through a law firm illegally, not reported to the Federal Election Commission, to pay for the Steele dossier, which we now know had as his sources high Russian-level officials that triggered the entire narrative, that certainly was within his jurisdiction, and that's not investigated at all.

Mr. <u>Gohmert.</u>  Yes.  Well, I appreciate the effort that you took. I know all three of you got paid well for being here today.

Mr. <u>Eastman.</u>  I missed that.

Mr. <u>Gohmert.</u>  And for those that don't know that, didn't get paid at all.  But thank you all for the time you took to prepare.  Thank you.

Ms. <u>Scanlon.</u>  The chair recognizes Mr. Johnson from Georgia --

Mr. <u>Johnson of Georgia.</u>  I thank the chairwoman.

Ms. <u>Scanlon.</u>  -- for 5 minutes.

Mr. <u>Johnson of Georgia.</u>   And I've heard more and more Republicans starting to pronounce Director Mueller's name as Mueller.  I've been hearing that over the past few weeks.  Is that some kind of Republican attempt to somehow besmirch Director Mueller?  Dr. Eastman?

Mr. <u>Eastman.</u>  No.  Maybe it's bit of my German heritage.  My mother's maiden name was Stein, and the Mueller is the German pronunciation.

Mr. <u>Johnson of Georgia.</u>  It's Mueller, and I've heard so many people saying Mueller on the other side.  It just seems like there's something that -- there's some kind of secret memo flowing out there.

But, listen, you are a -- an officer.  You are the chairman of The Federalist Society's Federalism & Separation of Powers Practice Group, are you not?

Mr. <u>Eastman.</u>  I am, Congressman.

Mr. <u>Johnson of Georgia.</u>  And so there's no doubt that you are a Republican or perhaps a Libertarian, but I suspect more Republican.

Mr. <u>Eastman.</u>  The Federalist Society is a nonpartisan organization.

Mr. <u>Johnson of Georgia.</u>  And it raises about $20 million a year for its various purposes, correct?

Mr. <u>Eastman.</u>  I've not looked into the budget of the Federal Society.  I'm a chairman of one of its practice groups.

Mr. <u>Johnson of Georgia.</u>  I understand.

Mr. <u>Eastman.</u>  And I should say that I'm not here speaking on behalf of The Federalist Society.

Mr. <u>Johnson of Georgia.</u>  Certainly.  Certainly.

And you're familiar with Director Mueller and his reputation.
You know that he is a former Marine officer, that he has practiced law
both in government, outside of government, former U.S. attorney,
United States Assistant Attorney General for the Criminal Division,
a homicide prosecutor in Washington, D.C.  He's been the Acting United
States Deputy Attorney General and he's been appointed to
Senate-confirmed positions by Presidents George Herbert Walker Bush,
Bill Clinton, George W. Bush, and Barack Obama.  And he's a Republican
too.

You're familiar with that, right?

Mr. <u>Eastman.</u>  I know he's got a long resume.  I didn't know he
was a Republican.

Mr. <u>Johnson of Georgia.</u>  You didn't know he was a registered
Republican?

Mr. <u>Eastman.</u>  It doesn't matter on my criticism of the report.

Mr. <u>Johnson of Georgia.</u>  Well, I mean, a man of that kind of
distinction, you do -- you may disagree with some of the conclusions
that he reached, but you have no -- you have no problem with his
truthfulness and veracity, do you?

Mr. <u>Eastman.</u>  Congressman, I have a real problem with his
flipping the burden of proof in Part II of the volume.

Mr. <u>Johnson of Georgia.</u>  That's not my question.  My question,
you believe him to be a man of good character?

Mr. <u>Eastman.</u>  I don't know his character.  I've never met the

man.  I will say this --

Mr. <u>Johnson of Georgia.</u>  Let me ask --

Mr. <u>Eastman.</u>  -- he staffed his office with people --

Mr. <u>Johnson of Georgia.</u>  Let me ask this.

Mr. <u>Eastman.</u>  -- who had an obvious political bias, and that's troubling to me.

Mr. <u>Johnson of Georgia.</u>  Let me ask you this.  You're at a congressional hearing, the title of the hearing being about the various constitutional processes for addressing Presidential misconduct.

Now, certainly this hearing that we're having today, you don't think we're overstepping our bounds by having this hearing, do you?

Mr. <u>Eastman.</u>  I do.  I have never said that Congress doesn't have oversight authority.

Mr. <u>Johnson of Georgia.</u>  But, I mean --

Mr. <u>Eastman.</u>  But it can be abused, and I think --

Mr. <u>Johnson of Georgia.</u>  For this hearing, you think that we're overstepping?

Mr. <u>Eastman.</u>  I do.  This matter has become a farce.

Mr. <u>Johnson of Georgia.</u>  Well, question --

Mr. <u>Eastman.</u>  It has become a farce.

Mr. <u>Johnson of Georgia.</u>  Question asked and answered.  Okay.  Thank you.

Let me ask Professor Gerhardt.  Sir, in your written testimony, you note that the theme that clearly emerges from early discussions of the scope of impeachable offenses are that they are not neatly

delineated but depend on context and gravity, and that you say also that not all crimes are impeachable and not all impeachable offenses are crimes.

I want to ask you this question:  Is impeachment limited only to criminal acts?

Mr. Gerhardt.  Not at all.  If you'll allow me, I just want to make sort of two points to clarify a couple of things.  The first is I've not been paid at all.  I've got three kids, one in college.  It would be great, you know, but --

Mr. Johnson of Georgia.  You're not being paid either to be here, right?

Mr. Gerhardt.  I'm not being paid to come here.  I'm not being paid to be here.  It's an honor.

The second point I just want to make is that kind of follows a little bit from what you've just suggested is a concern I have, and that is if the President -- and I think that concern has been sort of overshadowed by the efforts to deflect the attention away from the purpose of this hearing.

But if the President of the United States can remove the special prosecutor, not comply with lawful subpoenas, and is immune to criminal prosecution while he's in office, that's the definition of being above the law.

Mr. Johnson of Georgia.  Thank you.

And I yield back.

Ms. Scanlon.  And the chair recognizes the gentleman from

Virginia for 5 minutes.

Mr. <u>Cline.</u>   Thank you, Madam Chair.

And I want to thank our witnesses for taking the time out of their schedules, without pay, to be here today to participate in this exercise.   I want to also apologize to them because this is little more than an attempt, a blatant attempt to keep on life support this ongoing impeachment by any other name.   And as you can see from the audience, which is half full and the committee which is half full, I'm -- there are other things going on on the Hill today that are of importance as well.   There's a hearing about the border that is down the hall.   I think that is a critical issue about the humanitarian crisis going on at the border.   I would like to see this committee use its jurisdiction to look into the humanitarian crisis that's going on at the border.

I see the TV cameras here, and I want to apologize to people at home who've tuned in and think they're looking at a repeat of a past hearing because, no, it's not a repeat.   It's just the same pundits, journalists, and academics here opining about Volume I or Volume II of the Mueller report, not moving the ball forward at all, just really spinning the wheels of this committee, using up time and using up resources to come to no conclusion, other than the fact that the Democrats want to impeach this President but they don't have really enough to go on in the Mueller report.   And there are other issues that are of primary importance facing this country that are being addressed by other committees around this Congress.

And as a member of this committee, I worked hard to get on this

committee.  It is very disappointing to me that we continue just to spin the wheels of this committee.

So, Professor Eastman, I will ask you, as a former prosecutor, I was very confused by Volume II and the Mueller report, 400 pages of no charges, no recommendations for charges.  Robert Mueller determined he could not exonerate President Trump of the allegations that he obstructed justice.

I've never seen this as a prosecutor.  Have you ever seen a prosecutor use that line of logic?

Mr. Eastman.  No, I haven't.  And that's my fundamental disagreement with Part II.  It reassigns the burden of proof to the object of the investigation having to prove his innocence, rather than the prosecutor having to demonstrate guilt beyond a reasonable doubt.  And that violates one of our most fundamental precepts of fairness and justice in the criminal justice system, the presumption of innocence.

For him to have said that the President couldn't convince me he didn't do any of this, when his job was to determine whether he had enough information to bring an indictment or to present to this body things that would lead to either an impeachment or a post President-in-office indictment, that's what his job was.  And I think that is the greatest flaw in Volume II of the Mueller report.

Mr. Cline.  So in our systems, prosecutors either indict or not indict, and leave it at that.

So Mueller here is putting the burden on the President to prove his innocence instead of the burden being on Mueller to prove his guilt.

Professor Eastman, can a President obstruct justice by simply exercising his Article II powers?

Mr. <u>Eastman.</u>  That's a close question.  The reason it's close and the reason I'm hesitating and not giving you an unqualified no is if the President exercised his powers with a deliberate intent to prevent -- but we have no evidence of his intent here at all.  What we do have is documented in the report itself, things like, can you clear the way to let Flynn go because he suffered enough.  That's perfectly within the President's authority, and there's no even hint of bad intent there.  Can you get rid of Mueller because of his conflicts of interest?  No bad intent; that's clearly within the President's authority.

Mr. <u>Cline.</u>  When Bill Clinton tried to alter witness testimony before a grand jury, that --

Mr. <u>Eastman.</u>  That had the necessary intent and was rightly troubling.  Deliberately changing an FBI report to remove an element of a crime of trafficking into classified information in order to shield the Presidential candidate I prefer, that's an obstruction of justice with the requisite intent.

Mr. <u>Cline.</u>  Section 4 of Article II says the President, Vice President, and all civil officers of the United States shall be removed from office on impeachment for and conviction of treason, bribery, or other high crimes and misdemeanors.

Do you see anything in Volume II that rises to that level?

Mr. <u>Eastman.</u>  I do not, because I don't see anything in there that

demonstrates a requisite intent that would otherwise alter the President's perfect authority to control the executive branch.

Mr. Cline.  Thank you.

I yield back.

Ms. Scanlon.  The chair recognizes the gentleman from Florida for 5 minutes.

Mr. Deutch.  Thank you, Madam Chairman.

Thanks to all the witnesses for being here.

Mr. Gerhardt, your testimony describes several categories of formal remedies for Presidential misconduct:  congressional oversight activities, impeachment, censure, election, civil suits, criminal trials.

Was Special Counsel Mueller able to pursue any of these remedies for potential misconduct by President Trump?

Mr. Gerhardt.  No, he was not.  He was not in the sense of being able to do anything more than issue his report.

Mr. Deutch.  His investigation, just to be clear, was a criminal investigation, right?

Mr. Gerhardt.  Right.  It certainly was, yes.

Mr. Deutch.  And if he found criminal wrongdoing by the President, could he pursue a trial?

Mr. Gerhardt.  He could, or he might have thought he might be able to, but he was also -- he also plainly felt, as he said, that he was restricted by Department of Justice policy on this.

Mr. Deutch.  Well, he said he was restricted by the OLC policy,

didn't he?

Mr. Gerhardt.  Right.  That's what I'm saying, yeah.

Mr. Deutch.  Right.  So Presidential misconduct uncovered by Mueller didn't come with an inherent remedy, did it?

Mr. Gerhardt.  No, it did not come with an inherent remedy.

Mr. Deutch.  So the Mueller report itself, the Mueller report itself was never going to hold the President of the United States accountable?

Mr. Gerhardt.  That is absolutely true.  And, in fact, a couple of times, a couple of key times when discussing obstruction of justice, he mentions Congress.

Mr. Deutch.  Right.  So if -- exactly.  So, Mr. Gerhardt, if the special counsel cannot hold the President accountable, who can?

Mr. Gerhardt.  The answer is nobody.

Mr. Deutch.  Nobody can hold the President accountable?

Mr. Gerhardt.  Well, that is to say if the President -- I may have misunderstood.

Mr. Deutch.  Mr. Gerhardt, Congress can hold the President accountable, can't it?

Mr. Gerhardt.  Of course.  And I just --

Mr. Deutch.  Right.  I just wanted to clarify that.

Mr. Gerhardt.  Yeah.

Mr. Deutch.  Ms. Fredrickson, in your testimony, you note that special counsel couldn't exonerate President Trump, but he also couldn't proceed with a criminal remedy because he accepted the OLC

policy that a sitting President cannot be indicted.

Without those options, what did Mr. Mueller do in his report?

Ms. Fredrickson.  Well, I think he did the appropriate thing, which was to refer to Congress to pursue its constitutional processes, which is, in fact, what this committee is doing now.

Mr. Deutch.  Right.  So you -- he conducted the investigation. He preserved evidence.  He provided analysis of that.  And then, as you quote from the report and as you've just said now, the separation of powers doctrine authorizes Congress to protect official proceedings including, those of courts and grand juries, from corrupt, obstructive acts, regardless of their source.  Further, Special Counsel Mueller closes Volume II by stating, and I quote, the protection of the criminal justice system from corrupt acts by any person, including the President, accords with the fundamental principle of our government that no person in this country is so high that he is above the law.

Ms. Fredrickson, do you read these sections of the report as a referral to Congress to pick up where Mr. Mueller left off?

Ms. Fredrickson.  Well, I certainly read it as a -- as saying to Congress that there is important -- this was -- these allegations are incredibly disturbing, indicate actions by the President and his associates that are very destructive to rule of law and that Congress needs to examine.  I think it has a congressional duty to --

Mr. Deutch.  Thank you very much.

Mr. Gerhardt, on May 30, President Trump said he can't be impeached because there was no crime.  It appeared he was suggesting

that he would need to be found guilty in a criminal trial in order to be impeached.

Is that how impeachment works?  Is that what impeachment requires?

Mr. Gerhardt.  Impeachment --

Mr. Deutch.  Yes or no.

Mr. Gerhardt.  Impeachment does not require what the President said.

Mr. Deutch.  Right.  And you described, in fact, how the Framers thought of high crimes as violations of public trust and violations of a duty to our society.  Some have argued the President can't commit the crime of obstruction of justice when he's exercising his Article II powers.  We've heard that here today.

Regardless of the merits of that argument in a criminal trial, isn't the corrupt use of power exactly the sort of abuse that the Framers and historical Presidents show qualified as a high crime?

Mr. Gerhardt.  Absolutely.  That's why we have it.

Mr. Deutch.  Right.  So let me finish with this.

Professor Gerhardt, we heard that impeachment proceedings have begun without any formal vote for impeachment.  Who has the power to set the proceedings for this body, for Congress to implement a constitutional power such as impeachment?

Mr. Gerhardt.  Congress.

Mr. Deutch.  Right.  And do the House rules require a formal authorization of an impeachment inquiry?

Mr. Gerhardt.   Absolutely not.   It doesn't say that in any place.

Mr. Deutch.   Professor Gerhardt, does the United States Constitution require a formal authorization of an impeachment inquiry?

Mr. Gerhardt.   Absolutely not.   The words "impeachment inquiry" are not in the Constitution.

Mr. Deutch.   Thank you.

I yield back.

Ms. Scanlon.   Thank you.

The chair recognizes the gentleman from Louisiana for 5 minutes.

Mr. Johnson of Louisiana.   Thank you, Madam Chair.

Thank you to the witnesses for being here.

Mr. Gerhardt, over here on your right.   Yeah, sorry.   We've got a big committee.

You said in a recent interview with The New Yorker magazine that, quote, if the President has misled people, unquote, then it could be the basis for impeachment.

President Obama made a statement that became rather famous regarding ObamaCare, and he said, quote, if you like your healthcare plan, you can keep it, unquote.   It was famously called the lie of the year by PolitiFact.

So I don't mean this to be flippant.   I want to ask you a question about your intellectual consistency.   Is that an impeachable offense?

Mr. Gerhardt.   I would not say so, and it's partly because I think the President made a mistake.   Acting in good faith is pertinent to any impeachment inquiry.

Mr. <u>Johnson of Louisiana.</u>  Well, but didn't you just explain in your last set of answers here that a violation of the public trust is an impeachable offense?  I just heard you say that a few minutes ago.

Mr. <u>Gerhardt.</u>  That's true.  Absolutely true.

Mr. <u>Johnson of Louisiana.</u>  So is that not a violation of the public trust when half of America relied upon that great promise?

Mr. <u>Gerhardt.</u>  I don't think I would say it violated public trust. I think you need two things at least.  One is you need to have -- be doing a bad act.  That's one of the things required.  But the other is you need to have bad intent.  I think there are times when Presidents obviously are mistaken.  I don't think that was a deliberate falsehood at all.  I think that an inquiry would be justified any time that this committee or the House has concern about whether or not the President had said or done something with bad faith and that was a bad act.

Mr. <u>Johnson of Louisiana.</u>  Okay.  In a 1999 article that was entitled, The Lessons of Impeachment History, you quoted Alexander Hamilton in Federalist 65, and you wrote, quote, in the Federalist No. 65, Alexander Hamilton warned that impeachments often would begin in a partisan atmosphere.  Consequently, Hamilton counseled the further along an impeachment proceeded, the more that Members of Congress needed to find a nonpartisan basis on which to resolve the proceedings, unquote.  That's what you wrote.

Mr. <u>Gerhardt.</u>  Yes.

Mr. <u>Johnson of Louisiana.</u>  The Mueller report, of course, has been out for almost 3 months.  As of June 30, there were 79 elected

Democrats calling for impeachment and zero Republicans.  Our friend, Representative Amash, is now a registered Independent.

So the question is, if this body were to take Alexander Hamilton's advice, shouldn't impeachment be off the table at this point because there's no way that we find a nonpartisan basis to proceed?

Mr. Gerhardt.  The answer is no.  And part of the reason for that is because if one party decides to obstruct something, that is to say, doesn't agree, can't find common ground, that can't hamstring the institution.

Mr. Johnson of Louisiana.  Wait a minute.  So are you suggesting the Republicans are obstructing this now?

Mr. Gerhardt.  I'm sorry if that's overstated, but the point is --

Mr. Johnson of Louisiana.  It's greatly overstated.  Thank you for acknowledging, yes.

Mr. Gerhardt.  But the point is that if -- it may or may not begin in a partisan atmosphere.  You need fact-finding.  You need investigation to determine the evidence and the gravity.

Mr. Johnson of Louisiana.  That's what we had with the Mueller report, right?  Two years and $30 million and endless resources to do this.  Didn't we have that?

Mr. Gerhardt.  Congressman, the Mueller report does not bind this committee.  It does not bind --

Mr. Johnson of Louisiana.  No, but that was begun in a nonpartisan manner.  He was famously the objective arbiter of all this.

Let me move on.

Mr. Gerhardt.  I don't think he was the supreme arbiter of this.

Mr. Johnson of Louisiana.  All right.  Well, I mean, we've known your true colors now when you say we're obstructing, so I guess --

Mr. Gerhardt.  I'm sorry for that phraseology.  But the point is that it can become a strategy, let's say, to be able to prevent bipartisanship by simply choosing not to go along if there are other political motivations for that.

Mr. Johnson of Louisiana.  I got it.  I'm just saying, based upon your earlier scholarship, Alexander Hamilton would want this farce to end.  Okay.

Ms. Fredrickson, on March 22, 2019, your group, the American Constitution Center, issued a press release entitled, quote, Mueller Report, How far up the chain did the Trump campaign's efforts to conspire with Russia go?  It quoted you.  And you said, quote, the question isn't whether members of the Trump campaign conspired with Russia to sway the 2016 elections.  We already know they did, unquote.

As you may know, conspiracy to commit an offense or to defraud the U.S. is a Federal crime under 18 U.S. Code, Section 371.  I just want to know if you can remind this committee which members of the Trump campaign were charged and prosecuted for conspiring with Russia.

Ms. Fredrickson.  Well, and first, I'd like to say that I think it's unfortunate that so many on your side of the aisle don't seem to want to get to the bottom of what happened in terms of the Russian interference in our election.

Mr. Johnson of Louisiana.  To the contrary.  To the contrary. Just answer the question.

Ms. Fredrickson.  And that all of our intelligence agencies have indicated that there was sweeping attacks on our elections, that they were renewed in 2018 with some impact, and that there are anticipated attacks in 2020.

Mr. Johnson of Louisiana.  So you disagree with the Mueller report's findings, Volume I?

Ms. Fredrickson.  I think there is much more work for this Congress to do to understand what Russia has attempted, what they were successful at, and what they're planning.

Mr. Johnson of Louisiana.  I got it, but I'm out of time.  But just to follow up on that.  So with all the vast resources, the $30 million, the endless supply of investigators, the 500 witnesses, everything that the Mueller report had, did, and was involved in for 2 years, you think there's yet more for the people on this --

Ms. Fredrickson.  I do.

Mr. Johnson of Louisiana.  -- dais to dig into, right?

Ms. Fredrickson.  I do.  I think there were many people who had destroyed evidence.  There were people who Mueller was not allowed to interview.  And so I do think there's -- I mean, look, I'm deeply worried about the integrity of our elections, and I hope Congress is as well.

Mr. Johnson of Louisiana.  Well, I'm deeply worried about the integrity of your organization.

Ms. <u>Scanlon.</u>  The gentleman's time has expired.

Mr. <u>Johnson of Louisiana.</u>  I'm out of time.  I yield back.

Ms. <u>Scanlon.</u>  The chair recognizes the gentleman from Rhode Island for 5 minutes.

Mr. <u>Cicilline.</u>  Thank you, Ms. Fredrickson, for your last comment.  I know there are many on this committee who share your concern and frustration with the obstruction from our colleagues on the other side of the aisle.  And I think if Alexander Hamilton, great Founder who my friend mentioned, were alive, they would be appalled, frankly, at the conduct of this committee and their unwillingness to take on these very serious issues.

So I thank the chairman for convening this hearing on this very important question.

The hearing is entitled, Lessons from the Mueller Report: "Constitutional Processes for Addressing Presidential Misconduct."

Ms. Fredrickson, could you tell me what is the principle constitutional process available for addressing Presidential misconduct?

Mr. <u>Eastman.</u>  I'm sorry.  Was that addressed to me?

Mr. <u>Cicilline.</u>  No, it was addressed to Ms. Fredrickson.

Ms. <u>Fredrickson.</u>  Well, I mean, there -- Article I lays out Congress' authorities.  And they're multiple, but certainly the legislative power includes oversight as an essential part of it.  But also in Article I is the power to impeach.  Those tools are not alternative.  They're --

Mr. <u>Cicilline.</u>   And is it fair to say impeachment is the principal process to address Presidential misconduct?

Ms. <u>Fredrickson.</u>   I think it's one of the processes.   I don't think that -- I think there's more of a continuum.   As I mention in my testimony, during the Nixon -- during the Watergate hearings, there was actually -- almost a year went by before there was a referral to the full House for a vote on the articles.   So I think it's hard to separate, I would say.

Mr. <u>Cicilline.</u>   Okay.   Professor.

Mr. <u>Gerhardt.</u>   I agree.   I think that I agree with everything she just said.   I believe that it is completely within the discretion of this committee and the power of this committee to be able to, not just read the Mueller report, but to ask the very reasonable question whether we need to know anything else in order to undertake the constitutional responsibilities we have.

Mr. <u>Cicilline.</u>   And related to that, many of our -- many of our -- Congress' ability to hold the President accountable rely on the executive branch providing Congress with information that it needs to legislate, to conduct oversight, or to consider remedies like impeachment or censure.

Could you begin, Ms. Fredrickson, to describe generally what the Supreme Court has said about Congress' power to conduct investigations and to collect documents and testimony, including by use of subpoena, how the Court has described our power in that context?

Ms. <u>Fredrickson.</u>   The Court has been -- has used very sweeping

language to describe Congress' power.  Again, it's inherent and the legislative power is the power to conduct oversight and investigations.

Mr. <u>Cicilline.</u>  And the Court has, in fact, said the power to secure needed information is an attribute of the power to legislate, which is a core function of Congress.

Ms. <u>Fredrickson.</u>  Well, exactly.  I mean, Congress would not know how to respond to statutory gaps if it can't examine what the statutory gaps are.

Mr. <u>Cicilline.</u>  And the perils of Congress being unable to do its constitutionally required work if an executive branch decides to prevent witnesses from coming forward or to instruct witnesses not to cooperate or to not make the documents available is significant.

Professor, would you speak a little bit about, Professor Gerhardt, what the consequences of that would be for Congress?  I mean, we have a President, for example, who's told -- said publicly that he is going to fight all efforts by Congress to get information, that he's going to tell witnesses not to come and defy subpoenas.  What are the implications of that?

Mr. <u>Gerhardt.</u>  Well, they're not good.  I mean, the implications of that is, at the very least, Congress should be concerned. Obviously, this committee should be concerned.  And this committee is acting perfectly reasonably to consider what evidence -- I don't know if this has been put forward in the report or anywhere else.  If I may, can I read one sentence from the report from Mr. Mueller that just goes along these lines?

He says, with respect to the President -- with respect to whether the President can be found to have obstructed justice by exercising his powers under Article II of the Constitution, we concluded that Congress has authority to prohibit a President's corrupt use of his authority in order to protect the integrity of the administration of justice.

Congress has that authority.   This committee has that authority.

Mr. Cicilline.  So we have had a number of examples, both with respect to the White House Counsel Don McGahn and the former White House Communications Director Hope Hicks, where the White House asserted something called -- that they claim is absolute immunity, which is basically our right to prevent you from hearing anything relevant from these witnesses.

Would that sort of obstruction that we're seeing in an effort to prevent witnesses from appearing before the committee or producing documents in and of itself be an appropriate basis for an article of impeachment against a President, if proved?

Yes, Ms. Fredrickson.

Ms. Fredrickson.  Well, I think if you look again at the Nixon impeachment, you'll see that that exact kind of obstruction formed one of the articles in that.

Mr. Cicilline.  And, Professor Gerhardt.

Mr. Gerhardt.  Clearly, the Constitution allows this body and this committee to consider whether or not obstruction's happened. It's just important to really emphasize that it doesn't have to be a

technical violation of a statute.  It still may be a problem if the President obstructs justice in any way.

Mr. Cicilline.  Thank you.

I yield back, Madam Chair.

Ms. Scanlon.  The chair recognizes the gentleman from California for 5 minutes.

Mr. Lieu.  Thank you, Madam Chair.

Ms. Fredrickson, you were asked earlier a question about Russia. So for Special Counsel Mueller's investigation, 34 individuals were indicted.  Isn't that correct?

Ms. Fredrickson.  Yes, that's correct.

Mr. Lieu.  And at least eight have either pled guilty or been convicted.  Isn't that correct?

Ms. Fredrickson.  That's correct.

Mr. Lieu.  And the Mueller report identifies that Paul Manafort gave internal polling date to the Russians.  Isn't that correct?

Ms. Fredrickson.  That's correct.

Mr. Lieu.  And the Mueller report also shows numerous contacts between Russians and Trump campaign officials.  Isn't that correct?

Ms. Fredrickson.  That's correct.

Mr. Lieu.  And a fair reading of Volume I of the report would be that the Trump campaign knew about the Russian interference, welcomed it, embraced it, gave them internal information, and knew it was going to help Donald Trump win the election.  Isn't that correct?

Ms. Fredrickson.  That is correct.

Mr. <u>Lieu.</u>  Okay.  Let's move to Volume II now which focuses on obstruction of justice.  In the Nixon impeachment hearings, the first article of impeachment, what was that on?  It was obstruction of justice, wasn't it?

Ms. <u>Fredrickson.</u>  It was obstruction, yes.

Mr. <u>Lieu.</u>  All right.  Obstruction of justice, certainly under the Nixon hearings, was important enough to be the very first article of impeachment.  So if there was obstruction of justice related to Donald Trump, that would also certainly qualify as important enough to be an article of impeachment if it was established, correct?

Ms. <u>Fredrickson.</u>  It certainly could be.

Mr. <u>Lieu.</u>  Okay.  Let me talk to you now, Professor Gerhardt, about the obstruction we're seeing from the Trump administration to congressional oversight investigations.  And it's not just on the Mueller report; it's on everything.  So we want to know, for example, why is the Trump administration supporting the lawsuit to eliminate healthcare coverage for Americans with preexisting conditions?  We can't get that information.  We wanted to know why did Trump officials lie about the census?  We couldn't get that information.  We can't even get witnesses simply to show up here even under subpoena.

And the Trump administration is asserting something called absolute immunity.  No court has ever found that, correct?

Mr. <u>Gerhardt.</u>  No court has ever found that the President has kind of absolute immunity you're talking about, no.

Mr. <u>Lieu.</u>  Okay.  So given the assertions of this sort of fake

immunity, do you agree that if these witnesses don't show up, they would be subject, not just to the lawful subpoena, but also to any potential other consequences, and that they themselves would be liable for not showing up?

Mr. Gerhardt.  Absolutely.  And the committee and the chair have the power to issue subpoenas.  Subpoenas are lawful orders.  And it's a question of whether or not they're complying with the law when they're considering whether or not to comply with the subpoena.

Mr. Lieu.  Okay.  And then let's talk specifically again about obstruction of justice.  The Mueller report lays out multiple instances of obstruction of justice.  And then the special counsel goes, all right, here's three elements to establish obstruction of justice.  And in multiple cases, he shows that there's significant evidence of all three elements.  Isn't that correct?

Mr. Gerhardt.  Right.

Mr. Lieu.  And on the issue of intent, you can certainly infer intent from the very words of Donald Trump.  Isn't that right?

Mr. Gerhardt.  Well, you can infer intent from words, from circumstances, from context.

Mr. Lieu.  And when Trump fired Comey, he stated that he was receiving great pressure from the Russia investigation and that that pressure's been taken off.  That's certainly evidence of intent, isn't it?

Mr. Gerhardt.  It's perfectly reasonable to wonder about what's going on when he says something like that, yes.

Mr. <u>Lieu.</u>  When the President goes on national TV and says he fired Comey because of the Russia thing, that's certainly evidence of intent, isn't it?

Mr. <u>Gerhardt.</u>  It could be evidence of intent, absolutely.  It's certainly the statement of something that sounds like obstruction.

Mr. <u>Lieu.</u>  When the President orders one of their senior officials to create a fake document, that's certainly evidence of intent?

Mr. <u>Gerhardt.</u>  I'm sorry.  I missed that.

Mr. <u>Lieu.</u>  When the President orders one of his officials to create a fake document, that's certainly evidence of intent, isn't it?

Mr. <u>Gerhardt.</u>  Yeah, that's -- that's hugely problematic.  And, one, it's obstruction.  And I might also go further to say that one of the consequences of vesting the President with so many entitlements, such as absolute executive privilege, absolute immunity, means that if there's any delay that relates to something criminal 4 years or longer, what happens to the evidence?  That's a tremendous concern.  And so that's why I have argued that I don't think the President's immune to the criminal process or other processes.

Mr. <u>Lieu.</u>  And in the Mueller report, Special Counsel Mueller doesn't even put out any burden of proof.  He doesn't shift the burden.  He simply says, because I could not indict under the DOJ policy, I'm not going to make that prosecutorial judgment.  Isn't that right?

Mr. <u>Gerhardt.</u>  That's correct.

Mr. <u>Lieu.</u>  I yield back.

Ms. Scanlon.   The chair recognizes Mr. Raskin for 5 minutes.

Mr. Raskin.   Madam Chair, thank you very much.

Professor Gerhardt, let me start with you.   Why does the Congress have the power to impeach the President but the President doesn't have the power to dissolve the Congress or to impeach individual Members? Why does the Congress have the power to impeach justice in the Supreme Court but they don't have the power to remove Members of Congress?

Mr. Gerhardt.   Well, that's all part of checks and balances. And, of course, Congress has the power, in part, because Congress is accountable politically.

Mr. Raskin.   Yeah.

Mr. Gerhardt.   And the idea is clearly behind those restrictions and is, as you well know, the effort to actually prevent the President or prevent the COURT from becoming all-powerful.

Mr. Raskin.   Do you agree with the rhetoric of coequal branches? Every time the President tramples another constitutional right or value or principle of separation of powers, one of my colleagues would get up and say, we're coequal branches, Mr. President.   Please pay attention to us.

Do you agree with that?

Mr. Gerhardt.   I do agree.

Mr. Raskin.   Before you go on, let me just say I disagree with it, and I want to tell you why.   And I don't think it's just because I'm a Member of Congress now.   When I was a professor of constitutional law, I disagreed with it.   That's not the way I see the Constitution.

The Preamble starts with, We, the people, in order to form a more perfect union, and so on, established the Constitution.   The very next sentence says, All legislative powers are vested in the Congress of the United States.

Then you get pages of description of what the powers of Congress are, and they are comprehensive.  We have the power to declare war, to regulate domestic commerce --

Mr. Gerhard.  Right.

Mr. Raskin.  -- international commerce.  We have the power to impeach.  We have the power to control the seat of government, post office, copyright, you name it.  All of it's in there.

Then for the President, the President is the Commander in Chief in times of actual conflict, and his job is to take care that the laws are faithfully executed.

So the reason I ask the question about impeachment is, don't we have the power to impeach the President because this is a representative democracy and Article I puts Congress first and the President works to implement the laws that we've adopted?

Mr. Gerhardt.  I think what you've said makes imminent sense. And I don't want us to be talking past each other.

Mr. Raskin.  Yeah.

Mr. Gerhardt.  I think that each branch, of course, is vested with certain powers, and no other branch can interfere or undermine those powers.

Mr. Raskin.  Right.  But I think at least it's constitutionally

important to note that it's Congress that has the power to impeach everybody else and they don't have the power to impeach the Congress --

Mr. Gerhardt.  Absolutely right.

Mr. Raskin.  -- because we are elected by the people.

Mr. Gerhardt.  That's correct.

Mr. Raskin.  I want to ask you, Ms. Fredrickson, a question about impeachment, about law and politics.  There's been a lot of confusion in the country about this.  Some people say, well, look, it's very clear that there were 9 or 10 episodes of Presidential obstruction of justice. It's very clear from everything that the special counsel wrote and from what he did in sending two letters of protest to the Attorney General for misstating and distorting the contents of the report and for -- from his having a press conference to come out and say the reason that we didn't indict the President was because of the DOJ policy that we can't indict the President.

So some people are saying it's very clear there's Presidential obstruction of justice.  Why doesn't Congress just go ahead and impeach?  And then others say, well, you know, it's not just a legal question.  It's a political question because it's invested with Article I, with Congress.  It's not in the courts.  The courts don't have the power to do it.  Congress has to do it.

And so Members of Congress have to take into account, with everything else we're doing, with the border crisis, with trying to lower prescription drug prices.  We've got to think about public opinion.  We've got to think about our districts.

Are those political considerations really proper and appropriate in terms of what Congress should think about?  Should we be trying to think about this just as judges or should we think about it in the context of everything else we're trying to do?

Ms. <u>Fredrickson.</u>  I think Professor Gerhardt did an excellent job of explaining the language in the Constitution, what are high crimes and misdemeanors.  And they're not necessarily crimes.  They could be crimes, but they could be other types of activity that might be fully lawful but might have really harmed the fabric of the Nation.  And so it's a judgment call, and it's one that Congress has to make, among all of its other responsibilities.

Mr. <u>Raskin.</u>  Okay.  Very good.

Professor Gerhardt, let me come back to you.  What about the role of public opinion here?  Some people have said, well, only 19 percent of the people supported impeaching Richard Nixon before the impeachment hearings got started.  Forty-six percent of the people support impeachment today, which is extraordinary given that we haven't formally launched impeachment inquiry.  He's never reached 50 percent in the polls.  He's the only President since World War II who never has gotten up to 50 percent in his approval ratings.

Some people say, take that into account.  The President has committed high crimes and misdemeanors.  He's a sitting duck, and we should take that into account.  Others say public opinion is irrelevant.  And lots of Republicans, the majority of the Republicans still oppose it.  We should take that into account instead.

What is the role of public opinion in this decision?

Mr. Gerhardt.  Well, it's a great question.  I think the role of public opinion is something, of course, that you should take -- you're fully entitled to take into account.  It makes imminent sense for that to happen.  At the same time, there are fiduciary duties within each Chamber of Congress to consider how to exercise their respective powers, and public opinion, hopefully, will support that.  That's what Congress, of course, hopes for.

But as in the Watergate situation, as you just mentioned, it took a year at least to be able to figure out through an investigation, with no help from the President, on whether or not he had committed any kind of misconduct.  And it's entirely possible that public opinion wouldn't necessarily support Congress or the House or any particular -- as it moves along, but the evidence might inform public opinion and it might turn around, just like it did with President Nixon.

Mr. Raskin.  Finally, I have a yes-or-no question.  Does anyone here think that the -- that President Clinton should have been impeached for what I consider a low crime and misdemeanor, lying about sex?  Does anybody think that he -- that the House was correct in impeaching him?

Mr. Eastman.  I think he was.  It was not a low crime.  It was --

Mr. Raskin.  So yes, you believe that.

Mr. Eastman.  It was obstruction of justice.

Mr. Raskin.  Let me follow up with you then, Mr. Eastman.

Ms. Scanlon.  Time's up.

The chair recognizes Mr. Armstrong for 5 minutes.

Mr. Armstrong.  Thank you.

And I think that line of questioning is interesting in a lot of different reasons.  One, I think that's where you get the distinction between political and legal, because I think lying under oath is lying under oath, and it's a political distinction as to whether or not it's a minor crime or a major crime, so -- and I think Mr. Raskin and I could have long esoteric debates about this issue in a different format.

But, Professor Eastman, just I want to go to the obstruction stuff because we were just talking about it a little bit.  Do you think any of the 10 potential episodes of obstruction outlined in the Mueller report constitute obstruction of justice?

Mr. Eastman.  I do not, because I don't think any of them demonstrate the necessary intent to obstruct.  I think they are all well within the President's Article II authorities.

Mr. Armstrong.  Well, and I have two different questions about that, and one starts with the Article II authority.  And, I mean, so when you're -- I mean, the answer is any President can't be guilty of obstruction just for exercising their Article II authority.  I mean, otherwise, we'd get into this whole separation of powers, and there's -- I mean, we all want the President treated like everybody else because that makes everybody sound, I mean, like it is, but there's actually real sound separation of powers and policy reasons why that's not the case.

So can you elaborate on that just a little bit?

Mr. <u>Eastman.</u>  I agree.  And I think the two OLC memos that I focus on extensively in my written testimony outline why that's the case. The President -- and I'll go back to something Mr. Raskin said.  The powers given to the Congress are enumerated.  The power given to the President is unenumerated.  It is the executive power, the entirety of it.  And the Framers of the Constitution did that deliberately because the system they had before that under the articles of confession -- confederation was not working because we did not have an energetic executive who could execute the law both domestically and deal with anything that arose on the international scene.  That's not a part of a legislative power; that is a core executive power.

Mr. <u>Armstrong.</u>  Well, and then that goes to why that memo exists. I mean, without that memo in place and the President getting indicted, can you explain, I mean, where we end up on separation of powers and how that would affect, I mean, essentially governing structure of the United States?

Mr. <u>Eastman.</u>  It would be fundamentally altered.  Any individual prosecutor in any State or in any Federal U.S.  Attorney's Office could effectively unravel the results of an election.  And to think that those processes themselves won't become politicized is, I think, naive in the extreme.  And I think that's why the OLC memos, both under the Nixon administration and under the Clinton administration -- I want to point out.  This is a bipartisan conclusion by different administrations by the Office of Legal Counsel.

Mr. <u>Armstrong.</u>  Now, and I want to go back to now let's assume

the OLC memo doesn't exist.  Does your answer change on obstruction
of justice?

Mr. Eastman.  No.  No.  And this goes back to the earlier comment
I made about I think the fundamental flaw in the analysis in Part II
of the report is that it put the burden on the target of the
investigation to prove his innocence, rather than the normal
prosecutorial function which is to lay out a case to a grand jury -- in
this case, the grand jury would be the House -- to lay out a case of
why I have probable cause to bring an indictment that would lead me
to think I could get, you know, proof beyond a reasonable doubt.

The standard is not criminal, I agree with Professor Gerhardt on
that, but it also rises to the level of impeachment.  And I don't think
anything here, particularly in comparison to things we've witnessed
recently in recent administrations, I don't think anything gets close
to that standard.

Mr. Armstrong.  Well, and so there's been a lot made -- and I
practiced law in Federal court and done criminal law in my life, and
one of the things is we all understand you can have obstruction even
if the underlying crime doesn't exist.  There is a legal way that
occurs, and that is actually true.  But intent becomes a huge part of
this conversation.  It's also true that it's very rarely charged when
you find out there's not an underlying offense, and one of the reasons
is is illegitimate purpose and legitimate purpose.

And under the best or worst reading of any of these 10 obstruction
charges, can you -- I mean, can you find any one of those that doesn't

have a legitimate purpose?

Mr. Eastman.   You know, I don't find any of them that don't have a perfectly legitimate purpose, and it's a much more plausible purpose than any of the other stories that are being spun out to try and prove that there was an illegitimate purpose.

Mr. Armstrong.   Thank you.

With that, I yield back.

Ms. Scanlon.   The chair recognizes the gentlewoman from Washington for 5 minutes.

Ms. Jayapal.   Thank you, Madam Chair.

Ms. Fredrickson, let me start with you.   In his written testimony, Dr. Eastman argues that a sitting President is immune from prosecution and that, therefore, impeachment is the only constitutional remedy for Presidential misconduct.

Do you agree that a President is immune from prosecution?

Ms. Fredrickson.   No, I don't believe so.   I think, you know, again, just Professor Gerhardt laid out, I think rather extensively, the arguments with the OLC memo.   But, you know, I would say, however, that there is something interesting about this idea of sort of the structural arguments that make the President immune.   That is it's too cumbersome on his or her, hopefully someday, responsibilities and that, therefore, we just have to then find not in the text and not in the historical information an immunity for the President.

If that were the case, we should be able to find inherent in that text as well an automatic tolling of statute of limitations for criminal

prosecutions.  You should really need to pass -- have to pass legislation to do that.  So I think there's -- it's certainly very disputed that the President is immune.  I think there have been many scholars who have contested that, and certainly those who would also indicate that perhaps there can't be a prosecution but there could be an indictment.  Would an indictment actually be that cumbersome for a President?

So I think they are very important questions.  Again, I think it's indicative of how important it is for Congress to continue to examine the evidence underlying the Mueller report.

RPTR JOHNSON

EDTR ZAMORA

Ms. Jayapal.  I mean, you've sort of answered this, but let me

ask the question anyway for anyone who might be listening that hasn't

been following.

Can a President violate Federal criminal law through his exercise

of Article II powers?

Ms. Fredrickson.  Oh, absolutely.

Ms. Jayapal.  Okay.  So, for example, could -- could a President

violate Federal bribery statutes if he or she were to offer a pardon

to a witness in exchange for refusing to cooperate with a Federal

investigator?

Ms. Fredrickson.  Yes.

Ms. Jayapal.  Okay.  And, Professor Gerhardt, do you agree with

Dr. Eastman that the only constitutional remedy for Presidential

misconduct is impeachment?  Just briefly.

Mr. Gerhardt.  Not at all.  No, he and I respectfully disagree

on that.  I tried to lay out in my written statement a variety of other

processes for handling or addressing Presidential misconduct.

Impeachment obviously is one, but there may be others, depending upon

the severity and gravity of the offense and what else this committee

determines through legitimate investigation.

Ms. Jayapal.  So let me turn to another subject, and I'll stay

with you, Professor Gerhardt.  In Nixon v. Fitzgerald, the Supreme

Court held that the President is entitled to absolute immunity from damages liability based on his official acts.  Anticipating concerns that that finding would leave Nixon -- it would leave the Nation without sufficient -- and these are quoted words -- without sufficient protection against misconduct by the Chief Executive, and quote, the Court articulated several formal and informal checks on Presidential misconduct in addition to the constitutional remedy of impeachment.

And the Court described those checks as constant press scrutiny, vigilant oversight by Congress --

Mr. Gerhardt.  Yes.

Ms. Jayapal.  -- the desire to earn reelection, and the need to maintain prestige as an element of Presidential influence, and a President's traditional concern for his historical stature.

So can you elaborate on this -- this concept of informal checks?

Mr. Gerhardt.  I'll try to as briefly as possible.  So there are things that are spelled out in the Constitution that clearly are formal mechanisms for addressing Presidential misconduct.  The quote obviously sort of mentioned those.  Among them are the things you just mentioned as well, impeachment, public opinion among them. Congressional oversight's a key element of that.

But the informal checks are things that are not done by government or -- or done in any kind of official way, but they nevertheless might constrain a President.  So they would include some of the things that you just mentioned.

For example, concern about maintaining influence; you know,

popularity is important for a President to succeed in office.  At the same time, Presidents are in that unique position of thinking about what kind of influence or impact they'll have on the office itself or the Constitution over time.  And those things might constrain them as well.

Ms. Jayapal.  And let's talk about press for a second.  Because President Trump has repeatedly referred to the press as the enemy of the people, but the Court in Fitzgerald named the press as a really important check on the Presidency.

Mr. Gerhardt.  Yes.

Ms. Jayapal.  So when you have a President who openly encourages violence against the press, praised Representative Gianforte for assaulting a reporter, regularly attacks judges who rule against his policies, and refuses to release his tax returns, what effect does that have?

Mr. Gerhardt.  A terrible effect.  And that's something, of course, to take into account as well.  But the point you're making, I think, is a very sound one, that the press serves a very important function in this country of trying to put a spotlight on government and trying to actually allow for transparency in government.  And efforts to obstruct that -- I hope I'm using the word correctly in that context -- I think would be matters of great concern.

Ms. Jayapal.  Thank you, Professor.

I yield back.

Ms. Scanlon.  Okay.  The chair recognizes Mrs. Lesko for

5 minutes.

Mrs. <u>Lesko.</u>  Thank you, Madam Chairman.

I have a question for Professor Eastman.  And it is basically, Professor Eastman, did the Office of Legal Counsel memo that holds a sitting President cannot be indicted stop Mueller from ending his report with a suggestion that President Trump should be indicted for obstruction of justice?  Was there anything preventing him from doing that?

Mr. <u>Eastman.</u>  No, there was not.

Mrs. <u>Lesko.</u>  And I think this has been asked before maybe, because I was in the other room in the other committee actually being a witness.  But, you know, when I went -- have read through the Mueller report several times now, and what popped out to me was the thing about corrupt intent, that there was no underlying crime, no corrupt intent.  I don't know if you have anything to add on that, how it would be difficult, is what Mr. Mueller said, my reading, to prove corrupt intent when there's no underlying crime.

Mr. <u>Eastman.</u>  Well, it's difficult.  I agree with Professor Gerhardt that it's not impossible.  But we normally look at when there are two explanations for inaction, one's perfectly legitimate and the other a stretch to get to corrupt intent.  We tend to Occam's razor, take the short path to say the legitimate one is probably the right one.

Mrs. <u>Lesko.</u>  Well, good.  And, Mr. Eastman, since I wasn't here the whole time, is there anything that hasn't been said that you would

like to add for our record?

Mr. Eastman.  I think the bottom line conclusion of both OLC memos that I think is absolutely correct is precisely why they came to the conclusion that a sitting President, while he remains President, cannot be indicted, that the constitutional remedy is impeachment, because it puts the issue into a body that is itself politically accountable.  And I think that is the most important piece to take away this.

If the members of this committee and of this House truly believe that the things that Mr. Mueller has identified rise to the level of high crimes and misdemeanors, you would be being derelict in your duty not to bring impeachment charges.  So bring it on.

I don't think there's anything in here -- and I don't think the American people will agree that there's anything here that rises to that level.

The political accountability on that works both ways.  If you don't bring actions against a President who has committed high crimes and misdemeanors, you will be held to political account.  If you do pursue investigations on things that do not remotely rise to that level, you will also be held to political account.  That's the beauty of our system, and I think that's why the OLC memos reach the conclusion that they do.

Mrs. Lesko.  Thank you, Mr. Eastman and the other witnesses.

And I yield back my time.

Ms. Scanlon.  Thank you.

I recognize myself for 5 minutes.

Professor Gerhardt, you know, the purpose of these hearings are not just to educate Members of Congress but also the general public on topics they may not have had the opportunity to look at.  So I wanted to take a couple minutes to tap your expertise as a constitutional scholar and talk about what the authors of the Constitution considered to be impeachable offenses.

We had a little bit of quotation of Alexander Hamilton in the Federalist papers earlier, but I wanted to focus on his declaration that impeachable offenses are, and I quote, those offenses which proceed from the misconduct of public men, or in other words, the abuse or violation of the public trust.

Could you comment on what the Founders of our country meant to be impeachable offenses and any examples they discuss that might be relevant to our inquiry today?

Mr. Gerhardt.  Well, I'll try, certainly.  Alexander Hamilton obviously gets it right; that is to say his formulation or his understanding of the scope of impeachable offenses is very consistent with what we learn from the Constitutional Convention and what we can infer from the structure of our Constitution.

So the core elements or core, I guess, paradigms of impeachable offenses become things like abuse of power, things like a breach of public trust, things that seriously injure the republic.

So those won't be limited just to technical crimes.  They'll be limited to the kinds of unique things that a President is able to do.

He has the pardon power.  But in the Constitutional Convention, it's mentioned that if the pardon power is used to shield somebody with whom the President is in criminal conspiracy with -- I'm paraphrasing -- that's an impeachable offense.  And I think almost everybody would agree that that would be an abuse of power.

And so the terms that Mr. Hamilton used and the terms that others such as Justice James Wilson used in describing the scope of impeachable offense set up categories, if you will, set up the kinds of things that would have to be proved in order to constitute an impeachable offense.

Ms. Scanlon.  Thank you.

Turning to the history of impeachment proceedings in this country, and you may have touched on this a little bit already.  Given what you know of the facts laid out in the Mueller report, would it be appropriate for us to draw any parallels between the current moment and previous impeachment inquiries?

Mr. Gerhardt.  Absolutely.  The most obvious is obstruction of justice.  There was an obstruction of justice article approved by the House Judiciary Committee against President Nixon.

I will hope that that's not serious.

Ms. Scanlon.  Happens all the time.

Mr. Gerhardt.  Okay.  There was an impeachment article approved by the House against President Clinton.

It's well settled that obstruction of justice may provide a basis for Presidential impeachment.  It's Presidential misconduct of the worst kind, invading, undermining the other branches as they try to

exercise their legitimate powers to try and make -- try and determine the President's accountability.

Ms. Scanlon.  And we've heard a little bit of discussion about whether or not this particular President intended to obstruct justice. You have reviewed the Mueller report, right?

Mr. Gerhardt.  I've read it, yes.

Ms. Scanlon.  And you know that the President refused to answer any questions regarding the allegations of obstruction of justice, right?

Mr. Gerhardt.  Right.

Ms. Scanlon.  So we wouldn't have those words from his mouth unless he tweeted them.

Mr. Gerhardt.  That's correct.  And it's important to remember, the Mueller report doesn't just not bind this committee or the House, it doesn't displace this committee or the House.  So the committee certainly has the authority to inquire into these things.

Ms. Scanlon.  So I come to this proceeding with really profound concerns that misconduct by this President isn't limited to some ill-advised tweets but that his defiance of congressional subpoenas and the Constitution and the rule of law places our country in jeopardy. Call me old-fashioned, but I strongly have the opinion that the highest duty of the President is to serve the public and not to serve himself or to see how much he can get away with.

Can you speak to, you know, what our oversight or impeachment or other powers have to do with, you know, reigning in an administration

that might be defying the rule of law?

Mr. Gerhardt.   They have everything to do with trying to make sure that a President is accountable under law and pursuant to the Constitution.   And so I think that there -- I won't go into a long line of hypotheticals, but the important thing to understand is that it's perfectly reasonable for the committee to be able to inquire into the gravity of things, to look at evidence.   And if that evidence takes them to -- if that evidence supports approval of Articles of Impeachment, that's your job to consider.

There may be a variety of different processes, and we talked about them, that may be appropriate for holding a President accountable for misconduct, and we shouldn't lose sight of all of those different things.   I think all those different things empower the committee to do what it's doing.

Ms. Scanlon.   Thank you.

With that, I would recognize the gentlewoman from Texas, for 5 minutes.

Ms. Garcia.   Thank you, Madam Chair.   And thank you to the witnesses for being here this morning.

And let me just say that, for me, it's refreshing to hear some good dialogue about the important role of Congress and the role that we have in this process, not only in oversight, as has been laid out by Professor Gerhardt, but in continuing to look at this, and Ms. Fredrickson, for you to also outline that these things do take time.

I know that the ranking member made a show of talking about the

show that he thinks this is and bringing out the popcorn, and if we're going to do an impeachment, we ought to just say it, and this is an impeachment want-to-be -- inquiry want-to-be.  But we've done the opposite and met the first day -- or the second time we met and immediately gone and said it's time for impeachment, here's what we're going to do.  Everybody would have said we rushed to judgment one day. So it's about striking a balance and making sure that we're thorough and that we look at everything.

And one thing that has really concerned me as a lawyer and as a former judge -- and, Professor Gerhardt, I'll ask you the question, is this whole notion of the absolute immunity.  And it struck me that you said that no court has ever opined on that.

Mr. Gerhardt.  Right.

Ms. Garcia.  Is that because no President has ever exerted this complete absolute immunity?

Mr. Gerhardt.  Immunity to criminal process?

Ms. Garcia.  Yes, sir.

Mr. Gerhardt.  Not yet.

Ms. Garcia.  Or even from testifying.  If you recall, I was -- I, for one, was totally frustrated when Hope Hicks a couple of weeks ago came to -- to testify, and she walks in with, I forget, four or five lawyers, they objected to just about every question we asked.  I think they objected like about 155 times.  And it was anything having to do from the beginning of her -- the minute she walks in the White House, that she has absolute immunity and she can't testify about it.

Mr. Gerhardt.  No --

Ms. Garcia.  And it just seemed to me to be one of the most ridiculous assertions of any kind of privilege.

Mr. Gerhardt.  That would be an abuse of privilege, in my opinion. So privilege, executive privilege, attorney-client privilege, neither of these protects anyone, including the President or anybody that works for the President, to engage in criminal activity.

You wouldn't have the privilege to maintain the confidentiality of that.  In fact, the privilege is maybe not just waived but doesn't apply to conversations that -- or actions that may relate to criminal activity.

Ms. Garcia.  But in her case, it was more than just criminal -- potential criminal activity.

Have you read the transcript?  I mean, it was even talking about her job.

Mr. Gerhardt.  Right.

Ms. Garcia.  I mean, do you think that she's at a level of position that is so sensitive that she couldn't just say what she did at the White House?

Mr. Gerhardt.  And nobody is in that position, not even the President.  Executive privilege may well apply to certain conversations that happened, but they're fairly narrowly defined.  It certainly does not apply to everything the President does or the executive branch does.  If it did, then that -- then in the executive branch, the President would be immune from any kind of check and balance

that can be imposed by either of the other branches.

Ms. Garcia.  And it certainly -- you know, we've also seen many other Trump administration officials either be ordered not to come or they come and they don't really respond to many of our questions.  You know, what does that do to this check and balance that you're referring to?  I mean --

Mr. Gerhardt.  It impedes the authority.

Ms. Garcia.  Can you explain so that the average American understands just why really it's important for us to have Mr. Mueller come here next week, for Hope Hicks to come, for Jared Kushner, and all of the subpoenas?  I mean, this isn't about harassment; this is about getting to the truth.  Because if we don't do that, what might happen?

Mr. Gerhardt.  Yes.  I think it is immensely important.  As a constitutional law professor, my client's the Constitution.  I care about the Constitution.  I care about it being appropriately read and appropriately applied and understood.  And among the things that we would -- should understand about the Constitution is the fact that impeachment is something that happens at the end of a process.  It's not required at the beginning of a process.

You need to be able to have a process, of which this committee clearly, legitimately has the authority to conduct, to determine what happened, the gravity of what happened, and whether or not Articles of Impeachment are appropriate or some other mechanism is appropriate for addressing them.

Ms. Garcia.  And as you said, impeachment inquiry is not in the Constitution, the words?

Mr. Gerhardt.  No.  But impeachment, of course, is.  But Article I, Section 5, vests this committee with the -- vests this Congress the authority to -- to adopt rules for its internal governance. That's -- it's the rules that govern the process that each committee conducts.

Ms. Garcia.  All right.  One final question.  If you were here next week with us, what question would you ask Mr. Mueller?

Ms. Scanlon.  I'm sorry, it's time.

Mr. Gerhardt.  Thank you.

Ms. Scanlon.  You may finish -- did you have a quick answer?

Ms. Garcia.  Do you have a quick answer?  She's --

Mr. Gerhardt.  Oh, well, I can think of a lot of questions.  I do think it's important to clarify and make sure you probably understand the moments in his report when he defers to Congress and is passing the ball to Congress.

Ms. Garcia.  All right.  Thank you.

Thank you, Madam Chair.  I yield back.

Ms. Scanlon.  Okay.  I recognize the gentlewoman from Florida for 5 minutes.

Ms. Mucarsel-Powell.  Thank you, Madam Chair.

I wanted to ask -- start by asking Mr. Gerhardt a question. According to the Mueller report, and among other things, President Trump requested then-Attorney General Jeff Sessions to reverse his

recusal from the special counsel investigation with an eye toward
curtailing its scope.  Once President Trump learned that he was under
investigation for potential obstruction of justice, President Trump
then ordered White House Counsel Don McGahn to have Special Counsel
Mueller removed altogether.

So President Trump finds out of Jeff Sessions' recusal, he's
extremely upset about this, then he asks Don McGahn to remove the
special counsel.  Would this be considered, in your opinion,
impeachable conduct?

Mr. Gerhardt.  Well, it certainly raises serious concerns.  And
I would -- I would suggest that those actions do raise legitimate
suspicions about, not just the motivation, but about the effort to
obstruct the investigations into obstructing inquiries that
Mr. Mueller was authorized to conduct.

Ms. Mucarsel-Powell.  And can you elaborate on your opinion on
whether obstruction has also occurred after this President took office
as we in this committee have requested for several fact witnesses to
appear before us but they have been ordered by the President to not
appear before us?  How would you constitute that?

Mr. Gerhardt.  Well, that's an exercise of power that he's
attempting.  The question is whether or not that's an abuse of power.
To be able to direct people, not just who are currently in government,
but who used to be in government, from speaking at all to the committee
strikes me as a matter of great concern.  That could be an abuse of
power, because it stymies the committee's ability to gather evidence

and to make determinations based on that evidence.

Ms. Mucarsel-Powell.  And do you have a view on the Miers holding that there's no absolute immunity for a Presidential aide?  What is your view on that?

Mr. Gerhardt.  Now, immunity from what?  I just want to clarify.

Ms. Mucarsel-Powell.  From testifying.

Mr. Gerhardt.  Oh, from testifying.  I think that -- this is one of those areas where it has to be kind of carefully circumscribed.  So a President obviously has some ability to protect certain things, such as legitimate material protected by executive privilege.  But he -- it doesn't extend to preventing people from doing their constitutional duty, I would say, to be able to comply with a subpoena and come before the committee and talk about things that might have crossed the line and might have been illegal or unconstitutional.

Ms. Mucarsel-Powell.  Okay.  Thank you.

A couple of more questions.  If the executive branch has taken this position that a sitting President can't be indicted as a matter of constitutional law, then Congress probably can't change it through a statute.

Mr. Gerhardt.  Right.

Ms. Mucarsel-Powell.  But we can at least ensure that the statute of limitations for any offense doesn't run out before the President leaves office.

So this is for Ms. Fredrickson.  If the President is immune from prosecution while in office, do you agree that it would make sense for

us to pass a law tolling the statute of limitations for any offenses, to ensure that there will ultimately be a mode of accountability?

Ms. <u>Fredrickson.</u>  Well, it certainly seems like something Congress should examine.  And I think Professor Eastman actually had said that he supports that legislation, so maybe it's a place where you can get strong bipartisan support.

But I would hate to think that our Constitution insulates the President from -- from any kind of accountability while he's President. And so I think it's very important for Congress to consider how to ensure that the President is not above the law.

Ms. <u>Mucarsel-Powell.</u>  Thank you.

And, Mr. Gerhardt, are there any other types of legislation that Congress could enact that would help ensure some measure of accountability in situations where the Justice Department is refusing to bring charges against a sitting President?

Mr. <u>Gerhardt.</u>  I said quite possibly.  For example, I understand there may be legislation under consideration about protecting special prosecutors, special counsels from being easily terminated.  That would be one obvious thing to try to do to try and protect the person whose job it is to consider whether or not there's any misconduct undertaken by the President or anybody at his direction that -- that is criminal or possibly impeachable.

Ms. <u>Mucarsel-Powell.</u>  Thank you.

I yield back my time.

Ms. <u>Scanlon.</u>  Okay.  I just want to remind our committee members

that House rules and precedents require us to refrain from making inappropriate personal references to protected parties, including the President, and this includes accusations of dishonesty, criminality, treason, or other unethical or improper motive.

And with that, I would recognize Mr. Jordan for 5 minutes.

Mr. Jordan.  Thank you, Madam Chair.

Ms. Fredrickson, what's the name of the organization that you -- you head up?

Ms. Fredrickson.  The American Constitution Society.

Mr. Jordan.  American Constitution Society.

Before the Mueller report was made public, and actually 2 days before Attorney General Barr did his first letter to tell us anything about the report, which was March 24 of this year, 2 days prior to that, on March 22, 2019, you said this.  You said, the question isn't whether members of the Trump campaign conspired with Russia to sway the 2016 elections.  We already know they did.

How did you know that before the report even came out?

Ms. Fredrickson.  We had seen multiple indictments as well as prosecutions and convictions of people associated with Russia.

Mr. Jordan.  But shouldn't normally someone who's heading up the Constitution Society, don't you normally wait until an investigation is over?  Isn't -- in this great Nation, people are presumed to be innocent until -- till proven otherwise, and you are already making a finding, stating a finding as the head of the American Constitution Society before we even had the report by the special counsel's office.

Ms. Fredrickson. There was quite a lot of evidence already in the record. And I think the Mueller report then goes further to lay out multiple instances of contacts between Trump administration --

Mr. Jordan. What's interesting -- you just mentioned the Mueller report. What's interesting is that same day that you said the question isn't whether members of the Trump campaign conspired with Russia to sway the elections, we already know they did -- even though we didn't know that because the report wasn't done -- that same day you wrote an op-ed -- you just mentioned the Mueller report, but you wrote an op-ed that same day, March 22, 2019, where you said we don't need to read the Mueller report. And now you're telling us we do.

So before the report came out, before Bill Barr said anything, you said we already know he's guilty and, oh, by the way, don't read the report.

Ms. Fredrickson. Sir, I --

Mr. Jordan. Now you're telling us we should read the report?

Ms. Fredrickson. The point was a rhetorical one, that there is already so much evidence out there that Congress needs to examine.

Mr. Jordan. That's not what -- I've got the headline right there. We don't need to read the Mueller report. You wrote that, right?

Ms. Fredrickson. I didn't write the title actually. If you read the body of the opinion piece, you will see that it says Congress needs to get this report. So --

Mr. Jordan. Here's what you wrote -- just -- second paragraph.

Mr. Mueller's report may never go public, but we don't need to peek at the recommendations anyway.

So did you write that?

Ms. Fredrickson.  I did.

Mr. Jordan.  Okay.  So you did.  But now you're telling us we should read the report?

Ms. Fredrickson.  I do, yes.  There is much more in there.

Mr. Jordan.  Let's read the report --

Ms. Fredrickson.  We knew a fair amount already, but now we know more.  And I think Congress needs to actually see the full report and the evidence underlying it.  And --

Mr. Jordan.  Let's read the report.  Let's read the report.

Ms. Fredrickson.  -- understand how Russia interfered in our elections.  Which, again, I will state, I think it's troubling that your side of the aisle doesn't seem to want to examine --

Mr. Jordan.  I think it's troubling that the head of the American Constitution Society said we already know that he did something before the report was final.  Now you're telling us to read the report.

I'm going to read it on page 2.  Page 2, the investigation did not establish that members of the Trump campaign conspired or coordinated with the Russian Government in its election interference activity.

So now that you -- first, you said don't read the report.  Now you're saying read the report.  I'm reading the report, and it directly contradicts what you said as the head of the American Constitution

Society.

And, of course, the Democrats think it's fine and appropriate to have the head of the American Constitution Society come in here and lecture us today and tell us today how we need to move towards impeachment.  I mean, I just -- I fail to get it.  I fail to get it.

So what do you say about that sentence right there on page 2, that now that you've changed your mind and say we should read the report, where Bob Mueller says -- the special counsel's office says the investigation did not establish that members of the Trump campaign conspired or coordinated with the Russian Government in its election interference activities?

Ms. Fredrickson.  Well, I think it's unfortunate that you actually haven't read the opinion piece, which does say that Congress needs to see the full Mueller report.  That is what the opinion piece says.

Mr. Jordan.  We're talking about what you wrote, what you said, and what Bob Mueller said.  You said that --

Ms. Fredrickson.  Exactly what the opinion piece says, that Congress needs to get the full Mueller report.

Mr. Jordan.  I think -- Mr. Chairman, here's what's interesting. Here's what's interesting.  We have a witness today, who before the Mueller report was out, said we already know the President's guilty. Before Bill Barr issued his first statement on the report, says we already know he's guilty.  That same day that she said those things, she writes an op-ed piece saying don't read the Mueller report, because

if you do, you'll find out what she claimed is absolutely not true.

Ms. Fredrickson.  I would actually --

Mr. Jordan.  And she's an expert witness today.

Ms. Fredrickson.  -- once again, would recommend that you actually read the piece so that you can see what it says.

Mr. Jordan.  I read your piece.  I read the whole --

Ms. Fredrickson.  Apparently not, because it does say that Congress --

Mr. Jordan.  I did just a few minutes ago.  Because I remember the exchange we had a few months ago right after -- right after Bill Barr had sent his March 24 letter we had a little discussion about this same type -- I can't believe the Democrats invited you back.

I yield back.

Ms. Fredrickson.  As I said, it's really unfortunate you don't actually bother to read beyond the title.

Mr. Jordan.  Mr. Chairman, I've got 20 seconds -- I've got 4 seconds.  I did read -- and you know what?  I did not follow her advice. I read the Mueller report.  She's telling people not to.

Ms. Scanlon.  Okay.  And I know that the Mueller report then goes on to say that his conclusions would change if he were given access to additional evidence.

I now recognize Mr. Swalwell for 5 minutes.

Mr. Swalwell.  Thank you, Madam Chair.

Professor Fredrickson, is there a difference between criminal conspiracy, something that could be proved beyond a reasonable doubt,

and conspiracy?

Ms. <u>Fredrickson.</u>  Well, there's certainly a distinction in how the public talks about it and our understanding.  And one of the things I had, you know, was hoping to engage in with your colleague here from the other side of the aisle, is an understanding that all of our intelligence agencies have indicated that the Russians had made sweeping attacks on our election systems.  There were multiple contacts with Trump campaign officials that there were indictments, there were prosecutions.  There's an enormous need for Congress to actually probe more deeply into how this happened and how to prevent it from happening again.

Mr. <u>Swalwell.</u>  And when you read the 200 pages of Volume I that lay out the multiplicity of contacts between the Trump campaign and the Russians, do you see a failure of imagination by prior Congresses to write laws that would protect us from this type of conduct and to have a criminal remedy?  Do you see gaps that occurred, like being approached and not telling the FBI that foreign adversaries are trying to --

Ms. <u>Fredrickson.</u>  I know that Members of Congress are proposing such legislation.  I think it's important to, again, I think as part of your authorities, to examine what happened, to see if in fact the laws were too weak and that allowed hostile foreign powers to have undue influence on campaign officials and to understand how influence might have been reached.

And so, yes, I think it's a very important part of your duties

to protect the integrity of our elections.

Mr. Swalwell.  Thank you, Professor.

And, Professor Gerhardt, recognizing that the Mueller report says criminally the laws that we have now, no proof beyond a reasonable doubt that there was conspiracy in Volume I.  However, functionally, as a Congress and constitutionally, because of the conduct that's laid out, is there recourse through impeachment -- just in what you have seen in how the Founders have described impeachment and how prior Congresses have engaged on impeachment, do you see a recourse for impeachment based on the 200 pages of just Volume I conduct?

Mr. Gerhardt.  I think it's reasonable -- quite reasonable to consider the propriety of it.  I think that it is reasonable to inquire, to investigate, to determine evidence and, again, to be able to hear witnesses and put together a record that is helpful to Congress to understand the gravity of whatever's happened, and as well as just whatever did happen.

One other thing I would just sort of emphasize in this context is something we've repeated a few times today, but it's really important to remember, and that is impeachable offenses don't have to be actual crimes.  And so this committee, this House, or another committee or another House another time, may decide that there is something that's really serious, and they may want to call it conspiracy or they might want to call it something else, and they're entitled to do that.  And they can take -- they have the authority to conduct proceedings to figure out what's happened.

Mr. <u>Swalwell.</u>   And in your reading of the report, would you agree, Professor Gerhardt, that the Mueller team did not look at financial compromise of the President or anyone on his team?

Mr. <u>Gerhardt.</u>  That's correct.  And, again --

Mr. <u>Swalwell.</u>  And I'll just let you -- let me add on to that. And would you agree that an impeachment inquiry would not prohibit the inquiring body from looking at financial compromise?

Mr. <u>Gerhardt.</u>  That's correct.

Mr. <u>Swalwell.</u>  Great.  Thank you.

And I would yield back.  Thank you.

Ms. <u>Scanlon.</u>  Okay.  Thank you.

Okay.  This will conclude today's hearing.  I want to thank all the witnesses for attending.  We really appreciate your insights.

And without objection, all members will have 5 legislative days to submit additional written questions for the witnesses or additional materials for the record.

Without objection, the hearing's adjourned.

[Whereupon, at 11:47 a.m., the committee was adjourned.]