# EXHIBIT W

<u>RPTR FORADORI</u>

<u>EDTR SECKMAN</u>

FORMER SPECIAL COUNSEL ROBERT S. MUELLER III ON THE INVESTIGATION INTO

RUSSIAN INTERFERENCE IN THE 2016 PRESIDENTIAL ELECTION

Wednesday, July 24, 2019

U.S. House of Representatives,

Permanent Select Committee on Intelligence,

Washington, D.C.

The committee met, pursuant to call, at 12:50 p.m., in Room HVC-304, Capitol Visitor Center, the Honorable Adam Schiff (chairman of the committee) presiding.

Present:   Representatives Schiff, Himes, Sewell, Carson, Speier, Quigley, Swalwell, Castro, Heck, Welch, Maloney, Demings, Krishnamoorthi, Nunes, Conaway, Turner, Wenstrup, Stewart, Crawford, Stefanik, Hurd, and Ratcliffe.

The <u>Chairman.</u>  The committee will come to order.  At the outset and on behalf of my colleagues, I want to thank you, Special Counsel Mueller, for a lifetime of service to the country.  Your report, for those who have taken the time to study it, is methodical, and it is devastating, for it tells the story of a foreign adversary's sweeping and systematic intervention in a close U.S. Presidential election.  That should be enough to deserve the attention of every American, as you well point out.  But your report tells another story as well.

For the story of the 2016 election is also a story about disloyalty to country, about greed, and about lies.  Your investigation determined that the Trump campaign, including Donald Trump himself, knew that a foreign power was intervening in our election and welcomed it, built Russian meddling into their strategy and used it.

Disloyalty to country.  Those are strong words, but how else are we to describe a Presidential campaign which did not inform the authorities of an foreign offer of dirt on their opponent, which did not publicly shun it or turn it away, but which instead invited it, encouraged it, and made full use of it.  That disloyalty may not have been criminal.  Constrained by uncooperative witnesses, the destruction of documents and the use of encrypted communications, your team was not able to establish each of the elements of the crime of conspiracy beyond a reasonable doubt, so not provable crime in any event.  But I think maybe something worse.

A crime is the violation of law written by Congress, but disloyalty to country violates the very oath of citizenship, our devotion to a core principle on which our Nation was founded, that we, the people, and not some foreign power that wishes us ill, we decide who governs us.

This is also a story about money, about greed and corruption, about the

leadership of a campaign willing to compromise the Nation's interest, not only to win but to make money at the same time.   About a campaign chairman indebted to pro-Russian interests who tried to use his position to clear his debts and make millions.   About a national security advisory using his position to make money from still other foreign interests.   And about a candidate trying to make more money than all of them put together through a real estate project that to him was worth a fortune, hundreds of millions of dollars and the realization of a life-long ambition: a Trump Tower in the heart of Moscow.   A candidate who in fact viewed his whole campaign as the greatest infomercial in history.

Donald Trump and his senior staff were not alone in their desire to use the election to make money.   For Russia, too, there was a powerful financial motive.   Putin wanted relief from economic sanctions imposed in the wake of Russia's invasion of Ukraine and over human rights violations.

The secret Trump Tower meeting between the Russians and senior campaign officials was about sanctions.   The secret conversations between Flynn and the Russian Ambassador were about sanctions.   Trump and his team wanted more money for themselves, and the Russians wanted more money for themselves and for their oligarchs.

The story doesn't end here either, for your report also tells a story about lies, lots of lies.   Lies about a gleaming tower in Moscow and lies about talks with the Kremlin. Lies about the firing of FBI Director James Comey and lies about efforts to fire you, Director Mueller, and lies to cover it up.   Lies about secret negotiations with the Russians over sanctions and lies about WikiLeaks.   Lies about polling data and lies about hush money payments.   Lies about meetings in the Seychelles to set up secret back channels and lies about a secret meeting in New York Trump Tower.   Lies to the FBI. Lies to your staff.   And lies to this committee.   Lies to obstruct an investigation into the

most serious attack on our democracy by a foreign power in our history.

That is where your report ends, Director Mueller, with a scheme to cover up, obstruct, and deceive every bit as systematic and pervasive as the Russian disinformation campaign itself, but far more pernicious since this rot came from within.   Even now, after 448 pages and 2 volumes, the deception continues.   The President and his acolytes say your report found no collusion, though your report explicitly declined to address that question, since collusion can involve both criminal and noncriminal conduct.

Your report laid out multiple offers of Russian help to the Trump campaign, the campaign's acceptance of that help, and overt acts in furtherance of Russian help.   To most Americans, that is the very definition of collusion, whether it is a crime or not. They say your report found no evidence of obstruction, though you outline numerous actions by the President intended to obstruct the investigation.

They say the President has been fully exonerated, though you specifically declare you could not exonerate him.   In fact, they say your whole investigation was nothing more than a witch hunt, that the Russians didn't interfere in our election, that it is all a terrible hoax.   The real crime, they say, is not that the Russians intervened to help Donald Trump but that the FBI had the temerity to investigate it when they did.

But, worst of all, worse than all the lies and the greed is the disloyalty to country. For that, too, continues.   When asked if the Russians intervene again, will you take their help, Mr. President?   Why not, was the essence of his answer; everyone does it.

No, Mr. President, they don't.   Not in the America envisioned by Jefferson, Madison, and Hamilton.   Not for those who believe in the idea that Lincoln labored until his dying day to preserve the idea animating our great national experiments so unique then, so precious still, that our government is chosen by our people through our franchise, and not by some hostile foreign power.

This is what is at stake, our next election and the one after that for generations to come.   Our democracy.   This is why your work matters, Director Mueller, this is why our investigation matters, to bring these dangers to light.

Ranking Member Nunes.

[The statement of The Chairman follows:]


\*\*\*\*\*\*\*\* COMMITTEE INSERT \*\*\*\*\*\*\*\*

Mr. <u>Nunes.</u>    Thank you, Mr. Chairman.

Welcome, everyone, to the last gasp of the Russia collusion conspiracy theory. As Democrats continue to foist this spectacle on the American people, as well as you, Mr. Mueller, the American people may recall the media first began spreading this conspiracy theory in the spring of 2016 when Fusion GPS, funded by the DNC and the Hillary Clinton campaign, started developing the Steele dossier, an collection outlandish accusations that Trump and his associates were Russian agents.

Fusion GPS, Steele, and other confederates fed these absurdities to naive or partisan reporters, and to top officials in numerous agencies, including the FBI, the Department of Justice, and the State Department.   Among other things, the FBI used dossier allegations to obtain a warrant to spy on the Trump campaign, despite acknowledging dossier allegations as being salacious and unverified.   Former FBI Director James Comey briefed those allegations to President Obama and President-elect Trump, those briefings conveniently leaked to the press, resulting in the publication of the dossier and launching thousands of false press stories based on the word of a foreign ex-spy.   One who admitted he was desperate that Trump lose the election, and who was eventually fired as an FBI source for leaking to the press.

After Comey himself was fired, by his own admission, he leaked derogatory information on President Trump to the press for the specific purpose, and successfully so, of engineering the appointment of a special counsel who sits here before us today.

The FBI investigation was marred by further corruption and bizarre abuses.   Top DOJ official Bruce Ohr, whose own wife worked on Fusion GPS' anti-Trump operation, fed Steele's information to the FBI, even after the FBI fired Steele.

The top FBI investigator and his lover, another top FBI official, constantly texted

about how much they hated Trump and wanted to stop him from being elected.   And the entire investigation was opened based not on Five Eyes intelligence but on a tip from a foreign politician about a conversation involving Joseph Mifsud.   He is a Maltese diplomat who's widely portrayed as a Russian agent but seems to have far more connections with Western governments, including our own FBI and our own State Department, than with Russia.

Brazenly ignoring all these red flags as well as the transparent absurdity of the claims they are making, the Democrats have argued for nearly 3 years that evidence of collusion is hidden just around the corner.   Like the Loch Ness monster, they insist it's there, even if no one can find it.

Consider this, in March 2017, Democrats on this committee said they had more than circumstantial evidence of collusion, but they couldn't reveal it yet.   Mr. Mueller was soon appointed, and they said he would find the collusion.   Then when no collusion was found in Mr. Mueller's indictments, the Democrats said we'd find it in his final report. Then when there was no collusion in the report, we were told Attorney General Barr was hiding it.   Then when it was clear Barr wasn't hiding anything, we were told it will be revealed through a hearing with Mr. Mueller himself.

And now that Mr. Mueller is here, they're claiming that the collusion has actually been in his report all along, hidden in plain sight.   And they're right.   There is collusion in plain sight: collusion between Russia and the Democratic Party.   The Democrats colluded with Russian sources to develop the Steele dossier.   And Russian lawyer Natalia Veselnitskaya colluded with the dossier's key architect, Fusion GPS head Glenn Simpson.

The Democrats have already admitted, both in interviews and through their usual anonymous statements to reporters, that today's hearing is not about getting information at all.   They said they want to, quote, bring the Mueller report to life and create a

television moment through ploys like having Mr. Mueller recite passages from his own report.

In other words, this hearing is political theater. It's a Hail Mary attempt to convince the American people that collusion is real and that it's concealed in the report. Granted, that's a strange argument to make about a report that is public. It's almost like the Democrats prepared arguments accusing Mr. Barr of hiding the report and didn't bother to update their claims once he published the entire thing.

Among congressional Democrats, the Russia investigation was never about finding the truth. It's always been a simple media operation. By their own accounts, this operation continues in this room today. Once again, numerous pressing issues this committee needs to address are put on hold to indulge the political fantasies of people who believed it was their destiny to serve Hillary Clinton's administration.

It's time for the curtain to close on the Russia hoax. The conspiracy theory is dead. At some point, I would argue, we're going to have to get back to work. Until then, I yield back the balance of my time.

[The statement of Mr. Nunes follows:]


******** COMMITTEE INSERT ********

The <u>Chairman.</u>   To ensure fairness and make sure that our hearing is prompt -- I know we got a late start, Director Mueller -- the hearing will be structured as follows. Each member of the committee will be afforded 5 minutes to ask questions, beginning with the chair and ranking member.   As chair, I will recognize thereafter, in an alternating fashion and descending order of seniority, members of the majority and minority.

After each member has asked his or her questions, the ranking member will be afforded an additional 5 minutes to ask questions, followed by the chair, who will have additional 5 minutes for questions.   The ranking member and the chair will not be permitted to delegate or yield our final round of questions to any other member.

After six members of the majority and six members of the minority have concluded their 5-minute rounds of questions, we'll take a 5- or 10-minute break, that we understand you've requested, before resuming the hearing with Congressman Swalwell starting his round of questions.

Special Counsel Mueller is accompanied today by Aaron Zebley, who served as deputy special counsel from May 2017 until May 2019 and had day-to-day oversight of the special counsel's investigation.   Mr. Mueller and Mr. Zebley resigned from the Department of Justice at the end of May 2019 when the Special Counsel's Office was closed.

Both Mr. Mueller and Mr. Zebley will be available to answer questions today and will be sworn in consistent with the rules of the House and the committee.   Mr. Mueller and Mr. Zebley's appearance today before the committee is in keeping with the committee's long-standing practice of receiving testimony from current or former Department of Justice and FBI personnel regarding open and closed investigative matters.

As this hearing is under oath and before we begin your testimony, Mr. Mueller and Zebley, would you please rise and raise your right hands to be sworn.

Do you swear or affirm that the testimony you're about to give at this hearing is the whole truth and nothing but the truth?

Mr. <u>Mueller.</u>   I do.

Mr. <u>Zebley.</u>   I do.

The <u>Chairman.</u>   The record will reflect that the witnesses have been duly sworn. Ranking member?

Mr. <u>Nunes.</u>   Thank you, Mr. Chair.   I just want to clarify that this is highly unusual for Mr. Zebley to be sworn in.   We're here to ask Director Mueller questions. He's here as counsel.   Our side is not going to be directing any questions to Mr. Zebley, and we have concerns about his prior representation of the Hillary Clinton campaign aide. So I just want to voice that concern that we do have, and we will not be addressing any questions to Mr. Zebley today.

The <u>Chairman.</u>   I thank the ranking member.   I realize, as you probably do, Mr. Zebley, that there is an angry man down the street who's not happy about you being here today, but it is up to this committee and not anyone else who will be allowed to be sworn in and testify, and you are welcome, as a private citizen, to testify, and members may direct their questions to whoever they choose.

With that, Director Mueller, you are recognized for any opening remarks you would like to make.

Case 1:19-gj-00048-BAH   Document 1-24   Filed 07/26/19   Page 12 of 19

11

**TESTIMONY OF ROBERT S. MUELLER III, FORMER SPECIAL COUNSEL**

Mr. Mueller.   Thank you.   Good afternoon, Chairman Schiff, Ranking Member Nunes, and members of the committee.   I testified this morning before the House Judiciary Committee.   I ask that the opening statement I made before that committee be incorporated into the record here.

The Chairman.   Without objection, Director.

[The information follows:]


******** COMMITTEE INSERT ********

Mr. <u>Mueller</u>.   I understand that this committee has a unique jurisdiction and that you are interested in further understanding the counterintelligence implications of our investigation.   So let me say a word about how we handled the potential impact of our investigation on counterintelligence matters.

As we explained in our report, the special counsel regulations effectively gave me the role of United States Attorney.   As a result, we structured our investigation around evidence for possible use in prosecution of Federal crimes.   We did not reach what you would call counterintelligence conclusions.   We did, however, set up processes in the office to identify and pass counterintelligence information on to the FBI.

Members of our office periodically briefed the FBI about counterintelligence information.   In addition, there were agents and analysts from the FBI who were not on our team but whose job it was to identify counterintelligence information in our files and to disseminate that information to the FBI.   For these reasons, questions about what the FBI has done with the counterintelligence information obtained from our investigation should be directed to the FBI.

I also want to reiterate a few points that I made this morning.   I am not making any judgments or offering opinions about the guilt or innocence in any pending case.   It is unusual for a prosecutor to testify about a criminal investigation, and given my role as a prosecutor, there are reasons why my testimony will necessarily be limited.

First, public testimony could affect several ongoing matters.   In some of these matters, court rules or judicial orders limit the disclosure of information to protect the fairness of the proceedings.   And consistent with longstanding Justice Department policy, it would be inappropriate for me to comment in any way that could affect an ongoing matter.

Second, the Justice Department has asserted privileges concerning investigative information and decisions, ongoing matters within the Justice Department, and deliberations within our office. These are Justice Department privileges that I will respect. The Department has released a letter discussing the restrictions on my testimony. I, therefore, will not be able to answer questions about certain areas that I know are of public interest.

For example, I am unable to address questions about the opening of the FBI's Russia investigation, which occurred months before my appointment, or matters related to the so-called Steele dossier. These matters are the subject of ongoing review by the Department. Any questions on these topics should, therefore, be directed to the FBI or the Justice Department.

Third, as I explained this morning, it is important for me to adhere to what we wrote in our report. The report contains our findings and analysis and the reasons for the decisions we made. We stated the results of our investigation with precision. I do not intend to summarize or describe the results of our work in a different way in the course of my testimony today.

As I stated in May, I also will not comment on the actions of the Attorney General or of Congress. I was appointed as a prosecutor, and I intend to adhere to that role and to the Department's standards that govern.

Finally, as I said this morning, over the course of my career, I have seen a number of challenges to our democracy. The Russian Government's efforts to interfere in our election is among the most serious, and I am sure the committee agrees.

Now, before we go to questions, I want to add one correction to my testimony this morning. I want to go back to one thing that was said this morning by Mr. Lieu, who said, and I quote: You didn't charge the President because of the OLC opinion.

That is not the correct way to say it. As we say in the report, and as I said at the opening, we did not reach a determination as to whether the President committed a crime.

And, with that, Mr. Chairman, I'm ready to answer questions.

[The statement of Mr. Mueller follows:]

******** COMMITTEE INSERT ********

President's credibility?

    Mr. Mueller.   And that I can't get into.

    Mrs. Demings.   Director Mueller, I know based on your decades of experience you've probably had an opportunity to analyze the credibility of countless witnesses, but you weren't able to do so with this witness?

    Mr. Mueller.   Well, with every witness, particularly a leading witness, one assesses the credibility day by day, witness by witness, document by document.   And that's what happened in this case.   So we started with very little, and, by the end, we ended up with a fair amount.   My -- yeah, a fair amount.

    Mrs. Demings.   Thank you.   Well, let's go through some of the answers to take a closer look at his credibility, because it seems to me, Director Mueller, that his answers were not credible at all.

    Did some of President Trump's incomplete answers relate to Trump Tower Moscow?

    Mr. Mueller.   Yes.

    Mrs. Demings.   For example, did you ask the President whether he had at any time directed or suggested that discussions about Trump Moscow project should cease?

    Mr. Mueller.   Should what?

    Mrs. Demings.   Cease.

    Mr. Mueller.   Do you have a citation?

    Mrs. Demings.   Yes.   We're still in Appendix C, section 1-7.

    Mr. Mueller.   The first page?

    Mrs. Demings.   Uh-huh.   It says:   "The President 'did not answer whether he had at any time directed or suggested that discussions about the Trump Moscow project should cease...but he has since made public comments about that topic.'"

Mr. Mueller.   Okay.   And the question was?

Mrs. Demings.   Did the President -- let me go on to the next.   Did the President fully answer that question in his written statement to you about the Trump Moscow project ceasing?   Again, in Appendix C.

Mr. Mueller.   And can you direct me to the particular paragraph you're adverting to?

Mrs. Demings.   It would be Appendix C, C-1.   But let me move forward.

Nine days after he submitted his written answers, didn't the President say publicly that he, quote, "decided not to do the project," unquote?   And that is in your report.

Mr. Mueller.   I'd ask you, if you would, to point out the particular paragraph that you're focused on.

Mrs. Demings.   Okay.   We can move on.

Did the President answer your followup questions?   According to the report, there were followup questions because of the President's incomplete answers about the Moscow project.   Did the President answer your followup questions, either in writing or orally?

And we're now in --

Mr. Mueller.   No.

Mrs. Demings.   -- Volume II, page 150 through 151.

Mr. Mueller.   No.

Mrs. Demings.   He did not.

In fact, there were many questions that you asked the President that he simply didn't answer.   Isn't that correct?

Mr. Mueller.   True.

Mrs. Demings.   And there were many answers that contradicted other evidence

you had gathered during the investigation. Isn't that correct --

Mr. Mueller. Yes.

Mrs. Demings. -- Director Mueller?

Director Mueller, for example, the President, in his written answers, stated he did not recall having advance knowledge of WikiLeaks releases. Is that correct?

Mr. Mueller. I think that's what he said.

Mrs. Demings. But didn't your investigation uncover evidence that the President did, in fact, have advance knowledge of WikiLeaks public releases of emails damaging to his opponent?

Mr. Mueller. And I can't get into that area.

Mrs. Demings. Did your investigation determine after very careful vetting of Rick Gates and Michael Cohen that you found them to be credible?

Mr. Mueller. That we found the President to be credible?

Mrs. Demings. That you found Gates and Cohen to be credible in their statements about WikiLeaks?

Mr. Mueller. Those areas I'm not going to discuss.

Mrs. Demings. Okay.

Could you say, Director Mueller, that the President was credible?

Mr. Mueller. I can't answer that question.

Mrs. Demings. Director Mueller, isn't it fair to say that the President's written answers were not only inadequate and incomplete, because he didn't answer many of your questions, but where he did, his answers showed that he wasn't always being truthful?

Mr. Mueller. There I would say generally.

Mrs. Demings. Generally.

Director Mueller, it's one thing for the President to lie to the American people about your investigation, falsely claiming that you found no collusion or no obstruction. But it's something else altogether for him to get away with not answering your questions and lying about them.   And as a former law enforcement officer of almost 30 years, I find that a disgrace to our criminal justice system.

Thank you so --

Mr. Mueller.   Thank you, ma'am.

Mrs. Demings.   -- much.

I yield back to the chairman.

The Chairman.   Mr. Krishnamoorthi.

Mr. Krishnamoorthi.   Director Mueller, thank you for your devoted service to your country.

Earlier today, you described your report as detailing a criminal investigation, correct?

Mr. Mueller.   Yes.

Mr. Krishnamoorthi.   Director, since it was outside the purview of your investigation, your report did not reach counterintelligence conclusions regarding the subject matter of your report.

Mr. Mueller.   That's true.

Mr. Krishnamoorthi.   For instance, since it was outside your purview, your report did not reach counterintelligence conclusions regarding any Trump administration officials who might potentially be vulnerable to compromise or blackmail by Russia, correct?

Mr. Mueller.   Those decisions probably were made in a counter -- in the FBI.

Mr. Krishnamoorthi.   But not in your report, correct?