**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

IN RE:

APPLICATION OF THE COMMITTEE ON
THE JUDICIARY, U.S. HOUSE OF REPRE-
SENTATIVES, FOR AN ORDER AUTHORIZ-
ING THE RELEASE OF CERTAIN GRAND
JURY MATERIALS

Case No. 1:19-gj-00048-BAH

---

**MOTION OF CONSTITUTIONAL ACCOUNTABILITY
CENTER FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF
IN SUPPORT OF THE COMMITTEE ON THE JUDICIARY,
<u>U.S. HOUSE OF REPRESENTATIVES</u>**

*Amicus curiae* Constitutional Accountability Center respectfully moves for leave to file the

attached brief in support of the Committee on the Judiciary, U.S. House of Representatives.  In

support of this motion, *amicus* states:

1.      *Amicus* Constitutional Accountability Center (CAC) is a think tank, public interest

law firm, and action center dedicated to fulfilling the progressive promise of our Constitution's

text and history.  CAC works in our courts, through our government, and with legal scholars to

improve understanding of the Constitution and preserve the rights, freedoms, and structural safe-

guards that our nation's charter guarantees.

2.      This Court has "broad discretion" in deciding whether to allow the filing of *amicus*

*curiae* briefs.  *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 519 F. Supp. 2d 89, 93

(D.D.C. 2007) (citing *United States v. Microsoft Corp.*, No. 98-1232, 2002 WL 319366, at *2

(D.D.C. Feb. 28, 2002)).  "The filing of an *amicus* brief should be permitted if it will assist the

judge 'by presenting ideas, arguments, theories, insights, facts or data that are not to be found in

the parties' briefs.'"  *N. Mariana Islands v. United States*, No. 08-1572, 2009 WL 596986, at *1

(D.D.C. Mar. 6, 2009) (quoting *Voices for Choices v. Ill. Bell Tel. Co.*, 339 F.3d 542, 545 (7th Cir.

2003)); *In re Search of Info. Associated with [redacted]@mac.com*, 13 F. Supp. 3d 157, 167 (D.D.C. 2014) (same); *Iacangelo v. Georgetown Univ.*, No. 05-2086, 2009 WL 10693231, at *2 n.4 (D.D.C. June 11, 2009) (same).  Courts have permitted third parties to participate as *amici curiae* when they "are of aid to the court and offer insights not available from the parties," *United States v. El-Gabrowny*, 844 F. Supp. 955, 957 n.1 (S.D.N.Y. 1994), and when they have "relevant expertise and a stated concern for the issues at stake in [the] case," *District of Columbia v. Potomac Elec. Power Co.*, 826 F. Supp. 2d 227, 237 (D.D.C. 2011).  "The primary role of the *amicus* is to assist the Court in reaching the right decision in a case affected with the interest of the general public." *Russell v. Bd. of Plumbing Exam'rs.*, 74 F. Supp. 2d 349, 351 (S.D.N.Y. 1999); *see Nat'l Ass'n of Home Builders*, 519 F. Supp. 2d at 93 (granting leave to file because "the court may benefit from [the *amicus*]'s input"); *Potomac Elec. Power Co.*, 826 F. Supp. 2d at 237 (same); *Microsoft Corp.*, 2002 WL 319366, at *3 (same).

3.      The proposed, attached *amicus curiae* brief plainly satisfies this Court's standard for accepting *amicus* briefs.  CAC has studied the history of the grand jury, including the scope of grand jury secrecy both before and after the enactment of the Federal Rules of Criminal Procedure. The proposed *amicus* brief details that history, including in particular the application of grand jury secrecy rules to congressional requests for grand jury materials.  As the brief explains, grand jury secrecy has never been absolute, and courts have long authorized the disclosure of grand jury materials when the interests of justice require it.  And, significantly, there is a long history of Congress receiving grand jury materials to further its impeachment function.  The brief also explains why the Committee's request for grand jury materials in this case falls well within that long-standing tradition, and why its application should be granted.

4.      Counsel for the Committee on the Judiciary, U.S. House of Representatives has consented to the filing of this motion and the attached *amicus curiae* brief.  Counsel for the United States Department of Justice has taken no position on the filing of this motion and the attached *amicus curiae* brief.

For the foregoing reasons, leave to file the attached *amicus curiae* brief should be granted. A proposed order is enclosed with this motion.

Respectfully submitted,

Dated:  August 30, 2019                    /s/ Brianne J. Gorod
                                           Brianne J. Gorod

                                           Elizabeth B. Wydra (DC Bar No. 483298)
                                           Brianne J. Gorod (DC Bar No. 982075)
                                           Ashwin P. Phatak (DC Bar No. 1531218)
                                           CONSTITUTIONAL ACCOUNTABILITY CENTER
                                           1200 18th Street, N.W., Suite 501
                                           Washington, D.C. 20036
                                           (202) 296-6889
                                           brianne@theusconstitution.org

**CERTIFICATE OF SERVICE**

I hereby certify that on August 30, 2019, the foregoing document was filed with the Clerk

of the Court, using the CM/ECF system, causing it to be served on all counsel of record.

Dated: August 30, 2019

/s/ Brianne J. Gorod
Brianne J. Gorod

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

IN RE:

APPLICATION OF THE COMMITTEE ON
THE JUDICIARY, U.S. HOUSE OF REPRE-
SENTATIVES, FOR AN ORDER AUTHORIZ-
ING THE RELEASE OF CERTAIN GRAND
JURY MATERIALS

Case No. 1:19-gj-00048-BAH

**BRIEF OF CONSTITUTIONAL ACCOUNTABILITY
CENTER AS *AMICUS CURIAE* IN SUPPORT OF
THE COMMITTEE ON THE JUDICIARY,
<u>U.S. HOUSE OF REPRESENTATIVES</u>**

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Ashwin P. Phatak (DC Bar No. 1531218)
CONSTITUTIONAL ACCOUNTABILITY
   CENTER
1200 18th Street, N.W., Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTEREST OF *AMICUS CURIAE*.................................................................................... 1

INTRODUCTION ............................................................................................................. 1

ARGUMENT ..................................................................................................................... 5

   I.  THERE IS A LONG HISTORY OF GRAND JURY MATERIALS BEING DIS-
      CLOSED IN APPROPRIATE CIRCUMSTANCES, AND THE FEDERAL
      RULES OF CRIMINAL PROCEDURE MAINTAIN THAT LONG-STANDING
      LEGAL TRADITION................................................................................................ 5

  II.  COURTS HAVE ROUTINELY DISCLOSED GRAND JURY MATERIALS TO
      CONGRESS TO FURTHER ITS IMPEACHMENT FUNCTION............................ 11

 III.  THIS COURT SHOULD AUTHORIZE THE RELEASE OF THE GRAND JURY
      MATERIALS RELATED TO MUELLER'S REPORT THAT THE COMMIT-
      TEE HAS REQUESTED............................................................................................ 18

CONCLUSION.................................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Atwell v. United States*,
162 F. 97 (4th Cir. 1908)..................................................................... 2, 7, 8, 10

*Blair v. United States*,
250 U.S. 273 (1919) ............................................................................ 6

*Costello v. United States*,
350 U.S. 359 (1956) ............................................................................ 5

*Doe v. Rosenberry*,
255 F.2d 118 (2d Cir. 1958)................................................................ 2, 11

*Douglas Oil Co. of Cal. v. Petrol Stops Nw.*,
441 U.S. 211 (1979) ............................................................. 4, 5, 6, 20, 22

*Haldeman v. Sirica*,
501 F.2d 714 (D.C. Cir. 1974) ............................................. 3, 14, 15, 18

*In re Cisneros*,
426 F.3d 409 (D.C. Cir. 2005) ........................................................... 17, 22

*In re Espy*,
259 F.3d 725 (D.C. Cir. 2001) ........................................................... 17

*In re Grand Jury Investigation of Uranium Indus.*,
No. 78-0173, 1979 WL 1661 (D.D.C. Aug. 16, 1979)........................ 15

*In re Grand Jury Proceedings*,
4 F. Supp. 283 (E.D. Pa. 1933)........................................................... 2, 7, 8, 9

*In re Grand Jury Proceedings of Grand Jury No. 81-1 (Miami)*,
669 F. Supp. 1072 (S.D. Fla. 1987)...................................... 15, 16, 19, 22

*In re North*,
16 F.3d 1234 (D.C. Cir. 1994) ........................................................... 17

*In re Petition to Inspect & Copy Grand Jury Materials*,
735 F.2d 1261 (11th Cir. 1984)........................................................... 11

*In re Report & Recommendation of June 5, 1972 Grand Jury Concerning Transmission of Evidence to the House of Representatives*,
370 F. Supp. 1219 (D.D.C. 1974) ...................................................... *passim*

*McKeever v. Barr*,
920 F.3d 842 (D.C. Cir. 2019) ........................................................... 3, 15, 18

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Metzler v. United States*,
    64 F.2d 203 (9th Cir. 1933) ............................................................................... 2, 8, 9

*Pittsburgh Plate Glass Co. v. United States*,
    360 U.S. 395 (1959) ........................................................................................ 10, 20

*Schmidt v. United States*,
    115 F.2d 394 (6th Cir. 1940) ................................................................................. 10

*Special Feb. 1971 Grand Jury v. Conlisk*,
    490 F.2d 894 (7th Cir. 1973) ............................................................................... 2, 11

*United States v. Am. Med. Ass'n*,
    26 F. Supp. 429 (D.D.C. 1939) ............................................................................. 10

*United States v. Calandra*,
    414 U.S. 338 (1974) ................................................................................................ 5

*United States v. Farrington*,
    5 F. 343 (N.D.N.Y. 1881) ....................................................................................... 7

*United States v. Procter & Gamble Co.*,
    356 U.S. 677 (1958) ................................................................................................ 9

*United States v. Rose*,
    215 F.2d 617 (1954) ............................................................................................... 9

*United States v. Sells Eng'g, Inc.*,
    463 U.S. 418 (1983) ................................................................................................ 5

*United States v. Smith*,
    27 F. Cas. 1186 (C.C.D.N.Y. 1806) ....................................................................... 7

*United States v. Socony-Vacuum Oil Co., Inc.*,
    310 U.S. 150 (1940) ............................................................................................. 2, 9

Constitutional Provisions, Statutes, and Legislative Materials

28 U.S.C. § 594(h)(1)(B) (2014) ................................................................................. 17

165 Cong. Rec. (daily ed. Jan. 3, 2019) .................................................................. 4, 19

Fed. R. Crim. P. 6(e)(2) ............................................................................................... 9

Fed. R. Crim. P. 6(e)(3)(A)(i) .................................................................................... 10

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Fed. R. Crim. P. 6(e)(3)(C) ................................................................ 10

Fed. R. Crim. P. 6(e)(3)(E)(i) ............................................................ 2, 10

Fed. R. Crim. P. 6(e) 1944 advisory committee's note 1 ............................... 2, 10, 14

H.R. Rep. No. 100-810 (1988) ............................................................ 19

H.R. Rep. No. 111-427 (2010) ............................................................ 16

H.R. Rep. No. 116-105 (2019) ............................................................ 18

H.R. Res. 13, 116th Cong. (2019) ....................................................... 4, 19

H.R. Res. 128, 100th Cong. (1987) ...................................................... 19

U.S. Const. amend. V .................................................................... 6


Books, Articles, and Other Authorities

*Application of the Comm. on the Judiciary, U.S. House of Representatives, for an Order Authorizing the Release of Certain Grand Jury Materials* (July 26, 2019) .......... *passim*

Richard M. Calkins, *Grand Jury Secrecy*, 63 Mich. L. Rev. 455 (1965) ...................... 6

6 *Cannon's Precedents of the House of Representatives* (1921) .................................... 12, 13

*Constitution, Jefferson's Manual, and Rules of the House of Representatives*, H.R. Doc. No. 114-192 (2d Sess. 2017) ............................................................ 4, 19

Court Order, *In Re: Grand Jury Proceeding*, No. 09-30737 (5th Cir. Nov. 12, 2009) ... 16

Michael A. Foster, Cong. Research Serv., R45456, *Federal Grand Jury Secrecy: Legal Principles and Implications for Congressional Oversight* (2019) ...................... 6, 7

2 *Hinds' Precedents of the House of Representatives* (1907) ......................................... 12

3 *Hinds' Precedents of the House of Representatives* (1907) ................................... 3, 11, 12, 20

Mark Kadish, *Behind the Locked Door of an American Grand Jury: Its History, Its Secrecy, and Its Process*, 24 Fla. St. U. L. Rev. 1 (1996) ........................................... 6, 7

Special Counsel Robert S. Mueller, III, U.S. Dep't of Justice, *Report on the Investigation into Russian Interference in the 2016 Presidential Election* (Mar. 2019) ........... 1, 4, 20, 21

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

Order, *In Re: Grand Jury Investigation of U.S. Dist. Judge G. Thomas Porteous, Jr.*,
   No. 2:09-mc-04346-CVSG (E.D. La. Aug. 6, 2009) (Dkt. No. 10)..........................   16

*A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op.
   O.L.C. 222 (2000) ...............................................................................................   20

John Somers, *The Security of Inglish-Mens Lives, or the Trust, Power, and Duty of
   the Grand Jurys of England* (London, Benjamin Alsop 1682) ...................................   6

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus* Constitutional Accountability Center (CAC) is a think tank, public interest law firm, and action center dedicated to fulfilling the progressive promise of our Constitution's text and history.  CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and preserve the rights, freedoms, and structural safeguards that our nation's charter guarantees.  CAC thus has a strong interest in the grand jury as an institution and the circumstances under which grand jury materials may be disclosed, as well as the ability of Congress to exercise its oversight responsibilities.  CAC accordingly has an interest in this case.

## INTRODUCTION

In March, Special Counsel Robert Mueller issued a detailed report of his investigation into Russia's interference in the 2016 election, as well as President Trump's many efforts to obstruct that investigation.  *See* Special Counsel Robert S. Mueller, III, U.S. Dep't of Justice, *Report on the Investigation into Russian Interference in the 2016 Presidential Election* (Mar. 2019) ("Mueller Report").  However, the version of the report that was released publicly—including to Members of Congress—was significantly redacted.  Specifically, several key portions of the report that referenced grand jury proceedings or materials were omitted pursuant to Federal Rule of Criminal Procedure 6(e), which governs when and to whom grand jury materials may be disclosed.  The House Judiciary Committee has now filed an application requesting that this Court release to the Committee those portions of the report redacted as grand jury materials, as well as any underlying grand jury transcripts or exhibits that are referenced in the redacted portions of the report or that are related to actions of the President that the Committee is investigating.  *See Application of the*

---

[1] No person or entity other than *amicus* and its counsel assisted in or made a monetary contribution to the preparation or submission of this brief.

*Comm. on the Judiciary, U.S. House of Representatives, for an Order Authorizing the Release of Certain Grand Jury Materials* (July 26, 2019) ("*Committee Application*").  That request should be granted.

Although "[g]rand jury testimony is ordinarily confidential," the Supreme Court has long made clear that "after the grand jury's functions are ended, disclosure is wholly proper where the ends of justice require it."  *United States v. Socony-Vacuum Oil Co., Inc.*, 310 U.S. 150, 233-34 (1940); *In re Grand Jury Proceedings*, 4 F. Supp. 283, 284 (E.D. Pa. 1933) ("the rule of secrecy has long since been relaxed by permitting disclosure whenever the interest of justice requires," and that determination "rests largely within the discretion of the court whose grand jury is concerned").  Thus, courts have long permitted the release of grand jury materials under certain circumstances.  *See, e.g.*, *Metzler v. United States*, 64 F.2d 203 (9th Cir. 1933); *Atwell v. United States*, 162 F. 97 (4th Cir. 1908).

Against that background, when grand jury secrecy was codified in the Federal Rules of Criminal Procedure in 1946, those Rules incorporated the long-standing view that courts should have discretion to disclose grand jury materials under certain circumstances.  Indeed, the Advisory Committee that promulgated those rules explained that Rule 6(e) was intended to "continue[] the traditional practice of secrecy on the party of members of the grand jury, except when the court permits a disclosure."  Fed. R. Crim. P. 6(e) 1944 advisory committee's note 1.  To that end, the Rule explicitly permits a court to authorize disclosure of grand jury materials in certain circum-stances, including "preliminarily to or in connection with a judicial proceeding," Fed. R. Crim. P. 6(e)(3)(E)(i), and courts have disclosed grand jury materials pursuant to that Rule in a variety of circumstances, *see, e.g.*, *Special Feb. 1971 Grand Jury v. Conlisk*, 490 F.2d 894, 896-98 (7th Cir.

1973) (disclosure to police department investigating corruption); *Doe v. Rosenberry*, 255 F.2d 118, 120 (2d Cir. 1958) (disclosure to bar association investigating one of its members).

Indeed, both before and after the passage of the Federal Rules, Congress has received grand jury materials to further its impeachment and investigative functions.  For example, as early as 1811, a grand jury in the Mississippi Territory forwarded to the House of Representatives its presentment specifying charges against federal territorial judge Harry Toulmin, which set in motion a House inquiry regarding whether to initiate formal impeachment proceedings.  3 *Hinds' Precedents of the House of Representatives* § 2488, at 984-85 (1907); *see In re Report & Recommendation of June 5, 1972 Grand Jury Concerning Transmission of Evidence to the House of Representatives*, 370 F. Supp. 1219, 1230 & n.47 (D.D.C. 1974) ("*June 5, 1972 Grand Jury*") (citing this early example of disclosure of grand jury materials).  And following the passage of the Federal Rules, courts have disclosed grand jury materials to Congress for use in impeachment investigations.  Most prominently, this Court permitted the transfer of a grand jury report concerning allegedly illegal conduct by President Nixon to the House Judiciary Committee in 1974.  *June 5, 1972 Grand Jury*, 370 F. Supp. 1219.  Sitting en banc, the D.C. Circuit approved of this Court's decision, *Haldeman v. Sirica*, 501 F.2d 714, 715 (D.C. Cir. 1974) (en banc), and a D.C. Circuit panel recently clarified that, in its view, that report was released under "the Rule 6 exception for 'judicial proceedings,'" *McKeever v. Barr*, 920 F.3d 842, 847 n.3 (D.C. Cir. 2019).

In short, the D.C. Circuit has twice acknowledged that courts may disclose grand jury materials to Congress under Rule 6(e) to further Congress's impeachment function, and the House Judiciary Committee's request for the grand jury materials associated with Special Counsel Mueller's report plainly furthers that function.  As the House's application makes clear, the House Judiciary Committee is considering impeachment today, *see Committee Application* at 30-31;

indeed, several resolutions by Members of the House proposing impeachment have been referred to the Committee for its consideration pursuant to House rules, *see, e.g.*, 165 Cong. Rec. H211 (daily ed. Jan. 3, 2019) (referring H.R. Res. 13, 116th Cong. (2019), which proposed impeaching President Trump, to the House Judiciary Committee); *see also Constitution, Jefferson's Manual, and Rules of the House of Representatives* § 603, H.R. Doc. No. 114-192, at 319 (2d Sess. 2017) ("a resolution introduced by a Member and referred to a committee" can "set[] an impeachment in motion").

Moreover, the House's request satisfies the criteria the Supreme Court has recognized that "[p]arties seeking grand jury transcripts under Rule 6(e) must" satisfy: "the material they seek is needed to avoid a possible injustice in another judicial proceeding, . . . the need for disclosure is greater than the need for continued secrecy, and . . . their request is structured to cover only material so needed." *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 222 (1979).

First, failing to disclose these materials would result in injustice: although the Special Counsel concluded that the President engaged in serious misconduct, he did not indict him on the theory that it is Congress—not the Department of Justice—that must hold the President accountable. *See* 2 Mueller Report at 1 & n.2 (pointing to "constitutional processes for addressing presidential misconduct"). Congress should not now be prevented from viewing information plainly relevant to its impeachment deliberations because that evidence was also presented to a grand jury. Second, the need for disclosure is obviously greater than the need for continued secrecy. "It would be difficult to conceive of a more compelling need . . . for an unswervingly fair inquiry based on all the pertinent information" than an impeachment investigation of the President. *June 5, 1972 Grand Jury*, 370 F. Supp. at 1230. And the need for secrecy is lessened where the Committee seeks disclosure to only a limited number of authorized individuals in Congress, not the broader

public.  *See Douglas Oil Co.*, 441 U.S. at 223 ("as the considerations justifying secrecy become less relevant, a party asserting a need for grand jury transcripts will have a lesser burden in showing justification").  Third, the request covers only material the Committee needs: "information that the Special Counsel deemed sufficiently significant to be included or referenced in the Report itself; any grand jury materials that bear directly on or provide context regarding the President's state of mind; and grand jury materials that describe actions taken by the central witness to the Committee's investigation, Don McGahn."  *Committee Application* at 40.  In short, the Committee's request is both narrowly tailored and critical to its ability to investigate the President and make an informed decision regarding whether to impeach him.  This Court should grant the Committee's request.

## ARGUMENT

I.  **THERE IS A LONG HISTORY OF GRAND JURY MATERIALS BEING DISCLOSED IN APPROPRIATE CIRCUMSTANCES, AND THE FEDERAL RULES OF CRIMINAL PROCEDURE MAINTAIN THAT LONG-STANDING LEGAL TRADITION.**

The grand jury is a centuries-old institution, and while there is a long tradition of maintaining the secrecy of grand jury deliberations, grand jury secrecy has never been absolute.  Throughout the development of the federal grand jury in American law, grand jury materials have regularly been made public where courts concluded that the interests of justice required it.  And the Federal Rules of Criminal Procedure, which today govern grand jury proceedings, codified that tradition.

"[A]n English institution," the grand jury was "brought to this country by the early colonists and incorporated in the Constitution by the Founders."  *Costello v. United States*, 350 U.S. 359, 362 (1956); *see United States v. Calandra*, 414 U.S. 338, 342 (1974) ("The institution of the grand jury is deeply rooted in Anglo-American history."); *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 423 (1983) ("The grand jury has always occupied a high place as an instrument of justice

in our system of criminal law—so much so that it is enshrined in the Constitution.").  Specifically, the Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."  U.S. Const. amend. V. In other words, under the Fifth Amendment, the government may not indict an individual for a federal felony except with the consent of a grand jury.  *Blair v. United States*, 250 U.S. 273, 280 (1919) ("By the Fifth Amendment a presentment or indictment by grand jury was made essential to hold one to answer for a capital or otherwise infamous crime . . . .").

Even before the grand jury was enshrined in the Constitution, "grand jury proceedings [were] closed to the public, and records of such proceedings [were] kept from the public eye." *Douglas Oil Co.*, 441 U.S. at 218 n.9 (citing Richard M. Calkins, *Grand Jury Secrecy*, 63 Mich. L. Rev. 455, 457 (1965)).  Legal scholars in England, like John Somers, explained that "grand jurors were sworn not to disclose the subjects of the inquiry, the witnesses, or any of the evidence," and were also prohibited from revealing "their own personal knowledge, the knowledge of their fellow jurors, their investigative plans, or their deliberations."  Mark Kadish, *Behind the Locked Door of an American Grand Jury: Its History, Its Secrecy, and Its Process*, 24 Fla. St. U. L. Rev. 1, 14-15 (1996) (citing John Somers, *The Security of Inglish-Mens Lives, or the Trust, Power, and Duty of the Grand Jurys of England* 43 (London, Benjamin Alsop 1682)).

The Grand Jury Clause in the U.S. Constitution incorporated this tradition, making "grand jury secrecy an implicit part of American criminal jurisprudence."  *Id.* at 16.  Importantly, however, the general rule of grand jury secrecy was "not unyielding."  Michael A. Foster, Cong. Research Serv., R45456, *Federal Grand Jury Secrecy: Legal Principles and Implications for Congressional Oversight* 5 (2019).  Instead, the rule of secrecy was "relaxed [to] permit[] disclosure whenever the interest of justice requires," and the decision whether to disclose grand jury materials

has been left "largely within the discretion of the court whose grand jury is concerned." *In re Grand Jury Proceedings*, 4 F. Supp. at 284; *see United States v. Farrington*, 5 F. 343, 346 (N.D.N.Y. 1881) ("[i]t is only practicable" for courts to exercise "a salutary supervision over the proceedings of a grand jury" by "removing the veil of secrecy whenever evidence of what has transpired before them becomes necessary to protect public or private rights").

Most exceptions to grand jury secrecy developed in response to criminal defendants' arguments that the grand jury had heard improper evidence or that some other type of misconduct had infected the grand jury proceedings.  Foster, *supra*, at 5.  For instance, in *United States v. Smith*, decided only a few years after the Bill of Rights was ratified, a New York district court held that a defendant could challenge an indictment on the theory that illegal evidence was introduced to a grand jury.  27 F. Cas. 1186 (C.C.D.N.Y. 1806).  The prosecution argued that a grand jury was meant to be "independent, and irresponsible; judging for themselves as to the grounds on which they will prefer an accusation, and that no one has a right to investigate or to know what evidence they have had before them." *Id.* at 1188.  Defense counsel responded that "no unlawful act done in the grand jury, is such a secret as jurors are bound by their oaths to keep." *Id.* at 1189.  The court agreed with the defense, holding that although the grand jury itself is bound to "keep[] its deliberations secret," the court is entitled to determine whether it has acted "according to the rules of law." *Id.* at 1188.  The court therefore "implicitly accept[ed] the defense argument" that secrecy was in part intended to "protect[] the individual accused and, consequently, could be lifted where secrecy defeated that purpose." Kadish, *supra*, at 17.

Later cases came to a similar conclusion.  In *Atwell v. United States*, the Fourth Circuit held that the policy of grand jury secrecy alone did not shield a grand juror from being questioned about the evidence he considered while serving (though the court prevented the juror from

testifying for other reasons).  162 F. at 98, 101, 103.  The court acknowledged that secrecy was important "during the sittings and deliberations of the grand jury" because otherwise the grand jury's role "to make a preliminary and ex parte investigation . . . could easily be impeded by persons fearing indictment." *Id.* at 100.  Moreover, although the court suggested there should be "indefinite secrecy as to the discussions and vote of the individual members of the jury," it held that the "evidence adduced before the grand jury" could sometimes be made public "after such jury has made its presentment and indictment, publication thereof has been made, the grand jury finally discharged, and the defendant is in custody." *Id.*  At that point, the court held that secrecy must be maintained "[t]o the full extent necessary to fulfill the ends of justice, *and no further*." *Id.* (emphasis added).

And in *Metzler v. United States*, the Ninth Circuit held that "[a]fter the [grand jury's] indictment has been found and made public and the defendants apprehended, the policy of the law does not require the same secrecy as before." 64 F.2d at 206.  To the contrary, "[w]here the ends of justice can be furthered thereby and when the reasons for secrecy no longer exist, the policy of the law requires that the veil of secrecy be raised." *Id.*  Thus, the court permitted an assistant U.S. attorney to read into evidence his shorthand notes of grand jury proceedings in which certain defendants had confessed.  *Id.*

Finally, in *In re Grand Jury Proceedings*, a district court allowed the presentation of grand jury material from an investigation regarding an alleged conspiracy to violate the National Prohibition Act in a civil case regarding the revocation of a liquor license.  4 F. Supp. at 284.  The court noted that the secrecy rules were "designed for the protection of the witnesses who appear and for the purpose of allowing a wider and freer scope to the grand jury itself." *Id.* at 284-85.  However, "[t]he fact that the grand jury has adjourned and been discharged has often been considered as one

reason for abandoning secrecy as to its deliberations." *Id.* at 285.  In all, the court explained that

the decision to release grand jury material "yields to the general consideration whether the ends of

justice will be furthered by the disclosure." *Id.*  On that basis, the court allowed the grand jury

material to be introduced in the civil case.

Building on this precedent, the Supreme Court recognized nearly a century ago that grand

jury materials need not always remain secret.  Although "[g]rand jury testimony is ordinarily con-

fidential," the Court reasoned, "after the grand jury's functions are ended, disclosure is wholly

proper where the ends of justice require it." *Socony-Vacuum Oil Co.*, 310 U.S. at 233, 234 (citing

*Metzler*, 64 F.2d 203).

In 1946, the Federal Rules of Criminal Procedure were enacted, including several provi-

sions governing grand jury procedures.  Notably, Rule 6(e) codified grand jury secrecy principles

that had, up until that time, been a part of the common law enforced by courts, prohibiting grand

jurors, government attorneys, and others from disclosing a matter occurring before the grand jury

and any materials associated with that matter.  *See* Fed. R. Crim. P. 6(e)(2).  The Supreme Court

has explained that the secrecy rules codified in the Federal Rules serve the same purposes as the

common law rule of secrecy: they are intended to "prevent the escape of those whose indictment

may be contemplated," "insure the utmost freedom to the grand jury in its deliberations," prevent

"perjury or tampering with the witnesses," "encourage free and untrammeled disclosures," and

"protect [the] innocent accused who is exonerated from disclosure of the fact that he has been

under investigation." *United States v. Procter & Gamble Co.*, 356 U.S. 677, 681 n.6 (1958) (quot-

ing *United States v. Rose*, 215 F.2d 617, 628 (1954)).

Like the practice of courts before the Rules' enactment, however, the Rules do not fore-

close all disclosure of grand jury materials.  Instead, as the Advisory Committee Notes explain,

Rule 6(e) was intended to "continue[] the traditional practice of secrecy on the part of members of the grand jury, *except when the court permits a disclosure*."  Fed. R. Crim. P. 6(e) 1944 advisory committee's note 1 (emphasis added).  The Notes then cite three cases, all of which stand for the proposition that district courts have discretion to release grand jury materials publicly where appropriate.  *Id.*; *see Schmidt v. United States*, 115 F.2d 394, 397 (6th Cir. 1940) ("Logically, the responsibility for relaxing the rule of secrecy and of supervising any subsequent inquiry should reside in the court, of which the grand jury is a part and under the general instructions of which it conducted its 'judicial inquiry.'  It is a matter which appeals to the discretion of the court when brought to its attention." (citations omitted)); *United States v. Am. Med. Ass'n*, 26 F. Supp. 429, 430 (D.D.C. 1939) ("Neither indictment, arrest of the accused, nor expiration of the jury term will operate to release a juror from the oath of secrecy, as the defendants here contend.  That can only be done by a court acting in a given case when in its judgment the ends of justice so require." (citations omitted)); *Atwell*, 162 F. at 99-101 (described *supra* at 7-8).  As the Supreme Court explained following the Rules' enactment, "the federal trial courts as well as the Courts of Appeals have been nearly unanimous in regarding disclosure as committed to the discretion of the trial judge," and "Rule 6(e) is but declaratory" of "the same principle."  *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 399 (1959).  To that end, Rule 6(e) explicitly enumerates several exceptions to the secrecy requirement, including, for example, that "[a]n attorney for the government may disclose any grand-jury matter to another federal grand jury," Fed. R. Crim. P. 6(e)(3)(C), and that grand jury material can be made available to another "attorney for the government for use in performing that attorney's duty," Fed. R. Crim. P. 6(e)(3)(A)(i).  Most importantly for this case, the Rule permits a court to authorize disclosure in certain circumstances, including "preliminarily to or in connection with a judicial proceeding."  Fed. R. Crim. P. 6(e)(3)(E)(i).

In the years since the Rule was adopted, courts have routinely permitted the disclosure of grand jury materials in a variety of circumstances where the interests of justice required it.  *See, e.g.*, *In re Petition to Inspect & Copy Grand Jury Materials*, 735 F.2d 1261, 1263 (11th Cir. 1984) (permitting grand jury materials regarding a federal judge's indictment to be transferred to the Investigating Committee of the Judicial Council of the Eleventh Circuit as part of its investigation into whether it would recommend impeachment); *Special Feb. 1971 Grand Jury*, 490 F.2d at 895 (permitting grand jury transcripts pertinent to alleged criminal conspiracy and corruption among police officers to be released to a Chicago Police Department's board of inquiry); *Doe*, 255 F.2d at 119-20 (permitting grand jury testimony regarding an attorney's alleged corruption and criminal activity to be released to Grievance Committee of the New York City Bar Association).

\* \* \*

In short, there is a long history of grand jury materials being disclosed notwithstanding the general tradition of grand jury secrecy, and the Federal Rules of Criminal Procedure maintained that practice.  As the next Section describes, courts have been especially willing to permit disclosure of grand jury materials to Congress to further Congress's impeachment function.

## II.     COURTS HAVE ROUTINELY DISCLOSED GRAND JURY MATERIALS TO CONGRESS TO FURTHER ITS IMPEACHMENT FUNCTION.

The House has sometimes been described as "a grand jury . . . to the nation," with "the duty . . . to examine into the conduct of public officers."  3 *Hinds' Precedents of the House of Representatives* § 1729, at 85-86 (describing 1818 House resolution that formed a committee to investigate whether federal clerks and other officers "have conducted themselves improperly in their official duties"); *see id.* § 2342, at 714 (noting, in the debates over the impeachment inquiry of Justice Samuel Chase in 1804, that "[t]he analogy between the function of the House in this matter [impeachment] and that of a grand jury was correct and forcible"); *id.* § 2505, at 1009 (Rep.

Henry L. Dawes noting in the impeachment inquiry of Judge Mark W. Delahay that "[t]he Senate

is a perpetual court of impeachment, and in presenting these articles we act only as a grand jury").

Because the House effectively acts as a grand jury when investigating public officers and deciding

whether to impeach them, it has a special need for grand jury materials pertaining to those public

officers' misdeeds.  Indeed, there is a long tradition of both bodies of Congress receiving grand

jury materials, both before and after the passage of the Federal Rules of Criminal Procedure.

As early as 1811, a county grand jury in the Mississippi Territory forwarded to the House

of Representatives its presentment specifying charges against federal territorial judge Harry Toul-

min for consideration in a possible impeachment action.  *Id.* § 2488, at 984-85.  Indeed, the House

"inquiry as to Judge Toulmin was *set in motion* by action of a grand jury forwarded by a Territorial

legislature."  *Id.* at 984 (emphasis added).  While the House eventually "declined to order a formal

investigation," *id.* at 985, what is significant for these purposes is that it received the grand jury

materials, and so far as *amicus* is aware, that disclosure was not controversial at the time.

There are many similar examples prior to the adoption of the Federal Rules.  *See, e.g.*, 2

*id.* § 1123, at 700 (describing congressional investigation of election fraud in St. Louis in 1902 in

which a committee received "a report of a grand jury which sat in St. Louis" that described "a

conspiracy entered into by leading officials of sitting Member's party"); 6 *Cannon's Precedents

of the House of Representatives* § 74, at 99 (1921) (noting, in Senate inquiry into contested elec-

tion, that a grand jury had conducted a thorough investigation "[a]nd everything before the grand

jury which was deemed at all relevant was introduced at Grand Rapids, and the entire testimony

at Grand Rapids was available to th[e Senate] committee which, on the part of the Senate, exam-

ined into this matter"); *id.* § 399, at 565 (noting, in 1924 Senate inquiry into Senator Wheeler, that

a committee chairman sent "a telegram to the presiding judge of the court in Montana asking for

the minutes of the grand jury proceedings, the names of the witnesses, and the documentary evidence which had gone before the grand jury," and received that information).

This practice persisted following the enactment of the Federal Rules. Most prominently, this Court permitted a grand jury report concerning allegedly illegal conduct by President Nixon to be given to the House Judiciary Committee in 1974. *See June 5, 1972 Grand Jury*, 370 F. Supp. 1219. In that case, the grand jury "heard evidence that it regard[ed] as having a material bearing on matters within the primary jurisdiction of the Committee in its current inquiry [into the President]," and lodged with the Court a sealed report that it wished to be transmitted to the Committee. *Id.* at 1221. After concluding that the grand jury had the power to issue a report, independent of a prosecutor's decision to indict, *id.* at 1226, the Court turned to the issue of the propriety of disclosure. The Court noted that "[w]here, as here, a report is clearly within the bounds of propriety, . . . [a court] should presumptively favor disclosure to those for whom the matter is a proper concern and whose need is not disputed." *Id.* at 1227. The Court observed that "[t]he Report's subject [President Nixon] is referred to in his public capacity, and, on balance with the public interest, any prejudice to his legal rights caused by disclosure to the Committee would be minimal." *Id.* Indeed, "the President would not be left without a forum in which to adjudicate any charges against him that might employ Report materials." *Id.* And while the Court also noted that President Nixon himself "d[id] not object to release," *id.*, its decision made clear that his acquiescence was only one of many factors that made disclosure appropriate.

The Court also rejected the idea that Rule 6(e) prohibited disclosure of the report to the Judiciary Committee. Citing the language from the Advisory Committee Notes that the Rule "continues the traditional practice of secrecy . . . , except when the court permits a disclosure," Fed. R. Crim. P. 6(e) 1944 advisory committee's note 1, the Court reasoned that "Rule 6(e)[,] which was

not intended to create new law, remains subject to the law or traditional policies that gave it birth," *June 5, 1972 Grand Jury*, 370 F. Supp. at 1229.   None of those policies, in the Court's view, "dictate[d] that in this situation disclosure to the Judiciary Committee be withheld."  *Id.*   Indeed, examining the reasons that the Supreme Court had previously articulated as justifying grand jury secrecy, this Court noted that the grand jury's work was complete, so "[t]here is no need to protect against flight on anyone's part, to prevent tampering with or restraints on witnesses or jurors, to protect grand jury deliberations, [or] to safeguard unaccused or innocent persons with secrecy." *Id.*   Moreover, the Court noted that it was

> deal[ing] in a matter of the most critical moment to the Nation, an impeachment investigation involving the President of the United States.  It would be difficult to conceive of a more compelling need than that of this country for an unswervingly fair inquiry based on all the pertinent information.

*Id.* at 1230.   Believing that these considerations might even justify public disclosure, the Court concluded that at the very least they provided "ample basis for disclosure to a body that in this setting acts simply as another grand jury"—the House of Representatives.  *Id.*   This was especially so given that "[t]he Committee ha[d] taken elaborate precautions to insure against unnecessary and inappropriate disclosure of these materials."  *Id.*   In short, the Court concluded that Congress should be able to see this grand jury material.

Importantly, the D.C. Circuit, sitting en banc, affirmed this Court's decision and stated that it was "in general agreement with" this Court's handling of the "question of the grand jury's power to report."  *Haldeman*, 501 F.2d at 715.   And earlier this year, the D.C. Circuit again recognized the propriety of releasing the Nixon grand jury materials to the House Judiciary Committee, clarifying that, in its view, those materials were released under "the Rule 6 exception for 'judicial

proceedings.'"  *McKeever*, 920 F.3d at 847 n.3 (citing *Haldeman*, 501 F.2d at 717).[2]  In short, the

D.C. Circuit has twice acknowledged that courts may disclose grand jury materials to Congress to

further Congress's impeachment function.

Other courts have agreed.  For instance, in 1987, a federal court in Miami permitted the

disclosure of the record of a grand jury that indicted Judge Alcee Hastings to the House Judiciary

Committee to further its impeachment investigation of him for soliciting a bribe to influence a

judicial decision.  *In re Grand Jury Proceedings of Grand Jury No. 81-1 (Miami)*, 669 F. Supp.

1072, 1073 (S.D. Fla. 1987) ("*Miami Grand Jury*").  Specifically applying the Rule 6(e) judicial-

proceedings exception, the court held that "[t]here can be little doubt that an impeachment trial by

the Senate is a 'judicial proceeding' in every significant sense and that a House investigation pre-

liminary to impeachment is within the scope of the Rule."  *Id.* at 1075-76; *see id.* at 1076 (noting

that Article III, section 3 provides that "[t]he trial of all Crimes, except in Cases of Impeachment,

shall be by Jury," and that Article I uses the terms "cases of impeachment," "try," "convicted,"

and "judgment" in reference to impeachment).  According to the court, "[t]he fact that senators

rather than Article III judges decide the case does not make it any less judicial; it merely points to

a jurisdictional choice made by the framers for political and historical reasons."  *Id.*; *see In re*

*Grand Jury Investigation of Uranium Indus.*, No. 78-0173, 1979 WL 1661, at *7 (D.D.C. Aug. 16,

1979) (noting that a House impeachment investigation "certainly was preliminarily to or in con-

nection with a contemplated trial presided over by the Chief Justice of the United States—very

---

[2] While the dissenting judge in *McKeever* disagreed with the majority's analysis of the *Haldeman* decision, arguing that the *Haldeman* court approved the release of those grand jury documents pursuant to its inherent authority to oversee the grand jury, not pursuant to any enumerated exception in Rule 6, *see McKeever*, 920 F.3d at 854-55 (Srinivasan, J., dissenting), the important point for present purposes is that all three judges on the *McKeever* panel agreed that Congress may receive grand jury material where doing so would assist an impeachment inquiry.

much a judicial proceeding"). Having concluded that Rule 6(e) permitted disclosure to the House as part of an impeachment inquiry, the court also declined to place any limitations on the House's access to the materials, reasoning that "[i]t is within the province of the House Committee to review all of the information, including the grand jury record," and that the "request of the Chairman of the Committee on the Judiciary satisfies the standard of particularized need for disclosure of the record." *Miami Grand Jury*, 669 F. Supp. at 1077-78.

Similarly, a Louisiana district court approved the release of grand jury materials to the House Judiciary Committee for use in its impeachment investigation of Judge G. Thomas Porteous, Jr. *See* H.R. Rep. No. 111-427, at 8-10 (2010). The court reasoned that the Committee had "an interest in conducting a full and fair impeachment inquiry," and for that reason "[d]isclosure of the requested documents [wa]s warranted." Order at 3, *In Re: Grand Jury Investigation of U.S. Dist. Judge G. Thomas Porteous, Jr.*, No. 2:09-mc-04346-CVSG (E.D. La. Aug. 6, 2009) (Dkt. No. 10). Moreover, the court concluded that the request was "not overly broad" because "[a]ny testimony or materials obtained by the grand jury or grand juries in question that pertain to Judge Porteous are certainly relevant to the scope of the Judiciary Committee's inquiry." *Id.* at 6. The Fifth Circuit summarily affirmed that Order. Court Order, *In Re: Grand Jury Proceeding*, No. 09-30737 (5th Cir. Nov. 12, 2009).

Finally, in a set of cases applying the now-lapsed independent counsel statute, district courts in this Circuit have permitted the disclosure of grand jury materials to the public, sometimes reserving sensitive materials for only Congress. Under that statute, an independent counsel, prior to his or her termination, was required to submit a report to the Special Division of the court "setting forth fully and completely a description of the work of the independent counsel, including the disposition of all cases brought." 28 U.S.C. § 594(h)(1)(B) (2014). In multiple decisions, the D.C.

Circuit approved the public release of that report, despite the fact that the report contained grand jury matters, in part on the theory that the decision to release the report was to be made by a court and therefore qualified as a "judicial proceeding" under Rule 6(e).  *See, e.g.*, *In re Espy*, 259 F.3d 725, 728-30 (D.C. Cir. 2001); *In re North*, 16 F.3d 1234, 1242-45 (D.C. Cir. 1994).

Notably, in one case, the D.C. Circuit gave special solicitude to Congress in light of its need for such materials.  In *In re Cisneros*, the D.C. Circuit held that a report generated by an independent counsel concerning a former Secretary of Housing and Urban Development be mostly released to the public, but it held that Section V of the report be released to congressional leadership alone.  426 F.3d 409, 410-11 (D.C. Cir. 2005).  That section dealt with "investigations of alleged obstructions of justice and tax-related matters," *id.* at 412, which "did not result in indictments, certainly fostered no trials, and concerned individuals whose identities ha[d] not been generally disclosed to the public," only the grand jury, *id.* at 413.  Though the court ultimately declined to release Section V of the report to the public, it acknowledged that the report was "obviously a matter within the responsibility and concern of the Congress."  *Id.* at 415.  The court therefore ordered that Section V be transmitted "to appropriate officials of the Congress for such distribution to other Members as they deem necessary in the pursuit of congressional duties." *Id.*[3]

* * *

In short, there is a long history, beginning early in the Republic and continuing to modern times, of Congress receiving grand jury materials in furtherance of its impeachment function.  As the next Section explains, the Committee's request for grand jury materials in this case fits well within that long-standing tradition.

---

[3] As the Committee notes, in almost all of these cases, the Department of Justice has advocated *in favor* of releasing grand jury materials to Congress to aid congressional impeachment and other investigations.  *See Committee Application* at 20-21 & nn.31-32.

III.   **THIS COURT SHOULD AUTHORIZE THE RELEASE OF THE GRAND JURY MATERIALS RELATED TO MUELLER'S REPORT THAT THE COMMITTEE HAS REQUESTED.**

In this case, the House Judiciary Committee has requested the portions of Special Counsel Mueller's report that the Department of Justice redacted pursuant to Rule 6(e), as well as any underlying grand jury transcripts or exhibits referenced in the portions of the report that were redacted or related to certain actions of the President that the Committee is investigating.  *See Committee Application* at 25.  That request falls well within the historical tradition of Congress receiving grand jury materials pursuant to its impeachment function, and this Court should grant the Committee's request.

As described above, the D.C. Circuit has made clear that a court may disclose grand jury material to a congressional committee to further an impeachment investigation under Rule 6(e). In *Haldeman*, the en banc D.C. Circuit held that it was in "general agreement" with this Court's decision to release a grand jury report to the House Judiciary Committee for use in the Committee's investigation about whether to impeach President Nixon.  501 F.2d at 715.  And in *McKeever*, the D.C. Circuit made explicit that, in its view, disclosure to the House for use in an impeachment investigation "fit[s] within the Rule 6 exception for 'judicial proceedings.'"  920 F.3d at 847 n.3.

Disclosure is permissible here because, as the House Judiciary Committee explained in its application, it has "repeatedly made clear that it is assessing 'whether to approve articles of impeachment with respect to the President.'"  *Committee Application* at 30 (quoting H.R. Rep. No. 116-105, at 13 (2019)).  Indeed, House procedures *require* the Committee to be considering impeachment: "[i]n the House various events have been credited with setting an impeachment in motion," including "a resolution introduced by a Member and referred to a committee."  *Jefferson's Manual* § 603, at 319; *see id.* § 605 at 321 ("resolutions introduced through the hopper that directly call for the impeachment of an officer have been referred to the Committee on the

Judiciary").  That is precisely what has happened in the 116th Congress.  *See* 165 Cong. Rec. H211 (daily ed. Jan. 3, 2019) (referring H.R. Res. 13, 116th Cong. (2019), which called for impeaching President Trump for high crimes and misdemeanors, to the House Judiciary Committee).

The fact that it is early in the Committee's impeachment investigation makes no difference. Indeed, the circumstances here are almost identical to the circumstances in *Miami Grand Jury*, in which the Judiciary Committee requested grand jury materials early in its impeachment inquiry into Judge Hastings and well before it made its decision to recommend impeachment.  There, the Judicial Conference of the United States certified its conclusion that "Judge Hastings had engaged in conduct which might constitute grounds for impeachment" to the House on March 17, 1987. 669 F. Supp. at 1074.  On March 23, 1987, a Member introduced House Resolution 128 calling for Judge Hasting's impeachment.  H.R. Res. 128, 100th Cong. (1987).  Both the resolution and the Judicial Conference certification were referred to the Judiciary Committee, which on July 15, 1987 requested "all the records, transcripts, minutes and exhibits of the grand jury . . . which indicted Judge Hastings."  *Miami Grand Jury*, 669 F. Supp. at 1074 (quotations omitted).  The district court approved the disclosure of grand jury materials to the Committee on September 21, 1987.  *Id.* at 1072-73.  The Committee, however, did not conclude its investigation and issue its report recommending impeachment until August 1, 1988, almost a year later.  H.R. Rep. No. 100-810 (1988).

Notably, *Jefferson's Manual* explains that "charges transmitted from . . . a grand jury" can themselves "set[] an impeachment in motion."  *Jefferson's Manual* § 603, at 319.  Thus, the House need not even be considering impeachment to receive grand jury materials that would be relevant to a potential *future* impeachment inquiry.  Indeed, as described above, that is what happened in 1811 when the House "inquiry as to Judge Toulmin was *set in motion* by action of a grand jury

forwarded by a Territorial legislature." 3 *Hinds' Precedents of the House of Representatives* § 2488, at 984 (emphasis added). The fact that the Judiciary Committee today *is* actively considering impeachment of President Trump makes disclosure of these grand jury materials especially warranted.

Finally, the Committee has made the showing the Supreme Court has stated is required when "[p]arties seek[] grand jury transcripts under Rule 6(e)": "the material they seek is needed to avoid a possible injustice in another judicial proceeding," "the need for disclosure is greater than the need for continued secrecy," and "their request is structured to cover only material so needed." *Douglas Oil Co.*, 441 U.S. at 222. "[A] court called upon to determine whether grand jury [material] should be released necessarily is infused with substantial discretion." *Id.* (citing *Pittsburgh Plate*, 360 U.S. at 399).

Here, each of these factors points in favor of disclosure. First, failure to disclose the material the Committee is requesting would necessarily cause injustice. The President has been accused of serious wrongdoing, including crimes like obstruction of justice, and yet Mueller's report made clear that the Department of Justice would not indict him based on long-standing Department policy prohibiting the indictment of a sitting President. *See* 2 Mueller Report at 1 ("Given the role of the Special Counsel as an attorney in the Department of Justice and the framework of the Special Counsel regulations, . . . this Office accepted [the Office of Legal Counsel's] legal conclusion [that a sitting President cannot be indicted] for the purpose of exercising prosecutorial jurisdiction."); *see also A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 222, 260 (2000). Rather, Mueller pointed to "constitutional processes for addressing presidential misconduct"—referring, of course, to impeachment. 2 Mueller Report at 1 & n.2. It would be a miscarriage of justice if Congress were prevented from viewing information plainly relevant

to the "constitutional processes for addressing presidential misconduct" simply because that evidence was also presented to a grand jury.

Second, the need for disclosure is obviously greater than the need for continued secrecy. The Committee is carrying out one of its gravest duties: considering the impeachment of a President. As this Court explained when considering the disclosure of grand jury information regarding President Nixon, "it should not be forgotten that we deal in a matter of the most critical moment to the Nation, an impeachment investigation involving the President of the United States. It would be difficult to conceive of a more compelling need than that of this country for an unswervingly fair inquiry based on all pertinent information." *June 5, 1972 Grand Jury*, 370 F. Supp. at 1230. And the Committee needs this information: "the requested grand jury information is necessary for the Committee to assess the meaning and implications of the Mueller Report, including with regard to the Trump Campaign's contacts with agents for the Russian government, President Trump's knowledge of those contacts, and the President's state of mind when he took various steps to undermine Special Counsel Mueller's investigation." *Committee Application* at 34-35; *see id.* at 35-37 (explaining how the redacted passages involve key moments in President Trump's campaign and administration that are critical to the Committee's inquiry).

On the flip side, the need for secrecy is lessened where the Committee seeks disclosure only to a limited number of authorized individuals. *See id.* at 24-25. As the Committee itself has explained, it "will seek [the Select Intelligence Committee's] assistance in reviewing grand jury materials and other evidence . . . [g]iven [that Committee's] ability to handle the most sensitive classified information." *Id.* at 25. Where the Committee has "taken elaborate precautions to insure against unnecessary and inappropriate disclosure of these materials," *June 5, 1972 Grand Jury*, 370 F. Supp. at 1230, the considerations in favor of secrecy are far less persuasive. *See Douglas*

*Oil Co.*, 441 U.S. at 223 ("as the considerations justifying secrecy become less relevant, a party asserting a need for grand jury transcripts will have a lesser burden in showing justification"); *cf. In re Cisneros*, 426 F.3d at 415 (permitting the disclosure of certain more sensitive information to only Congress, not the broader public).  Moreover, the fact that the grand jury has completed its work means that "[t]here is no need to protect against flight on anyone's part, to prevent tampering with or restraints on witnesses or jurors, to protect grand jury deliberations, [or] to safeguard un-accused or innocent persons with secrecy." *June 5, 1972 Grand Jury*, 370 F. Supp. at 1229.

Finally, the request covers only material the Committee needs: "information that the Special Counsel deemed sufficiently significant to be included or referenced in the Report itself; any grand jury materials that bear directly on or provide context regarding the President's state of mind; and grand jury materials that describe actions taken by the central witness to the Committee's investigation, Don McGahn." *Committee Application* at 40.  This request is eminently reasonable, especially given the gravity of the subject matter that the Committee is investigating. *Cf. Miami Grand Jury*, 669 F. Supp. at 1077 ("It is within the province of the House Committee to review *all* of the information." (emphasis added)).  For all those reasons, the Committee's request should be granted.

## CONCLUSION

For the foregoing reasons, the House Judiciary Committee's request should be granted.

Respectfully submitted,

Dated:  August 30, 2019

/s/ Brianne J. Gorod
Brianne J. Gorod

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Ashwin P. Phatak (DC Bar No. 1531218)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street, N.W., Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 30, 2019, the foregoing document was filed with the Clerk

of the Court, using the CM/ECF system, causing it to be served on all counsel of record.

Dated: August 30, 2019

/s/ Brianne J. Gorod
Brianne J. Gorod

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

IN RE:

APPLICATION OF THE COMMITTEE ON
THE JUDICIARY, U.S. HOUSE OF REPRE-
SENTATIVES, FOR AN ORDER AUTHORIZ-
ING THE RELEASE OF CERTAIN GRAND
JURY MATERIALS

Case No. 1:19-gj-00048-BAH

---

**ORDER**

Upon consideration of the motion of Constitutional Accountability Center for leave to file

its proposed *amicus curiae* brief in support of the Committee on the Judiciary, U.S. House of

Representatives, it is hereby

ORDERED that the motion is GRANTED.


Dated: _____

_____
BERYL A. HOWELL
United States District Judge