# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

IN RE:

APPLICATION OF THE COMMITTEE
ON THE JUDICIARY, U.S. HOUSE OF
REPRESENTATIVES, FOR AN ORDER
AUTHORIZING THE RELEASE OF
CERTAIN GRAND JURY MATERIALS

)
)
)
) Civil Action No.  1:19-gj-00048-BAH
)
)
)
)

## DEPARTMENT OF JUSTICE'S RESPONSE TO THE APPLICATION OF THE HOUSE JUDICIARY COMMITTEE FOR AN ORDER AUTHORIZING RELEASE OF CERTAIN GRAND JURY MATERIALS

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
CRISTEN C. HANDLEY
Attorneys, Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street NW
Washington, DC 20005
Tel: (202) 514-5302
Fax: (202) 616-8460

*Counsel for Department of Justice*

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

BACKGROUND .................................................................................................................. 7

    A.    Procedural Background.................................................................................. 7

    B.    Statutory Background .................................................................................. 9

ARGUMENT ...................................................................................................................... 12

I.    No Rule 6(e) Exception Applies to the Committee's Request ........................................ 12

    A.    The Plain Meaning of "Judicial Proceeding" Does Not Include
Congressional Proceedings. ................................................................... 13

    B.    This Circuit's Recent Decision in *McKeever* Did Not Hold that
Impeachment Constituted a Judicial Proceeding. .................................. 19

II.    Even if Removal Proceedings in the Senate Were a "Judicial Proceeding,"
the Current Proceedings Are Not "Preliminary" to that Proceeding ............................... 24

III.    The Committee Has Failed to Establish a Particularized Need for the Requested
Grand Jury Materials........................................................................................................ 30

    A.    The Committee Fails To Identify Any Injustice That Would Result if it
Does Not Receive the Requested Grand Jury Materials....................... 30

    B.    There Remains A Compelling Need for Continued Secrecy  ............................ 36

    C.    The Committee's Request is Overbroad. ............................................................. 37

CONCLUSION.................................................................................................................... 39

# TABLE OF AUTHORITIES

## CASES

*Bankers Life & Cas. Co. v. Holland*,
  346 U.S. 379 (1953) ................................................................................. 2, 20, 21

*Bradley v. Fairfax*,
  634 F.2d 1126 (8th Cir. 1980) ................................................................................. 13

*Branzburg v. Hayes*,
  408 U.S. 665 (1972) ................................................................................. 9

*De Beers Consolidated Mines v. United States*,
  325 U.S. 212 (1945) ................................................................................. 18

*Doe v. Cabrera*,
  126 F. Supp. 3d 160 (D.D.C. 2015) ................................................................................. 18

*Doe v. Rosenberry*,
  255 F.2d 118 (2d Cir. 1958) ................................................................................. 13, 14

*\*Douglas Oil Co. of Cal. v. Petrol Stops Nw.*,
  441 U.S. 211 (1979) ................................................................................. *passim*

*Food & Drug Admin v. Brown & Williamson*,
  529 U.S. 120 (2000) ................................................................................. 17, 18

*Fund for Constitutional Gov't v. Nat'l Archives & Records Sers.*,
  656 F.2d 856 (D.C. Cir. 1981) ................................................................................. 10

*\*Haldeman v. Sirica*,
  501 F.2d 714 (D.C. Cir. 1974) ................................................................................. *passim*

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
  530 U.S. 1 (2000) ................................................................................. 12

*In re Application to Unseal Dockets Related to the Independent Counsel's 1998
Investigation of President Clinton*,
  308 F. Supp. 3d 314 (D.D.C. 2018), *appeal filed*,
  No. 18-5142 (D.C. Cir. May 17, 2018) ................................................................................. 14, 15, 21, 36

*In re Grand Jury 89-4-72*,
  932 F.2d 481 (6th Cir. 1991) ................................................................................. 14, 16, 32

*In re Grand Jury Proceedings of Grand Jury No. 81-1 (Miami)*,
  669 F. Supp. 1072 (S.D. Fla. 1987) ................................................................................. 23

*In re Grand Jury Subpoena, Judith Miller*,
    493 F.3d 152 (D.C. Cir. 2007) ............................................................. 36

*In re J. Ray McDermott & Co.*,
    622 F.2d 166 (5th Cir. 1980) ............................................................... 13

*In re Petition to Inspect & Copy Grand Jury Materials (Hastings)*,
    735 F.2d 1261 (11th Cir. 1984) ........................................................... 22

*In re Report and Recommendation of June 5, 1972 Grand Jury Concerning Transmission*
    *of Evidence to the House of Representatives*,
    370 F. Supp. 1219 (D.D.C. 1974) ......................................................... 34

*In re Request for Access to Grand Jury Materials Grand Jury No. 81-1 (Miami)*,
    833 F.2d 1438 (11th Cir. 1987) ........................................................... 23

*In re Sealed Case*,
    801 F.2d 1379 (D.C. Cir. 1986) ........................................................... 37

*In re Special February 1971 Grand Jury v. Conlisk*,
    490 F.2d 894 (7th Cir. 1973) ............................................................... 13

*INS v. Chadha*,
    462 U.S. 919 (1983) ........................................................................... 5

*Landreth Timber Co. v. Landreth*,
    471 U.S. 681 (1985) ........................................................................... 12

*McKeever v. Barr*,
    920 F.3d 842 (D.C. Cir. 2019), *docketing petition for cert.*,
    No. 19-307 (U.S. Sept. 5, 2019)................................................... *passim*

*Nixon v. United States*,
    506 U.S. 224 (1993) ........................................................................... 15

*Pittsburgh Plate Glass Co. v. United States*,
    360 U.S. 395........................................................................................ 9

*United States v. Procter & Gamble Co.*,
    356 U.S. 677 (1958) .................................................................... 18, 29

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940) ......................................................................... 18

*United Kingdom v. United States*,
    238 F.3d 1312 (11th Cir. 2001)........................................................... 37

*United States v. AT&T,*
    567 F.2d 121 (D.C. Cir. 1977) ............................................................................ 5

*\*United States v. Baggot,*
    463 U.S. 476 (1983) ............................................................................... *passim*

*United States v. Bates,*
    627 F.2d 349 (D.C. Cir. 1980) .......................................................................... 13

*United States ex rel. Stone v. Rockwell Int'l Corp.,*
    173 F.3d 757 (10th Cir.1999) ...................................................................... 32, 36

*\*United States v. Sells Eng'g, Inc.,*
    463 U.S. 418 (1983) ............................................................................... *passim*

*United States v. Williams,*
    504 U.S. 36 (1992) ............................................................................................ 34

**STATUTES**

18 U.S.C. § 3500 .................................................................................................. 10

28 U.S.C. § 595 .................................................................................................... 22

**UNITED STATES CONSTITUTION**

U.S. Const. art. I § 3 .............................................................................................. 15

U.S. Const. art. III § 1 ........................................................................................... 14

U.S. Const. amend. V ............................................................................................. 9

**RULES**

Fed. R. Crim. P. 6 ................................................................................... *passim*

Fed. R. Crim. P. 16 ................................................................................................ 10

Fed. R. Crim. P. 26.2 ............................................................................................. 10

Fed. R. Crim. P. 53 ................................................................................................ 17

**REGULATIONS**

28 C.F.R. § 600.8 .................................................................................................... 6

## OTHER AUTHORITIES

Andrew Desiderio, *Nadler: 'This is Formal Impeachment Proceedings,'* Politico,
https://www.politico.com/story/2019/08/08/nadler-this-is-formal-impeachment-
proceedings-1454360 .................................................................................... 26

Black's Law Dictionary (1933) ......................................................... 13

Black's Law Dictionary (11th ed. 2019) ................................................. 13

Bryan A. Garner, et al., *The Law of Judicial Precedent* (Thompson Reuters) (2016) ................ 20

Caroline Kelly, *Tallying all 36 pages of redactions in the Mueller Report*, CNN,
Apr. 18, 2019,
https://www.cnn.com/2019/04/18/politics/mueller-report-redactions/indexhtml ..................... 7

*House Judiciary Committee Press Conference on Oversight Agenda Following
Mueller Hearing*, July 26, 2019,
https://www.c-span.org/video/?463045-1/house-judiciary-committee-democrats-defend-
robert-mueller-plan-continue-investigation .............................................. 25

H.R.J. Res. 13, 116th Cong. (2019) .................................................... 27

H. R.J. Res. 498, 116th Cong. (2019) .................................................. 25

H. Res. 525 (1998) .................................................................... 27

H. Res. 581 (1998) .................................................................... 27

H. Res. 803 (1974) .................................................................... 27

Joseph Story, *Commentaries on the Constitution* (1833) ............................... 15

Lindsey McPherson, *Hoyer contradicts Judiciary Committee on Impeachment Inquiry*,
Roll Call (Sept. 12, 2019),
https://www.rollcall.com/news/hoyer-contradicts-judiciary-committee-on-impeachment-
inquiry ............................................................................... 26

Majority Report,
https://docs.house.gov/meetings/IG/IG00/20180322/108023/HRPT-
115-1_1-p1-U3.pdf ..................................................................... 32

Michael J. Gerhardt, *Book Review: Grand Inquests: The Historic Impeachments of Justice
Samuel Chase and President Andrew Johnson. by William H. Rehnquist*, Constitutional
Commentary,
https://scholarship.law.umn.edu/cgi/viewcontent.cgi?article=1775&context=concomm. ....... 16

Minority Views,
    https://intelligence.house.gov/uploadedfiles/20180411_-_final_-
    _hpsci_minority_views_on_majority_report.pdf .................................................................... 32

*Nadler: Impeachment timetable doesn't hinge on Don McGahn*, by Kyle Cheney, Politico,
    Sept. 9, 2019,
    https://www.politico.com/story/2019/09/09/nadler-impeachment-don-mcgahn-1487788 ............. 31

Nicholas Fandos, *Is It an Impeachment Inquiry or Not? Democrats Can't Seem to
    Agree*," The NY Times, Sept. 11, 2019,
    https://www.nytimes.com/2019/09/11/us/politics/democrats-house-impeachment-
    inquiry.html ........................................................................................................................ 26

Opening Statement of Attorney General Janet Reno, Senate Hearing 106-131,
    *The Future of the Independent Counsel Act,* presented March 17, 1999 .................................. 22

*Rep. Nancy Pelosi (D-CA) Continues Resisting Impeachment Inquiry*, CNN, June 11, 2019,
    http://transcripts.cnn.com/TRANSCRIPTS/1906/11/cnr.04.html ........................................... 26

S. Rep. No. 354 (1977), *reprinted in* 1977 U.S.C.C.A.N. 527 .................................................... 10

Senate Manual, *Rules of Procedure and Practice in the Senate When Sitting on
    Impeachment Trials* (Jan. 1, 2014),
    https://www.govinfo.gov/content/pkg/SMAN-113/pdf/SMAN-113-pg223.pdf. ..................... 16

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

IN RE:                                                )
                                                           )
APPLICATION OF THE COMMITTEE      )          Civil Action No.  1:19-gj-00048-BAH
ON THE JUDICIARY, U.S. HOUSE OF      )
REPRESENTATIVES, FOR AN ORDER    )
AUTHORIZING THE RELEASE OF            )
CERTAIN GRAND JURY MATERIALS       )

## DEPARTMENT OF JUSTICE'S RESPONSE TO THE APPLICATION OF THE HOUSE JUDICIARY COMMITTEE FOR AN ORDER AUTHORIZING RELEASE OF CERTAIN GRAND JURY MATERIALS

## INTRODUCTION

The Judiciary Committee of the House of Representatives ("Committee") has asked this Court to order the Executive Branch to disclose portions of Special Counsel Robert S. Mueller, III's confidential report ("Mueller Report" or "Report") that reflect matters occurring before a grand jury. That information is subject to the fundamental principle of grand jury secrecy codified in Rule 6(e) of the Federal Rules of Criminal Procedure and the strict limitations that provision imposes. In an effort to accommodate the Committee's desire for information, the Department of Justice ("Department") has already provided the Committee's Chairman and Ranking Member access to the full, unredacted contents of the Mueller Report, with the sole exception of its minimal redactions for material covered by Rule 6(e). Yet now, without offering any particular reason to believe that the grand jury material will further its investigation, the Committee requests an extraordinary order compelling not only the disclosure of grand jury information referenced in the Report, but also the disclosure of any grand jury information not included in the Report that would, as the Committee puts it, reflect the President's "state of mind." The Committee's Application

conflicts with the terms of Rule 6(e) and fails for a lack of substantial need regardless. It should be denied.

The Application fails at the outset because it relies solely on Rule 6(e)(3)(E)(i)'s authorization to disclose grand jury material "preliminarily to or in connection with a judicial proceeding," whereas impeachment proceedings in Congress—including hypothetical removal proceedings in the Senate—are not "judicial proceedings" under the plain and ordinary meaning of that term. "Judicial" proceedings are legal proceedings governed by law that take place in a judicial forum before a judge or magistrate. Proceedings that occur outside the judicial setting are not "judicial" proceedings even if they are called a "trial" and include some of the procedures familiar from a courtroom, such as sworn testimony or lawyer-led questioning of witnesses. The remainder of Rule 6(e) confirms as much by describing such proceedings as ones that involve "courts," a term that plainly does not include Congress or any of its subcomponents.

The Committee, for its part, offers no explanation for how Rule 6(e)'s reference to "judicial proceeding[s]" authorizes access to grand jury materials for congressional proceedings administered by Members of Congress rather than legal proceedings overseen by judges. The Committee relies instead on a footnote in the D.C. Circuit's recent decision in *McKeever v. Barr*, 920 F.3d 842 (D.C. Cir. 2019), *docketing petition for cert.*, No. 19-307 (U.S. Sept. 5, 2019), but the *McKeever* court did not rule on the meaning of the term "judicial proceeding." There, it was undisputed that the historical grand jury information at issue fell entirely outside Rule 6(e), and the question presented was only whether a court could nonetheless order disclosure based on its own inherent authority. That decision thus does not bind this Court to deviate from the Rule's plain language, as the Committee asks it to do here.

Nor does the D.C. Circuit's denial of a petition for mandamus in *Haldeman v. Sirica*, 501 F.2d 714 (D.C. Cir. 1974) (en banc) (per curiam), require this Court to depart from the plain language of Rule 6(e).  The only issue decided in that case was whether the petitioners had shown that the district court's order was a "clear abuse of discretion or usurpation of judicial power" from which the petitioners had a clear and indisputable right to relief.  *Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 383 (1953) (citations omitted).  That is a very high standard, and it is unsurprising that the D.C. Circuit was able to deny the petition without engaging in any "meaningful analysis of Rule 6(e)'s terms," *McKeever*, 920 F.3d at 855 (Srinivasan, J., dissenting). *Haldeman* thus stands for nothing more than what it held, which was that the extraordinary step of mandamus against the order at issue was not warranted by the text of the rule and the binding precedent as it existed in 1974.

Even if an impeachment proceeding in the Senate were a "judicial proceeding" under Rule 6(e), though, the Committee's current investigation is too far removed from a hypothetical judicial proceeding to be something that is being conducted "preliminarily" to that proceeding within the meaning of Rule 6(e)(3)(E)(i).  The Supreme Court has made clear that "preliminarily" does not mean any stage prior to a potential future judicial proceeding; otherwise, literally anything that could lead to a "judicial proceeding" would be conducted "preliminarily" to it.  Instead, the activity must be "related fairly directly" to "identifiable" litigation.  *United States v. Baggot*, 463 U.S. 476, 480 (1983).  The Committee's own description of its investigation makes clear that it is too far removed from any potential judicial proceeding to qualify.  As the Committee's Chairman has stressed—and as the Speaker of the House and the House Majority Leader both reiterated this week—the purpose of its investigation is to assess numerous possible remedial measures, including censure, articles of impeachment, legislation, Constitutional amendments, and more.

What may come of this investigation—if anything—remains unknown and unpredictable.  Just as a tax audit was not preliminary to a possible taxpayer legal challenge in the seminal Supreme Court decision on this issue, *see Baggot*, 463 U.S. at 480, the Committee's investigation here is too laden with contingencies to satisfy Rule 6(e)(3)(E)(i)'s requirement that the activity be "related fairly directly" to the relevant judicial proceeding, *id*.

The Court need not address these threshold legal questions, however, because even if the Committee's investigation were being conducted "preliminarily to" a "judicial proceeding," the Committee still would not have carried the burden imposed on any party that seeks grand jury material pursuant to one of Rule 6(e)'s exceptions—demonstrating a "particularized need" for presumptively secret grand jury materials.   Here, carrying that burden would require the Committee to show "that the material [it] seek[s] is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that [its] request is structured to cover only material so needed." *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 222 (1979).  The Committee has not made that showing.  The Committee purports to be investigating whether "the President of the United States repeatedly attempted to undermine and derail a criminal investigation," Application ("HJC App.") at 1, ECF No. 1,  but the Committee's Chairman and Ranking Member already have access to the entire Mueller Report in unredacted form, with the exception of the grand jury information.   And that grand jury information comprises a tiny percentage of the overall Report, with hardly any of it appearing in Volume II, which is the portion of the Report that addresses the President's actions in connection with alleged obstruction of justice.  The Committee's leadership thus already has access to 99.9% of the Report's Volume II, while the minuscule 0.1% that remains redacted is done so surgically

and surrounded by unredacted context that already provides a clear picture of the President's conduct.

In attempting to explain why it requires the additional 0.1% of information, the Committee relies entirely on speculation.  The Committee speculates first about why this material is so critical that disclosure is necessary to prevent an "injustice" in some hypothetical future impeachment proceeding, and then it speculates further by advancing vague, overbroad requests for grand jury material that the Committee imagines might exist within the Department's files without having been included in the Report.  The Committee's failure to provide a tailored request accompanied by a concrete explanation for why this material is necessary is particularly striking given the extensive investigations Congress has already conducted into Russian inference with the 2016 election, gathering information to which the Committee already has access.

In addition to not explaining why this information is necessary to avoid an "injustice," the Committee does not address the continuing need for secrecy concerning what transpired in these very recent grand jury proceedings.  Multiple investigations and judicial proceedings that grew out of the Special Counsel's investigation are ongoing, including cases that have outstanding fugitives, as well as individuals who are currently under investigation for related conduct.  The need to ensure that all charged defendants receive fair trials and the need to preserve the integrity of ongoing investigations far outweigh the Committee's asserted need for the requested materials.[1]

In short, the Committee's Application does not justify its request even if the Committee had otherwise satisfied Rule 6(e), and that alone is sufficient basis to deny the Application.  In

---

[1] To assist the Court, the Department has proffered a sealed declaration further addressing the issue of particularized need.  That declaration is sealed because it contains factual information that is itself subject to protection under Rule 6(e).  A redacted version of the declaration, however, is attached at Exhibit ("Exh.") 10.

cases such as this, where co-equal branches of the government are at odds, the Supreme Court has long admonished the courts to avoid unnecessarily resolving difficult legal questions.  *See INS v. Chadha*, 462 U.S. 919, 960 (1983) (Powell, J., concurring) ("[T]he respect due its judgment as a coordinate branch of Government cautions that our holding should be no more extensive than necessary to decide this case."); *see also United States v. AT&T*, 567 F.2d 121, 127 (D.C. Cir. 1977) ("[E]ach branch should take cognizance of an implicit constitutional mandate to seek optimal accommodation through a realistic evaluation of the needs of the conflicting branches in the particular fact situation).   Here, the Department has accommodated the Committee by providing its Chairman and Ranking Member access to a complete, unredacted version of the Mueller Report (other than grand jury information), along with providing extensive access to other Members of Congress to unredacted versions of Volumes I and II of that Report (other than grand jury information). [2]   Despite having access to this extensive information—as well as the considerable information other Congressional investigations have compiled over the past two-and-a-half years—the Committee has come nowhere close to demonstrating a particularized need for the limited grand jury information redacted from the Report.

---

[2] The Department has made the entirety of Volume II, with only grand jury redactions, available for review by any member of the House (or Senate) Judiciary Committees.  It has done the same with regard to Volume I for the House (and Senate) Intelligence Committees.  And it has made the entire Report available with only grand jury redactions to the "Gang of Twelve" from both houses of Congress (a group that includes the Chairman and Ranking Member from the House Judiciary Committee).

# BACKGROUND

## A.  Procedural Background

On March 22, 2019, Special Counsel Robert S. Mueller, III submitted his confidential Report to the Attorney General pursuant to 28 C.F.R. § 600.8(c).[3]   Mindful of the public interest in the matter, the Attorney General notified Congress the same day that he would work to determine what information could be released.   Exh. 1 (Letter dated March 22, 2019, from Attorney General Barr to Congress).   The Attorney General updated Congress on the review process on March 24, 2019, reiterating his commitment to "release as much of the Special Counsel's report as" possible "consistent with the applicable law, regulations and Departmental policies."   Exh. 2 at 4 (Letter dated March 24, 2019, from Attorney General Barr to Congress). The Attorney General followed up days later with another letter informing the Senate and House Judiciary Committee Chairs that the Department of Justice—with assistance from the Special Counsel's Office—was in the process of redacting the Report for public release.   Exh. 3 (Letter dated March 29, 2019, from Attorney General Barr to Chairmen Graham and Nadler).   The Attorney General explained that the categories of information identified for redaction included (1) grand jury information; (2) information that the intelligence community identified as compromising sources and methods; (3) information that could impact ongoing law enforcement matters; and (4) information that would unduly violate the personal privacy of third parties.   Exh. 3.

On March 25, 2019, and again on April 1, 2019, Congress wrote to the Attorney General demanding immediate production of the unredacted Report, including the grand jury information,

---

[3] The Report is entitled "*Report On The Investigation Into Russian Interference In The 2016 Presidential Election*."   *See* Exh. 8 (Volume I); Exh. 9 (Volume II & Appendices).

and threatening compulsory process.  HJC App., Exhs. C & D.  The House Permanent Select

Committee on Intelligence sent a similar letter to the Attorney General on March 27, 2019.  HJC

App., Exh. E.

In accordance with the Attorney General's commitment to release as much information as

possible, the minimally redacted Report was released to the public on April 18, 2019.[4]  In the letter

to Congress that accompanied the Report, the Attorney General explained that the Report was

being "released to the public and to Congress to the maximum extent possible, subject only to

those redactions required by law or by compelling law enforcement, national security, or personal

privacy interests."  Exh. 4 at 3 (letter from the Attorney General to Congress, dated April 18,

2019).  That same day, the Department advised that "it is appropriate to provide the Chairman and

Ranking Members of the House and Senate Committees on the Judiciary, the members of the

'Gang of Eight,' and one designated staff person per member" the ability to review the Report *in

camera,* unredacted except for the grand jury information, and subject to appropriate

confidentiality restrictions.  Exh. 5 (Letter from Stephen E. Boyd, to Chairmen Graham and

Nadler, dated April 18, 2019).  Unsatisfied, on April 19, 2019, the House Judiciary Committee

served a subpoena demanding the Attorney General's testimony, as well as, *inter alia*, the

unredacted Report, all documents referenced in the Report, and all documents created by the

Special Counsel's Office.  HJC App., Exh. G.

With respect to the grand jury information redacted from the Report, the Attorney General

explained that disclosing that information was prohibited by Criminal Rule 6(e).  Citing *McKeever*

---

[4] Media reports have estimated that only 8% of the 448-page Report was redacted.  *See, e.g.*, Caroline Kelly, *Tallying all 36 pages of redactions in the Mueller Report*, CNN, Apr. 18, 2019,  https://www.cnn.com/2019/04/18/politics/mueller-report-redactions/indexhtml  (accessed on May 30, 2019).

*v. Barr*, 920 F.3d 842 (D.C. Cir. 2019), he wrote that "Rule 6(e) contains no exception that would permit the Department to provide grand jury information to the Committee in connection with its oversight role."  HJC App., Exh. K at 4.  "The Department has, however, provided you . . . with access to a version of the report that redacts only the grand jury information . . . .  [T]his minimally redacted version would permit review of 98.5% of the report, including 99.9% of Volume II, which discusses the investigation of the President's actions."  *Id*.

While protecting grand jury information—as Rule 6(e) requires—the Department continued to try to accommodate the Committee's stated need for the information sought in its subpoena.  *See, e.g*., Exh. 6 (Letter from Stephen E. Boyd to Chairman Nadler, dated May 6, 2019).  Eventually, the Committee sent the Department a list of FBI Form 302 interview reports (FBI-302s) referenced in Volume II of the Mueller Report, as well as a list of notes and other documents, and advised that the production of those documents "would satisfy the Committee's subpoena."  HJC App., Exh. O at 2.  With respect to the grand jury information, the Committee stated that it "intends to seek a court order permitting the Committee to receive those portions of the report redacted on Rule 6(e) grounds."  *Id*. at 2 n.2.  Two months later, this Application followed.[5]

### B.  Statutory Background

The Supreme Court has repeatedly emphasized the unique importance of the federal grand jury, an institution the Constitution itself provides as a procedural safeguard for individual liberty.  *See* U.S. Const., amend. V.  Dating back to 12th-century England, the grand jury has the "dual function of determining if there is probable cause to believe that a crime has been committed and of protecting citizens against unfounded criminal prosecutions."  *Branzburg v. Hayes*, 408 U.S.

---

[5] The Constitutional Accountability Center filed an amicus brief supporting the Committee.  *See* ECF No. 16-1.  Because it largely repeats the Committee's arguments, we do not separately address it.

665, 686-87 (1972) (footnote omitted); *see generally United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 423-24 (1983).

The proper functioning of the grand jury system depends upon the secrecy of its proceedings.  As the Supreme Court has explained:

> [I]f preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony.  Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements. There also would be the risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment. Finally, by preserving the secrecy of the proceedings, we assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule.

*Douglas Oil*, 441 U.S. at 219 (footnotes omitted); *see also Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 399-400.  Accordingly, "[b]oth Congress and this Court have consistently stood ready to defend [grand jury secrecy] against unwarranted intrusion.  In the absence of a clear indication in a statute or Rule, we must always be reluctant to conclude that a breach of this secrecy has been authorized."  *Sells Engineering*, 463 U.S. at 425 (internal quotations omitted).

Rule 6(e) codified the traditional rule of grand jury secrecy.  *See, e.g.*, S. Rep. No. 354, at 7-8 (1977), reprinted in 1977 U.S.C.C.A.N. 527, 530-32.  The Rule was enacted directly by Congress and has the force and effect of a statute.  *Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856, 867 (D.C. Cir. 1981) (reviewing legislative history of Rule 6(e)).  The Supreme Court has explained that the Rule's narrow exceptions operate as "an affirmative limitation on the availability of court-ordered disclosure of grand jury materials," and reflect Congress's "judgment that not every beneficial purpose, or even every valid governmental purpose, is an appropriate reason for breaching grand jury secrecy."  *Baggot*, 463 U.S. at 479-80.

Accordingly, Rule 6(e) requires enumerated categories of individuals to maintain grand jury secrecy, "[u]nless these rules provide otherwise." Fed. R. Crim. P. 6(e)(2)(B). Rule 6(e)(3)(E) then specifies the only circumstances in which a district court may authorize the disclosure of grand jury matters.[6] *McKeever*, 920 F.3d at 845.  As relevant here, Rule 6(e)(3)(E)(i) provides that the Court may authorize disclosure of a grand jury matter (at a time, in a manner, and subject to any other conditions that the Court directs), "preliminarily to or in connection with a judicial proceeding." Fed. R. Crim. P. 6(e)(3)(E)(i).[7]

The term "judicial proceeding" used in subsection 6(e)(3)(E)(i) is also used in two other subsections of Rule 6(e).  Subsection F provides that "[a] petition to disclose a grand-jury matter under Rule 6(e)(3)(E)(i) must be filed in the district where the grand jury convened[,]" and grants "the parties to the judicial proceeding" an opportunity to be heard on the petition, as well as "any other person whom the court may designate." Fed. R. Crim. P. 6(e)(3)(F)(ii)-(iii).  And Subsection (G) then provides that, "[i]f the petition to disclose arises out of a judicial proceeding in another district, the petitioned court must transfer the petition to the other court unless the petitioned court can reasonably determine whether disclosure is proper." Fed. R. Crim. P. 6(e)(3)(G).

---

[6]  Certain other Criminal Rules provide for disclosure of grand jury materials in limited circumstances not relevant here.  *See* Fed. R. Crim. P. 16(a)(1)(B)(iii) (mandating disclosure to a defendant of his "recorded testimony before a grand jury"); Fed. R. Crim. P. 26.2(f)(3) (requiring disclosure to a defendant of a witness's "statement to a grand jury, however taken or recorded" pursuant to the Jencks Act, 18 U.S.C. § 3500).

[7]  The judicial proceeding mentioned in Rule 6(e)(3)(E)(i) does not refer to the proceeding brought for the purpose of obtaining disclosure.  Instead, "[t]he focus is on the *actual use* to be made of the material.  If the primary purpose of the disclosure is not to assist in preparation or conduct of a judicial proceeding, disclosure . . . is not permitted." *Baggot*, 463 U.S. at 480; *see also Fund for Constitutional Gov't*, 656 F.2d at 868.

**ARGUMENT**

**THE COURT SHOULD DENY THE COMMITTEE'S PETITION TO PIERCE THE SECRECY OF THE GRAND JURY PROCEEDINGS**

No Rule 6(e) exception permits the disclosure of grand jury information for the general purpose of congressional oversight, or even for the Committee's recently asserted purpose of considering articles of impeachment. Those congressional activities do not fall within the term "judicial proceeding," nor is the Committee's work being conducted "preliminarily" to such a proceeding. And regardless, the Committee has failed to demonstrate a particularized need for the requested information—it identifies no injustice that would occur should it not receive this information, it fails to account for the continuing need for secrecy, and the request it has lodged is plainly overbroad. The Court should deny the Application in its entirety.

**I.      No Rule 6(e) Exception Applies to the Committee's Request.**

The Committee claims that its Application falls within an exception to the disclosure prohibition of Rule 6(e) because its investigation into the President's conduct includes—among several stated purposes—the possibility that it could result in a Committee vote to send articles of impeachment to the floor of the House of Representatives for a separate vote on impeachment. If the Committee were to approve such articles, and if the full House were to ratify them, impeachment would occur and the Senate would then conduct a proceeding to determine whether or not to remove the President from office. The Committee does not attempt to argue (nor could it) that an impeachment proceeding in the House is itself a "judicial proceeding" under Rule 6(e); rather, the Committee claims that, "at the least," the Senate's removal proceeding to consider whether to remove the President "constitutes the requisite 'judicial proceeding[]'" because that political process in the Senate would include certain attributes of the courtroom and is a "trial," though not a legal one. *See* HJC App. at 28. According to the Committee, its current investigation must thus

- 12 -

be deemed as happening "preliminarily to" that hypothetical future proceeding.  *See* HJC App. at 26-31.  But for numerous reasons, the Committee's syllogism fails.  A Senate proceeding following impeachment by the House is not a "judicial proceeding" under any plausible interpretation of that phrase, and, even if it were, the Committee's current investigation is not preliminary to such a proceeding within the meaning of Rule 6(e).

### A. The Plain Meaning of "Judicial Proceeding" Does Not Include Congressional Proceedings.

As an initial matter, the Committee makes no effort to reconcile its position with the plain language of Rule 6(e), relying instead on the (incorrect) assumption that the D.C. Circuit definitively resolved this issue in its recent *McKeever* decision.  *See* discussion *infra*, at I.B.  But that decision did not resolve the issue.  As a result, this Court's statutory analysis must begin with the language of the statute itself.  *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685 (1985). Where the language is clear, that is also where the inquiry should end.  *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (where the language of a statute is clear, "the sole function of the courts is to enforce it according to its terms") (citation omitted).

By its plain terms, the phrase "judicial proceeding" means a matter that transpires in court before a neutral judge according to generalized legal rules.  Standard legal dictionaries, for example, define a "judicial proceeding" as "[a]ny court proceeding; any proceeding initiated to procure an order or decree, whether in law or in equity."  JUDICIAL PROCEEDING, Black's Law Dictionary (11th ed. 2019).  Earlier dictionary definitions are similar, defining "judicial power" as "[t]he authority vested in courts and judges, as distinguished from the executive and legislative power[]" and describing a judicial proceeding as "[a] proceeding in a legally constituted court[]" and "[a] general term for proceedings relating to, practiced in, or proceeding from a court of justice[.]"  Black's Law Dictionary at 1033 (1933).  Dictionaries also define "Judicial" as "[o]f,

relating to, or by the court or a judge," and "[i]n court."  JUDICIAL, Black's Law Dictionary (11th ed. 2019).

This straightforward reading of the phrase "judicial proceeding" is consistent with guidance from the Supreme Court and this Court.  The Supreme Court has described a "judicial proceeding" in terms of "litigation."  *See Baggot*, 463 U.S. at 480.[8]  And Judge Learned Hand described a judicial proceeding as including "any proceeding determinable by a court, having for its object the compliance of any person, subject to judicial control, with standards imposed upon his conduct in the public interest, even though such compliance is enforced without the procedure applicable to the punishment of crime." *Doe v. Rosenberry*, 255 F.2d at 120; *see also In re Grand Jury 89-4-72*, 932 F.2d 481, 484 (6th Cir. 1991) (describing Judge Hand's definition as "the most commonly relied upon definition of . . . 'judicial proceeding'" within the meaning of Rule 6(e). This Court was therefore correct when it recognized that "[c]onsideration by the House of Representatives, even in connection with a constitutionally sanctioned impeachment proceeding,

---

[8] In *Baggot*, the parties agreed that certain proceedings in the United States Tax Court qualified as judicial proceedings, so the Court did not address the "knotty question of what, if any, sorts of proceedings other than garden-variety civil actions or criminal prosecutions might qualify as judicial proceedings."  463 U.S. at 479 n.2.  The Court cited to four such "knotty" cases, all of which likewise support the Department's position here.  One of the cited cases concluded that a parole hearing was not a judicial proceeding, *see Bradley v. Fairfax*, 634 F.2d 1126, 1129 (8th Cir. 1980), and another determined that an investigation by the Federal Energy Regulatory Commission (FERC) into violations of the Natural Gas Act was not a judicial proceeding, *see In re J. Ray McDermott & Co*., 622 F.2d 166, 170-71 (5th Cir. 1980).  The other two cited cases held the proceedings at issue to be preliminary to judicial proceedings because they involved judges at a later stage in the proceeding.  *See In re Special February 1971 Grand Jury v. Conlisk*, 490 F.2d 894, 897 (7th Cir. 1973) (holding that a Chicago police board hearing regarding disciplinary charges was a judicial proceeding because the finding was subject to review by a court); *Doe v. Rosenberry*, 255 F.2d 119-20 (2d Cir. 1958) (holding that hearing by bar association grievance committee was a judicial proceeding because a misconduct finding is reviewed by the Supreme Court of New York).  *See also United States v. Bates*, 627 F.2d 349, 351 (D.C. Cir. 1980) (holding that Federal Maritime Commission investigation into possible antitrust activities was not a judicial proceeding, and contrasting that to attorney disciplinary proceedings where bar committees act as an arm of the court).

falls outside the common understanding of 'a judicial proceeding.'" *In re Application to Unseal Dockets Related to the Independent Counsel's 1998 Investigation of President Clinton*, 308 F. Supp. 3d 314, 318 n.4 (D.D.C. 2018) (Howell, C.J.), *appeal filed*, No. 18-5142 (D.C. Cir. May 17, 2018).

The Constitution reinforces the distinction between a "judicial proceeding" and the impeachment process.  Unlike a judicial proceeding in court overseen by a neutral judge insulated from politics, impeachment is a political process that the Constitution textually commits to the legislative branch to be overseen by Representatives and Senators who are politically accountable to the voters in regular elections.  *See* U.S. Const. art. I § 3 ("The Senate shall have the sole Power to try all Impeachments").  The Constitution addresses courts elsewhere, *see* U.S. Const. art. III § 1 ("The judicial power of the United States shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."), and draws a clear distinction between the *political* sanction of removal from public office and the *penal* sanction that comes from conviction in a judicial proceeding post-removal, *see* U.S. Const. art. I, § 3, cl. 7 ("Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law.").

The Constitution carefully separates congressional impeachment proceedings from criminal judicial proceedings, because, as Justice Story explained in his *Commentaries on the Constitution*, "the offences, to which the remedy of impeachment has been, and will continue to be principally applied, are of a political nature," such that it is "natural to suppose" they "will be often exaggerated by party spirit."  Joseph Story, *Commentaries on the Constitution* (1833) § 783.

It was accordingly "deemed most advisable by the convention" that "the power of the senate to inflict punishment should merely reach the right and qualifications to office." *Id.*; *see also id.* § 781 ("The constitution, then, having provided, that judgment upon impeachments shall not extend further, than to removal from office, and disqualification to hold office … has wisely subjected the party to trial in the common criminal tribunals, for the purpose of receiving such punishment, as ordinarily belongs to the offence."); *Nixon v. United States*, 506 U.S. 224, 234 (1993) (describing the Framers' separation of impeachment and a criminal trial as a mechanism "to avoid raising the specter of bias and to ensure independent judgments").

The Senators' plenary authority over impeachment proceedings in the Senate underscores the reality that those proceedings are political rather than legal.  When the Senate presides over impeachments, there is typically no judicial officer involved; the proceedings are overseen by the Vice President or whichever Senator is presiding at that time.  And while it is true that "[w]hen the President of the United States is tried, the Chief Justice shall preside," U.S. Const. art. I, § 3, the Chief Justice's role is purely administrative, akin to a Parliamentarian.  The Senators act as both judge and jury, retaining plenary authority over both the procedural rules and substantive standards that govern the proceeding.  *See, e.g.*, *Nixon*, 506 U.S. at 229 (authority to try impeachments "is reposed in the Senate and nowhere else"); Senate Manual, *Rules of Procedure and Practice in the Senate When Sitting on Impeachment Trials* (Jan. 1, 2014) (Presiding Officer during "the trial may rule on all questions of evidence … which ruling shall stand as the judgment of the Senate, unless some Member of the Senate shall ask that a formal vote be taken thereon," which "will submit any such question to a vote of the Members of the Senate");[9] Michael J.

---

[9]  Available at https://www.govinfo.gov/content/pkg/SMAN-113/pdf/SMAN-113-pg223.pdf.

Gerhardt, *Book Review: Grand Inquests: The Historic Impeachments of Justice Samuel Chase and President Andrew Johnson. by William H. Rehnquist*, Constitutional Commentary, p. 443 ("No one understood better than the Chief Justice that the impeachment trial was the Senate's to conduct as it saw fit.").[10]  In short, regardless of the labels one might attach to Senate removal proceedings, *see* HJC App. at 28-29, "no amount of artificial judicial procedure," *In re Grand Jury 89-4-72*, 932 F.2d 481, 487 (6th Cir. 1991), can transform the congressional impeachment process into a "judicial proceeding" under Rule 6(e)(3)(E)(i).

In addition to the plain meaning of "judicial proceeding" and the Constitution's careful delineation between the legal judicial process and the political impeachment process, the rest of the Rule confirms that its drafters understood "judicial proceedings" to refer to those conducted in courts.  Two other provisions of Rule 6(e) use the term "judicial proceeding," and each of them unambiguously refers to a court proceeding.  Subsection 6(e)(3)(F) provides that a petition for disclosure under the "judicial proceedings" exception "must be filed in the district where the grand jury convened," and that "the petitioner must serve the petition on . . . an attorney for the government[,]" as well as "the parties to the judicial proceeding[s]" and "any other person whom the court may designate."  Fed. R. Crim. P. 6(e)(3)(F).  In addition, "[i]f the petition to disclose arises out of a judicial proceeding in another district," Subsection 6(e)(3)(G) provides that "the petitioned court must transfer the petition to the other court unless the petitioned court can reasonably determine whether disclosure is proper."  Fed. R. Crim. P. 6(e)(3)(G).  If the "petitioned court" decides to transfer the petition, it must send the "transferee court" the material sought to be disclosed.  *Id.*

---

[10] Available at
https://scholarship.law.umn.edu/cgi/viewcontent.cgi?article=1775&context=concomm.

The Advisory Committee Notes further confirm judicial proceeding means a proceeding in court by explaining the Rule's transfer provision in terms of "courts"—specifically, "the grand jury court" and "the judicial proceeding court." *See* Fed. R. Crim. P. 6(e)(3)(G), Advisory Committee Notes, 1983 Amendments (describing what was then codified at subsection 6(e)(3)(E)).[11] The Advisory Committee further stated in the Committee Note that "transfer is proper only if the proceeding giving rise to the petition is in federal district court in another district. If, for example, the proceeding is located in another district but is at the state level, a situation encompassed within 6(e)(3)(C)(i), . . . there is no occasion to transfer." *Id.*[12] These additional provisions of Rule 6(e) would make little sense if the drafters understood the term "judicial proceeding" to adopt a broad standard that could include any manner of quasi-judicial proceedings, such as the Senate's impeachment process. *See Food & Drug Admin v. Brown & Williamson,* 529 U.S. 120, 132-33 (2000) (It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme") (citation omitted).

The broad and amorphous standard the Committee advocates would also be entirely inconsistent with the Rule's historical emphasis on secrecy. *See Douglas Oil*, 441 U.S. at 219 n.2 ("Since the 17th Century, grand jury proceedings have been . . . kept from the public eye[.]"). Even before the codification of grand jury secrecy, the Supreme Court recognized that a breach of

---

[11] The only other Criminal Rule to use the term "judicial proceeding" likewise clearly refers to proceedings occurring before a court. *See* Fed. R. Crim. P. 53 ("Except as otherwise provided by a statute or these rules, the court must not permit the taking of photographs in the courtroom during judicial proceedings or the broadcasting of judicial proceedings from the courtroom.").

[12] Tellingly, rulemakers did not include the possibility that a congressional proceeding could constitute a judicial proceeding, even though the 1983 amendments post-dated *Haldeman v. Sirica*, 501 F.2d 714 (D.C. Cir. 1974) (en banc) (per curiam), a case on which the Committee primarily relies.

grand jury secrecy should occur only when necessary to avoid misleading a trier of fact.  *See, e.g.*, *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 233-34 (1940) (permitting use of grand jury testimony to refresh a witness' recollection of prior testimony).  Thus, the judicial proceedings exception typically arose when a litigant sought to use a grand jury transcript "to impeach a witness, to refresh his recollection, to test his credibility and the like."  *Douglas Oil*, 441 U.S. at 222 n.12, citing *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682-83 (1958) (holding that a party must demonstrate that without the grand jury material, a defense would be "greatly prejudiced" or an "injustice would be done"); *see also Doe v. Cabrera*, 126 F. Supp. 3d 160 (D.D.C. 2015) (grand jury transcript of alleged sexual assault victim necessary to avoid injustice in civil action against alleged perpetrator).  Here, the Committee seeks grand jury information for reasons far afield from the paradigmatic examples the Supreme Court has identified as constituting judicial proceedings.  Such dissonance with the exception's intended purpose reinforces what a common sense reading already shows:   that impeachment proceedings are not "judicial proceedings" within the meaning of Criminal Rule 6(e).

### B. This Circuit's Recent Decision in *McKeever* Did Not Hold that Impeachment Constituted a Judicial Proceeding.

The Committee contends that the D.C. Circuit in *McKeever* "squarely held" that "an investigation regarding impeachment" fits within the exception for judicial proceedings "as a matter of binding Circuit precedent," HJC App. at 26, but *McKeever* held no such thing.  To the contrary, *McKeever* held that Rule 6(e) comprehensively regulates disclosures of grand jury information, and that district courts lack inherent authority to order disclosure of grand jury information beyond what the Rule expressly provides.  920 F.3d at 845.  The petitioner, a researcher who sought the grand jury testimony from a 1957 trial of a former FBI agent and CIA lawyer, conceded that his request fell outside Rule 6(e)'s textual exceptions allowing disclosure of

grand jury material.  *Id*.  He argued instead that courts could rely on their inherent authority to disclose historically interesting grand jury information, or alternatively, that courts were not bound by Rule 6(e) at all.  *Id*. at 845, 847.  The petitioner never relied on the judicial proceeding exception to Rule 6(e), nor was that exception necessary to the D.C. Circuit's legal analysis.  The D.C. Circuit relied on the text and structure of the Rule to hold that "persons bound by grand jury secrecy must not make any disclosures about grand jury matters '[u]nless these rules provide otherwise.'"  *Id*. at 845 (quoting Criminal Rule 6(e)(2)(B)).   And the Court bolstered that textual analysis with a review of Supreme Court and D.C. Circuit precedents.  *Id*. at 846.

The discussion the Committee cites as *McKeever*'s "holding" appears in a footnote, and only in response to concerns expressed by the dissenting judge.  That judge did not take issue with the majority's textual analysis of Rule 6(e), but instead felt constrained by the D.C. Circuit's prior decision in *Haldeman v. Sirica*, 501 F.2d 714 (D.C. Cir. 1974) (en banc) (per curiam), which he conceded "contained no meaningful analysis of Rule 6(e)'s terms," but which he read to rely primarily on atextual exceptions to the Rule.   *McKeever*, 920 F.3d at 855 (Srinivasan, J., dissenting).  The majority agreed that *Haldeman*, and the district's court's decision reviewed in that case, were "ambiguous" as to the source of authority for the disclosure at issue.  *Id*. at 847 n.3.  But the majority chose to read *Haldeman* as having been decided under the judicial proceedings exception, because doing so "reads the case to cohere, rather than conflict, with the Supreme Court and D.C. Circuit precedents discussed above, which both predate and postdate *Haldeman*."  *Id*.  The *McKeever* court thus simply read an ambiguous prior decision in a way that reconciled it with the understanding of Rule 6(e) reflected in an unbroken line of cases from the Supreme Court and the D.C. Circuit.  In no sense, though, did the *McKeever* court reach an independent holding that impeachment constitutes a "judicial proceeding" within the meaning of Rule 6(e).  The *McKeever*

court was not faced with that issue, and thus had no occasion to decide it.  *See* Bryan A. Garner, et al., *The Law of Judicial Precedent*, pp. 44-45 (Thompson Reuters) (2016) (holdings consist of "the parts of a decision that focus on the legal questions actually presented to and decided by the court.").

The more relevant question is whether *Haldeman* itself held that impeachment is a "judicial proceeding," but review of that decision makes clear it did not.  In *Haldeman*, the full D.C. Circuit denied a mandamus petition that sought to block the disclosure of grand jury materials to the Judiciary Committee of the House of Representatives as material to the committee's "inquiry . . . into possible grounds for impeachment of the President."  501 F.2d at 715.  Since the case was before the D.C. Circuit on a petition for writ of mandamus, the question before the court was whether the petitioners had shown that the district court's order was a "clear abuse of discretion or usurpation of judicial power" from which the petitioners had a clear and indisputable right to relief. *Bankers Life*, 346 U.S. at 383 (citations omitted).

Given the D.C. Circuit's tightly constrained review under the mandamus standard, it is no surprise that *Haldeman* "contains no meaningful analysis of Rule 6(e)'s terms," *McKeever*, 920 F.3d at 855 (Srinivasan, J., dissenting), and instead noted only the court's "general agreement with [the district court's] handling" of the case. *Haldeman*, 501 F.2d at 715.  Even if the *district* court's opinion in that proceeding could be read as grounded in the judicial proceedings exception, *see* HJC App. at 27-28, the *circuit* court's decision in *Haldeman* established nothing beyond its holding that the drastic remedy of mandamus against the district court (and the order at issue) was not warranted by the text of the rule and the binding precedent as it existed in 1974.   Indeed, the D.C. Circuit concluded its opinion by underscoring the limited nature of its review. *See Haldeman*, 501 F.2d at 716 ("This claim is, obviously, that we should intervene by prohibition or mandamus

to exert our supervisory power . . . .  It almost goes without saying that this is not the kind of abuse of discretion or disregard of law amounting to judicial usurpation for which the extraordinary writs were conceived."); *see also Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 382-83 (1953) ("[The district court's] decision against petitioner, even if erroneous—which we do not pass upon—involved no abuse of judicial power . . . The supplementary review power conferred on the courts by Congress in the All Writs Act is meant to be used only in the exceptional case where there is clear abuse of discretion or 'usurpation of judicial power[.]'") (quoting *De Beers Consolidated Mines v. United States*, 325 U.S. 212, 217 (1945)).

The D.C. Circuit did not then and has not since directly considered whether impeachment qualifies as a "judicial proceeding" under Rule 6(e).  Thus, nothing in *Haldeman* precludes this Court from undertaking its own analysis of Rule 6(e) to hold that "[c]onsideration by the House of Representatives, even in connection with a constitutionally sanctioned impeachment proceeding, falls outside the common understanding of 'a judicial proceeding.'"  *In re Application to Unseal Dockets Related to the Independent Counsel's 1998 Investigation of President Clinton*, 308 F. Supp. 3d at 318 n.4 (citation omitted).

The other judicial authorities on which the Committee relies are similarly inapposite.  *See, e.g.*, HJC App. at 20, n.21.  Foremost, Independent Counsels, appointed under the now-expired Independent Counsel Act, had express statutory authority to provide their final reports to Congress. *See* 28 U.S.C. § 595(c) ("An independent counsel shall advise the House of Representatives of any substantial and credible information which such independent counsel receives, in carrying out the independent counsel's responsibilities under this chapter, that may constitute grounds for an impeachment.  Nothing in this chapter or section 49 of this title shall prevent the Congress or either House thereof from obtaining information in the course of an impeachment proceeding.").  Cases

involving Independent Counsels providing grand jury information in their final reports to Congress thus turned on different legal authorities and are of little relevance here.  If anything, the Independent Counsel Act undercuts the Committee's "judicial proceeding" argument because it demonstrates that Congress knows how to authorize the provision of grand jury information for a potential impeachment, but chose not to do so in Rule 6(e) or elsewhere after the Independent Counsel Act expired.[13]

Nor are the cases involving the impeachment of former judge Alcee Hastings relevant here.  *See* HJC App. at 28-29.  The district court in that case gave multiple grounds for disclosing grand jury information related to misconduct by a federal judge.  These included relying on the district court's "inherent power," which that court could do under binding Eleventh Circuit precedent that permitted district courts to order disclosure of grand jury material even when no Rule 6(e) exception applied.  *In re Grand Jury Proceedings of Grand Jury No. 81-1(Miami)*, 669 F. Supp. 1072, 1076 (S.D. Fla. 1987) (citing *In re Petition to Inspect & Copy Grand Jury Materials (Hastings)*, 735 F.2d 1261, 1268 (11th Cir. 1984)).[14]  To be sure, the district court also suggested, as an alternative ground, that an impeachment trial by the Senate constituted a judicial proceeding "in every significant sense."  *Id.* at 1075-76.  But the Court of Appeals never reviewed that holding

---

[13]  In allowing the Independent Counsel Act to sunset, Congress heard testimony from (among others) then-Attorney General Reno, who noted that the final report requirement of that statute was flawed:  "[T]he report requirement cuts against many of the most basic traditions and practices of American law enforcement. Under our system, we presume innocence and we value privacy. We believe that information obtained during a criminal investigation should, in most all cases, be made public only if there is an indictment and prosecution, not in lengthy and detailed reports filed after a decision has been made *not* to prosecute."  *See* Opening Statement of Attorney General Janet Reno, Senate Hearing 106-131, *The Future of the Independent Counsel Act*, presented March 17, 1999.

[14]  The *en banc* Eleventh Circuit is currently considering whether *Hastings* was correctly decided as part of a separate petition for access to historical grand jury information, *In re Pitch*, No. 17-15016, Order dated July 12, 2019.

because the parties did not contest it.  The Eleventh Circuit thus focused entirely on whether there was a particularized need sufficient to warrant disclosure.  *See In re Request for Access to Grand Jury Materials Grand Jury No. 81-1 Miami*, 833 F.2d 1438, 1440-41 (11th Cir. 1987) ("We . . . do not have before us an issue concerning the interpretation of" Rule 6(e)(3)(E)(i).  And to the extent the district court suggested that the Constitution's use of the terms "cases of impeachment," "try," "convicted," and "judgment," are relevant in addressing impeachment proceedings, *In re Grand Jury Proceedings*, 669 F. Supp. at 1076, that reasoning was incorrect.  The fact that the Constitution uses general terms that may also apply to criminal proceedings does not establish that impeachment—which is not limited to criminal offenses, does not occur in court pursuant to general legal rules, and generally includes none of the defining features applicable to legal proceedings before judges—is itself a judicial proceeding under Rule 6(e)(3)(E)(i).  Judicial impeachments and other proceedings involving "quasi-judicial" attributes, including the Committee's Application here, simply do not fall within the "judicial proceedings" exception of Criminal Rule 6(e).

## II.     Even if Removal Proceedings in the Senate Were a "Judicial Proceeding," the Current Proceedings Are Not "Preliminarily" to that Proceeding.

Even were the Court to conclude that a removal proceeding in the Senate qualified as a "judicial proceeding" under Rule 6(e), disclosure would still be prohibited because the Committee's actions thus far—which at most amount to an exploratory inquiry where impeachment is one of many possible outcomes—are not being undertaken "preliminarily to" a Senate impeachment proceeding.

"[N]ot every beneficial purpose, or even every valid governmental purpose, is an appropriate reason for breaching grand jury secrecy."  *Baggot*, 463 U.S. at 480.  Accordingly, an applicant seeking grand jury materials must show that it will use the materials in a manner that is

"related fairly directly to some identifiable litigation, pending or anticipated." *Id.* "[I]t is not enough to show that some litigation may emerge from the matter in which the material is to be used, or even that litigation is factually likely to emerge.  The focus is on the *actual use* to be made of the material.  If the primary purpose of disclosure is not to assist in preparation or conduct of a judicial proceeding, disclosure under [Rule (6)(e)] is not permitted." *Id.*

Given the Supreme Court's decision in *Baggot*, it is not clear that Committee proceedings could ever be conducted "preliminarily" to a Senate impeachment proceeding because the Committee does not have the authority to precipitate a Senate impeachment proceeding.  The most the Committee can do is refer articles of impeachment to the full House of Representatives, which would then need to have its own debate and its own vote adopting the articles in order to trigger a Senate proceeding.  The Committee fails to address that gap, but it is analogous to the situation in *Baggot*, where the Court held that an IRS civil audit is not conducted "preliminarily to or in connection with a judicial proceeding," partly because "there is no particular reason why [the audit] must lead to litigation."  *See* 463 U.S. at 480-81.  Here, there is no reason why the Committee's investigation must lead to referral of articles of impeachment to the floor of the House, or why (on top of that) referral of articles of impeachment "must" lead to a Senate trial. *Id.*  To the contrary, the investigation could take a different turn, particularly given that the full House in the current Congress has already voted overwhelmingly *against* impeachment.  *See* H. R.J. Res. 498, 116th Cong. (2019) (defeated 332-95).  The ultimate Senate proceeding is thus only one of several possibilities in a tenuous chain of events that "may emerge" from the Committee's investigation. *See Baggot*, 463 U.S. at 480.[15]

---

[15] The Committee incorrectly states that *McKeever* "necessarily concluded that an impeachment investigation by this Committee meets *Baggot*'s standard." *See* HJC App at 29.  As explained in Section I, *supra*, however, *McKeever* does not control this case.  Moreover, to the

That is particularly true here, given that the "primary purpose" of the Committee's request for the grand jury materials is not even to prepare for removal proceedings in the Senate, but rather to help the Committee consider what actions, if any, it might ultimately pursue in response to the Mueller Report. *See* HJC App., Exh. A at 4 ("[T]he Committee needs to review the unredacted report, the underlying evidence, and associated documents so that it can ascertain the facts and consider its next steps."). As Chairman Nadler explained in a news conference the same day the Committee filed this Application, "[a]n impeachment inquiry is when you consider only impeachment. That's not what we're doing. We're investigating all of this and will see what remedies we could recommend, including articles of impeachment but not limited to that." *House Judiciary Committee Press Conference on Oversight Agenda Following Mueller Hearing*, July 26, 2019, (transcript available at https://www.c-span.org/video/?463045-1/house-judiciary-committee-democrats-defend-robert-mueller-plan-continue-investigation). The additional "remedies" the Committee is considering include censure, various legislative proposals, Constitutional amendments, and a Congressional referral to the Department of Justice for prosecution or civil enforcement. HJC App., Exh. T at 6-7.[16]

The Leadership of the House of Representatives has made even more definitive statements about the nature of the current investigation. Most prominently, the Speaker of the House has been

---

extent the Committee argues that *Haldeman* meets *Baggot*'s standard and necessarily determined that impeachment qualifies as preliminary to a judicial proceeding, that is wrong—*Haldeman* predated *Baggot* by nearly a decade.

[16] On August 8, 2019, Chairman Nadler attempted to rebrand the proceeding by calling it "formal impeachment proceedings." *See* Andrew Desiderio, *Nadler: 'This is Formal Impeachment Proceedings,'* Politico, https://www.politico.com/story/2019/08/08/nadler-this-is-formal-impeachment-proceedings-1454360 (last visited Sept. 12, 2019). His description of the current proceedings, however, is substantively no different from his Committee hearing remarks appended to the Committee's application in which the Chairman includes impeachment as one of the Committee's myriad possible options at the end of its investigation. HJC App., Exh. T.

emphatic that the investigation is not a true impeachment proceeding.  On the same day the House

adopted the resolution that the Committee claims authorized this suit, the Speaker told a reporter

the House Democrat caucus was "not even close" to an "impeachment inquiry."  *Rep. Nancy Pelosi*

*(D-CA)    Continues    Resisting    Impeachment    Inquiry*,    CNN,    June    11,    2019,

http://transcripts.cnn.com/

TRANSCRIPTS/1906/11/cnr.04.html (last visited Sept. 13, 2019).  More recently, she has said, "I

do know that we've been on a path of investigation and that includes the possibility of legislation

or impeachment."  *See* Lindsey McPherson, *Hoyer contradicts Judiciary Committee on*

*Impeachment Inquiry*,  Roll  Call  (Sept.  12,  2019),  https://www.rollcall.com/news/hoyer-

contradicts-judiciary-committee-on-impeachment-inquiry (last visited Sept. 11, 2019).   And the

House  Majority  Leader  had  even  explained  that  branding  the  Committee's  proceeding  as

"impeachment" is a simply a device to enhance the Committee's legal arguments in this and other

courts.  *See* Nicholas Fandos, *Is It an Impeachment Inquiry or Not? Democrats Can't Seem to*

*Agree*,"      The      NY      Times,      Sept.      11,      2019,

https://www.nytimes.com/2019/09/11/us/politics/democrats-house-impeachment-inquiry.html

(last visited Sept. 12, 2019) ("Mr. Hoyer suggested instead that Mr. Nadler and members of his

panel were merely trying to convince the federal courts that they were contemplating impeachment

so they could expedite their court cases and meet the criteria for sharing sensitive grand jury secrets

collected  as  a  part  of  the  Russia  investigation.").   Regardless  of  how  the  House  labels  its

proceedings, however, it is clear that the Committee is "perform[ing] the nonlitigative function"

of assessing various Congressional actions rather than preparing for a judicial proceeding.[17]  *See*

*Baggot*, 463 U.S. at 483.

Nor does the Committee provide any basis to distinguish its current "investigation" from

the sort of oversight that Congress routinely undertakes, all of which could potentially lead to the

impeachment of Executive Branch officials.  The Committee notes that the House has referred a

single Member's articles of impeachment to it, *see* HJC App. at 13, 32; *see also* H.R.J. Res. 13,

116th Cong. (2019), but that is in stark contrast to every prior presidential impeachment

proceeding, in which there was a vote by the full House adopting a resolution authorizing an

impeachment inquiry.  The impeachments of Presidents Clinton and Andrew Johnson were

investigated in multiple phases with each phase authorized by the House's adoption of resolutions.

*See* H. Res. 581 (1998); H. Res. 525 (1998); III Hinds' Precedents §§ 2400-2402, 2408, 2412.

Before the Judiciary Committee initiated an impeachment inquiry into President Nixon, the

Committee's chairman recognized "a[n] [inquiry] resolution has always been passed by the

House" and "is a necessary step."  III Deschler's Precedents ch. 14, § 15.2.  The House satisfied

this requirement through its adoption of H. Res. 803 (1974).

But no court has ever suggested that congressional committees can obtain grand jury

material to conduct oversight or consider hypothetical future impeachments based on a lone

Representative's referral.  Such a conclusion would be completely inconsistent with *Baggot*, which

held that the presence of intervening contingencies suffices to prevent something (there, an IRS

investigation) from actually proving "preliminary" to a judicial proceeding (there, the possible

---

[17]  The recently adopted "Resolution for Investigative Procedures" has no bearing on the scope
of the current proceedings.  That resolution provides for procedures governing the Committee's
inquiry, but neither expands nor narrows the investigative focus and has not been endorsed by
the full House in any event.  *See* Exh. 11 (Resolution for Investigative Procedures)

litigation that would ensue).  As the Supreme Court made clear in *Sells Engineering*, which it issued together with *Baggot*, Rule 6(e) does not allow investigators (there, Civil Division attorneys) to obtain automatic access to grand jury information for use in collateral investigations. That is because if investigators "enjoyed unlimited access to grand jury material . . . there would be little reason for them to resort to their usual, more limited avenues of investigation[.]"  *Sells Eng'g Inc.*, 463 U.S. at 433-34 (rejecting automatic access to grand jury information to government attorneys other than prosecutors entitled to be in the grand jury room); *see also id.* at 431-32 (while it would be "of substantial help" for Civil Division attorneys to access "a storehouse of evidence compiled by a grand jury," such disclosure "poses a significant threat to the integrity of the grand jury itself").   Here, the full House has not even expressly endorsed the Committee's investigation—much less voted to commence a removal proceeding in the Senate—such that the Committee's request for grand jury material is not being made "preliminarily" to a Senate proceeding that, again, the House has not even voted to investigate the *possibility* of initiating, much less voted to *actually* initiate.  Even if such a Senate removal proceeding were "judicial" (which it is not), it is currently entirely hypothetical rather than "likely to emerge," *Baggot*, 463 U.S. at 480, as Rule 6(e) requires.

In short, even if a Senate impeachment proceeding were a "judicial" one, and even if a House Committee's investigation could in some circumstance be conducted "preliminarily" to the Senate impeachment process, the Committee's current investigation, with myriad possible outcomes, based on as little as an impeachment referral from a single Representative, *see* HJC App. at 13, is neither sufficiently likely to lead to some future Senate proceeding nor sufficiently proximate to any hypothetical Senate proceeding to establish the close nexus to a "judicial proceeding" that Rule 6(e) requires.  The Committee's investigation is not, in other words,

sufficiently tied to "actual litigation," *Baggot*, 463 U.S. at 480, to come within Rule 6(e)(3)(E)(i). For that reason, too, the Court should reject the Committee's Application.

### III.   The Committee Has Failed to Establish a Particularized Need for the Requested Grand Jury Materials.

In addition to failing to satisfy the requirements of Rule 6(e), the Committee's Application fails on the threshold ground that the Committee has not sufficiently demonstrated it actually *needs* the secret grand jury information it has requested—a basis for decision that would, if adopted, eliminate the need to address the broader legal issues discussed above.   Because of the strong policy reasons favoring grand jury secrecy, the Supreme Court has held that a party seeking disclosure under Rule 6(e)(3)(E)(i) must make a "strong showing of a particularized need for grand jury materials," well beyond "mere relevance."   *Sells Eng'g Inc.*, 463 U.S. at 443; *Procter & Gamble*, 356 U.S. at 682.   Specifically, parties seeking grand jury material must show "that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed."   *Douglas Oil*, 441 U.S. at 222.   Requests for wholesale disclosure of grand jury transcripts generally do not satisfy this requirement.   *Id*.

For the reasons detailed below, and in the *ex parte* submission accompanying this memorandum, the Court can reject the Committee's Application on this ground alone.

### A.   The Committee Fails To Identify Any Injustice That Would Result if it Does Not Receive the Requested Grand Jury Materials.

The Committee's explanation of the "injustice" that would occur if it does not obtain the requested grand jury testimony reduces to the argument that the Committee is considering recommending impeachment to the full House, and it needs the information to question witnesses

and "seek further leads for the Committee's overall investigation."  *See* HJC App. at 37.  For numerous reasons, this explanation fails.

*First*, the Committee has access to the Mueller Report, which the Attorney General has made public with minimal redactions, even though the Special Counsel's Office prepared and submitted it to him as a confidential document.   Moreover, the Committee's Chairman and Ranking Member were given access to the *unredacted* report other than grand jury information. The redacted grand jury information comprises less than 2% of the overall Report, and in Volume II—the section addressing the President' conduct and the alleged obstruction matters the Committee purports to be interested in—99.9% of the Report is unredacted.  *See* HJC App, Exh. K at 1.  Moreover, the redactions for grand jury information are surgical, allowing the Committee to understand the context of the discussion (and its relevance to the President) from the surrounding text.  The Committee provides no reason to believe that anything useful to their investigation into the President lies under those redactions; indeed, the examples it cites of supposedly relevant, redacted information are all within Volume I of the Report, which, again, does not address whether the President's actions "constitute obstruction of justice" that is the Committee's stated investigatory target.  HJC App. at 35; *see also id.* at 1 (Committee is investigating whether "the President of the United States repeatedly attempted to undermine and derail a criminal investigation of the utmost importance to the nation").  And while the Committee stresses that it requires access to the information in order to question former White House Counsel Donald McGahn, HJC App. at 37,[18] *none* of the discussion involving Mr. McGahn in Volume II of the

---

[18]   Chairman Nadler has since stated that he could advance articles of impeachment through his committee even without the testimony of Mr. McGahn.  *See Nadler: Impeachment Timetable Doesn't Hinge on Don McGahn*, by Kyle Cheney, Politico, Sept. 9, 2019, https://www.politico.com/story/2019/09/09/nadler-impeachment-don-mcgahn-1487788 (last visited

Report reflects *any* redactions for grand jury information.  *See* Report, Vol II, pp. 43-158 (Exh. 9).[19]   Indeed, in the discussions of Mr. McGahn, the Report repeatedly references FBI-302 interview reports rather than grand jury testimony.[20]  And the Department has already reached an agreement with the Committee to provide FBI-302 interview reports, appropriately redacted, including the interview reports for Mr. McGahn.  *See* HJC App., Exh. O.

The Committee thus presents no evidence that the requested grand jury information would be of any help to its current inquiry, particularly in light of the Attorney General's decisions to both make most of the Report public and provide the Committee's Chairman and Ranking Member with access to all redacted portions of the Report other than the minimal redactions comprising the grand jury information.  The Committee's mere desire to know what lies behind those redactions is not the sort of particularized need the Committee must establish to overcome the presumption of grand jury secrecy that attaches even to disclosures otherwise authorized by Rule 6(e).  "No grand jury testimony is to be released for the purpose of a fishing expedition or to satisfy an unsupported hope of revelation of useful information," *United States ex rel Stone v. Rockwell Int'l Corp.*, 173 F.3d 757, 760 (10th Cir. 1999), but that is all that underlies the Committee's request here.

*Second*, Congress is conducting its own investigation into the matters addressed in the Report, and continues to investigate those matters.  "In weighing the need for disclosure," courts

---

Sept. 12, 2019) ("[T]here's a lot of testimony we have without McGahn.")  That statement is not, of course, consistent with the strong particularized need necessary to overcome grand jury secrecy.

[19] In the entirety of Volume II of the Report, targeted redactions for grand jury information appear on five pages.  *See* Exh. 9, pp. 13, 18, 46, 97, 105.  None appears in paragraphs discussing Mr. McGahn.

[20] The Report references interviews of Mr. McGahn on 11/30/17, 12/12/17, 12/14/17, 3/8/18 and 2/28/19.  *See generally* Report, Vol. II (Exh. 9).

must account for "any alternative discovery tools available" to the party seeking disclosure. *Sells Eng'g, Inc.*, 463 U.S. at 445. A finding of "particularized need" is especially inappropriate where, as here, the Committee is collecting its own evidence to complete its investigation and has not yet exhausted its available discovery tools. *See, e.g.*, *In re Grand Jury 89-4-72*, 932 F.2d 481, 488 (6th Cir. 1991) ("[T]he federal grand jury cannot be the vehicle of investigation . . . particularly in a case such as this one where the Commission holds the unused power to subpoena witnesses to gather its own evidence to protect the public.").[21]

In apparent recognition that Volume II of the Mueller Report is almost entirely unredacted, the Committee argues that grand jury redactions from Volume I could also lead to relevant information regarding the President's "state of mind." HJC App. at 35-37. But Volume I of the Report concerns Russian interference in the 2016 election and its interactions with the Trump Campaign, *see* Report, Vol. I (Exh. 8) — a topic on which the Committee has many alternative sources of information. Indeed, Congress has already conducted multiple investigations. Evidence gathered by the House Permanent Select Committee on Intelligence ("HPSCI"), as well as the detailed majority and minority reports drawing on that evidence, are available to the Committee for its investigation here.[22] *See* HJC App. at 14 n.8 ("Evidence obtained through HPSCI's

---

[21] The Committee cannot, of course, show particularized need by citing assertions of testimonial immunity and privilege. *See, e.g.*, HJC App., Exh. A at 10-12. Valid assertions of privilege do not establish a basis to pierce grand jury secrecy. And indeed, the Committee, in separate proceedings, has already challenged the assertion of testimonial immunity on behalf of Mr. McGahn. *See Committee on the Judiciary of the U.S. House of Representatives v. McGahn II*, Civ. A. No. 19-cv-02379 (D.D.C. 2019).

[22] https://docs.house.gov/meetings/IG/IG00/20180322/108023/HRPT-115-1_1-p1-U3.pdf ("Majority Report");

https://intelligence.house.gov/uploadedfiles/20180411_-_final_-_hpsci_minority_views_on_majority_report.pdf ("Minority Views")

investigation will further inform the Judiciary Committee's consideration of whether to recommend articles of impeachment against the President.").

The Minority Views in the HPSCI's Report discuss at length the "[e]vents surrounding the June 9, 2016 Trump Tower meeting," HJC App. at p. 35, and "[f]ormer Trump Campaign adviser Carter Page's July 2016 trip to Moscow," *id.*, among other topics.  *See* Minority Views, p. 24-34; 41-44.  The Committee claims a need for grand jury information related to a meeting between Kirill Dmitriev and Erik Prince, HJC App. at 35, but fails to note that Erik Prince appeared before the HPSCI.  Minority Views at 82.  Indeed, the HPSCI Minority cites to 58 different witnesses who appeared before the HPSCI in Executive Session.[23]  Minority Views at 80-84.  This evidence is available to the Committee, in addition to its own hearings and witnesses.  The Committee never explains what specifically it lacks from these proceedings, and why that information is only available from protected grand jury proceedings.  That is all the more true because, again, the Department has agreed to accommodate the Committee by providing certain FBI-302 interview reports the Committee requested that were cited in Volume II of the Report.  HJC App., Exh. O at 4.  Given the wealth of information already at the Committee's disposal, the Committee cannot demonstrate a particularized need for the grand jury information.

---

[23] Those witnesses include Mike Rogers, John Brennan, Dan Coats, Evelyn Farkas, John Podesta, Michael Caputo, Jared Kushner, JD Gordon, Andrew Brown, Yared Tamene, Roger Stone, Boris Epshteyn, Matt Tait, Jonathon Safron, Peter Fritsch, Thomas Catan, Brad Parscale, Michael Cohen, Carter Page, Irakly Kaveladze, Keith Schiller, Glenn Simpson, Rinat Akhmetshin, Anatoli Samochornov, Erik Prince, Jeff Sessions, Diane Denman, Shawn Henry, Donald Trump, Jr., Walid Phares, Michael Goldfarb, Sam Clovis, Marc Elias, Alexander Nix, Debbie Wasserman-Schultz, Michael Sussman, Rob Goldstone, David Kramer, Felix Sater, Dana Rohrabacher, Jake Sullivan, Rhona Graff, Steve Bannon, Rick Dearborn, Corey Lewandowski, Hope Hicks, James Comey, John Brennan, James Clapper, John Carlin, Susan Rice, Samantha Power, Loretta Lynch, Ben Rhodes, Mary McCord, Sally Yates, Andrew McCabe, and Michael Gaeta.

*Third*, the Committee must establish its *own* particularized need.  HJC App. at 34.  Relying heavily on *Haldeman*, which permitted the Watergate grand jury to send its "Roadmap" to Congress, the Committee suggests that its "need" for the information is self-evident.  But the circumstances in *Haldeman* were much different from the current Application.  In *Haldeman*, it was not the House of Representatives that initially sought disclosure of secret grand jury proceedings.  Rather, it was the *grand jury itself* that sought to share its findings with Congress.  *See In re Report and Recommendation of June 5, 1972 Grand Jury Concerning Transmission of Evidence to the House of Representatives,* 370 F. Supp. at 1221.[24]  The grand jury is uniquely situated, as it is not "textually assigned . . . to any of the branches," *United States v. Williams*, 504 U.S. 36, 47 (1992), and its request in 1974 was unusual and *sui generis*.  In addition, the Special Prosecutor in that case, Leon Jaworski, did not draft and issue his own detailed report with a lengthy narrative describing his findings that was publicly available separately from any grand jury material.  Given these fundamental differences from the circumstances in *Haldeman*, the Committee cannot base its request merely on its invocation of "impeachment."

Urging otherwise, the Committee contends that because impeachment is a grave matter that the Constitution entrusts to the House of Representatives, HJC App. at 34, the Committee has by definition established a particularized need to avoid an injustice.  But that constitutional assignment says nothing about whether particular grand jury testimony is necessary for such a proceeding, let alone for the Senate trial that follows.  And the Committee contends that "impeachment" can begin in any number of ways, including on referral to the Committee by a single member of Congress.  *Id.* at 30, 32.  The argument that a single member of Congress can

---

[24] The Rodino Letter, HJC App., Exh. Y, was written a week after the Grand Jury had submitted its Report and Recommendation to Judge Sirica and requested that it be provided to the House Judiciary Committee.  *See id*., Exh. P.

initiate an inquiry that satisfies the threshold requirements of Rule 6(e) and *also* establishes a per se "particularized need" is, to say the least, an extraordinarily low threshold for providing grand jury information to Congress.   And such a permissive interpretation of Rule 6(e) is flatly inconsistent with the care that rule otherwise takes to protect this extremely sensitive information. This Court should not endorse it.

### B.  There Remains A Compelling Need for Continued Secrecy.

The Committee also argues that its need for this information outweighs "any marginal intrusion" on grand jury secrecy, primarily because the Committee has established some procedures for safeguarding the information.   HJC App. at 38.   The Committee's procedures, however, are entirely illusory.   Even the Committee concedes that the material would remain confidential only "absent further action by the Committee."   *Id*.   And the procedures themselves make clear that information may be made public on a simple majority vote of the Committee.   HJC App., Exh. X, ¶ 5.   And besides, protective measures are plainly not *themselves* a basis to grant access; they enter the analysis only if and when the court has found a particularized need.   *Douglas Oil*, 441 U.S. at 223 ("[i]f disclosure is ordered, the court may include protective limitations on the use of the disclosed material).

The burden a party must carry to overcome grand jury secrecy is heaviest when there are ongoing criminal proceedings that implicate the same grand jury matters.   *See Douglas Oil*, 441 U.S. at 223.   Here, there are a number of ongoing and pending criminal and national security matters that arose as part of the Special Counsel's investigation and that the Special Counsel's Office referred for investigation and prosecution.   *See* Mueller Report, Appendix D (Exh. 9). These include *United States v. Internet Research Agency, LLC, et al.* (D.D.C. No. 1:18-cr-00032); *United States v. Netyksho, et al.* (D.D.C. No. 1:18-cr-00215); *United States v. Flynn* (D.D.C. No.

1:17-cr-00232); *United States v. Gates* (D.D.C. No. 1:17-cr-00201); *United States v. Kilimnik* (D.D.C. No. 1-17- cr-00201); *United States v. Stone* (D.D.C. No. 1:19-cr-00018); *United States v. Khusyaynova* (E.D.V.A. No. 1:18-mj-00464); and *United States v. Morenets et al.* (W.D. Pa. 1:18-cr-00263). *See* Declaration of Vanessa Brinkman, dated June 3, 2019, filed in *EPIC, v. DOJ*, Civil Action No. 19-810 (D.D.C. 2019) (attached at Exh. 7), ¶¶ 44-45. The defendants in some of these prosecutions remain fugitives, and there remain individuals under investigation for related conduct, all of whom could commit further illegal activities similar to those charged. *Id*. These ongoing trials and investigations weigh heavily in favor of maintaining secrecy.[25]

### C.   The Committee's Request is Overbroad.

Finally, in addition to failing for the reasons detailed above, the Committee's requests for essentially all grand jury material in the Department's possession that relates to the President's "state of mind" or one particular witness in the investigation are overbroad. The Committee argues that it needs the relevant grand jury materials in order to "[a]ssess[] the President's knowledge and state of mind . . . [and] determine whether he acted with corrupt intent when he took actions to impede the Special Counsel's investigation." HJC App. at 35. In order to effectuate that asserted goal, the Committee seeks three categories of information:  (1) grand jury information referenced in the Mueller Report; (2) grand jury materials "that bear directly on or provide context regarding

---

[25] It is irrelevant that some witnesses have acknowledged their grand jury appearances. HJC App. at 39. Witnesses are not bound by Rule 6(e), and this case is a far cry from a situation where disclosure is so "sufficiently widely known" that "it . . . los[es] its character as Rule 6(e) material." *In re Grand Jury Subpoena, Judith Miller*, 493 F.3d 152, 154 (D.C. Cir. 2007) (citation omitted). Nor is this case similar to the recent application to unseal materials from the Independent Counsel's 1998 Investigation of President Clinton. There, the grand jury materials had been made public in the Independent Counsel's Final Report, and the primary issues were discerning whether still-sealed judicial filings referencing that public material could be unsealed, and what still-secret information remained. *See generally In re App. To Unseal Dockets Related to the Independent Counsel's 1998 Investigation of President Clinton (Independent Counsel Dockets)*, 308 F. Supp. 3d 314 (D.D.C. 2018).

the President's state of mind"; and (3) grand jury materials that "describe actions taken by . . . Don McGahn." *Id.* at 40.

The Committee has failed to show a particularized need for the information in the first category (information cited in the Report), while the other two categories it requests are facially improper.  Rather than identify particular information that it purportedly needs, these requests would require the Executive Branch to survey the entirety of existing materials, and assess which materials might reflect "corrupt intent" or illuminate the President's "state of mind," as well as which materials describe "actions" that one witness may or may not have taken.  These two requests are neither particularized nor "limited," and can be rejected on that additional basis, too. *See Sells Eng'g*, 463 U.S. at 443; *Cf.*, *In re Petition of Geoffrey Shepard*, Misc. No. 11-44 (D.D.C.), Order dated 7/29/11 (ECF No. 7) (holding that grand jury disclosures should not be "indiscriminate" and denying petition for all Watergate grand jury information as overbroad and "inappropriate"); s*ee also In re Sealed Case*, 801 F.2d 1379, 1381 (D.C. Cir. 1986) (denying overbroad request for grand jury information as failing the particularized need standard); *United Kingdom v. United States*, 238 F.3d 1312, 1321 (11th Cir. 2001) (a "blanket request for *all* of the unused grand jury materials from [a] prosecution cannot be described as the kind of particularized request required for the production of otherwise secret information.").[26]

---

[26] The Court need not address the Committee's alternative argument seeking disclosure of the requested materials based on the court's inherent authority.  HJC App. at 40-41.  As the Committee recognizes, that argument is foreclosed by *McKeever*, 920 F.3d at 848-49.  If the Supreme Court were to hear the case, and to reverse, the Committee could at that time renew its petition to argue for discretionary disclosure on the basis of inherent authority.

## CONCLUSION

For the reasons stated above and in the Department's *ex parte* submission, the Department respectfully requests that the Court deny the Application in full.

Date:  September 13, 2019                     Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

*/s/ Elizabeth J. Shapiro*
ELIZABETH J. SHAPIRO
CRISTEN C. HANDLEY
Attorneys, Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street NW
Washington, DC 20005
Tel: (202) 514-5302
Fax: (202) 616-8460

*Counsel for Department of Justice*