## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE:

APPLICATION OF THE COMMITTEE ON
THE JUDICIARY, U.S. HOUSE OF
REPRESENTATIVES, FOR AN ORDER
AUTHORIZING THE RELEASE OF
CERTAIN GRAND JURY MATERIALS

Case No. 1:19-GJ-00048-BAH

## MEMORANDUM AMICUS CURIAE OF RANKING MEMBER DOUG COLLINS IN SUPPORT OF DENIAL

Carlton Davis (Va. Bar No. 80283)
*Chief Oversight Counsel*
Ashley Callen (Va. Bar No. 70868)
*Senior Advisor and Counsel*
Daniel Johnson (DC Bar No. 1024590)
*Counsel*
M. Jacob Greenberg (Mo. Bar No. 70089)
*Counsel*
Minority Staff
House Committee on the Judiciary
Rayburn House Office Building Rm 2142
Washington, DC 20515
(202) 225-6906
Danny.Johnson@mail.house.gov

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTEREST OF AMICUS CURIAE .......................................................................................... 1

INTRODUCTION ...................................................................................................................... 1

ARGUMENT .............................................................................................................................. 5

I.   The Committee's Investigation is Not Preliminary to a Judicial Proceeding Because the House Has Not Authorized the Committee to Open an Impeachment Proceeding ...................... 5

    A.  The Constitution Gives the Impeachment Power to the House, but the House Has Not Delegated that Power to the Committee........................................................................................ 5

        1.     The House Has Delegated Legislative Authority to the Committee ............................ 6

        2.     The House Has Not Delegated Impeachment Power to the Committee....................... 8

    B.  Historical Precedent ................................................................................................................ 9

II.   The Committee's Attempts to Recharacterize its Investigation as a House Authorized Impeachment Inquiry Fail.......................................................................................................... 13

III.  The Committee Has Not Demonstrated a Particularized Need to Pierce the Well-Established Policy of Grand Jury Secrecy ..................................................................................................... 21

    A.  The Committee Can Obtain the Requested Information Without Court Intervention ....... 21

    B.  The Committee Has Not Explained With Particularity How the Requested Material is Relevant to its Stated Rationales for Needing the Material ..................................................... 23

CONCLUSION .......................................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Fund for Const. Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856 (D.C. Cir. 1981) .......... 22

*Gojack v. United States*, 384 U.S. 702 (1966) ................................................................. 7

*Haldeman v. Sirica*, 501 F.2d 714 (D.C. Cir. 1974) ...................................................... 13

*In re Grand Jury Impanelled October 2, 1978 (78-2)*, 510 F. Supp. 112 (D.D.C. 1981) .............. 8

*In re Grand Jury Investigation of Uranium Indus.*, No. 78-0173, 1979 WL 1661 (D.D.C. Aug. 16, 1979) ............................................................................................ 2, 8, 22

*John Hancock Mut. Life Ins. Co. v. Harris Trust and Sav. Bank,* 510 U.S. 86 (1993) ................ 16

*Judicial Watch, Inc. v. Tillerson*, 270 F. Supp. 3d 1 (D.D.C. 2017)............................................ 23

*McGrain v. Daugherty* 273 U.S. 135 (1927) ................................................................. 5, 6

*McKeever v. Barr*, 920 F.3d 842 (D.C. Cir. 2019) ........................................................... 1

*Raines v. Byrd*, 521 U.S. 811 (1997) ............................................................................ 9

*Tobin v. United States*, 306 F.2d 270 (D.C. Cir. 1962) ........................................... passim

*United States v. Baggot*, 463 U.S. 476 (1983)................................................................... 8

*United States v. House of Representatives of U.S.,* 556 F. Supp. 150 (D.D.C. 1983) ................. 22

*United States v. Procter & Gamble Co.*, 356 U.S. 677 (1958).................................................. 23

*United States v. Rumely*, 345 U.S. 41 (1953).......................................................... 7, 16

*United States v. Sells Eng'g. Inc.*, 463 U.S. 418 (1983) ................................................ 21

*United States v. Turkette,* 452 U.S. 576 (1981) ............................................................. 16

*Watkins v. United States*, 354 U.S. 178 (1957)............................................................... 6

*Wilkinson v. United States,* 365 U.S. 399 (1961)........................................................... 13

*Yellin v. United States*, 374 U.S. 109, 121 (1963) ......................................................... 7

**Statutes**

28 U.S.C. § 355........................................................................................................... 10

28 U.S.C. § 372........................................................................................................... 10

28 U.S.C. § 595........................................................................................................... 10

Fed. R. Crim. P. 6 ............................................................................................. 22

Fed. R. Crim. P. 6(e) .................................................................................... 1, 4

Pub. L. No. 95-78, s 2(a), 91 Stat. 319 (1977) ............................................... 22

**Other Authorities**

105 Cong. Rec. H10018 (Oct. 8, 1998) ........................................................... 12

120 Cong. Rec. 2171 (Feb. 6, 1974) ............................................................... 11

120 Cong. Rec. H2351 (Feb. 6, 1974) .............................................................. 2

165 Cong. Rec. H211 ...................................................................................... 19

165 Cong. Rec. H4411 .................................................................................... 15

Cong. Globe, 27th Cong., 144 (1843) ............................................................... 9

Cong. Globe, 39th Cong., 320-21 (1867) ......................................................... 10

Cong. Globe, 40th Cong., 1400 (1868) ............................................................ 11

Cong. Globe, 40th Cong., 68 (1867) ................................................................ 11

H. Rep. No. 116-105 (2019) ............................................................................ 18

H. Rep. No. 116-108 (2019) ............................................................................ 16

H. Rep. No. 93-1305 (1974) .............................................................................. 3

H. Res. 1258, 110th Cong. (2008) ................................................................... 10

H. Res. 13, 116th Cong. (2019) ................................................................. 19, 23

H. Res. 318, 72nd Cong. (1932) ........................................................................ 9

H. Res. 34, 102nd Cong. (1991) ........................................................................ 9

H. Res. 370, 98th Cong. (1983) ......................................................................... 9

H. Res. 374, 54th Cong. (1896) ......................................................................... 9

H. Res. 430, 116th Cong. (2019) ..................................................................... 15

H. Res. 525, 105th Cong. (1998) ..................................................................... 12

H. Res. 581, 105th Cong. (1998) ..................................................................... 12

H. Res. 6, 116th Cong. at R. X (2019) .......................................................... 2, 7

H. Res. 614, 82nd Cong. (1952) ........................................................................ 9

H. Res. 803, 93d Cong. (1974) ................................................................................ 11

Horace Twiss, *The Public and Private Life of Chancellor Eldon, Vol. II* (1844) ........................ 14

Jerrold Nadler, Chair, H. Comm. on the Judiciary, *Memorandum Re: Hearing on "Lessons from the Mueller Report, Part III: 'Constitutional Processes for Addressing Presidential Misconduct"* (July 11, 2019) ................................................................................ 19

Jerrold Nadler, Chair, H. Comm. on the Judiciary, *Memorandum Re: Hearing on H. 5, the Equality Act* (Apr. 1, 2019) ................................................................................ 19

Jerrold Nadler, Chairman, H. Comm. on the Judiciary, "House Judiciary Committee Procedures for Handling Grand Jury Information." ................................................................ 20

John V. Sullivan, Parliamentarian, U.S. House of Representatives, *How Our Laws Are Made*, H. Doc. No. 110-49 (2007) ................................................................................ 4

*Lessons from the Mueller Report: Bipartisan Perspectives, Before the H. Comm. On the Judiciary*, 116th Cong. (2019) ................................................................................ 17

*Lessons from the Mueller Report: Presidential Obstruction of Justice and Other Crimes*, Before the H. Comm. on the Judiciary, 116th Cong. (2019) .............................................. 17

Letter from Chairman Eliot Engel, Chairman Adam Schiff, & Chairman Elijah Cummings to The Honorable Michael Pompeo, Secretary of State (Sept. 27, 2019) .............................. 14

Letter from Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary to Mr. Alan Garten et al., (Mar. 4, 2019) ................................................................................................ 7

Letter from President George Washington to the U.S. House of Reps. (Mar. 30, 1796) ............... 6

*Oversight of the Report on the Investigation into Russian Interference in the 2016 Presidential Election: Former Special Counsel Robert S. Mueller, III: Hearing Before the H. Comm. on the Judiciary*, 116th Cong. (2019) ................................................................ 18

Report of the National Commission on Judicial Discipline and Removal, 152 F.R.D. 265 (1993) ................................................................................................................ 10

Res. Recommending that the House of Reps. Find William P. Barr, Att'y Gen., U.S. Dept. of Justice, in Contempt of Congress for Refusal to Comply With a Subpoena Duly Issued by the Comm. on the Judiciary, Rep. 116-XXX, H. Comm. on the Judiciary ............................... 18

*Resolution authorizing issuance of subpoenas, Before the H. Comm. On the Judiciary*, 116th Cong. (2019) ................................................................................................ 17

THE FEDERALIST No. 65 ................................................................................................ 6

**Rules**

House Rule X ................................................................................................ passim

House Rule XI ................................................................................................ 20

**Treatises**

Mark J. Oleszek, CONG. RESEARCH SERV., R44001, *How to Introduce a House Bill or Resolution* (Jan. 31, 2019) ................................................................................................................ 19

Morton Rosenberg, WHEN CONGRESS COMES CALLING: A STUDY ON THE PRINCIPLES, PRACTICES, & PRAGMATICS OF LEGISLATIVE INQUIRY, 15 (2017)............................................ 2

Todd Garvey and Walter J. Oleszek. CONG. RESEARCH SERV., RL 30240, *Congressional Oversight and Investigations* (Dec. 1, 2014)................................................................. 9

Valerie Heitshusen, CONG. RESEARCH SERV., 97-780, *The Speaker of the House: House Officer, Party Leader, and Representative* (May 16, 2017) .................................................... 14

Wilson C. Freeman, CONG. RESEARCH SERV., R45636, *Congressional Participation in Litigation: Article III and Legislative Standing* (Mar. 28, 2019) ................................. 6

**Constitutional Provisions**

U.S. Const. Art. I, § 1 ............................................................................................... 5, 16

U.S. Const. Art. I, § 2 ............................................................................................ 2, 5, 16

U.S. Const. Art. I, § 5 ..................................................................................................... 6

U.S. Const. Art. II, § 1 .................................................................................................... 6

U.S. Const. Art. II, § 2 .................................................................................................... 6

**News Sources**

Nancy Pelosi, *Pelosi Remarks Announcing Impeachment Inquiry* (Sept. 24, 2019).................... 14

Nicholas Fandos, *Nancy Pelosi Announces Formal Impeachment Inquiry of Trump*, N.Y. TIMES, Sept. 24, 2019 ....................................................................................................... 4

Press Conference, Jerrold Nadler, July 26, 2019 ......................................................... 18

Press Release, U.S. House Permanent Select Committee on Intelligence (Jan. 29, 2018).......... 21

Rachael Bade and Mike DeBonis, "Democrats Count of Schiff to Deliver Focused Impeachment Inquiry of Trump," WASHINGTON POST, Sept. 29, 2019 .......................................... 14

Stephen Battagllio, *Mueller Hearing Watched by 13 Million TV Viewers*, L.A. TIMES, July 25, 2019 ...................................................................................................................... 18

## INTEREST OF AMICUS CURIAE

Representative Doug Collins is the Ranking Member of the Committee on the Judiciary, U.S. House of Representatives, where he has served for seven years. In this position, he has been the lead Republican for every hearing during the Committee's investigation into obstruction of justice and has been copied on every letter sent by Chairman Jerrold Nadler during the Committee's investigation. Ranking Member Collins previously served for four years on the Committee on Rules, where he was Chairman of the Subcommittee on Rules and Organization of the House. Given these roles, Ranking Member Collins is in a unique position to explain to the Court the contours of the Committee's investigation, and why it is not engaged in an authorized impeachment proceeding. In addition, Ranking Member Collins can provide to the Court a brief historical perspective of impeachment proceedings to further differentiate the current investigation from those events. Ranking Member Collins, accordingly, has an interest in the case.

## INTRODUCTION

Ranking Member Collins agrees with the Committee on the Judiciary (the "Committee") that an impeachment inquiry authorized by the full U.S. House of Representatives (the "House") would fall under Federal Rule of Criminal Procedure 6(e)'s judicial proceeding exception because the authorized inquiry would be preliminary to a trial in the U.S. Senate (the "Senate"). *See McKeever v. Barr*, 920 F.3d 842, 847 n.3 (D.C. Cir. 2019). The problem for the Committee, however, is the House has not authorized it to conduct a formal impeachment proceeding. Without an explicit delegation of authority from the House, the Committee's investigation is regular legislative oversight and does not fall within Rule 6(e)'s judicial proceeding exception. *See* Fed. R. Crim. P. 6(e)(3)(E)(i) ("Rule 6(e) Exception"). In short, the Committee petitions the Court to enforce a power of the House the Committee does not possess.

The House's power to conduct oversight emanates from Congress's authority to legislate

under Article I, Section 1 of the Constitution.  By contrast, the House's "sole Power of

Impeachment" is granted under Article I, Section 2 of the Constitution.  The House has delegated

its Section 1 legislative oversight authority to standing committees under House Rule X.  H. Res.

6, 116th Cong. at R. X (2019).  Each standing committee has "only the power to inquire into

matters within the scope of the authority delegated to it by the full House or Senate."[1]

The House has not delegated to any of the standing committees its "sole Power of

Impeachment."  U.S. Const. Art. I, § 2.  Accordingly, the Committee's investigation has been

conducted exclusively under the House's Article I, Section 1 authority to conduct legislative

oversight—not its Article I, Section 2 impeachment power.  Courts have rejected the argument

that legislative oversight falls within the Rule 6(e) Exception.  *See In re Grand Jury*

*Investigation of Uranium Indus.*, No. 78-0173, 1979 WL 1661, at *7 (D.D.C. Aug. 16, 1979)

(finding that congressional oversight did not fall under the Rule 6(e) Exception).  Therefore, the

Committee's Application[2] should be denied.  *See infra* Section I.A.

The precedent established by the House's historical handling of impeachment further

demonstrates the Committee is not acting pursuant to the House's impeachment authority.  An

impeachment inquiry was authorized, in explicit terms, by the full House in the two previous

cases where presidents were impeached.[3]  Indeed, in the Committee's 206-year history, the

Committee has *never* reported articles of impeachment against a president without first

conducting an impeachment proceeding authorized by a full House vote.  *See infra* Section I.B.

---

[1] Morton Rosenberg, WHEN CONGRESS COMES CALLING: A STUDY ON THE PRINCIPLES, PRACTICES, & PRAGMATICS OF LEGISLATIVE INQUIRY, 15 (2017), https://constitutionproject.org/wp-content/uploads/2017/05/WhenCongressComesCalling.pdf (citing *United States v. Rumely*, 345 U.S. 41, 42-44 (1953)).

[2] Application of the Committee on the Judiciary, U.S. House of Representatives, for an Order Authorizing the Release of Certain Grand Jury Materials (the "Application"), ECF No. 1.

[3] *See* 120 Cong. Rec. H2351 (Feb. 6, 1974) (citing remarks by the Committee Ranking Member Hutchinson explaining that the Rules of the House do not grant one committee authority

Tellingly, the Committee has not argued the House has formally authorized it to conduct an impeachment proceeding.  Instead, it argues that at some undefined point over the past six months its investigation morphed from legislative oversight into a formal impeachment investigation.  *See generally* Application at 13-24.  The Committee's argument is based on various Committee documents and statements by the Chairman.  *Id.*  The Committee claims its impeachment authority derives from the following: 1) the passage of House Resolution 430 and its accompanying Rules Committee Report; 2) the Chairman's statements made at a series of Committee hearings; 3) a May 8, 2019, contempt report approved by the Committee; 4) internal Committee documents issued by the Chairman, including a July 11, 2019, Memorandum by the Chairman; 5) the January 3, 2019, referral to the Committee of House Resolution 13, containing articles of impeachment introduced by Representative Brad Sherman; and 6) recently adopted Committee procedures and protocols to "protect the confidentiality of any grand jury materials disclosed to the Committee." *Id.* at 24.  Read individually or collectively, the documents and statements do not delegate the House's impeachment power to the Committee.  *See infra* Section II.

Without an explicit authorization from the full House, the Court has no determinative measure of when an official impeachment proceeding has begun and when the Committee is merely exercising its normal oversight powers.  To allow the Committee to conflate these separate functions of the House would be to concede that the House is, in effect, in a perpetual state of impeachment with uninterrupted power to penetrate the secrecy surrounding grand jury proceedings.  Votes—not words or press conferences by Members, the Chairman, or the Speaker—are the mechanism through which Congress acts.  *See Tobin v. United States*, 306 F.2d 270, 276 (D.C. Cir. 1962) (explaining that the House delegates its powers to committees by

---

to conduct impeachment); *see also* H. Rep. No. 93-1305 (1974) (citing H. Res. 803 which authorized the impeachment inquiry into President Nixon).

passing resolutions).

If the Committee seeks judicial interference in its proceedings, the House must take the procedural and political action required of it by holding a vote to delegate its impeachment power to the Committee. Barring such action, the Committee advances an unprecedented and untested argument. A single House committee chairman, Member, or Speaker does not, and should not, wield the power to delegate the House's impeachment authority without a full House vote.[4] Without such a vote, the Committee is merely conducting ordinary legislative oversight under House Rule X to determine whether an impeachment inquiry may be warranted in the future. Speaker of the House Nancy Pelosi's September 24, 2019, announcement that multiple House committees will "proceed under that umbrella of impeachment inquiry" does not change the fact the whole House has not voted to delegate its impeachment authority to the Committee—or committees—for an inquiry.[5] Her statement has no legal effect; the Speaker's press conferences do not provide her extra-legislative authority.

Additionally, the Committee has not shown a compelling need for the grand jury information it requests because it has alternative means to obtain the information. Congress enacted Rule 6(e), and Congress can amend it to cover the circumstances present here. The Committee has also failed to show with particularity how the specific grand jury information it requests is connected to its purported rationale for conducting its investigation. *See infra* Section III.

The Committee's current investigation is too far removed from a speculative impeachment proceeding in the Senate, and the Application amounts to little more than a

---

[4] John V. Sullivan, Parliamentarian, U.S. House of Representatives, *How Our Laws Are Made*, H. Doc. No. 110-49 at 3 (2007) ("Each Representative has one vote.").

[5] Nicholas Fandos, *Nancy Pelosi Announces Formal Impeachment Inquiry of Trump*, N.Y. TIMES, Sept. 24, 2019, https://www.nytimes.com/2019/09/24/us/politics/democrats-impeachment-trump.html.

manipulation of the House Rules and an assault on House practice and precedent.  Without a

proper foundation, the Committee is asking the Court to exercise the extraordinary action of

intervening on behalf of one branch against the protected privacy of a group of American

citizens, safeguarded by another branch.  The Court should demur.

## ARGUMENT

## I.   The Committee's Investigation is Not Preliminary to a Judicial Proceeding Because the House Has Not Authorized the Committee to Open an Impeachment Proceeding

The Committee's investigation has been conducted pursuant to its legislative authority,

and is, therefore, not a properly authorized impeachment proceeding.  The House's authority to

conduct legislative oversight stems from a different section of the Constitution than its authority

to impeach.  The House has delegated legislative and oversight authority to the Committee; it has

not delegated impeachment authority.  Therefore, without full House authorization, the

Committee is not exercising the House's constitutional powers of impeachment and its

investigation does not fall within the Rule 6(e) Exception.

### A.   The Constitution Gives the Impeachment Power to the House, but the House Has Not Delegated that Power to the Committee

The Constitution grants the House the power to legislate.  U.S. Const. Art. I, § 1.  The

House's oversight authority is derived from its power to legislate.  *McGrain v. Daugherty,* 273

U.S. 135, 174 (1927) ("We are of the opinion that the power of inquiry – with the process to

enforce it – is an essential and appropriate authority to the legislative function.").  The

Constitution vests in the House the "sole Power of Impeachment."  U.S. Const. Art. I, § 2, cl. 5.

The impeachment power, granted under a separate section of the Constitution, is distinct from

the House's legislative authority, and has been since the earliest years of the Republic.[6]

---

[6] In 1796, the House requested from President George Washington access to certain papers in connection with John Jay's negotiated treaty with the infamous King George III of Great Britain.  President Washington declined to release the papers to the House, stating: "It does not occur that the inspection of the papers asked for can be relative to any purpose under the cognizance of the House of Representatives, *except that of an impeachment, which the resolution*

One of these powers is not derived from the other, just as the President's duty to execute

the laws is not derived from his or her power to appoint "Judges of the Supreme Court."

*Compare* U.S. Const. Art. II, § 1 *with* U.S. Const. Art. II, § 2, cl. 5.  As Alexander Hamilton

explained, the impeachment power is not legislative in nature, but a component of checks and

balances.[7]

The Committee cannot exercise the House's impeachment or legislative powers unless

the House delegates such authority to the Committee.  Though each house of Congress "may

determine the Rules of its Proceedings," U.S. Const. Art. I, § 5, when a person or body comes

before the Court purporting to act on behalf of that house, such party must demonstrate it has

been bestowed with the power it would have the Court enforce.  *See Tobin*, 306 F.2d at 274

(analyzing "whether Congress gave the Judiciary Committee of the House . . . authority

sufficient" to undertake the investigation at issue).[8]

### 1.      The House Has Delegated Legislative Authority to the Committee

The House's authority to conduct oversight and investigations emanates from its

legislative authority granted under Article I, Section 1 of the Constitution.  *See McGrain,* 273

U.S. at 174 (holding that Congress's oversight authority stems from its legislative power);

*Watkins v. United States*, 354 U.S. 178, 186 (1957) ("The power of the Congress to conduct

investigations is inherent in the legislative process.").  The House has delegated legislative and

---

*has not expressed*."  Letter from President George Washington to the U.S. House of Reps. (Mar. 30, 1796) (emphasis added).

[7] *See* THE FEDERALIST NO. 65 (Alexander Hamilton) (stating that the subject of impeachments "are those offenses which proceed from the misconduct of public men, or, in other words, from the abuse or violation of some public trust. They are of a nature which may with peculiar propriety be denominated POLITICAL, as they relate chiefly to injuries done immediately to the society itself") (capitalization in original).

[8] *See also* Wilson C. Freeman, CONG. RESEARCH SERV., R45636, *Congressional Participation in Litigation: Article III and Legislative Standing* (Mar. 28, 2019) ("Courts have routinely concluded that congressional plaintiffs who obtain authorization to sue before initiating litigation are significantly more likely to have standing.").

oversight authority to various standing committees in the House. *See* H. Res. 6, 116th Cong.

(2019) (each rule a "House Rule" and, collectively, the "House Rules"). House Rule X

establishes the Committee on the Judiciary as a standing committee of the House. House Rule

X.1(*l*). House Rule X defines nineteen specific areas of jurisdiction for the Committee,

including "[t]he judiciary and judicial proceedings, civil and criminal," "[c]riminal law

enforcement and criminalization," "[f]ederal courts and judges," "Presidential succession," and

"[s]ubversive activities affecting the internal security of the United States." House Rule

X.1(*l*)(1), (7), (8), (15), & (19). The House Rules also authorize the Committee to perform

oversight of "subjects within the jurisdiction of a committee." House Rule X.2(b)(1). The

Committee is authorized to conduct investigations only to the extent authorized by the full House

under the House Rules or pursuant to a House resolution. *See Gojack v. United States*, 384 U.S.

702 (1966) (holding that Congressional committees must follow their own rules of procedure);

*Yellin v. United States*, 374 U.S. 109, 121 (1963) (same); *United States v. Rumely*, 345 U.S. 41,

44 (1953) ("This [resolution] is the controlling charter of the committee's powers. Its right to

exact testimony and to call for the production of documents must be found in this language.").

      The Committee launched its investigation on March 4, 2019, when the Chairman issued

document requests to 81 associates, current and former employees, business associates, family,

and friends of the President to "investigat[e] a number of actions that threaten our nation's

longstanding commitment to the rule of law, including allegations of obstruction of justice,

public corruption, and other abuses of power."[9]  Those requests were an exercise of the

Committee's oversight authority arising from House Rule X. As described in detail below in

Section II, neither the Committee nor the House has taken any action since March 4 to indicate

the investigation crossed the threshold from legislative oversight to a House authorized

---

[9] Letter from Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary to Mr. Alan
Garten et al., (Mar. 4, 2019), https://judiciary.house.gov/story-type/letter/house-judiciary-
committee-document-requests-3419 (last visited Sept. 11, 2019).

impeachment proceeding under Article 1, Section 2 of the Constitution.

Legislative oversight does not fall under the Rule 6(e) Exception for activity conducted "preliminarily to or in connection with a judicial proceeding." *In re Grand Jury Investigation of Uranium Indus.*, No. 78-0173, 1979 WL 1661, at *7 (D.D.C. Aug. 16, 1979). In *Uranium Industry*, a Senate committee argued it needed grand jury material because "*it might result* in its recommendation to the House Judiciary Committee that impeachment proceedings be initiated" against executive branch officials. *Id.* (emphasis added). The court found that the possibility a congressional investigation could lead to impeachment "is too remote to trigger the Rule 6(e) exception." *Id.* The court further noted that permitting legislative oversight to fall within Rule 6(e)'s exceptions would require the court to "carve out a new exception" to the rule. *Id.; see also In re Grand Jury Impanelled October 2, 1978 (78-2)*, 510 F. Supp. 112, 114 (D.D.C. 1981) (holding that a Senate committee's "general oversight proceedings do not constitute a 'judicial proceeding.'"). The same analysis applies here, where the Committee's investigation has been conducted under the House's legislative power and could lead to myriad possible outcomes.

Thus, the Committee's oversight investigation is too far attenuated to a speculative impeachment trial in the Senate to fall under the Rule 6(e) Exception. *See United States v. Baggot*, 463 U.S. 476, 480 (1983) ("[T]he Rule contemplates only uses related fairly directly to some identifiable litigation, pending or anticipated."); *see also* Department of Justice's Response to the Application of the House Judiciary Committee for an Order Authorizing Release of Certain Grand Jury Materials ("DOJ Response") at 25, ECF No. 20.

### 2.     The House Has Not Delegated Impeachment Power to the Committee

The House's impeachment power under Article I, Section 2, by contrast, has not been delegated to the Committee, or any other standing committee in the House. House Rules are silent on the issue of impeachment. *See generally* House Rules. Since the Committee was not formed until 1813, a quarter century after the Constitution was ratified, the Constitution's silence

on the Committee's place in the impeachment process relative to the House and Senate is not surprising. The Committee was created under the rules of the House, and its powers are only those delegated to it by the House.[10] The Committee has not been granted the power to launch an impeachment proceeding under the House Rules, and the House has not passed a resolution authorizing the Committee to exercise the House's impeachment power.

The Committee is not entitled to come before the Court under the House's Article I, Section 2 impeachment power unless it can demonstrate the House has given the Committee that power. *See Raines v. Byrd*, 521 U.S. 811, 829 (1997) ("We attach some importance to the fact that appellees have not been authorized to represent their respective Houses of Congress in this action . . . ."). The alternative to requiring an authorizing resolution would be to allow any Representative who introduces articles of impeachment against a president, or committee that is conducting garden variety oversight, to demand from the Court access to grand jury material. Granting the Committee's request would diminish the House's function by allowing the House's authority to be subsumed by its committees acting without House authorization. *See Tobin*, 306 F.2d at 274-75 (requiring the committee be authorized to engage in the investigation in question).

### B. Historical Precedent

In the history of the Republic, the House has impeached only two presidents, though the impeachment and removal of President Richard Nixon is largely accepted to have been inevitable barring his resignation.[11] In all three of these cases, the full House voted to authorize

---

[10] Todd Garvey and Walter J. Oleszek. CONG. RESEARCH SERV., RL 30240, *Congressional Oversight and Investigations* (Dec. 1, 2014) ("Oversight and investigative authority rests with the House of Representatives and the Senate, which in turn have delegated this authority to various entities, most relevantly the standing committees of each chamber. Committees only possess powers that have been delegated to them by their parent body.").

[11] Calls for impeachment of a sitting president are not by and large uncommon. *See, e.g.*, resolutions calling for the impeachment of Presidents Tyler (Cong. Globe, 27th Cong., 3 Sess. 144 (1843)), Cleveland (H. Res. 374, 54th Cong. (1896)), Hoover (H. Res. 318, 72nd Cong. (1932)), Truman (H. Res. 614, 82nd Cong. (1952)), Reagan (H. Res. 370, 98th Cong. (1983)), George H.W. Bush (H. Res. 34, 102nd Cong. (1991)), and George W. Bush (H. Res. 1258, 110th

impeachment proceedings.[12]  Even in the wake of an investigation conducted by an independent

counsel, whose statutory obligation was to inform the House whether articles of impeachment

should be pursued,[13] the House recognized the importance of a full House vote to initiate the

most extreme check enshrined in the Constitution: the removal of a duly-elected president and

commander-in-chief.

The impeachment of President Andrew Johnson began in 1867 with the authorization by

the full House to commit the matter to the Committee on the Judiciary for the purpose of

inquiring into President Johnson's conduct.[14]  The Committee recommended articles of

---

Cong. (2008)).  But it has been the authorizing resolution of the full House, recommended by the
House Committee on Rules, that has elevated simple resolutions to the level of impeachment
inquiries entitled to expansive inquiry powers beyond normal investigations.

[12] Compare this to the modern impeachment practice for federal judges, specifically
Judges Harry Claiborne, Alcee Hastings, and Walter Nixon.  The House can delegate
components of its impeachment power, but it has not done so permanently regarding the
impeachment of a president.  By contrast, for judicial officers, the House has delegated initial
investigatory authority for impeachment to the U.S. Judicial Conference through the passage of
the Judicial Conduct and Disability Act of 1980.  28 U.S.C. § 355(b) (subsection titled "If
Impeachment Warranted").  The impeachments of Judge Claiborne, Judge Hastings, and Judge
Nixon were preceded by criminal proceedings and letters to the House from the Judicial
Conference, headed by the Chief Justice of the Supreme Court, in a process recognized by
Congress with the passage of former 28 U.S.C. § 372(c)—in effect delegating impeachment
authority for federal judges to the Judicial Branch.

The National Commission on Judicial Discipline and Removal observed:  "Congress
implicitly acknowledged as much in a 1990 amendment that permits the Judicial Conference to
initiate and transmit such a determination on the basis of the criminal record.  In the matter of
Judge Hastings, however, the exhaustive investigation by a special committee and subsequent
report and certification by the judicial council—coming as they did after the acquittal of Hastings
on criminal charges—were undoubtedly critical to the House's willingness to proceed."  Report
of the National Commission on Judicial Discipline and Removal, 152 F.R.D. 265, 278-79
(1993).  There is no analogous delegation by Congress for impeachment of a president.

[13] 28 U.S.C. § 595(c) ("An independent counsel shall advise the House of
Representatives of any substantial and credible information which such independent counsel
receives, in carrying out the independent counsel's responsibilities under this chapter, that may
constitute grounds for an impeachment.").

[14] Cong. Globe, 39th Cong., 320-21 (1867).

impeachment, but the articles were rejected by the House.[15]  In 1868, that investigation was

transferred to the Committee on Reconstruction, and that committee reported an impeachment

resolution to the House, which was ultimately adopted by a vote of 126 to 47.[16]

In the cases of President Richard Nixon in 1974 and President William Clinton in 1998,

the full House on each occasion explicitly granted the Committee authority to conduct an

impeachment proceeding.

In the Nixon impeachment, the House passed H. Res. 803 on February 6, 1974, which

stated "[t]he Committee on the Judiciary . . . is authorized and directed to investigate fully and

completely whether sufficient grounds exist for the House of Representatives to exercise its

constitutional power to impeach Richard M. Nixon."[17]   Judiciary Committee Chairman Peter

Rodino stated at the time:

> The Constitution says, in article 1, section 2, clause 5: 'the House of
> Representatives shall have the sole power of impeachment.' We have reached the
> point when it is important that *the House explicitly confirm our responsibility
> under the Constitution* [...] *Such a resolution has always been passed by the
> House* [...] *It is a necessary step if we are to meet our obligations* [...] [t]he sole
> power of impeachment carries with it the power to conduct a full and complete
> investigation of whether sufficient grounds for impeachment exist or do not exist,
> and by this resolution these investigative powers are conferred to their full extent
> upon the Committee on the Judiciary.[18]

In the Clinton impeachment, the House passed *two* resolutions that recognized the

importance of a full House vote in initiating impeachment proceedings.  On September 11, 1998,

the full House passed H. Res. 525 allowing the Committee on the Judiciary "to determine

whether sufficient grounds exist to recommend to the House that an impeachment inquiry be

---

[15] Cong. Globe, 40th Cong., 67-68 (1867).

[16] Cong. Globe, 40th Cong., 1087, 1400 (1868).

[17] H. Res. 803, 93d Cong. (1974).

[18] 120 Cong. Rec. 2171 (Feb. 6, 1974) (emphasis added).

commenced."[19]  Then, on October 8, 1998, consistent with its Article I, Section 2 authority, the full House passed H. Res. 581, which stated, "The Committee on the Judiciary . . . is authorized and directed to investigate fully and completely whether sufficient grounds exist for the House of Representatives to exercise its constitutional power to impeach William Jefferson Clinton."[20]

The notion that the Committee may initiate an impeachment proceeding on behalf of the House, *sua sponte,* without any debate or vote on the floor of the House is unprecedented and undemocratic.[21]  Here, the House has not given the Committee express authority to exercise the House's impeachment power.  Similarly, in *Tobin*, the court was asked to determine whether a subcommittee of the House Judiciary Committee was acting within the scope of its authority delegated to it by the House.  *Tobin*, 306 F.2d at 275.  In finding that the committee had not been delegated the authority it was claiming, the court stated: "if Congress had intended the Judiciary Committee to conduct such a novel investigation it would have spelled out this intention in words more explicit than the general terms found in the authorizing resolutions under consideration."  *Id.*[22]  The same is true here.

Thus, the Committee is not in an authorized impeachment inquiry and instead is conducting garden variety oversight under its Article I, Section 1 powers, delegated to it by House Rule X.  While the Committee's current investigation meets the Supreme Court's test to

---

[19] H. Res. 525, 105th Cong. (1998).

[20] H. Res. 581, 105th Cong. (1998).

[21] During the House floor debate preceding the vote to authorize the Clinton impeachment proceeding, Rep. Jerrold Nadler said: "The supreme insult to the American people, an hour of debate on the House floor on whether to start, for the third time in the American history, a formal impeachment proceeding.  We debated two resolutions to name post offices yesterday for an hour and a half."  105 Cong. Rec. H10018 (Oct. 8, 1998).

[22] Additionally, in *Tobin*, the court required the congressional committee to show the House had properly delegated authority to the committee under Article I, Section 10 of the Constitution, the interstate compact clause.  *Tobin*, 306 F.2d at 275.  Here, the court is asked to assess whether the House has delegated its Article I, Section 2 impeachment power to the Committee.  The Committee should be held to the same exacting standard as in *Tobin*.

conduct legislative oversight,[23] given the range of possible outcomes—noted by the Chairman himself on multiple occasions—the Committee's current investigation does not qualify for the Rule 6(e) Exception. *Cf. Haldeman v. Sirica*, 501 F.2d 714, 717 (D.C. Cir. 1974) (granting access to grand jury materials *after* the House authorized an impeachment proceeding).

## II.   The Committee's Attempts to Recharacterize its Investigation as a House Authorized Impeachment Inquiry Fail

The Committee's *post hoc* attempts to recharacterize its investigation as impeachment proceedings have no support in any official House action. That the Committee relies on Speaker of the House Nancy Pelosi's September 24, 2019, press conference to support its claim that it has long been engaged in a House authorized impeachment proceeding highlights the absurdity of the Committee's argument. *See* Reply of the Committee on the Judiciary, U.S. House of Representatives, in Support of its Application for an Order Authorizing the Release of Certain Grand Jury Materials at 2 & 14, ECF No. 33 ("Committee Reply"). The impeachment process can only begin once, but the Committee seems to revel in making a commencement announcement every few weeks.

On September 24, 2019, almost two months after the Committee filed its Application claiming it was engaged in an impeachment inquiry, Speaker Pelosi declared, "[t]oday, I am announcing the House of Representatives is moving forward with an official impeachment inquiry. I am directing our six Committees to proceed with their investigations under that umbrella of impeachment inquiry."[24] Putting aside the fact that neither the Speaker nor any other Member of the House has authority under the House Rules to unilaterally delegate to the

---

[23] *See Wilkinson v. United States,* 365 U.S. 399, 407 (1961) (analyzing the test for constitutionality of a congressional investigation to determine whether it is properly authorized, has a "valid legislative purpose" and the questions propounded are pertinent to the inquiry).

[24] Nancy Pelosi, *Pelosi Remarks Announcing Impeachment Inquiry* (Sept. 24, 2019), https://www.speaker.gov/newsroom/92419-0.

Committee the House's impeachment power,[25] the Speaker's September 24 decree  undercuts the July 26 Application claiming it had *already* been engaged in an authorized impeachment inquiry. *See* Application, at 30.  The Speaker's proclamation changes nothing.[26]

Furthermore, the Speaker has determined that the Committee will not be involved in the Speaker's inquiry-by-fiat.[27]  It will instead be handled by three other committees and focus "narrowly on the Ukraine matter."[28]  Therefore, even if the Speaker's September 24 decree had legal significance, it would undercut the Committee's claim that it is conducting an authorized impeachment inquiry.

In addition to the Speaker's proclamation, the Committee claims its impeachment authority flows from cherry-picked excerpts from the following materials:

1) House Resolution 430 and its accompanying Rules Report (the "Rules Report");

---

[25] Although the Speaker's responsibilities have fluctuated throughout history, they have never included the ability to forego Member votes by permitting the Speaker unilateral, dictatorial authority. For a detailed description of the status of the modern Speaker's responsibilities, *see* Valerie Heitshusen, CONG. RESEARCH SERV., 97-780, *The Speaker of the House: House Officer, Party Leader, and Representative* (May 16, 2017).

[26] In the Speaker's press conference, she alluded multiple times to Benjamin Franklin. The Speaker's preference for grand statements over substance and apparent disregard for representative democracy was perhaps more reminiscent of one of Franklin's contemporaries' rhetorical flair: "Lord Chancellor, did I deliver the speech well?  I am glad of that, for there was nothing in it."  George III, King of England.  Horace Twiss, *The Public and Private Life of Chancellor Eldon, Vol. II*, page 52 (1844) (Opening session of Parliament to John Scott, 1st Earl of Eldon).

[27] *See* Rachael Bade and Mike DeBonis, "Democrats Count on Schiff to Deliver Focused Impeachment Inquiry of Trump," WASHINGTON POST, Sept. 29, 2019, https://www.washingtonpost.com/politics/pelosi-turns-to-schiff-to-lead-house-democrats-impeachment-inquiry-of-trump/2019/09/28/ed6c4608-e149-11e9-8dc8-498eabc129a0_story.html.

[28] *Id.*; *see also* Letter from Chairman Eliot Engel, Chairman Adam Schiff, & Chairman Elijah Cummings to The Honorable Michael Pompeo, Secretary of State, at 1 (Sept. 27, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/2019-09-27.EEC%20Engel%20Schiff%20%20to%20Pompeo-%20State%20re%20Document%20Subpoena.pdf (stating that the subpoenaed documents will be used by the Committee on Foreign Affairs, the Permanent Select Committee of Intelligence, and the Committee on Oversight and Reform Committee, but not the Committee on the Judiciary).

2) the Chairman's statements from a series of Committee hearings;

3) a May 8, 2019, Contempt Report approved by the Committee (the "Contempt Report");

4) internal Committee staff documents and memoranda;

5) a January 3, 2019, referral to the Committee of articles of impeachment introduced by Representative Brad Sherman (the "Sherman Resolution"); and

6) newly issued Committee procedures and protocols to "protect the confidentiality of any grand jury materials disclosed to the Committee" (the "Protocols").

*See* Application at 13-23. As outlined below, none of these materials includes authorization from the House to conduct an impeachment inquiry.

**H. Res 430 and Rules Report:** On June 11, 2019, the House of Representatives passed H. Res. 430, which gave the Committee "all necessary authority under Article I of the Constitution" to use civil litigation to enforce subpoenas and seek disclosure of certain grand jury material. H. Res. 430, 116th Cong. (2019). The Committee now appears to argue that by voting on H. Res. 430 to give the Committee Article I authority to initiate or intervene in civil litigation, the House also authorized the Committee to open an impeachment inquiry. Committee Reply at 13 & 16.

A plain reading of H. Res. 430, however, does not support the Committee's argument. H. Res. 430 gives the Committee Article I authority for a specific purpose—to "initiate or intervene in any judicial proceeding before a Federal court." H. Res .430. It says nothing about impeachment and nowhere claims to authorize the Committee to open an impeachment proceeding. It is no wonder then that neither the Chairman nor any other Democrat mentioned the word "impeachment" during floor debate surrounding H. Res. 430. *See* 165 Cong. Rec. H4411 (debate on H. Res. 430). The Committee's interpretation would require the Court to isolate a section of a sentence and ignore its larger context—that Article I authority was given for the purpose going to court and says nothing about impeachment authority. *See John Hancock Mut. Life Ins. Co. v. Harris Trust and Sav. Bank,* 510 U.S. 86, 94 (1993) ("[W]e examine first

the language of the governing statute, guided not by a single sentence or member of a sentence, but looking to the provisions of the whole law, and to its object and policy.").

To infer that H. Res. 430 gave the Committee *all* Article I power under the Constitution, which is what the Committee appears to be arguing, would lead to absurd ends, including the Committee's ability to pass legislation on its own without a full vote of the House (Art. I, § 1) or select a Speaker of its choosing (Art. I, § 2, cl. 5). *See United States v. Turkette,* 452 U.S. 576, 580 (1981) (finding that statutes should be read to avoid absurd results). The Committee cannot retroactively change the meaning of its resolution. *See United States v. Rumely.* 345 U.S. 41, 46 (1953) ("Whenever constitutional limits upon investigative power of Congress have to be drawn by this Court, it ought only be done after Congress has demonstrated its full awareness of what is at stake by unequivocally authorizing an inquiry of dubious limits.").

In short, the Committee is trying to slip impeachment in through the back door via a procedural obscurity never publicly mentioned by any Member from the majority party at the time of floor debate. H. Res. 430 cannot, and does not, authorize the Committee to conduct a formal impeachment inquiry. *See Tobin*, 306 F.2d at 274-75 ("[W]hen Congress authorizes a committee to conduct an investigation, the courts have adopted the policy of construing such resolutions of authority narrowly . . . .").

The Committee also claims a report accompanying H. Res. 430 issued by the Committee on Rules supports its authority to pursue an authorized impeachment proceeding. Application at 22-23. Yet, this accompanying report contained only one single mention of impeachment—on page thirteen of a seventeen-page report—in relation to the Committee's investigation. H. Rep. No. 116-108 (2019). Further, this single mention was nothing more than a direct quote from the Committee's May 8 Contempt Report about the Attorney General, discussed below. The Rules Report has no formal significance.

***Chairman Statements and Oversight Hearings:***  The Committee also claims that "[c]oncurrently" with H. Res. 430 "the Committee began holding a series of hearings regarding the Mueller Report's findings . . . ."  Application at 23.  Yet, in the weeks following the passage of H. Res. 430, little, if anything, changed regarding the Chairman's public statements and the Committee's activities regarding impeachment.

On June 10, 2019, the Committee held a hearing titled "Lessons from the Mueller Report: Presidential Obstruction and Other Crimes."  Neither the Chairman nor any other Democratic Member on the Committee mentioned impeachment in connection with the Committee's investigation.  *Lessons from the Mueller Report: Presidential Obstruction of Justice and Other Crimes*, *Before the H. Comm. on the Judiciary*, 116th Cong. (2019).

On June 20, 2019, the Committee held a hearing entitled "Lessons from the Mueller Report: Bipartisan Perspectives."  Just nine days after the House voted on H. Res. 430, Democratic Committee Member Steve Cohen asked a witness, "If this Committee gets into an impeachment inquiry, do you believe these are areas that should be looked into?"  *Lessons from the Mueller Report: Bipartisan Perspectives*, *Before the H. Comm. On the Judiciary*, 116th Cong. (2019), at 1:04.  The question itself, by a member of the Committee for over a decade, shows the Committee's Members themselves did not believe they were conducting a formal impeachment proceeding by that time.

On July 11, 2019, the Committee held a business meeting to consider subpoenas for twelve individuals pertaining to the Mueller Report.  *Resolution authorizing issuance of subpoenas*, *Before the H. Comm. On the Judiciary*, 116th Cong. (2019).  During this public meeting, the Chairman did not mention impeachment as an activity the Committee was pursuing or as a reason why the Committee needed to authorize the subpoenas.

On July 24, 2019, the Committee held a hearing titled "Oversight of the Report on the Investigation into Russian Interference in the 2016 Presidential Election: Former Special

Counsel Robert S. Mueller, III." That hearing, at which Special Counsel Mueller testified, was watched by over 13 million Americans.[29] Yet, despite the Committee spending nine pages in its Application discussing the importance of the "Findings of Special Counsel Mueller," neither the Chairman nor 22 other Democratic Members of the Committee even mentioned impeachment at the hearing.[30]

*Contempt Resolution:* The Committee references a May 8, 2019, Committee vote to approve a resolution recommending Attorney General William P. Barr be held in contempt of Congress. H. Rep. No. 116-105 (2019). The Application says the Contempt Report explains one of three purposes of the Committee's ongoing investigation is to consider "whether any of the conduct described in the Special Counsel's Report warrants the Committee in taking any further steps under Congress's Article I powers," including approval of "articles of impeachment." Application at 18.

Setting aside the multiple stated purposes of the Committee's investigation—indicating impeachment is one of just many possible outcomes[31]—the mention of impeachment occurs just once in the 27-page document, buried deep in a paragraph on page nineteen.[32] Such an obscure

---

[29] Stephen Battaglio, *Mueller Hearing Watched by 13 Million TV Viewers*, L.A. TIMES, July 25, 2019, https://www.latimes.com/entertainment-arts/business/story/2019-07-25/mueller-tv-ratings.

[30] *Oversight of the Report on the Investigation into Russian Interference in the 2016 Presidential Election: Former Special Counsel Robert S. Mueller, III: Hearing Before the H. Comm. on the Judiciary*, 116th Cong. (2019).

[31] For example, during a July 26 press conference, Chairman Nadler stated, "If you said an impeachment inquiry is when you are considering only impeachment. That's not what we're doing. We're investigating all of this and will see what remedies we could recommend, including the possibility of articles of impeachment but not limited to that." Press Conference, Jerrold Nadler, July 26, 2019, https://www.c-span.org/video/?463045-1/house-judiciary-committee-democrats-defend-robert-mueller-plan-continue-investigation; *see also* DOJ Response at 26.

[32] Res. Recommending that the House of Reps. find William P. Barr, Att'y Gen., U.S. Dept. of Justice, in Contempt of Congress for Refusal to Comply With a Subpoena Duly Issued by the Comm. on the Judiciary, Rep. 116-XXX, H. Comm. on the Judiciary.

reference—within a section titled "Need for the Legislation" (i.e., operating under the Committee's Article I, Section 1 powers)—does not support the notion the full House has authorized the Committee's impeachment inquiry.

*Internal Committee Staff Documents*: The Committee also points to a July 11, 2019, memorandum to Committee Members citing the need for "key documentary evidence . . . to determine whether the Committee should recommend articles of impeachment against the President or any other Article I remedies, and if so in what form."[33] The memorandum, issued in connection with a hearing the following day with law professors testifying about Congress's ability to impeach the President, was nothing more than a routine memorandum issued by the Chairman's staff before all Committee hearings. *See, e.g.*, Jerrold Nadler, Chair, H. Comm. on the Judiciary, *Memorandum Re: Hearing on H. 5, the Equality Act* (Apr. 1, 2019).

*Sherman Resolution*: Additionally, on January 3, 2019, Representative Brad Sherman dropped a resolution "in the hopper"[34] and the House Parliamentarian referred the resolution to the Committee. 165 Cong. Rec. H211 (daily ed. Jan. 3, 2019) (referral to the Committee of H. Res. 13, 116th Cong. (2019)). The Sherman Resolution had only one co-sponsor and focused on the termination of James Comey as Director of the FBI and, therefore, is likely unrelated to any grand jury material redacted in the Report on the Investigation into Russian Interference in the 2016 Presidential Election and requested by the Committee.

On February 4, 2019, the resolution was referred to the Committee's Subcommittee on the Constitution, Civil Rights, and Civil Liberties. No further action has been taken on the

---

[33] Jerrold Nadler, Chair, H. Comm. on the Judiciary, *Memorandum Re: Hearing on "Lessons from the Mueller Report, Part III: 'Constitutional Processes for Addressing Presidential Misconduct'"* (July 11, 2019).

[34] When a House bill is ready for introduction it is placed in a box, referred to as the hopper, on the House floor near the House Clerk's desk. *See* Mark J. Oleszek, CONG. RESEARCH SERV., R44001, *How to Introduce a House Bill or Resolution* (Jan. 31, 2019) https://www.crs.gov/Reports/R44001?source=search&guid=a44662f212514721afd303aabb00de6f&index=7.

Sherman Resolution.  The full House never voted on the Sherman Resolution, and it has not been discussed at any meetings of the Committee or in any correspondence from the Chairman.  In fact, the first public mention of the Sherman Resolution by the Committee was in the Application.

*Committee Protocols*:  On July 26, 2019, the same day the Committee submitted its Application, the Chairman created the Protocols "to protect the confidentiality of any grand jury materials disclosed to the Committee."  *See* Jerrold Nadler, Chairman, H. Comm. on the Judiciary, "House Judiciary Committee Procedures for Handling Grand Jury Information."   The Protocols should have no bearing on the Court's decision to grant the Application.  If the Committee were in fact exercising its Article I, Section 2 power of impeachment, as the Committee would like the Court to believe, the Protocols would be incorporated into a resolution authorizing the Committee or another committee of the House to engage in an impeachment proceeding.  Such a resolution would provide protections the Protocols do not.

The Protocols are also problematic for the following reasons: 1) the Protocols allow the House Permanent Select Committee on Intelligence to also access these grand jury materials;[35] 2) the Protocols are contrary to House Rule XI.2(e)(2)(A), which says the Chairman does not have the authority to limit Member access to this material; and 3) the Protocols allow for grand jury material to be made public with a majority vote by the Committee.[36]  These loopholes further undermine the Committee's claim it will keep grand jury information secret.

------

[35] The Committee has not demonstrated the House Permanent Select Committee on Intelligence has been authorized to conduct a formal impeachment inquiry, thereby indicating these materials would be used under the committees' general oversight powers.

[36] Clause 11 of House Rule X outlines a process for HPSCI to disclose classified information if "the public interest would be served by such a disclosure."  This extraordinary power was used just last year when the Committee voted, along partisan lines, to release information favorable to the President regarding Russian interference in the 2016 presidential election. *See, e.g.*, Press Release, U.S. House Permanent Select Committee on Intelligence (Jan. 29, 2018), https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=342.

Without authorization from the full House, the Committee's attempt to recharacterize its investigation as an authorized impeachment inquiry fails. The House has not delegated its impeachment authority to the Committee, and none of the documents or statements cited by the Committee even purports to delegate the House's impeachment power to the Committee. *See Tobin v. United States*, 306 F.2d 270, 274 n.7 (D.C. Cir. 1962) ("Regardless of what Congress might have done or how Congress might have approached the instant problem, we are bound by what Congress in fact did do."). The repackaging of the mundane cannot paper-over past endeavors' aimlessness; the path the Committee has finally chosen to tread cannot be retroactively proclaimed traveled.

## III.   The Committee Has Not Demonstrated a Particularized Need to Pierce the Well-Established Policy of Grand Jury Secrecy

To pierce the veil of grand jury secrecy, the Committee must also make a "strong showing of a particularized need" for the requested material. *United States v. Sells Eng'g. Inc.*, 463 U.S. 418, 443 (1983). The Committee has not met that burden because, among other reasons,[37] 1) it can obtain the requested information without intervention by the judicial branch, and 2) it has failed to adequately explain how the information requested is linked to its stated rationale for needing the information.

### A. The Committee Can Obtain the Requested Information Without Court Intervention

Ranking Member Collins strongly supports Congress's right to petition the courts to resolve conflicts with the Executive Branch. However, Congress should do so only when it has no other means to resolve the conflict. *See United States v. House of Representatives of U.S.*, 556 F. Supp. 150, 152 (D.D.C. 1983) ("[T]he Court should not address [intragovernmental disputes] until circumstances indicate that judicial intervention is necessary."). Here, the Committee has multiple ways to obtain the requested material without judicial intervention. For

example, as outlined in the DOJ Response, the Committee can obtain the requested information from other committees in Congress.  *See* DOJ Response pp. 30-34.  Alternatively, if the Committee believes grand jury material should be available to Congress under the present circumstances, it can amend the law.

Rather than seek authority from the full House to conduct a formal impeachment inquiry, the Committee has asked the Court to re-interpret the phrase "preliminarily to or in connection with a judicial proceeding" to encompass traditional legislative oversight.[38]  Courts have routinely rejected that position.  *See In re Grand Jury Investigation of Uranium Indus.*, No. 78-0173, 1979 WL 1661, at *7 (discussed in detail *supra* Section I.A.1).  Therefore, instead of asking the judiciary to re-interpret the statute in a way that defies even a strained interpretation of the phrase, Congress can amend the law.  Congress enacted Rule 6(e) in 1977.  Pub. L. No. 95-78, §2(a), 91 Stat. 319 (1977).[39]  Since 1977, Rule 6 has been amended over ten times, including most recently in 2014.[40]  Congress could do so again if it so desired, and, in fact, doing so is within the Committee's delegated legislative jurisdiction under House Rule X.1(*l*)(1).

Accordingly, if the Committee believes it needs grand jury material to conduct its oversight of the Executive Branch, it can amend the law to permit disclosure of grand jury materials under the circumstances here.

---

[37] *See* DOJ Opposition § III explaining that the Committee failed to establish a particularized need for the requested information.

[38] *See supra* Section I.

[39] The DC Circuit has provided an overview of the legislative history of Rule 6, and explained it was positively enacted by Congress.  *Fund for Const. Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856, 867 (D.C. Cir. 1981).

[40] *See* Fed. R. Crim. P. 6, Notes (listing amendments to Rule 6), https://www.law.cornell.edu/rules/frcrmp/rule_6.

### B.   The Committee Has Not Explained With Particularity How the Requested Material is Relevant to its Stated Rationales for Needing the Material

Finally, the Committee has yet to adequately explain—either to the Court or during legislative time—why the grand jury material in the Mueller Report is connected to its obstruction of justice investigation.  It is well established that grand jury secrecy "must not be broken except where there is a compelling necessity." *Judicial Watch, Inc. v. Tillerson*, 270 F. Supp. 3d 1, 5 (D.D.C. 2017).  The "party seeking disclosure must show 'with particularity' why it needs the information." *Id.* (citing *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958).  The Committee thus far has offered only generalities about why the specific and limited redacted portions of the Mueller Report are necessary to evaluate "whether to approve articles of impeachment." *See* Application at 34-38.  Thus, the requisite particularity is lacking.

For example, the Committee claims it needs the requested material to evaluate whether to adopt H. Res. 13, the articles of impeachment referred to the Committee in January 2019 by Representative Brad Sherman.  Application at 31.[41]  But H. Res. 13 has little, if any, apparent connection to the redacted grand jury materials in the Mueller Report.

H. Res. 13 resolves to impeach President Trump on two grounds:  1) for allegedly asking former FBI Director Comey in early 2017 to "curtail the investigation of the activities of General Michael Flynn" and 2) for firing former FBI Director Comey.  H. Res. 13, 116th Cong. (2019).  None of the grand jury materials in Volume I of the Mueller Report has any apparent connection to those two events.[42]  In Volume II,[43] one redaction, on page 46, has an apparent connection to

---

[41] H. Res. 13 has one cosponsor, Representative Al Green.  No Member on the Committee is a cosponsor of H. Res. 13 and the full House has taken no action with respect to H. Res. 13.

[42] *See* DOJ Response Ex. 8 (Vol. I).  The following pages in Volume I contain grand jury materials:  52-56, 59, 63, 67-70, 72, 75, 76, 82, 85, 90, 91, 93-104, 110-114, 116-123, 126, 130, 136, 137, 139, 140, 142, 143, 146-156, 163-170, 172, 176, 194, 199.

[43] *See id.* Ex. 9 (Vol. II).  The following pages in Volume II contain grand jury materials: 13, 18, 46, 97, 105.

the FBI investigation of General Flynn, but the redaction is less than half of a line of text and is related to General Flynn lying to the FBI, and not Former FBI Director Comey's investigation of Flynn.[44]

There are no grand jury redactions with any apparent connection to the firing of former FBI Director Comey.  Accordingly, it is difficult to imagine that the benefits of disclosing a few words related to General Flynn are so significant that it justifies violating the long-standing and widely accepted policy of grand jury secrecy.  The Committee, the party with the burden of proof, has failed to identify those benefits.

## CONCLUSION

For the foregoing reasons, the Application should be denied without prejudice.


Dated:  October 3, 2019                    Respectfully submitted,

                                           /s/ Daniel Johnson

                                           Carlton Davis (Va. Bar No. 80283)
                                               *Chief Oversight Counsel*
                                           Ashley Callen (Va. Bar No. 70868)
                                               *Senior Advisor and Counsel*
                                           Daniel Johnson (DC Bar No. 1024590)
                                               *Counsel*
                                           M. Jacob Greenberg (Mo. Bar No. 70089)
                                               *Counsel*
                                           Minority Staff
                                           House Committee on the Judiciary
                                           Rayburn House Office Building Rm 2142
                                           Washington, DC 20515
                                           (202) 225-6906
                                           Danny.Johnson@mail.house.gov

                                           *Counsel for Amicus Curiae*

---

[44] *Id.* at 46.

24

**CERTIFICATE OF SERVICE**

I hereby certify that on October 3, 2019, the foregoing document was filed with the Clerk

of the Court, using the CM/ECF system, causing it to be served on all counsel of record.


Dated:  October 3, 2019                                    /s/ Daniel Johnson
                                                           Daniel Johnson