## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

*In re* APPLICATION OF THE
COMMITTEE ON THE JUDICIARY, U.S.
HOUSE OF REPRESENTATIVES, FOR AN
ORDER AUTHORIZING THE RELEASE
OF CERTAIN GRAND JURY MATERIALS

Grand Jury Action No. 19-48 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION GRANTING THE APPLICATION OF THE COMMITTEE ON THE JUDICIARY, U.S. HOUSE OF REPRESENTATIVES

### Table of Contents

I.   BACKGROUND.................................................................................................................... 3
     A.  The Special Counsel's Investigation ................................................................................ 3
     B.  Release of the Mueller Report ........................................................................................ 13
     C.  The Instant Proceeding.................................................................................................... 16
II.  LEGAL STANDARD........................................................................................................... 18
III. DISCUSSION....................................................................................................................... 19
     A.  Rule 6(e)'s "Judicial Proceeding" Requirement is Satisfied Because an Impeachment Trial is
         Such a Proceeding ......................................................................................................... 21
         1.  The Term "Judicial Proceeding" in Rule 6(e) Has a Broad Meaning ..................... 22
         2.  An Impeachment Trial is Judicial in Nature............................................................ 26
         3.  Historical Practice Before Enactment of Rule 6(e) Informs Interpretation of that Rule ......... 34
         4.  Binding D.C. Circuit Precedent Forecloses Any Conclusion Other Than That an
             Impeachment Trial is a "Judicial Proceeding" ....................................................... 37
     B.  HJC's Consideration of Articles of Impeachment is "Preliminarily To" an Impeachment Trial . 44
         1.  Governing Legal Principles Demonstrate That House Proceedings Can be "Preliminarily To"
             a Senate Impeachment Trial ................................................................................... 44
         2.  HJC's Primary Purpose is to Determine Whether to Recommend Articles of Impeachment . 47
             a.  DOJ's Proposed "Preliminarily To" Test is Contrary to *Baggot* ....................... 47
             b.  No House "Impeachment Inquiry" Resolution is Required............................... 49
             c.  The Record of House and HJC Impeachment Activities Here Meets the "Preliminarily
                 To" Test ...................................................................................................... 55
         3.  Requiring More Than the Current Showing by HJC, as DOJ Demands, Would Improperly
             Intrude on Article I Powers Granted to House of Representatives.......................... 58
         4.  DOJ's Remaining Objections are Unpersuasive .................................................... 61
     C.  HJC Has a "Particularized Need" for the Requested Materials ................................. 62
         1.  Disclosure is Necessary to Avoid Possible Injustice............................................. 64
         2.  The Need for Disclosure Outweighs the Need for Continued Secrecy ................... 71
         3.  Scope of Disclosure Authorized.............................................................................. 74
IV.  CONCLUSION ..................................................................................................................... 74

In March 2019, Special Counsel Robert S. Mueller III ended his 22-month investigation and issued a two-volume report summarizing his investigative findings and declining either to exonerate the President from having committed a crime or to decide that he did.  *See generally* Special Counsel Robert S. Mueller, III, U.S. Dep't of Justice, *Report On The Investigation Into Russian Interference In The 2016 Presidential Election* ("Mueller Report") (Mar. 2019), ECF Nos. 20-8, 20-9.  The Special Counsel explained that bringing federal criminal charges against the President would "potentially preempt constitutional processes for addressing presidential misconduct."  *Id*. at II-1.  With this statement, the Special Counsel signaled his view that Congress, as the federal branch of government tasked with presidential impeachment duty under the U.S. Constitution, was the appropriate body to resume where the Special Counsel left off.

The Speaker of the House of Representatives has announced an official impeachment inquiry, and the House Judiciary Committee ("HJC"), in exercising Congress's "sole Power of Impeachment," U.S. CONST. art. I, § 2, cl. 5, is reviewing the evidence set out in the Mueller Report.  As part of this due diligence, HJC is gathering and assessing all relevant evidence, but one critical subset of information is currently off limits to HJC: information in and underlying the Mueller Report that was presented to a grand jury and withheld from Congress by the Attorney General.

The Department of Justice ("DOJ") claims that existing law bars disclosure to the Congress of grand jury information.  *See* DOJ's Resp. to App. of HJC for an Order Authorizing Release of Certain Grand Jury Materials ("DOJ Resp."), ECF No. 20.  DOJ is wrong.  In carrying out the weighty constitutional duty of determining whether impeachment of the President is warranted, Congress need not redo the nearly two years of effort spent on the Special Counsel's investigation, nor risk being misled by witnesses, who may have provided information

to the grand jury and the Special Counsel that varies from what they tell HJC.  As explained in more detail below, HJC's application for an order authorizing the release to HJC of certain grand jury materials related to the Special Counsel investigation is granted.  *See* HJC's App. for an Order Authorizing the Release of Certain Grand Jury Materials ("HJC App."), ECF No. 1.

## I.     BACKGROUND

What follows begins with a brief review of the initiation of the Special Counsel's investigation, the key findings in the Mueller Report and the grand jury secrecy redactions embedded therein, as well as the significant gaps in the Special Counsel's investigation that contributed to the Special Counsel assessment that "[t]he evidence we obtained about the President's actions and intent presents difficult issues that would need to be resolved if we were making a traditional prosecutorial judgement."  Mueller Report at II-8.[1]  Next reviewed is Congress's response to the release of the public redacted version of the Mueller Report and ensuing—and ultimately unsuccessful—negotiations with DOJ to obtain the full Report and related investigative materials, leading HJC to file the instant application, pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E)(i).

### A.     The Special Counsel's Investigation

On May 17, 2017, then-Deputy Attorney General ("DAG") Rod J. Rosenstein appointed Robert S. Mueller III to serve as Special Counsel for DOJ "to investigate Russian interference with the 2016 presidential election and related matters."  U.S. Dep't of Justice, Office of the Deputy Attorney General, Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters ("Appointment

---

[1]      As noted, the Mueller Report is in two volumes, with each volume re-starting the page numbering. Thus, citations to this report use a nomenclature indicating the page number in either Volume I or Volume II.

Order") (May 17, 2017) (capitalization altered).[2] Prior to the Special Counsel's appointment, the

Federal Bureau of Investigation ("FBI") had already initiated "an investigation into whether

individuals associated with the Trump Campaign [had] coordinat[ed] with the Russian

government" to interfere in the 2016 presidential election.  Mueller Report at I-1.  The order

authorizing the Special Counsel's appointment thus had the effect of transferring the ongoing

FBI investigation to his office.  *See* Appointment Order ¶ b (authorizing the Special Counsel "to

conduct the investigation confirmed by then-FBI Director James B. Comey in testimony before

[Congress] on March 20, 2017").   The Special Counsel was also granted "jurisdiction to

investigate matters that arose directly from the FBI's Russia investigation, including whether the

President had obstructed justice in connection with Russia-related investigations" and

"potentially obstructive acts related to the Special Counsel's investigation itself."  Mueller

Report at II-1.  Pursuant to this grant of authority—and upon receiving evidence "relating to

potential issues of obstruction of justice involving the President"—the Special Counsel

"determined that there was a sufficient factual and legal basis to further investigate . . . the

President."  *Id.* at II-12.

In compliance with the DOJ regulations authorizing his appointment, upon completion of

his investigation the Special Counsel issued a confidential report to the Attorney General

"explaining the prosecution or declination decisions [he] reached."  *Id*. at I-1 (quoting 28 C.F.R §

600.8(c)).   That Report laid out the Special Counsel's findings in two volumes, totaling 448

pages.  Both HJC and DOJ point to the contents of the Report as highly relevant to resolving the

---

[2]      Then-Attorney General Jeff Sessions had recused himself "from any existing or future investigations of any matters related in any way to the campaigns for President of the United States," Press Release, U.S. Dep't of Justice, Attorney General Sessions Statement of Recusal (Mar. 2, 2017), making the Deputy Attorney General the "Acting Attorney General, by operation of law" as to such matters, *In re Grand Jury Investigation*, 315 F. Supp. 3d 602, 621 (D.D.C. 2018), *aff'd*, 916 F.3d 1047 (D.C. Cir. 2019).

current legal dispute.  Indeed, DOJ submitted the public redacted version of the Mueller Report

as exhibits to support its arguments.  *See* DOJ's Resp., Exs. 8 (Volume I), 9 (Volume II), ECF

Nos. 20-8, 20-9.  Therefore, a recounting of some of the key events chronicled in and

conclusions (or lack thereof) reached by the Special Counsel in the Mueller Report is in order.

Volume I of the Mueller Report "describe[s] the factual results of the Special Counsel's

investigation of Russia's interference in the 2016 presidential election."  Mueller Report at I-2.

The Special Counsel concluded that "[t]he Russian government interfered in the 2016

presidential election in sweeping and systematic fashion," "principally through two operations."

*Id*. at I-1. "First, a Russian entity carried out a social media campaign that favored presidential

candidate Donald J. Trump and disparaged presidential candidate Hillary Clinton.  Second, a

Russian intelligence service conducted computer-intrusion operations against entities,

employees, and volunteers working on the Clinton Campaign and then released stolen

documents."  *Id.*  Russia hacked and stole "hundreds of thousands of documents," *id.* at I-4, from

the Democratic National Committee, the Democratic Campaign Committee, and the Clinton

Campaign, and then disseminated those documents through fictitious online personas and

through the website WikiLeaks in order to influence the outcome of the 2016 presidential

election.  *Id.* at I-4, 38, 41, 48, 58.

Volume I of the Mueller Report also details evidence of "links between the Russian

government and individuals associated with the Trump [2016 Presidential] Campaign."  *Id.* at I-

2–3.  According to the Special Counsel, "the [Trump] Campaign expected it would benefit

electorally from information stolen and released through Russian efforts," and the links between

the Russian government and the Trump Campaign were "numerous."  *Id.* at I-1–2.  For instance,

a meeting occurred on June 9, 2016 at Trump Tower in New York City, between a Russian

lawyer and senior Trump Campaign officials Donald Trump Jr., Jared Kushner, and then-campaign manager Paul Manafort, triggered by information provided to those campaign officials that the Russian lawyer would deliver "official documents and information that would incriminate Hillary [Clinton]."  *Id.* at I-6 (internal quotation marks omitted).  Additionally, the Mueller Report documents connections between Ukraine and Manafort, who had previously "work[ed] for a pro-Russian regime in Ukraine."  *Id.* at I-129.  Among other things, the Special Counsel determined that "during the campaign" Manafort—through "Rick Gates, his deputy on the Campaign"—"periodically sent" internal Trump Campaign "polling data" to Konstantin Kilimnik, Manafort's long-time business associate in Ukraine with alleged ties to Russian intelligence, with the expectation that Kilimnik would "share that information with others in Ukraine."  *Id.*  The Mueller Report further recounts evidence suggesting that then-candidate Trump may have received advance information about Russia's interference activities, stating:

> Manafort, for his part, told the Office that, shortly after WikiLeaks's July 22 release, Manafort also spoke with candidate Trump **[redacted]**.  Manafort also **[redacted]** wanted to be kept apprised of any developments with WikiLeaks and separately told Gates to keep in touch **[redacted]** about future WikiLeaks releases.

> According to Gates, by the late summer of 2016, the Trump campaign was planning a press strategy, a communications campaign, and messaging based on the possible release of Clinton emails by WikiLeaks.  **[Redacted]** while Trump and Gates were driving to LaGuardia Airport.  **[Redacted]**, shortly after the call candidate Trump told Gates that more releases of damaging information would be coming.

*Id.* at I-53–54 (footnotes omitted) (redactions in original, with citation in referenced footnote 206 redacted due to grand jury secrecy).

The public version of Volume I contains over 240 redactions on the basis of grand jury secrecy.[3]  These redactions occur in parts of the Mueller Report that include discussion of the Trump Tower Meeting, then-candidate Trump's discussion with associates about releases of hacked documents, and Manafort's contacts with Kilimnik.  *See id.* at I-54 & n.206, 111–12, 117, 120, 136–37, 140, 143.

Volume II of the Mueller Report summarizes the "obstruction investigation," which "focused on a series of actions by the President that related to the Russian-interference investigations, including the President's conduct towards the law enforcement officials overseeing the investigations and the witnesses to relevant events."  *Id.* at II-3 (capitalization altered).  The Special Counsel determined that "the President of the United States took a variety of actions towards the ongoing [Russia-related investigations] . . . that raised questions about whether he had obstructed justice."  *Id.* at II-1.  For example, in the summer of 2017 after news reports about the Trump Tower Meeting, President Trump "directed aides not to publicly disclose the emails setting up the June 9 meeting" and "edited a press statement for Trump Jr.," eliminating the portion "that acknowledged that the meeting was with 'an individual who [Trump Jr.] was told might have information helpful to the campaign,'" even while President Trump's personal attorney "repeatedly denied the President had played any role" in Trump Jr.'s statement.  *Id.* at II-5 (alteration in original).

In another instance involving potential witness tampering, the Mueller Report examined the events leading to former Trump Organization executive and attorney Michael Cohen

---

[3]      Redactions in the Mueller Report were not applied by the Special Counsel's Office but "by Department of Justice attorneys working closely together with attorneys from the Special Counsel's Office, as well as with the intelligence community, and prosecutors who are handling ongoing cases."  William P. Barr, Attorney General, Department of Justice, Attorney General William P. Barr Delivers Remarks on the Release of the Report on the Investigation into Russian Interference in the 2016 Presidential Election (Apr. 18, 2019), https://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-remarks-release-report-investigation-russian.

providing false testimony to Congress, in 2017, about a deal to build a Trump Tower in Moscow, Russia. *Id.* at II-6. While Cohen was preparing to give that false testimony the President's personal counsel told Cohen, according to Cohen, that "Cohen should 'stay on message' and not contradict the President." *Id.* Then, in April 2018, after Cohen became the subject of a criminal investigation and the FBI had searched Cohen's home and office, the President stated publicly "that Cohen would not 'flip'" and "contacted [Cohen] directly to tell him to 'stay strong,'" at the same time that President Trump's personal counsel "discussed pardons" with Cohen. *Id.*

As DOJ points out, DOJ Resp. at 32 n.19, the public version of Volume II contains some, but far fewer, redactions on the basis of grand jury secrecy than does the public version of Volume I.[4] Again, the Mueller Report recounts an incident when then-candidate Trump spoke to associates indicating that he may have had advance knowledge of damaging leaks of documents illegally obtained through hacks by the Russians, stating "shortly after WikiLeaks's July 22, 2016 release of hacked documents, [Manafort] spoke to Trump **[redacted]**; Manafort recalled that Trump responded that Manafort should **[redacted]** keep Trump updated. Deputy campaign

---

[4]     The reason for the fewer grand jury–related redactions in Volume II addressing "questions about whether [the President] had obstructed justice," Mueller Report at II-1, becomes clear upon analysis. The introduction to this part of the Mueller Report provides assurances that "we conducted a thorough factual investigation in order to preserve the evidence when memories were fresh and documentary materials were available." *Id*. at II-2. As the Mueller Report highlights, "a President does not have immunity after he leaves office," and, quoting DOJ policy, the Report further observes that "an immunity from prosecution for a sitting President would not preclude such prosecution once the President's term is over or he is otherwise removed from office by resignation or impeachment." *Id*. at II-1 & n.4 (quoting *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 255 (2000) [hereinafter *OLC Op.*]). Yet, some individuals whose actions figure prominently in incidents described in Volume II were never compelled to testify under oath before the grand jury to preserve their testimony. For example, several witnesses, who simply declined to speak to the Special Counsel, as is their right, were not pursued with the tools available to prosecutors to gather material evidence in a criminal investigation. Certain consequences flow from these prosecutorial choices—other than the obvious fact that the grand jury was given no opportunity to consider this evidence—namely: the testimony of these individuals is not formally preserved but also any statements or documentary evidence that was obtained from these individuals is not protected by grand jury secrecy. *See In re Application of the Committee on the Judiciary*, No. 19-gj-48, 2019 WL 5268929, at *1 (Oct. 17, 2019) (ordering DOJ to unseal improperly redacted portion of declaration pertaining to "identities of individuals who did not testify before the grand jury"); DOJ's Notice of Compliance with Ord. of Oct. 17, 2019 ("DOJ Notice"), Ex. 10, Decl. of Associate Deputy Attorney General ("ADAG") Bradley Weinsheimer ¶ 4 ("Revised ADAG Decl."), ECF No. 44-1 (revealing that "Don McGahn did not testify before the grand jury" and "Donald Trump, Jr. also did not testify before the grand jury").

manager Rick Gates said that . . . Manafort instructed Gates **[redacted]** status updates on

upcoming releases.  Around the same time, Gates was with Trump on a trip to an airport

**[redacted]**, and shortly after the call ended, Trump told Gates that more releases of damaging

information would be coming."  *Id.* at II-18 (footnotes omitted) (redactions in original, with

citation in footnote 27 redacted due to grand jury secrecy).  In addition, a discussion related to

the Trump Tower Meeting contains two grand jury redactions: "On July 12, 2017, the Special

Counsel's Office **[redacted]** Trump Jr. **[redacted]** related to the June 9 meeting and those who

attended the June 9 meeting."  *Id.* at II-105 (redactions in original).

    The Mueller Report acknowledges investigative "gaps" that were sufficiently significant

that the Special Counsel could not "rule out the possibility that the unavailable information

would shed additional light on (or cast in a new light) the events described in the report."  *Id.* at

I-10.  Six "identified gaps" were that: (1) "[s]ome individuals invoked their Fifth Amendment

right against compelled self-incrimination and were not, in the Office's judgment, appropriate

candidates for grants of immunity"; (2) "[s]ome of the information obtained . . . was

presumptively covered by legal privilege and was screened from investigators"; (3) "other

witnesses and information—such as information known to attorneys or individuals claiming to

be members of the media"—were not pursued "in light of internal Department of Justice

policies"; (4) "practical limits" prevented the gathering of information and questioning of

witnesses abroad; (5) "[e]ven when individuals testified or agreed to be interviewed, they

sometimes provided information that was false or incomplete"; and (6) "some of the individuals

we interviewed or whose conduct we investigated—including some associated with the Trump

Campaign—deleted relevant communications or communicated during the relevant period using

applications that feature encryption or that do not provide for long-term retention of data or

communications records." *Id.* Consequently, the Mueller Report cautions that "[a] statement that the investigation did not establish particular facts does not mean there was no evidence of those facts." *Id.* at I-2.

The Report acknowledges that these gaps adversely affected the investigation and, in some instances, precluded the Special Counsel from reaching any conclusion about whether criminal conduct occurred. For example, evidence related to the President's knowledge about his personal attorney's involvement in the preparation of Cohen's false testimony to Congress was not pursued. The Mueller Report states that "[t]he President's personal counsel declined to provide us with his account of his conversations with Cohen," and "we did not seek to obtain the contents of any . . . communications" between President Trump and his attorney during that time period. *Id.* at II-154. "The absence of evidence about the President and his counsel's conversations about the drafting of Cohen's statement precludes us from assessing what, if any, role the President played." *Id.* In another example, the Special Counsel examined the circumstances of a meeting held, during the transition, on January 11, 2017, on the Seychelles Islands between Kirill Dmitriev, the chief executive officer of Russia's sovereign wealth fund, and Erik Prince, a businessman with close ties to Trump Campaign associates, including senior Trump advisor Steve Bannon. *See id*. at I-7, 148. Prince said he discussed the meeting with Bannon in January 2017, but Bannon denied this, and "[t]he conflicting accounts . . . could not be independently clarified . . . because neither [Prince nor Bannon] was able to produce any of the [text] messages they exchanged in the time period surrounding the Seychelles meeting." *Id.* at I-156. "Prince's phone contained no text messages prior to March 2017" and "Bannon's devices similarly contained no messages in the relevant time period," and neither Prince nor

Bannon could account for the absent messages. *Id.*; *see also id.* at I-153–55 (extensive grand jury redactions).[5]

Some areas of the report describing such gaps contain redactions of grand jury material. For example, in describing the Trump Tower Meeting, the Mueller Report states: "The Office spoke to every participant [at the Trump Tower Meeting] except [Natalia] Veselnitskaya and Trump, Jr., the latter of whom declined to be voluntarily interviewed by the Office," with the remainder of the sentence redacted for grand jury secrecy. *Id.* at I-117.  The Special Counsel declined to pursue charges related to this meeting in part because "the Office did not obtain admissible evidence likely to meet the government's burden to prove beyond a reasonable doubt that these individuals acted 'willfully.'" *Id.* at I-186.[6]

The Mueller Report also reveals the Special Counsel's unsuccessful effort to speak directly with the President: "We also sought a voluntary interview with the President.  After more than a year of discussion, the President declined to be interviewed," which statement is followed by two lines redacted for references to grand jury material. *Id*. at II-13.  Although "the President did agree to answer written questions on certain Russia-related topics, and he provided us with answers," the President refused "to provide written answers to questions on obstruction topics or questions on events during the transition." *Id*.  The Special Counsel acknowledged "that we had the authority and legal justification to issue a grand jury subpoena to obtain the

---

[5]        Both Prince and Bannon testified before congressional committees.  *See Testimony of Erik Prince Before the H. Permanent Select Comm. on Intelligence*, 115th Cong. (Nov. 30, 2017), https://docs.house.gov/meetings/IG/IG00/20171130/106661/HHRG-115-IG00-Transcript-20171130.pdf; H. PERMANENT SELECT COMM. ON INTELLIGENCE, 115TH CONG., SCOPE OF INVESTIGATION, MINORITY VIEWS at 11 (MARCH 26, 2018), https://perma.cc/D9HE-AFUH (reporting on Steve Bannon's testimony).
[6]        Another example involves a July 2016 trip to Moscow by Carter Page, then a Trump Campaign official, who gave a speech in Moscow and represented in emails to other Campaign officials that he also spoke with Russian government officials.  Mueller Report at I-96, I-98, I-101.  Yet, "[t]he Office was unable to obtain additional evidence or testimony about who Page may have met or communicated with in Moscow; thus, Page's activities in Russia . . . were not fully explained." *Id.* at I-101.  This same paragraph reporting this gap in the evidence contains redacted references to grand jury material. *See id*.

President's testimony," but "chose not to do so."  *Id.*; *see also* Mueller Report App'x C

(describing efforts to interview the President in greater detail).  When the Special Counsel

testified before Congress on July 24, 2019, he acknowledged that the President's written

responses to questions posed by the Special Counsel's Office were "generally" not only

"inadequate and incomplete," but also "showed that he wasn't always being truthful."  HJC

App., Ex. W, *Former Special Counsel Robert S. Mueller, III on the Investigation into Russian*

*Interference in the 2016 Presidential Election: Hearing before the H. Permanent Select Comm.*

*on Intelligence*, 116th Cong. 83 (July 24, 2019), ECF No. 1-24.

     The Special Counsel's investigation "did not establish that members of the Trump

Campaign conspired or coordinated with the Russian government in its election interference

activities."  Mueller Report at I-2.  Nor did the Special Counsel "make a traditional prosecutorial

judgment" or otherwise "draw ultimate conclusions about the President's conduct."  *Id.* at II-8.

At the same time, the Special Counsel stated that "if we had confidence after a thorough

investigation of the facts that the President clearly did not commit obstruction of justice, we

would so state."  *Id.* at II-2.  "[W]hile this report does not conclude that the President committed

a crime, it also does not exonerate him."  *Id.; see also id.* at II-8, II-182 (reiterating that Report

"does not exonerate" President).  "Given the role of the Special Counsel as an attorney in the

Department of Justice and the framework of the Special Counsel regulations," the Special

Counsel "accepted" the DOJ Office of Legal Counsel's ("OLC") legal conclusion that "'the

indictment or criminal prosecution of a sitting President would impermissibly undermine the

capacity of the executive branch to perform its constitutionally assigned functions' in violation

of 'the constitutional separation of powers.'"  *Id.* at II-1 (citation omitted) (quoting *OLC Op.* at

222, 260).  This OLC legal conclusion has never been adopted, sanctioned, or in any way approved by a court.

At the same time, impeachment factored into this analysis, as the Special Counsel also concluded "that Congress may apply the obstruction laws to the President's corrupt exercise of the powers of office [which] accords with our constitutional system of checks and balances and the principle that no person is above the law."  *Id*. at II-8.

## B.    Release of the Mueller Report

On March 22, 2019, Attorney General ("AG") William Barr, as required by 28 C.F.R. § 600.9(a)(3), notified the Chairmen and Ranking Members of the United States House and Senate Judiciary Committees, via a one-page letter, that the Special Counsel had completed his investigation.  DOJ Resp., Ex. 1, Letter from William P. Barr, Attorney Gen., Dep't of Justice, to Lindsey Graham, Chairman, S. Comm. on the Judiciary, et al. (Mar. 22, 2019), ECF No. 20-1. AG Barr stated that he "intend[ed] to consult with Deputy Attorney General Rosenstein and Special Counsel Mueller to determine what other information from the report [could] be released to Congress and the public consistent with the law," and that he "remain[ed] committed to as much transparency as possible."  *Id.*  Two days later, on March 24, 2019, AG Barr sent a second, four-page letter to the Chairmen and Ranking Members of the United States House and Senate Judiciary Committees, advising them "of the principal conclusions reached by Special Counsel Robert S. Mueller III," and reiterating his "intent . . . to release as much of the Special Counsel's report as [possible] consistent with applicable law," noting that he first needed to identify information "subject to Federal Rule of Criminal Procedure 6(e)," as well as "information that could impact other ongoing matters."  DOJ Resp., Ex. 2, Letter from William P. Barr, Attorney

Gen., Dep't of Justice, to Lindsey Graham, Chairman, S. Comm. on the Judiciary, et al. 1, 4 (Mar. 24, 2019), ECF No. 20-2.[7]

The next day, March 25, 2019, the chairpersons of six House committees ("House Committee Chairpersons")—including HJC Chairman Jerrold Nadler—responded to AG Barr in a three-page letter. *See* HJC App., Ex. C, Letter from Jerrold Nadler, Chairman, H. Comm. on the Judiciary, et al., to William P. Barr, Attorney Gen., Dep't of Justice (Mar. 25, 2019), ECF No. 1-4. Highlighting that each of their committees was "engaged in oversight activities that go directly to the President's conduct, his attempts to interfere with federal and congressional investigations, his relationships and communications with the Russian government and other foreign powers, and/or other alleged instances of misconduct," the House Committee Chairpersons "formally request[ed]" that AG Barr "release the Special Counsel's full report to Congress" and "begin transmitting the underlying evidence and materials to the relevant committees." *Id.* at 1. This information, they explained, was necessary "to perform their duties under the Constitution," such as their duty to "make an independent assessment of the evidence regarding obstruction of justice." *Id.* at 1, 2.[8]

---

[7]    In his summary of the Mueller Report's "principal conclusions," AG Barr stated that "[t]he Special Counsel's investigation did not find that the Trump campaign or anyone associated with it conspired or coordinated with Russia in its efforts to influence the 2016 U.S. presidential election," Letter from William P. Barr to Lindsey Graham, et al., *supra*, at 2 (Mar. 24, 2019), and that "[t]he Special Counsel . . . did not draw a conclusion—one way or the other—as to" whether the "actions by the President . . . that the Special Counsel investigated" "constituted obstruction," *id.* at 3. AG Barr determined that "[t]he Special Counsel's decision to describe the facts of his obstruction investigation without reaching any legal conclusions" left it to him as the Attorney General "to determine whether the conduct described in the report constitutes a crime," and he "concluded that the evidence developed during the Special Counsel's investigation is not sufficient to establish that the President committed an obstruction-of-justice offense." *Id.*

[8]    On February 22, 2019—before the Mueller Report was submitted to AG Barr but when media reporting suggested that the Special Counsel investigation was nearing its end—the House Committee Chairpersons had submitted a similar request to AG Barr, noting that "because the Department has taken the position that a sitting President is immune from indictment and prosecution, Congress could be the only institution currently situated to act on evidence of the President's misconduct." HJC App., Ex. B, Letter from Jerrold Nadler, Chairman, H. Comm. on the Judiciary, et al., to William P. Barr, Attorney Gen., Dep't of Justice 2 (Feb. 22, 2019), ECF No. 1-3 (footnote omitted).

Four days later, on March 29, 2019, AG Barr responded to both the House Committee Chairpersons' letter and a letter sent by Senate Judiciary Committee ("SJC") Chairman Lindsey Graham. *See* DOJ Resp., Ex. 3, Letter from William P. Barr, Attorney Gen., Dep't of Justice, to Lindsey Graham, Chairman, S. Comm. on the Judiciary, and Jerrold Nadler, Chairman, H. Comm. on the Judiciary (Mar. 29, 2019), ECF No. 20-3.  AG Barr reaffirmed that he was preparing the Report for release, again noting that redactions would be required to protect material that was subject to grand jury secrecy under Rule 6(e) and that could compromise sensitive sources and methods, as well as to protect information that could pose harm to other ongoing matters or was related to the privacy and reputations of third parties. *Id.* at 1.

The House Committee Chairpersons objected to AG Barr's proposed redactions. *See* HJC App., Ex. D, Letter from Jerrold Nadler, Chairman, H. Comm. on the Judiciary, et al., to William P. Barr, Attorney Gen, Dep't of Justice (Apr. 1, 2019), ECF No. 1-5.  They observed that "[t]he allegations at the center of Special Counsel Mueller's investigation strike at the core of our democracy," such that "Congress urgently needs his full, unredacted report and its underlying evidence in order to fulfill its constitutional role." *Id.* at 2; *see also id.* App'x at 1 (stating that Congress has an "independent duty to investigate misconduct by the President").  As to grand jury material, the House Committee Chairpersons proposed that DOJ "seek leave from the district court to produce those materials to Congress—as it has done in analogous situations in the past," *id.* at 2, explaining that the material was needed because "[HJC] is engaged in an ongoing investigation of whether the President has undermined the rule of law, including by compromising the integrity of the Justice Department," *id*. App'x at 2.

On April 18, 2019, AG Barr released the Mueller Report in redacted form to the Congress and the public. *See* DOJ Resp., Ex. 4, Letter from William P. Barr, Attorney Gen.,

Dep't of Justice, to Lindsey Graham, Chairman, S. Comm. on the Judiciary, et al. (Apr. 18, 2019), ECF No. 20-4.  AG Barr also promised to "make available" to SJC Chairman Graham, HJC Ranking Member Dianne Feinstein, HJC Chairman Nadler, and HJC Ranking Member Collins "a version of the report with all redactions removed except those relating to grand-jury information."  *Id.* at 4.

Not satisfied with the redacted version of the Mueller Report, the next day HJC served a subpoena on AG Barr requiring the production of three classes of documents: (1) "[t]he complete and unredacted version of the [Mueller Report]," including attachments; (2) "[a]ll documents referenced in the Report"; and (3) "[a]ll documents obtained and investigative materials created by the Special Counsel's office."  HJC App., Ex. G, Subpoena by Authority of the H. of Representatives to William P. Barr, Attorney Gen., Dep't of Justice 3 (Apr. 19, 2019), ECF No. 1-8.

DOJ has granted HJC access to "the entirety of Volume II, with only grand jury redactions" and did "the same with regard to Volume I" for "the Chairman and Ranking Member from [HJC]."  DOJ Resp. at 6 n.2.  DOJ has not, however, allowed HJC to review the portions of the Mueller Report redacted pursuant to Rule 6(e).  *See, e.g.*, HJC App., Ex. K, Letter from Stephen E. Boyd, Assistant Attorney Gen., Dep't of Justice, to Jerrold Nadler, Chairman, H. Comm. on the Judiciary 4 (May 1, 2019), ECF No. 1-12 (stating that "Rule 6(e) contains no exception that would permit the Department to provide grand-jury information to the Committee in connection with its oversight role").

## C.    The Instant Proceeding

On July 26, 2019, HJC submitted the instant application for an order pursuant to Federal Rule of Criminal Procedure 6(e) authorizing the release to HJC of certain grand jury materials

related to the Special Counsel's investigation.  HJC App.  HJC requests the release to it of three

categories of material:

1.  all portions of [the Mueller Report] that were redacted pursuant to Federal
    Rule of Criminal Procedure 6(e);

2.  any underlying transcripts or exhibits referenced in the portions of the
    Mueller Report that were redacted pursuant to Rule 6(e); and

3.  transcripts of any underlying grand jury testimony and any grand jury
    exhibits that relate directly to (A) President Trump's knowledge of efforts
    by Russia to interfere in the 2016 U.S. Presidential election; (B) President
    Trump's knowledge of any direct or indirect links or contacts between
    individuals associated with his Presidential campaign and Russia,
    including with respect to Russia's election interference efforts; (C)
    President Trump's knowledge of any potential criminal acts by him or any
    members of his administration, his campaign, his personal associates, or
    anyone associated with his administration or campaign; or (D) actions
    taken by former White House Counsel Donald F. McGahn II during the
    campaign, the transition, or McGahn's period of service as White House
    Counsel."

*Id.* at 1–2.

After entry of a scheduling order in accord with the dates proposed by the parties, *see*

Min. Ord. (July 31, 2019), DOJ filed its response to HJC's application on September 13, 2019,

maintaining that Rule 6(e) prohibits disclosure of the requested material to HJC, *see* DOJ Resp.,

and HJC filed its reply on September 30, 2019, *see* HJC's Reply in Support of its App. for an

Order Authorizing the Release of Certain Grand Jury Materials ("HJC Reply"), ECF No. 33.[9]

Following a hearing on October 8, 2019, the parties provided supplemental submissions to

---

[9]     On August 30, 2019, the Constitutional Accountability Center submitted an amicus brief in support of
HJC's application, *see* Br. of Constitutional Accountability Ctr. as *Amicus Curiae* in Support of HJC, ECF No. 16-1,
and, on October 3, 2019, Representative Doug Collins, HJC's Ranking Member, submitted an amicus brief urging
denial of HJC's application, *see* Mem. Amicus Curiae of Ranking Member Doug Collins in Support of Denial
("Collins Mem."), ECF No. 35.

address additional issues not covered by the initial briefing.  *See* Min. Ord. (October 8, 2019).[10]
This matter is now ripe for resolution.

## II.   LEGAL STANDARD

Under Rule 6(e) of the Federal Rules of Criminal Procedure, disclosure of "a matter
occurring before the grand jury" is generally prohibited.  FED. R. CRIM. P. 6(e)(2)(B).  While
witnesses are expressly exempted from any "obligation of secrecy," *id.* 6(e)(2)(A), the Rule
provides a list of seven categories of persons privy to grand jury proceedings who must keep
secret "[i]nformation . . . presented to the grand jury," *In re Sealed Case No. 99-3091 (Office of
Indep. Counsel Contempt Proceeding)*, 192 F.3d 995, 1002 (D.C. Cir. 1999) (per curiam),
including grand jurors, interpreters, court reporters, operators of recording devices, persons who
transcribe recorded testimony, attorneys for the government, and certain other persons to whom
authorized disclosure is made, FED. R. CRIM. P. 6(e)(2)(B)(i)–(vii).[11]

Rule 6(e) also sets out exceptions to grand jury secrecy, some of which allow disclosure
without any judicial involvement and others of which require either judicial notice or a court
order.  *See* FED. R. CRIM. P. 6(e)(3)(A)–(E).[12]  The D.C. Circuit recently held, in *McKeever v.*

---

[10]     As part of this supplemental briefing, DOJ was directed to provide its reasoning for redacting from public
view, as grand jury material, portions of a declaration submitted by DOJ in support of its position that HJC's
application should be denied.  *See* Min. Order (Oct. 8, 2019).  This Court determined that the declaration had been
improperly redacted and ordered DOJ to correct its error.  *In re Application of the Committee on the Judiciary*, 2019
WL 5268929.  DOJ complied with that order on October 20, 2019.  *See* DOJ Notice.

[11]     The definition of "a matter occurring before the grand jury" can also encompass information "that would
'tend to reveal some secret aspect of the grand jury's investigation, including" the "strategy" or future "direction of
the investigation,'" *Bartko v. U.S. Dep't of Justice*, 898 F.3d 51, 73 (D.C. Cir. 2018) (quoting *Hodge v. FBI*, 703
F.3d 575, 580 (D.C. Cir. 2013)), but the D.C. Circuit has "cautioned . . . about 'the problematic nature of applying
so broad a definition,'" *see In re Sealed Case No. 99-3091*, 192 F.3d at 1001 (quoting *In re Sealed Case No. 98-
3077*, 151 F.3d 1059, 1071 n.12 (D.C. Cir. 1998) (per curiam)).

[12]     For instance, under Rules 6(e)(3)(A)(ii) and 6(e)(3)(D), the government may disclose grand jury material in
certain circumstances without a court order but must provide notice of disclosure to the court that impaneled the
grand jury.  *See* FED. R. CRIM. P. 6(e)(3)(B), (D)(ii).  In March 2016, this Court instituted a system for docketing
such notices received in this District, and since that time the government has submitted 783 notice letters.  *See In re
Grand Jury Disclosures*, 16-gj-1 (D.D.C. 2016) (184 notices); *In re Grand Jury Disclosures*, 17-gj-1 (D.D.C. 2017)
(83 notices); *In re Grand Jury Disclosures*, 18-gj-1 (D.D.C. 2018) (244 notices); *In re Grand Jury Disclosures*, 19-
gj-1 (D.D.C. 2019) (272 notices). This number undercounts the actual number of disclosures, given that a single
notice often advises that grand jury information has been shared with multiple persons and entities.  Among these

*Barr*, 920 F.3d 842 (D.C. Cir. 2019), *reh'g denied*, Order, No. 17-5149 (D.C. Cir. July 22, 2019),

*docketing petition for cert.*, No. 19-307 (U.S. Sept. 5, 2019), that the "text of the Rule" prevents

disclosure of a "'matter appearing [sic] before the grand jury'" "'unless these rules provide

otherwise.'" *Id.* at 848 (quoting incorrectly FED. R. CRIM. P. 6(e)(2)(B)).[13]  In the D.C. Circuit's

binding view, "deviations from the detailed list of exceptions in Rule 6(e) are not permitted," *id.*

at 846, and thus a "district court has no authority outside Rule 6(e) to disclose grand jury

matter," *id*. at 850.[14]

## III.   DISCUSSION

HJC is "not requesting the entire grand jury record" of the Special Counsel's

investigation.  HJC Reply at 24.[15]  Instead, HJC seeks only disclosure of the grand jury

---

notices were sixteen instances when grand jury information was revealed to foreign governments.  DOJ has represented that "[n]o grand jury information collected from the Mueller investigation and protected from disclosure was shared with any foreign government pursuant to Rule 6(e)(3)(D)."  DOJ's Supplemental Submission in Resp. to Min. Ord. of Oct. 8, 2019 ("DOJ Second Supp.") at 2, ECF No. 40.

[13]      The D.C. Circuit's narrow textual reading of Rule 6(e) is based on the subsection in the Rule that secrecy is required "[u]nless *these rules* provide otherwise."  FED. R. CRIM. P. 6(e)(2)(B) (emphasis added).  Yet, this subsection is difficult to reconcile with other statutory authorities that either require or permit disclosure of grand jury matter in civil forfeiture, financial regulatory, special–grand jury, and criminal defense contexts.  *See, e.g.,* 18 U.S.C. § 3322(a) (allowing disclosure of grand jury information to "an attorney for the government . . . for use in connection with any civil forfeiture provision of federal law"); *id.* §§ 3322(a), (b)(1)(A) (authorizing disclosure of grand jury information to "an attorney for the government for use in enforcing section 951 of the Financial Institutions Reform, Recovery and Enforcement Act of 1989" and to federal and state financial institution regulatory agencies "for use in relation to any matter within the jurisdiction of such regulatory agency" when the relevant grand jury was investigating "a banking law violation"); *id.* §§ 3333(a), (b) (permitting special grand juries to provide reports that the impaneling court may make public); *id.* §§ 3500(b), (e)(3) (requiring disclosure to criminal defendant of certain grand jury testimony of trial witnesses).

[14]      The D.C. Circuit in *McKeever* rejected the view articulated by this Court and several Circuit Courts of Appeals that courts have inherent authority to disclose grand jury material. *See, e.g., In re Application to Unseal Dockets Related to the Independent Counsel's 1998 Investigation of President Clinton*, 308 F. Supp. 3d 314, 324 (D.D.C. 2018) (Howell, C.J.), *appeal docketed*, No. 18-5142 (D.C. Cir. May 17, 2018); *In re Petition of Kutler*, 800 F. Supp. 2d 42, 47 (D.D.C. 2011) (Lamberth, C.J.); *see also Carlson v. United States*, 837 F.3d 753, 766–67 (7th Cir. 2016); *In re Craig*, 131 F.3d  99, 103 (2d Cir. 1997); *Pitch v. United States*, 915 F.3d 704, 707 (11th Cir. 2019), *rehearing en banc ordered and opinion vacated*, 925 F.3d 1224 (11th Cir. 2019).  HJC acknowledges, conceding that "*McKeever* currently forecloses the Committee from prevailing before this Court on [an inherent-authority] argument," but nonetheless raises inherent authority as a basis for disclosure to "preserve[] its argument" "[i]n the event *McKeever* is subject to further review."  HJC App. at 40.

[15]      The entire grand jury record would be extensive since the Special Counsel's investigation involved the execution of "nearly 500 search-and-seizure warrants," issuance of "more than 230 orders for communications records under 18 U.S.C. § 2703(d)," "almost 50 orders authorizing use of pen registers," "13 requests to foreign governments pursuant to Mutual Legal Assistance Treaties," and "more than 2,800 subpoenas under the auspices of

information referenced in or underlying the Mueller Report as well as grand jury information

collected by the Special Counsel relating to four categories of information pursuant to Rule

6(e)'s exception for disclosure "preliminarily to or in connection with a judicial proceeding."

HJC App. at 26 (internal quotation marks omitted) (quoting FED. R. CRIM. P. 6(e)(3)(E)(i)).

Disclosure of grand jury information is proper under this exception when three requirements are

satisfied.  The person seeking disclosure must first identify a relevant "judicial proceeding"

within the meaning of Rule 6(e)(3)(E)(i); then, second, establish that the requested disclosure is

"preliminarily to" or "in connection with" that proceeding; and, finally, show a "particularized

need" for the requested grand jury materials.  *See United States v. Sells Eng'g, Inc.*, 463 U.S.

418, 443 (1983) ("Rule 6(e)(3)([E])(i) simply authorizes a court to order disclosure

'preliminarily to or in connection with a judicial proceeding.' . . . We have consistently

construed the Rule, however, to require a strong showing of particularized need for grand jury

materials before any disclosure will be permitted."); *United States v. Baggot*, 463 U.S. 476, 480

(1983) (explaining that the "preliminarily to or in connection with a judicial proceeding" and the

"particularized need" requirements "are independent prerequisites to ([E])(i) disclosure" (internal

quotation marks omitted)).

As discussed more fully below, HJC has identified the requisite "judicial proceeding" to

be a possible Senate impeachment trial, which is an exercise of judicial power the Constitution

assigned to the Senate.  *See* U.S. CONST. art. I, § 3, cl. 6.  HJC has demonstrated that its current

investigation is "preliminarily to" a Senate impeachment trial, as measured—per binding

Supreme Court and D.C. Circuit precedent—by the "primary purpose" of HJC's requested

disclosure to determine whether to recommend articles of impeachment against the President.

---

a grand jury sitting in the District of Columbia," and interviews of "approximately 500 witnesses," "almost 80" of
whom "testified before a grand jury."  Mueller Report at I-13.

This purpose has only been confirmed by developments occurring since HJC initially submitted its application.  Finally, HJC has further shown a "particularized need" for the requested grand jury materials that outweighs any interest in continued secrecy.  *See Douglas Oil Co. of Ca. v. Petrol Stops Nw.*, 441 U.S. 211, 222–23 (1979).  The need for continued secrecy is reduced, given that the Special Counsel's grand jury investigation has ended, and is easily outweighed by HJC's compelling need for the grand jury material referenced and cited in the Mueller Report to conduct a fulsome inquiry, based on all relevant facts, into potentially impeachable conduct by the President.

The three requirements for disclosure under Rule 6(e)(3)(E)(i) are addressed *seriatim.*

### A.      Rule 6(e)'s "Judicial Proceeding" Requirement is Satisfied Because an Impeachment Trial is Such a Proceeding

HJC posits that an impeachment trial before the Senate is a "judicial proceeding," and that Rule 6(e)'s "judicial proceeding" requirement is thus satisfied.  HJC App. at 28.[16]  DOJ, for its part, rejects the proposition that any congressional proceeding may qualify as a "judicial proceeding."  DOJ Resp. at 13 ("The plain meaning of 'judicial proceeding' does not include congressional proceedings.") (capitalization altered). This dispute thus presents the threshold issue of whether an impeachment trial in the Senate is a "judicial proceeding" under Rule 6(e). Consideration of this issue requires an understanding of (1) what the drafters of Rule 6(e) meant

---

[16]      An impeachment inquiry in the House may itself constitute a judicial proceeding.  *See, e.g.*, *Marshall v. Gordon*, 243 U.S. 521, 547 (1917) (characterizing instances when a "committee contemplat[es] impeachment" as times that congressional power is "transformed into judicial authority"); *Kilbourn v. Thompson*, 103 U.S. (13 Otto) 168, 191 (1880) (explaining that the House "exercises the judicial power . . . of preferring articles of impeachment"); *Trump v. Mazars USA, LLP*, No. 19-5142, 2019 WL 5089748, at *27 (D.C. Cir. Oct. 11, 2019) (Rao, J., dissenting) (explaining that the House's "power to investigate pursuant to impeachment . . . has always been understood as a limited judicial power").  HJC's primary contention, however, is not that a House impeachment inquiry is a judicial proceeding, but that HJC's current inquiry satisfies Rule 6(e) because that inquiry is "'preliminar[y] to' an impeachment trial."  HJC App. at 29 (alteration in original).  As explained *infra* in Part III.B., HJC's "preliminarily to" argument succeeds, and, consequently, whether a House impeachment inquiry constitutes a "judicial proceeding" within the meaning of Rule 6(e) need not be addressed.

by "judicial proceeding," and (2) the precise nature of an impeachment trial.  Both considerations

are informed by history and, contrary to DOJ's position, point to the same conclusion: an

impeachment trial is, in fact, a "judicial proceeding" under Rule 6(e), as binding D.C. Circuit

precedent correctly dictates.

### 1. The Term "Judicial Proceeding" in Rule 6(e) Has a Broad Meaning

In the Rule 6(e) context, "[t]he term judicial proceeding has been given a broad

interpretation by the courts." *In re Sealed Motion*, 880 F.2d 1367, 1379 (D.C. Cir. 1989) (per

curiam).  The D.C. Circuit has indicated that "judicial proceeding" might "include[] every

proceeding of a judicial nature before a competent court or before a tribunal or officer clothed

with judicial or quasi judicial powers." *Id.* at 1380 (quoting *Jones v. City of Greensboro*, 277

S.E.2d 562, 571 (N.C. 1981), *overruled in part on other grounds by Fowler v. Valencourt*, 435

S.E.2d 530 (N.C. 1993)); *see also In re North*, 16 F.3d 1234, 1244 (D.C. Cir. 1994) (quoting *In

re Sealed Motion*, 880 F.2d at 1380)); *Haldeman v. Sirica*, 501 F.2d 714, 717 (D.C. Cir. 1974)

(en banc) (MacKinnon, J, concurring in part and dissenting in part) (describing Rule 6(e) judicial

proceeding as one "in which due process of law will be available"); *In re Grand Jury

Investigation of Uranium Indus.* (*In re Uranium Grand Jury*), No. 78-mc-0173, 1979 WL 1661,

at *6 (D.D.C. Aug. 21, 1979) (Bryant, C.J.) (noting that the "judicial proceeding" exception

authorizes disclosure of grand jury materials to a "wide variety of official bodies").[17]

---

[17]     DOJ relies on the definition first articulated by Judge Learned Hand in *Doe v. Rosenberry*, 255 F.2d 118
(2d Cir. 1958).  *See* DOJ Resp. at 14–15.  That definition provides: "[T]he term 'judicial proceeding' includes any
proceeding determinable by a court, having for its object the compliance of any person, subject to judicial control,
with standards imposed upon his conduct in the public interest, even though such compliance is enforced without the
procedure applicable to the punishment of crime."  *Doe*, 255 F.2d at 120. DOJ's reliance on this definition is
puzzling since courts—including the D.C. Circuit—have consistently recognized that Judge Hand gave "judicial
proceeding" "a broad interpretation," *In re Sealed Motion*, 880 F.2d at 1379, and judges of this Court have already
twice recognized that Judge Hand's definition encompasses an impeachment trial, *see In re Report &
Recommendation of June 5, 1972 Grand Jury*, 370 F. Supp. 1219, 1228–30 (D.D.C. 1974) (citing *Doe*); *In re
Uranium Grand Jury*, 1979 WL 1661, at *5–7 (citing *Doe*) (explaining that a Senate impeachment trial "presided
over by the Chief Justice of the United States" is "very much a judicial proceeding," *id.* at *7).

In keeping with the term's "broad meaning," disclosure of grand jury materials has been judicially authorized under the "judicial proceeding" exception in an array of judicial and quasi-judicial contexts.  Courts, for instance, have determined that attorney disciplinary proceedings are "judicial proceedings" because such a proceeding is "designed in the public interest to preserve the good name and uprightness of the bar, made up, as it is, of attorneys who are public officers."  *Doe v. Rosenberry*, 255 F.2d 118, 120 (2d Cir. 1958); *see also, e.g.*, *In re J. Ray McDermott & Co.*, 622 F.2d 166, 170 (5th Cir. 1980).  Similarly, courts have permitted disclosure in connection with internal police disciplinary proceedings under the "judicial proceeding" exception.  *See, e.g.*, *In re Bullock*, 103 F. Supp. 639, 641, 643 (D.D.C. 1952).  The D.C. Circuit's decisions are in accord.  The Circuit has held that the following proceedings are eligible for disclosure under Rule 6(e): (1) "disciplinary proceedings of lawyers" conducted by "bar committees," *United States v. Bates*, 627 F.2d 349, 351 (D.C. Cir. 1980) (per curiam), (2) grand jury investigations themselves, *In re Grand Jury*, 490 F.3d 978, 986 (D.C. Cir. 2007) (per curiam), and (3) proceedings pursuant to the now-expired Independent Counsel Act, 28 U.S.C. § 591 *et seq.* (1987), to determine what portions of an independent counsel report are appropriate for release, *see, e.g.*, *In re Sealed Motion*, 880 F.2d at 1380.  Additionally, the D.C. Circuit has even indicated that parole hearings might qualify.  *See In re Sealed Motion*, 880 F.2d at 1380 n.16 (citing *United States v. Shillitani*, 345 F.2d 290, 293 (2d Cir. 1965), *vacated on other grounds*, 384 U.S. 364 (1966)).

As these examples illustrate, the term "judicial proceeding" in Rule 6(e) does not refer exclusively to proceedings overseen by courts exercising the "judicial Power of the United States" referred to in Article III of the Constitution.  U.S. Const. art. III, § 1.  Plainly, proceedings in state courts are "judicial proceedings" eligible for disclosure of grand jury

information.  *See, e.g., United States v. Colonial Chevrolet Corp.*, 629 F.2d 943, 947 & n.9 (4th

Cir. 1980) (noting that the court "may authorize disclosure under the circumstances detailed in

Rule 6(e)(3); in fact it has done so in many cases in support of proceedings in both federal and

state judicial, and even in state administrative, proceedings") (citing *Doe*, 255 F.2d 118; *In re*

*Disclosure of Testimony, Etc.*, 580 F.2d 281 (8th Cir. 1978) (authorizing disclosure of federal

grand jury material to municipality investigating judicial misconduct); *In re 1979 Grand Jury*

*Proceedings*, 479 F. Supp. 93 (E.D.N.Y. 1979) (authorizing disclosure of federal grand jury

material regarding obstruction by municipal employees to municipality)); *In re Petition for*

*Disclosure of Evidence Before Oct., 1959 Grand Jury*, 184 F. Supp. 38, 41 (E.D. Va. 1960)

(citing *Doe*, 255 F.2d 118) ("We cannot agree with the United States that this phrase refers only

to a Federal proceeding.").

Moreover, at the federal level, "the judicial power of the United States is not limited to

the judicial power defined under Article III."  *Freytag v. Comm'r of Internal Revenue*, 501 U.S.

868, 889 (1991) (citing *Am. Ins. Co. v. Canter*, 26 U.S. (1 Pet.) 511, 546 (1828)).  The United

States Tax Court, for example, "is not a part of the Article III Judicial Branch," and "its judges

do not exercise the 'judicial Power of the United States' under Article III," *Kuretski v. Comm'r*

*of Internal Revenue*, 755 F.3d 929, 940 (D.C. Cir. 2014).  Nevertheless, the Tax Court "exercises

a portion of the judicial power of the United States," *Freytag*, 501 U.S. at 891, and that judicial

power has, in turn, been deemed sufficient to make Tax Court proceedings "judicial

proceedings" under Rule 6(e), *see In re Grand Jury Subpoenas Duces Tecum*, 904 F.2d 466, 468

(8th Cir. 1990) ("[T]he tax court redetermination hearing satisfies the judicial proceeding

requirement."); *Patton v. Comm'r of Internal Revenue*, 799 F.2d 166, 172 (5th Cir. 1986)

("Clearly a tax court petition for redetermination is a 'judicial proceeding' within the meaning of

24

Rule 6(e)(3)([E])(i).”); *United States v. Anderson*, No. 05-cr-0066, 2008 WL 1744705, at *2

(D.D.C. Apr. 16, 2008) (ordering that grand jury materials be shared pursuant to Rule

6(e)(e)(E)(i) in connection with a “law suit . . . pending before the United States Tax Court”); *see*

*also, e.g.*, *In re Grand Jury Proceedings*, 62 F.3d 1175, 1180 (9th Cir. 1995) (indicating that

disclosure in connection with tax court litigation would be permissible under Rule 6(e) “upon an

adequate showing” of need).[18]   Accordingly, while judicial power of some kind may be

necessary to make a proceeding “judicial” under Rule 6(e), the exercise of *Article III* judicial

power is not required.

Notwithstanding the weight of these precedents, DOJ maintains that an impeachment trial

cannot be a “judicial proceeding” under Rule 6(e) because the plain and ordinary meaning of the

term refers to “legal proceedings governed by law that take place in a judicial forum before a

judge or a magistrate.”  DOJ Resp. at 2; *see also id.* at 13 (“By its plain terms, the phrase

‘judicial proceeding’ means a matter that transpires in court before a neutral judge according to

generalized legal rules.”).[19]   This plain-meaning argument ignores the broad interpretation given

to the term “judicial proceeding” as used in Rule 6(e), s*ee, e.g., In re Sealed Motion*, 880 F.2d at

---

[18]      Even the Supreme Court, in *Baggot*, recognized that Tax Court proceedings are “judicial proceedings” under Rule 6(e).  Although purporting not to address “the knotty question of what, if any, sorts of proceedings other than garden-variety civil actions or criminal prosecutions might qualify as judicial proceedings under ([E])(i),” 463 U.S. at 479 n.2, the Court advised that the Seventh Circuit “correctly held” that “the IRS may seek ([E])(i) disclosure” when a “taxpayer ha[s] clearly expressed its intention to seek redetermination of [a claimed tax] deficiency in the Tax Court” and “the Government’s primary purpose is . . . to defend the Tax Court litigation,” *id.* at 483.

[19]      DOJ also cites to the use of “judicial proceeding” in two other subsections of Rule 6(e)—(e)(3)(F) and (e)(3)(G)—as generally referring to court proceedings, DOJ Resp. at 17, but this argument relies on one of the least probative statutory-interpretation presumptions.  Although “[o]ne ordinarily assumes ‘that identical words used in different parts of the same act are intended to have the same meaning,’” “the presumption of consistent usage ‘readily yields’ to context, and a statutory term . . . ‘may take on distinct characters from association with distinct statutory objects calling for different implementation strategies.’” *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 319–20 (2014) (internal quotation marks omitted) (quoting *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007)).  Moreover, as HJC explains, subsection (e)(3)(F) may in fact cover a Senate impeachment trial, and as to subsection (e)(3)(G), significant textual differences distinguish this subsection from (e)(3)(E)(i).  *See* HJC Reply at 12–13.  In any event, historical practice and binding precedent guide the proper construction of Rule 6(e)(3)(E)(i), no matter the use of the term “judicial proceeding” in other parts of the criminal procedure rules.

1379, and fails to grapple with the judicial nature of an impeachment trial, *see infra* Part III.A.2. In any event, applying DOJ's plain-meaning construction and imposing a requirement that a "judge" preside to qualify as a "judicial proceeding" would not remove an impeachment trial from Rule 6(e)'s ambit since the Chief Justice of the Supreme Court presides over any Senate impeachment trial of the President.  U.S. CONST. art. I, § 3, cl. 6.[20]  DOJ dismisses the Chief Justice's role in impeachment trials as "purely administrative, akin to a Parliamentarian," whose decisions can be overridden by a vote of the Senate.  DOJ Resp. at 16.  Even if true up to a point, the fact remains that the Senate may grant the Chief Justice as significant a role as it sees fit.

In sum, "judicial proceeding," as used in Rule 6(e), is a term with a broad meaning that includes far more than just the prototypical judicial proceeding before an Article III judge.

### 2.      An Impeachment Trial is Judicial in Nature

DOJ flatly states that no congressional proceeding can constitute a Rule 6(e) "judicial proceeding" because "[t]he Constitution carefully separates congressional impeachment proceedings from criminal judicial proceedings."  DOJ Resp. at 15.  This stance, in service of the obvious goal of blocking Congress from accessing grand jury material for any purpose, overlooks that an impeachment trial is an exercise of judicial power provided outside Article III and delegated to Congress in Article I.[21]  Contrary to DOJ's position—and as historical practice, the Federalist Papers, the text of the Constitution, and Supreme Court precedent all make clear— impeachment trials are judicial in nature and constitute judicial proceedings.

---

[20]      DOJ observes that impeachment trials of officials other than the President are presided over by "the Vice President or whichever Senator is presiding at that time," rather than by the Chief Justice.  DOJ Resp. at 16.  This constitutional quirk is irrelevant here since the instant petition concerns the possible impeachment of the President.
[21]      Although Representative Collins, like DOJ, supports denial of HJC's application, he "agrees with [HJC] that an impeachment inquiry . . . fall[s] under Federal Rule of Criminal Procedure 6(e)'s judicial proceeding exception because" an impeachment inquiry is "preliminary to a trial in the U.S. Senate."  Collins Mem. at 1.

"The institution of impeachment is essentially a growth deep rooted in the ashes of the past." Wrisley Brown, *The Impeachment of the Federal Judiciary*, 26 HARV. L. REV. 684, 685 (1913). It was "born of the parliamentary usage of England," *id.*, where "the barons reserved to Parliament the right of finally reviewing the judgments' [sic] of all the other courts of judicature." *Id.* "[T]he assembled parliament . . . represent[ed] in that respect the judicial authority of the king," and "[w]hile this body enacted laws, it also rendered judgments in matters of private right." *Kilbourn v. Thompson*, 103 U.S. (13 Otto) 168, 183 (1880); *see also* Brown, *supra*, at 685. (explaining that "the Parliament [was] the high court of the realm in fact as well as in name"). "Upon the separation of the Lords and Commons into two separate bodies . . . called the House of Lords and the House of Commons, the judicial function of reviewing by appeal the decisions of the courts of Westminster Hall passed to the House of Lords." *Kilbourn*, 103 U.S. (13 Otto) at 183–84. "To the Commons," however, "was left the power of impeachment, and, perhaps, others of a judicial character." *Id.* at 184. "And during the memorable epoch preluding the dawn of American independence," the English practice of impeachment, "though seldom put into application, was still in the flower of its usefulness." Brown, *supra*, at 687.

During the drafting of the Constitution, this English history informed how the Framers approached impeachment, and examination of pertinent Federalist Papers confirms that they viewed the impeachment power as judicial. *See* THE FEDERALIST NO. 65, at 397 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (explaining that impeachment in the United States was "borrowed" from the "model" "[i]n Great Britain"). Alexander Hamilton's writings in Federalist Nos. 65 and 66 are illustrative. The preceding Federalist Nos. 62, 63, and 64 had discussed most of the powers that the new Constitution granted to the Senate. *See* THE FEDERALIST NOS. 62–63

(probably James Madison), No. 64 (John Jay).  The only "remaining powers" to be discussed were those "comprised in [the Senate's] participation with the executive in the appointment to offices, and in [the Senate's] judicial character," and Hamilton accordingly used Federalist Nos. 65 and 66 to "conclude" the discussion of the Senate "with a view of the judicial character of the Senate" "as a court for the trial of impeachments."  The Federalist No. 65, *supra*, at 396 (Alexander Hamilton).

As Hamilton's thinking on the subject of impeachment demonstrates, his choice of the words "judicial" and "court for the trial of impeachments" was purposeful.  *See Nixon v. United States*, 938 F.2d 239, 260 (D.C. Cir. 1991) (Randolph, J., concurring) ("The inference that the framers intended impeachment trials to be roughly akin to criminal trials is reinforced by seemingly unrefuted statements made by Alexander Hamilton during the ratification debates."), *aff'd*, 506 U.S. 224 (1993).[22]  For instance, Hamilton described the appointment of officers— which is an executive function—and impeachment, as powers given to the Senate "in a distinct capacity" from all of the Senate's other powers.  The Federalist No. 65, *supra*, at 396.  By citing those two powers in particular and separating them from all others bestowed on the Senate, he thus conveyed that those powers were, unlike those that came before, *not* legislative.  Additionally, when Hamilton considered potential alternative "tribunal[s]," *id.* at 398, that might be granted the power of trying impeachments, he considered the primary alternatives to be

---

[22]    Indeed, Hamilton's discussion of the Senate's impeachment power in Federalist Nos. 65 and 66, uses such judicial terms repeatedly and consistently.  Hamilton referred to the "court," the "court of impeachments," and the "court for the trial of impeachments" a total of *seventeen* times.  The Federalist Nos. 65–66, *supra*, at 396–407 (Alexander Hamilton).  Moreover, when referring to impeachment, Hamilton also used the following additional terms associated with the judicial nature of the proceeding: "jurisdiction" once; "offense(s)" or "offender" five times; "prosecution" or "prosecutors" three times; "accused," "accusers," "accusation," or "accusing" nine times; "case(s)" five times; "decision," "decide," or "deciding" eight times; "innocence" or "innocent" three times; "guilt" or "guilty" five times; "inquest," "inquisitors," or "inquiry" four times; "tribunal" twice; "judges" or "judging" ten times; "sentence" or "sentenced," including "sentence of the law," five times; "party" once; "punishment" or "punish" seven times; "conviction" once; "trial" or "try" four times, not counting instances of "courts for the trial of impeachments"; "verdict(s)" twice; "liable" once; and "charges" once.  *Id.*

assignment of the power directly to the Supreme Court alone, *id.*, or assignment to the "Supreme

Court with the Senate," *id.* at 399*,* underscoring the judicial nature of the impeachment-trial

power.

Most importantly, when Hamilton addressed the objection that making the Senate the

"court of impeachments" "confound[ed] legislative and judiciary authorities in the same body,"

he *accepted* the premise that granting the Senate the power to try impeachments produced an

"intermixture" of "legislative and judiciary authorities."  THE FEDERALIST NO. 66, *supra*, at 401;

*see also* THE FEDERALIST NO. 81, *supra*, at 482 (Alexander Hamilton) (noting that there are

"men who object to the Senate as a court of impeachments, on the ground of an improper

intermixture of powers").  Such "partial intermixture," he argued, is "not only proper but

necessary to the mutual defense of the several members of the government against each other."

THE FEDERALIST NO. 66, *supra*, at 401–02.  He pointed out that many states at the time combined

legislative and judicial functions: the New York constitution made the New York Senate,

"together with the chancellor and judges of the Supreme Court, not only a court of

impeachments, but the highest judicatory in the State, in all causes, civil and criminal," *id.* at

402; in New Jersey, "the final judiciary authority [was] in a branch of the legislature," *id.* at

402 n.*; and "[i]n New Hampshire, Massachusetts, Pennsylvania, and South Carolina, one

branch of the legislature [was] the court for the trial of impeachments," *id.*  These Federalist

Papers leave no doubt that the power to try impeachments was, in Hamilton's view, inherently

judicial.  *See Nixon*, 938 F.2d at 261 (Randolph, J., concurring) ("From all of [Hamilton's]

statements, it can be reasonably inferred that the framers intended that the Senate would

approach its duty of trying impeachments with the solemnity and impartiality befitting judicial

action . . . .").

Hamilton was not the only Founder who conceived of the impeachment power as inherently judicial.  Notably, James Madison shared Hamilton's view.  In Federalist No. 38, Madison, like Hamilton, noted that a principle objection to the Constitution was "the trial of impeachments by the Senate, . . . when this power so evidently belonged to the judiciary department."  THE FEDERALIST NO. 38, *supra*, at 236 (James Madison).  Then, in Federalist No. 47, Madison defended this mixing of powers.  In the British system, Madison pointed out, "the legislative, executive, and judiciary departments are by no means totally separate and distinct from each other" because, *inter alia*, "[o]ne branch of the legislative department . . . is the sole depositary of judicial power in cases of impeachment."  THE FEDERALIST NO. 47, *supra*, at 302 (James Madison) (spelling irregularity in original).  Such mixing, he pointed out, occurred in the states as well, such as in New Hampshire, where "[t]he Senate, which is a branch of the legislative department, is also a judicial tribunal for the trial of impeachments," and in Massachusetts, where "the Senate, which is a part of the legislature, is a court of impeachment," notwithstanding a declaration in the state's constitution "'that the legislative department shall never exercise the . . . judicial powers.'"  *Id.* at 304–05 (citing also to the "court for the trial of impeachments" in New York "consist[ing] of one branch of the legislature and the principal members of the judiciary department," *id.* at 305, and to the "court of impeachments" in Delaware, "form[ed]" by "one branch of the [legislative department]," *id.* at 306)).

Hamilton and Madison's view is confirmed by the text of the Constitution.  By making the Senate the "court of impeachments," *id.* at 306; THE FEDERALIST NO. 65, *supra*, at 398 (Alexander Hamilton), the Framers tasked the Senate with a judicial assignment.  Article I uses judicial terms to refer to impeachment trials in three separate instances in the sixth clause of its third section, stating that the Senate is granted "the sole Power to *try* all Impeachments"; "[w]hen

the President of the United States is *tried*, the Chief Justice shall preside"; "[a]nd no person shall be *convicted* without the Concurrence of two thirds of the Members present." U.S. CONST. art. I, § 3, cl. 6 (emphases added). The next clause continues the theme: "*Judgment* in *Cases* of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office . . . : but the Party *convicted* shall nevertheless be liable and subject to [criminal prosecution]." *Id.* cl. 7 (emphases added). Article II, meanwhile, prevents the President's power to pardon from extending to "*Cases* of Impeachment," *id.* art. II, § 2, cl. 1 (emphasis added), and allows for removal of the President "on Impeachment for, and *Conviction* of, Treason, Bribery, or other high *Crimes* and *Misdemeanors*." *Id.* § 4 (emphases added). Finally, even Article III—despite being the article devoted to the "judicial" branch—reveals that when it comes to impeachment, the Senate takes on a judicial character, for Article III requires that "[t]he *Trial* of all *Crimes*, except in *Cases* of Impeachment, shall be by Jury." *Id.* art. III, § 2, cl. 3 (emphases added).

These words employed in the Constitution to describe the Senate's role—"trial," "convict," "judgment," "case," "crime," and "misdemeanor"—are inherently judicial. Any layperson asked whether a constitutionally prescribed "trial" of a "case" in order to reach a "judgment" as to whether a person should be "convicted" of a "crime" or "misdemeanor," is judicial in character, would invariably answer yes—and rightly so. *Cf. Mazars*, 2019 WL 5089748, at *32 (Rao, J., dissenting) ("Article I makes clear that in this [impeachment] role, the Senate acts as a court trying impeachable offenses and renders judgment . . . ."); *id.* at *50 ("Senate trials of impeachment are an exercise of judicial power . . . .").

Black's Law Dictionary confirms this intuition. "Trial" means "[a] formal judicial examination of evidence and determination of legal claims in an adversary proceeding." *Trial*,

BLACK'S LAW DICTIONARY (11th ed. 2019) [hereinafter BLACK'S].  "Convict" means "[t]o prove or officially announce (a criminal defendant) to be guilty of a crime after proceedings in a law court; specif., to find (a person) guilty of a criminal offense upon a criminal trial, a plea of guilty, or a plea of nolo contendere (no contest)."  *Convict*, BLACK'S.  "Judgment" can mean either "mental faculty" or "[a] court's final determination of the rights and obligations of the parties in a case" (or, in English law, "[a]n opinion delivered by a member of the appellate committee of the House of Lords; a Law Lord's judicial opinion"), *Judgment*, BLACK'S—and in the context of other words like "trial" and "convict," the *noscitur a sociis* canon counsels against adopting the first definition, *see Yates v. United States*, 135 S. Ct. 1074, 1085 (2015) (plurality) (explaining that *noscitur a sociis* means that "a word is known by the company it keeps").  "Case" means, as relevant here, "[a] civil or criminal proceeding, action, suit, or controversy at law or in equity" or "[a]n instance, occurrence, or situation"—again, *noscitur a sociis* pushes strongly in favor of relying on the first definition here.  Finally, "crime" means "[a]n act that the law makes punishable; the breach of a legal duty treated as the subject-matter of a criminal proceeding," *Crime*, BLACK'S, and "misdemeanor" means "[a] crime that is less serious than a felony and is usu. punishable by fine, penalty, forfeiture, or confinement (usu. for a brief term) in a place other than prison (such as a county jail)."  *Misdemeanor*, BLACK'S.[23]  As these dictionary definitions demonstrate, at every turn the Constitution uses words that mark the judicial nature of the Senate's power to try impeachments.

Not surprisingly, therefore, the Supreme Court has confirmed, on at least three separate occasions, that the Senate's power to try impeachments is judicial.  First, in *Hayburn's Case*, 2

---

[23] The variation "high crime" similarly means "[a] crime that is very serious, though not necessarily a felony," *Crime*, BLACK'S, and "high misdemeanor" historically meant in English law "[a] crime that ranked just below treason in seriousness," *Misdemeanor*, BLACK'S.

U.S. (2 Dall.) 408 (1792), the Court quoted a letter from "[t]he circuit court for the district of North Carolina (consisting of Iredell, Justice, and Sitgreaves, District Judge)" observing that "no judicial power of any kind appears to be vested [in the legislature], but the important one relative to impeachments." *Id.* at 410 n.* (capitalization altered).  Second, in *Kilbourn*, the Court explained that "[t]he Senate . . . exercises the judicial power of trying impeachments."  103 U.S. (13 Otto) at 191.  Third, in *Marshall v. Gordon*, 243 U.S. 521 (1917), the Court noted that congressional contempt power can be "transformed into judicial authority" when a "committee contemplat[es] impeachment."  *Id.* at 547.

As the foregoing demonstrates, impeachment trials are judicial in nature, notwithstanding the Founders' decision to make the Senate the "court of impeachments."  As Chief Justice Rehnquist stated, in considering a Senator's objection to House Managers' "referring to the Senate sitting as triers in a trial of the impeachment of the President of the United States," 145 Cong. Rec. S279 (statement of Sen. Harkin), "the objection . . . is well taken, that the Senate is not simply a jury; it is a court in this case," *id.* (statement of Chief Justice Rehnquist). "Therefore," Chief Justice Rehnquist continued, "counsel should refrain from referring to the Senators as jurors."  *Id.*  The views of the Senators participating in the last impeachment trial of a sitting President confirm their understanding of their judicial role.  *See id.* at S1584 (statement of Sen. Leahy) (noting that when "Senate is the court," "Senators are not merely serving as petit jurors" but "have a greater role and a greater responsibility in this trial"); *id.* at S1599 (statement of Sen. Stevens) (noting that "an impeachment trial is no ordinary proceeding" and that Senators "sit as judge and jury—rulers on law and triers of fact"); *id.* at S1602 (statement of Sen. Lieberman) (noting that impeachment "is unique in that it is a hybrid of the legislative and the judicial, the political and the legal" (quoting *Senate Rules and Precedents Applicable to*

*Impeachment Trials: Executive Session Hearing Before the S. Comm. on Rules and Administration*, 93rd Cong. 193 (1974) (statement of Sen. Mansfield)); *id.* at S1618 (statement of Sen. Crapo) ("As each Senator took the oath to provide impartial justice, . . . [n]o longer was the Senate a legislative body, it was a court of impeachment.  A unique court, to be sure, not identical to traditional civil and criminal courts, but a court nonetheless.").

This further supports the conclusion that an impeachment trial constitutes "a judicial proceeding" under Rule 6(e)(3)(E)(i).[24]

### 3.   Historical Practice Before Enactment of Rule 6(e) Informs Interpretation of that Rule

Historical practice confirms that, contrary to DOJ's position, Rule 6(e) does not bar disclosure of grand jury information to Congress.  Indeed, grand jury investigations have prompted and informed congressional investigations, and Rule 6(e) was meant to codify this practice.

Several examples illustrate that Congress was afforded access to grand jury material prior to the enactment of Rule 6(e) in 1946.  In 1902, a House committee investigated allegations of election fraud in St. Louis, Missouri, based on "a report of a grand jury which sat in St. Louis"

---

[24]   This analysis disposes of DOJ's argument that an impeachment trial is not judicial in nature because impeachment proceedings "are political."  DOJ Resp. at 16.  While the House "has substantial discretion to define and pursue charges of impeachment," *Mazars*, 2019 WL 5089748, at *28 (Rao, J., dissenting), the Constitution nevertheless "limits the scope of impeachable offenses," *id.* at *50 (citing U.S. CONST. art. II, § 4); *see id.* at *32 ("[I]mpeachment addresses a public official's wrongdoing—treason, bribery, and high crimes or misdemeanors— while problems of general maladministration are left to the political process."); *see also* 3 Lewis Deschler, *Deschler's Precedents of the House of Representatives* Ch. 14 App'x [hereinafter Deschler] ("The impeachment of President Andrew Johnson . . . rested on allegations that he had exceeded the power of his office and had failed to respect the prerogatives of Congress.").  Thus Hamilton, for instance, viewed an impeachment trial's character as judicial even while he viewed impeachment offenses as "of a nature which may with peculiar propriety be denominated POLITICAL."  THE FEDERALIST No. 65 (emphasis in original).  Further, while Members of the U.S. Senate are politically accountable, this accountability merely ensures that Senators properly exercise their judicial power to try impeachments.  *See* MICHAEL J. GERHARDT, THE FEDERAL IMPEACHMENT PROCESS: A CONSTITUTIONAL AND HISTORICAL ANALYSIS 110 (1996) ("[M]embers of Congress seeking reelection have a political incentive to avoid any abuse of the impeachment power. . . . [T]he cumbersome nature of the impeachment process makes it difficult for a faction guided by base personal or partisan motives to impeach and remove someone from office.").

that a city police board in the district apparently had assisted with the election fraud.  2 Asher C.

Hinds, *Hinds' Precedents of the House of Representatives* Ch. 40 § 1123 [hereinafter Hinds].[25]

Twenty years later, in 1924, the Senate launched an investigation of a Senator who had been

indicted by a grand jury.  6 Cannon Ch. 188 § 399.  Seeking to ensure that the congressional

investigation had access to all information relevant to the allegations, the chairman of the

investigating committee "sen[t] a telegram to the presiding judge . . . asking for the minutes of

the grand jury proceedings, the names of the witnesses, and the documentary evidence which had

gone before the grand jury," and subsequently received what he requested.  *Id.* (indicating that

"reply to the telegram" helped the committee compile its list of witnesses, and that "[n]o

evidence [was] left out of the [Senate committee] hearings").

Again, in 1924, in response to a grand jury report from the Northern District of Illinois

implicating two unnamed Members of the House in a matter involving the payment of money,

the House directed the Attorney General to submit to it "the names of the two [Members] and the

nature of the charges made against them."  *Id.* § 402.  The Attorney General objected to the

request, but only insofar as the request would lead to "two tribunals attempting to act upon the

same facts and to hear the same witnesses at the same time," which would "result in confusion

and embarrassment and . . . defeat the ends of justice."  *Id.*  Accordingly, the Attorney General

---

[25]     Even earlier, in 1811, the House received a "copy of a presentment against [territorial judge] Harry
Toulmin, . . . made by the grand jury of Baldwin County, specifying charges against the said judge," which "set in
motion" a House "inquiry" "looking to the impeachment" of Judge Toulmin.  3 Hinds Ch. 79 § 2488.  Also, in 1921
a Senate committee confronted another allegation of election fraud, and because the committee's investigation post-
dated a grand jury inquiry, the Senate committee had access to "everything before the grand jury which was deemed
at all relevant," because the material had been introduced at trial to HJC.  6 Clarence Cannon, *Cannon's Precedents
of the House of Representatives* Ch. 159 § 74 [hereinafter Cannon].  In these instances, the grand jury information
was presumably no longer secret, but Chief Judge Sirica nevertheless deemed the 1811 Judge Toulmin "precedent"
to be "persuasive" when he ordered disclosure of the Watergate grand jury report.  *See In re Report &
Recommendation of June 6, 1972 Grand Jury* (*In re 1972 Grand Jury Report*), 370 F. Supp. 1219, 1230 (D.D.C.
1974) (Sirica, C.J.) ("If indeed [Rule 6(e)] merely codifies existing practice, there is convincing precedent to
demonstrate that common-law practice permits the disclosure here contemplated.").

assured the House that if, "acting within its constitutional power (under Article I) to punish its Members for disorderly behavior or to expel such Member, [the House] request[ed] that all the evidence now in the possession of anyone connected with the Department of Justice . . . be turned over to [it]," he would "direct all such evidence, statements, and information obtainable to be immediately turned over to [the House] or to such committee as may be designated by the House." *Id.*

In 1946, Rule 6(e) was enacted to codify current practice and not "to create new law." *In re 1972 Grand Jury Report*, 370 F. Supp. at 1229. As the Advisory Committee Notes explain, Rule 6(e) "continues the traditional practice of secrecy on the part of members of the grand jury, *except* when the court permits a disclosure." FED. R. CRIM. P. 6(e) advisory committee's note 1 (1944 adoption) (emphasis added); *see also, e.g.*, *Sells Eng'g, Inc.*, 463 U.S. at 425 (noting that Rule 6(e) "codifie[d] the traditional rule of grand jury secrecy"); *Haldeman*, 501 F.2d at 716 (MacKinnon, J, concurring in part and dissenting in part) (observing that Rule 6(e) "is a codification of long-standing decisions that hold to the 'indispensable secrecy of grand jury proceedings . . . except where there is a compelling necessity'") (omission in original) (quoting *United States v. Procter & Gamble Co.*, 356 U.S. 677, 683 (1958)).[26] The practice, albeit fairly rare, of sharing grand jury information with Congress at the time of Rule 6(e)'s enactment lends support to the conclusion that this rule, particularly the "judicial proceedings" exception, is correctly construed to include impeachment trials.

This conclusion is bolstered by the fact that these historical examples share a common thread: allegations of election fraud and punishment of Members of Congress. In these

---

[26]  "In the absence of a clear legislative mandate, the Advisory Committee Notes [to the Federal Rules of Criminal Procedure] provide a reliable source of insight into the meaning of a rule, especially when, as here, the rule was enacted precisely as the Advisory Committee proposed." *United States v. Vonn*, 535 U.S. 55, 64 n.6 (2002).

situations, as with cases of impeachment, Congress is acting more in a judicial rather than a legislative capacity.  As the Supreme Court explained in *Kilbourn*, when the House "punish[es] its own members and determin[es] their election," the House "partake[s]" in some "degree" of the "character" of a "court."  103 U.S. (13 Otto) at 189; *see also id.* at 190 ("Each House is by the Constitution made the *judge* of the election and qualification of its members.  In deciding on these it has an undoubted right to examine witnesses and inspect papers, subject to the usual rights of witnesses in such cases; and it may be that a witness would be subject to like punishment at the hands of the body engaged in *trying* a contested election, for refusing to testify, that he would if the *case* were pending before a *court of judicature*."  (emphases added)).  Further, the Supreme Court has stated that the Senate has "certain powers, which are not legislative, but judicial, in character," and that "[a]mong these is the power to judge of the elections, returns, and qualifications of its own members."  *Barry v. United States ex rel. Cunningham*, 279 U.S. 597, 613 (1929) (citing U.S. CONST. art. I, § 5, cl. 1).

**4.      Binding D.C. Circuit Precedent Forecloses Any Conclusion Other Than That an Impeachment Trial is a "Judicial Proceeding"**

The D.C. Circuit has already expressly concluded at least twice—in *Haldeman v. Sirica* and *McKeever v. Barr*—that an impeachment trial is a "judicial proceeding" under Rule 6(e), and these decisions bind this Court.  *See also In re Sealed Motion*, 880 F.2d at 1380 n.16 (quoting approvingly a District of Kansas decision noting that *Haldeman* decided "disclosure of grand jury material to [a] House Committee considering impeachment" was made preliminarily to or in connection with a judicial proceeding (quoting *United States v. Tager*, 506 F. Supp. 707, 719 (D. Kan. 1979)).

Forty-five years ago, Chief Judge John Joseph Sirica ordered that the Watergate grand jury's report on the President's conduct ("Watergate Roadmap") be sent to HJC, which was then

engaged in an impeachment-related investigation of President Richard Nixon.  *See In re 1972 Grand Jury Report*, 370 F. Supp. 1219.  In ordering that disclosure, Chief Judge Sirica confronted the same issue currently pending in this case: Is an impeachment trial a "judicial proceeding" within the meaning of Rule 6(e)?  *See id.* at 1227.  Chief Judge Sirica answered, emphatically, yes.  "[I]t should not be forgotten," he explained, "that we deal in a matter of the most critical moment to the Nation, an impeachment investigation involving the President of the United States."  *Id.* at 1230.  "Certainly Rule 6(e) [could not] be said to mandate" the withholding of such a report from HJC.  *Id.*

In *Haldeman v. Sirica*, the D.C. Circuit, sitting en banc, reviewed Chief Judge Sirica's decision.  Two defendants facing charges arising from the same grand jury investigation filed petitions for writs of prohibition or mandamus, asserting that the release of the grand jury's Watergate Roadmap to HJC would adversely affect their right to a fair trial.  *Haldeman*, 501 F.2d at 714–15.  Notably, by contrast to its position in the instant case, DOJ filed a memorandum before the D.C. Circuit supporting Chief Judge Sirica's decision to release the grand jury report to HJC.  *Id.* at 714.

The D.C. Circuit agreed with Chief Judge Sirica, DOJ, and the grand jury, and thus allowed the disclosure of grand jury materials to HJC to occur.  In so doing, the Circuit rejected the petitioners' argument that "the discretion ordinarily reposed in a trial court to make such disclosure of grand jury proceedings as he deems in the public interest is, by the terms of Rule 6(e) of the Federal Rules of Criminal Procedure, limited to circumstances incidental to judicial proceedings and that impeachment does not fall into that category."  *Id.* at 715.  The Circuit determined that Rule 6(e) presented no obstacle to the disclosure that Chief Judge Sirica had ordered: "Judge Sirica has dealt at length with this contention . . . in his filed opinion.  We are in

general agreement with his handling of these matters, and we feel no necessity to expand his discussion." *Id.*

One judge—Judge MacKinnon—wrote separately in *Haldeman,* agreeing that Rule 6(e)'s judicial proceeding exception authorized the disclosure. *See id.* at 717 (MacKinnon, J., concurring in part and dissenting in part). In fact, he pointed out that "[a]t oral argument the prosecutor represented that this disclosure of the grand jury material to the House Judiciary Committee and eventually possibly to the House and Senate is being made 'preliminarily to (and) in connection with a judicial proceeding,' and explained that his "concurrence in the release of the grand jury material ha[d] taken this representation into consideration." *Id.* (quoting FED. R. CRIM. P. 6(e)). For Judge MacKinnon, the problem with Chief Judge Sirica's decision was that it had not gone far *enough* in disclosing grand jury material to HJC. *See id.* at 716 ("I would . . . permit the House Judiciary Committee . . . to have access not only to the limited testimony accompanying the report and index but to the entire grand jury proceedings under supervision of the court . . . .").

*Haldeman* has stood the test of time. Earlier this year, in fact, the D.C. Circuit turned back to *Haldeman* in *McKeever*. The primary issue in *McKeever* was whether courts possess inherent authority to disclose grand jury materials, and the Circuit answered that question in the negative. 920 F.3d at 850. The *McKeever* dissent, though, argued that the majority's decision conflicted with *Haldeman*. On the dissent's reading, Chief Judge Sirica's decision had been an exercise of inherent authority, and *Haldeman*, in turn, "affirmed [Chief Judge Sirica's] understanding that a district court retains discretion to release grand jury materials outside the Rule 6(e) exceptions." *Id.* at 855 (Srinivasan, J., dissenting).[27] In response, the *McKeever*

---

[27] DOJ relies on a footnote from a prior decision of this Court, *see* DOJ Resp. at 14–15 (quoting *In re Application to Unseal Dockets Related to the Independent Counsel's 1998 Investigation of President Clinton*, 308 F.

majority acknowledged "ambigu[ity]" in *Haldeman*'s reasoning, but the majority opted to "read[] the case to cohere, rather than conflict, with the Supreme Court and D.C. Circuit precedents" that formed the basis for the *McKeever* holding.  *Id.* at 847 n.3 (majority opinion). Accordingly, the Circuit "read *Haldeman* as did Judge MacKinnon in his separate opinion concurring in part, as fitting within the Rule 6 exception for 'judicial proceedings.'"  *Id.*

Together, *Haldeman* and *McKeever* hold that an impeachment trial is a "judicial proceeding" under Rule 6(e), and these decisions bind this Court.  *See Save Our Cumberland Mountains, Inc. v. Hodel*, 826 F.2d 43, 54 (D.C. Cir. 1987) (Ginsburg, Ruth B., J., concurring) (explaining that D.C. Circuit law is binding "unless and until overturned by the court en banc or by Higher Authority"), *vacated in part on reh'g on other grounds*, 857 F.2d 1516 (D.C. Cir. 1988) (en banc).  These decisions alone require ruling in HJC's favor on the threshold requirement that an impeachment trial is a "judicial proceeding" within the meaning of Rule 6(e).  Indeed, in addition to Chief Judge Sirica and the *Haldeman* Court, *every* other court to have considered releasing grand jury material to Congress in connection with an impeachment investigation has authorized such disclosure.  *See* Order, *In Re: Grand Jury Investigation of U.S. Dist. Judge G. Thomas Porteous, Jr.*, No. 2:09-mc-04346-CVSG (E.D. La. Aug. 6, 2009), *summarily aff'd sub nom. In Re Grand Jury Proceeding*, No. 09-30737 (5th Cir. Nov. 12, 2009); *In re Grand Jury Proceedings of Grand Jury No. 81-1 (Miami)*, 669 F. Supp. 1072 (S.D. Fla. 1987), *aff'd sub nom. In re Request for Access to Grand Jury Materials (Hastings)*, 833 F.2d 1438 (11th Cir. 1987).[28]

---

Supp. 3d at 318 n.4), for a plain reading of the term "judicial proceeding" as precluding application to a congressional proceeding, but the cited decision read *Haldeman,* like Judge Srinivasan, as "allow[ing] for district court disclosures beyond Rule 6(e)'s exceptions," *Mckeever*, 920 F.3d at 853 (Srinivasan, J., dissenting).  The *Mckeever* panel majority read *Haldeman* differently to include impeachment proceedings within the "judicial proceeding" exception, and that reading now controls.

[28]      DOJ describes as "telling[]" that "rulemakers did not include the possibility that a congressional proceeding could constitute a judicial proceeding, even though" the 1983 amendments to Rule 6(e)(3)(E)(i) "post-dated

DOJ strains to distinguish *Haldeman* and *McKeever* with arguments that are simply unpersuasive. As to *Haldeman*, DOJ focuses on the procedural posture, claiming that "[t]he only issue decided in that case was whether the petitioners had shown that the district court's order was a 'clear abuse of discretion or usurpation of judicial power' from which the petitioners had a clear and indisputable right to relief," and thus "it is unsurprising that the D.C Circuit was able to deny the petition without engaging in any 'meaningful analysis of Rule 6(e)'s terms.'" DOJ Resp. at 3 (first quoting *Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 383 (1952); then quoting *McKeever*, 920 F.3d at 855 (Srinivasan, J., dissenting)); *see* Hr'g Tr. at 87:24–88:1 ("That page-and-a-half decision talked about the standard of review being the extraordinary writ of mandamus seven times in the opinion . . . ."). DOJ misreads *Haldeman*. When discussing Rule 6(e), the mandamus standard is not mentioned, although this standard comes up repeatedly in *other* parts of the opinion. Instead, after explaining that Chief Judge Sirica had "dealt at length" with whether an impeachment trial is a judicial proceeding, the *Haldeman* Court expressed "general agreement with his handling of these matters." 501 F.2d at 715. This "agreement" was so strong, in fact, that the *Haldeman* majority felt "no necessity to expand [Chief Judge Sirica's] discussion," *id.*, "thereby subscrib[ing] to Chief Judge Sirica's rationale for his disclosure order," *McKeever*, 920 F.3d at 854 (Srinivasan, J., dissenting) (describing *Haldeman* as having "ratified" Chief Judge Sirica's decision).[29] Notably, despite the affirming

---

*Haldeman*." DOJ Resp. at 18 n.12. If any inference can be gleaned from leaving the judicial proceeding exception unchanged, however, the correct inference is that Congress "adopted the earlier judicial construction of th[e] phrase," *Helsinn Healthcare S.A. v. Teva Pharm. USA, Inc.*, 139 S. Ct. 628, 633–34 (2019), namely: that disclosure of grand jury material to Congress for an impeachment investigation was already authorized by this exception.

[29]    DOJ characterizes the *Haldeman* majority's "general agreement" with Chief Judge Sirica's reasoning as indicating merely that the majority believed any error in Chief Judge Sirica's analysis did not merit reversal in light of the deferential standard of review, DOJ Resp. at 21 (internal quotation marks omitted) (quoting *Haldeman*, 501 F.2d at 715), but appellate courts are not coy about acknowledging when decisions turn on standards of review, *see, e.g.*, *Pallet Cos. v. NLRB*, 634 Fed. App'x 800, 801 (D.C. Cir. 2015) (per curiam) ("Particularly in light of our deferential standard of review, we have no basis to disturb that credibility judgment."); Judgment, *Giron v. McFadden*, 442 Fed. App'x 574, 575 (D.C. Cir. 2011) ("Particularly in light of the deferential standard of review,

language in *Haldeman*, DOJ has gone so far as to say here that Rule 6(e) did not in fact authorize

the disclosure of the grand jury's Watergate Roadmap, which Chief Judge Sirica ordered

disclosed to HJC during the impeachment investigation of President Nixon. *See* Hearing Tr. at

89:21–90:2.

DOJ also discounts *McKeever*'s analysis of *Haldeman* as mere dicta, contending that

*McKeever* "did not rule on the meaning of the term 'judicial proceeding,'" because "it was

undisputed that the historical grand jury information at issue fell entirely outside Rule 6(e)."

DOJ Resp. at 2. Again, DOJ is wrong. *McKeever*'s interpretation of *Haldeman* was "'reasoning

essential' to the Court's holding." *Apprendi v. New Jersey*, 530 U.S. 466, 488 n.14 (2000)

(quoting *id.* at 536 (O'Connor, J., dissenting)). *Haldeman* after all, was an en banc decision. If

*Haldeman* had been decided on inherent authority grounds, the *McKeever* panel would have had

no choice but to apply that precedent faithfully. The *McKeever* panel recognized as much;

indeed, this argument was the sole subject of the dissent. *See* 920 F.3d at 847 n.3 ("[O]ur

dissenting colleague cite[s] *Haldeman* . . . as stepping outside the strict bounds of Rule 6(e).");

*id.* at 853–55 (Srinivasan, J., dissenting). Thus, when the *McKeever* majority "read *Haldeman* as

did Judge MacKinnon in his separate opinion concurring in part, as fitting within the Rule 6

exception for 'judicial proceedings," *id.* at 847 n.3 (majority opinion), the majority made that

interpretation the binding law in this Circuit.[30]

---

we hold that the District Court did not abuse its discretion . . . ."), rather than straightforward approval of the
decision below. The *Haldeman* Court did the latter.

[30]     When queried about reconciling DOJ's current position with its historical support of providing grand jury
materials to Congress for use in impeachment inquiries, DOJ responded that its position has "evolved." Hr'g Tr. at
85:24. No matter how glibly presented, however, an "evolved" legal position may be estopped. "[W]here a party
assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter,
simply because his interests have changed, assume a contrary position . . . ." *New Hampshire v. Maine*, 532 U.S.
742, 749 (2001) (alteration in original) (internal quotation mark omitted) (quoting *Davis v. Wakelee*, 156 U.S. 680,
689 (1895)). This rule also applies when a party, including a governmental entity, makes "a claim in a legal
proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *Id.* at 749 (internal
quotation mark omitted), *see also id.* at 755–56 (applying estoppel to a state government). Here, DOJ has changed

Most troubling, DOJ's proposed reading of "judicial proceeding" raises constitutional concerns.  DOJ policy is that a sitting President cannot be indicted, *OLC Op.*, which policy prompted the Special Counsel to abstain from "mak[ing] a traditional prosecutorial judgment" or otherwise "draw[ing] ultimate conclusions about the President's conduct."  Mueller Report at II-8.  This leaves the House as the only federal body that can act on allegations of presidential misconduct.  Yet, under DOJ's reading of Rule 6(e), the Executive Branch would be empowered to wall off any evidence of presidential misconduct from the House by placing that evidence before a grand jury.  Rule 6(e) must not be read to impede the House from exercising its "sole Power of Impeachment."  U.S. CONST. art. I, § 2, cl. 5; *cf. Trump v. Comm. on Oversight and Reform of U.S. House of Representatives*, 380 F. Supp. 3d 76, 95 (D.D.C. 2019) ("It is simply not fathomable that a Constitution that grants Congress the power to remove a President for reasons including criminal behavior would deny Congress the power to investigate him for unlawful conduct . . . ."), *aff'd sub nom. Trump v. Mazars USA, LLP*, No. 19-5142, 2019 WL 5089748 (D.C. Cir. 2019).

\*       \*       \*

---

its longstanding position regarding whether impeachment trials are "judicial proceedings" and whether *Haldeman* so held.  In *Haldeman* itself, the special prosecutor argued for disclosure of the grand jury materials and "represented that this disclosure of the grand jury material to the House Judiciary Committee and eventually possibly to the House and Senate [was] being made 'preliminarily to (and) in connection with a judicial proceeding.'"  *Haldeman*, 501 F.2d at 717 (MacKinnon, J. concurring in part and dissenting in part) (quoting FED. R. CRIM. P. 6(e)).  Similarly, when grand jury material was released to HJC during the impeachments of Judges Hastings and Porteous, DOJ raised no objections.  *See Hastings*, 833 F.2d at 1441–42 ("[T]he Department of Justice has stated that it has 'no objection' to this disclosure to the Committee."); Order, *In Re: Grand Jury Investigation of U.S. Dist. Judge G. Thomas Porteous, Jr.*, No. 2:09-mc-04346-CVSG, at 2 ("DOJ does not oppose the request.").  Most importantly, in *McKeever* itself DOJ successfully argued—*just last year*—that the D.C. Circuit has "treated *Haldeman* as standing only for the proposition that an impeachment proceeding may qualify as a 'judicial proceeding' for purposes of Rule 6(e)," *see* Brief for Appellee at 37, *McKeever*, 920 F.3d 842 (No. 17-1549), and the D.C. Circuit agreed, *see McKeever*, 920 F.3d at 847 n.3.  DOJ's position has had a speedy evolution indeed.  Nevertheless, since DOJ's reading of *Haldeman* and *McKeever* fails on the merits, further consideration of whether DOJ's new position is estopped is unnecessary.

As the foregoing analysis shows, a Senate impeachment trial is a "judicial proceeding" within the meaning of Rule 6(e).  *Quod erat demonstrandum*.

**B.     HJC's Consideration of Articles of Impeachment is "Preliminarily To" an Impeachment Trial**

Rule 6(e)(3)(E)(i)'s authorization of disclosure "preliminarily to or in connection with a judicial proceeding" is "an affirmative limitation on the availability of court-ordered disclosure of grand jury materials." *Baggot*, 463 U.S. at 480.  Thus, "[i]f the primary purpose of disclosure is not to assist in preparation or conduct of a judicial proceeding, disclosure under ([E])(i) is not permitted." *Id*.  For HJC's current impeachment-related proceedings to qualify as "preliminarily to . . . a judicial proceeding" and disclosure to be permissible, HJC must be engaged in an investigation that is "related fairly directly to" an "anticipated" impeachment trial.  *Id.*  As explained in more detail below, the "primary purpose," *id.*, of HJC's investigation is to determine whether to recommend articles of impeachment and HJC therefore satisfies this prerequisite for disclosure.

**1.     Governing Legal Principles Demonstrate That House Proceedings Can be "Preliminarily To" a Senate Impeachment Trial**

The Supreme Court has addressed the issue of how to apply Rule 6(e)'s "preliminarily to" requirement only once, in *Baggot*.  There, the Court addressed two situations—one that met the "preliminarily to" requirement, and one that did not.  First, the Supreme Court considered an Internal Revenue Service ("IRS") "audit of civil tax liability," the purpose of which was "not to prepare for or conduct litigation, but to assess the amount of tax liability through administrative channels."  *Id.*  This failed the "preliminarily to" test because, even "[a]ssuming *arguendo* that this audit will inevitably disclose a deficiency," "[t]he IRS's decision is largely self-executing, in the sense that it has independent legal force of its own, without requiring prior validation or enforcement by a court."  *Id.* at 481.  By contrast, the Court discussed a second situation where

"the IRS had closed its audit and issued a notice of deficiency, and the taxpayer had clearly expressed its intention to seek redetermination of the deficiency in the Tax Court." *Id.* at 483.  In that second situation, the Supreme Court explained the Seventh Circuit "correctly held . . . that the IRS may seek [Rule 6(e)(3)(E)(i) disclosure" because "[i]n such a case, the Government's primary purpose is plainly to use the materials sought to defend the Tax Court litigation, rather than to conduct the administrative inquiry that preceded it." *Id.* (citing *In re Grand Jury Proceedings (Miller Brewing Co.)*, 687 F.2d 1079 (7th Cir. 1982)).

Between these two situations, a myriad of alternative circumstances is possible.  The Supreme Court abstained, however, in footnote 6, from defining precisely "the level of likelihood of litigation that must exist before an administrative action is preliminary to litigation." *Id.* at 482 n.6.  In so doing, the Court acknowledged, in practical terms, how investigations evolve to reach the point of contemplating litigation, stating:

> [a]s a general matter, many an investigation, begun to determine *whether* there has been a violation of law, reaches a tentative affirmative conclusion on that question; at that point, the focus of the investigation commonly shifts to ascertaining the scope and details of the violation and building a case in support of any necessary enforcement action.

*Id*. (emphasis in original).  Given these practical realities, the Court declined to specify "how firm the agency's decision to litigate must be before its investigation can be characterized as 'preliminar[y] to a judicial proceeding,'" *id*. (alteration in original), noting that in the case before it, the Court was confronted with a "clear" case of the "IRS's proposed use" being to "assess[] taxes rather than to prepare for or to conduct litigation," *id*. at 483.

The D.C. Circuit similarly has had limited opportunity to consider application of the "preliminarily to" requirement in Rule 6(e).  Post-*Baggot*, the D.C. Circuit has made clear that "a party requesting grand jury material must demonstrate that his 'primary purpose' for acquiring

the material is preliminary to or in connection with a judicial proceeding." *In re Sealed Motion*, 880 F.2d at 1379 n.15.[31]  As suggested by *Baggot*'s footnote 6, the D.C. Circuit has further indicated that an investigation can be "preliminarily to" a judicial proceeding even though no litigation is actually pending but may only be "possible."  *In re Grand Jury*, 490 F.3d at 986 (holding that grand jury investigation satisfies the "preliminarily to" test as "preliminary to a possible criminal trial").

DOJ actually makes little effort to dispute that *if* an impeachment trial is a judicial proceeding, the House's consideration of articles of impeachment is "preliminary to" that proceeding at least in some circumstances.  DOJ Resp. at 26, n.15; *see id*. at 24–30.  DOJ is wise not to waste much energy on that argument.  To the extent the House's role in the impeachment context is to investigate misconduct by the President and ascertain whether that conduct amounts to an impeachable offense warranting removal from office, the House performs a function somewhat akin to a grand jury.  *See In re 1972 Grand Jury Report*, 370 F. Supp. at 1230 (stating that House "acts simply as [a] grand jury."); 3 Hinds Ch. 72 § 2343 ("The analogy between the function of the House in this matter [referring to 1804 impeachment of Justice Samuel Chase] and that of a grand jury was correct and forcible."); *id.* Ch. 54 § 1729 (explaining in the context of an 1818 "inquiry into the conduct of clerks in the Executive Departments" "that the House was in the relation of a grand jury, to the nation, and that it was the duty of the House to examine into the conduct of public officers"); *id.* Ch. 79 § 2505 (explaining in 1873 during the impeachment of Judge Delahay that "[t]he Senate is a perpetual court of impeachment, and in

---

[31]  At least two other circuits have reached the same conclusion.  *See Patton v. C.I.R.*, 799 F.2d 166, 172 (5th Cir. 1986) ("In *Baggot*, the Supreme Court observed that Rule [6(e)(3)(E)(i)] 'contemplates only uses related fairly directly to some identifiable litigation, pending or anticipated,' as measured by the 'primary purpose of the disclosure.'" (quoting *Baggot*, 463 U.S. at 480)); *In re Barker*, 741 F.2d 250, 254 (9th Cir. 1984) ("Under *Baggot*, the proper inquiry is whether the primary purpose of the disclosure is to assist in the preparation or conduct of judicial proceedings.").

presenting these articles we act only as a grand jury"); *Mazars*, 2019 WL 5089748, at *32 (Rao, J., dissenting) ("In the context of an impeachment inquiry, the House serves as a kind of grand jury, investigating public officials for misconduct."); *cf. Jefferson's Manual of Parliamentary Procedure* § 615a ("*Jefferson's Manual*") ("[The English House of Commons] have been generally and more justly considered, as is before stated, as the grand jury.").[32]

Accordingly, just as a grand jury investigation is "preliminary to a possible criminal trial," *In re Grand Jury*, 490 F.3d at 986, a House impeachment inquiry occurs preliminarily to a possible Senate impeachment trial.

### 2. HJC's Primary Purpose is to Determine Whether to Recommend Articles of Impeachment

HJC's investigation is in fact "preliminarily to" an impeachment trial because its primary purpose is to determine whether to recommend articles of impeachment. Before detailing how the record of House and HJC impeachment activities verifies this primary purpose, DOJ's and Representative Collins' proposed criteria for meeting the "preliminarily to" test are considered and, due to their critical shortcomings, rejected.

#### a. *DOJ's Proposed "Preliminarily To" Test is Contrary to* Baggot

Despite the clarity with which the Supreme Court "decline[d]," *Baggot*, 463 U.S. at 482 n.6, to draw the line when an investigation becomes "preliminarily to . . . a judicial proceeding," DOJ relies heavily on *Baggot* to contend that HJC's inquiry fails to cross that line. *See* DOJ Resp. at 24–25. In this vein, DOJ construes *Baggot* as requiring HJC to show that its

---

[32]    The grand jury analogy is not perfect. *See* 145 Cong. Rec. S1586 (1999) (statement of Sen. Leahy) (noting that the analogy between the House and a grand jury is "loose" (quoting *Background and History of Impeachment: Hearing Before the Subcomm. On the Constitution of the HJC*, 105th Cong., XX S. Doc. 106-3 at 228 (statement of Laurence H. Tribe) (1998)). When the House decides whether to impeach, it functions as more than a "mere 'accuser.'" *Id.* "The House's constitutional responsibility for charging the President should not be misinterpreted to justify applying only a grand jury's 'probable cause' standard of proof." *Id.* at S1587. Rather, "House Members who vote to impeach should also be convinced th[e] President has so abused the public trust and so threatens the public that he should be removed." *Id.*

investigation "must lead to referral of articles of impeachment to the floor of the House," *id.* at

25, and further that "referral of articles of impeachment 'must' lead to a Senate trial," *id.*  Short

of those dual showings of action in the House and in the Senate, DOJ posits that HJC's

investigation amounts only to "[a] nonlitigative function," *id.* at 27 (quoting *Baggot*, 463 U.S. at

483), with only a "tenuous" connection to an impeachment trial, *id.* at 25, which is "entirely

hypothetical rather than 'likely to emerge,'" *id.* at 29 (quoting *Baggot*, 463 U.S. at 480)).

The line-drawing suggested by DOJ—requiring dual showings of the House's intention

to pass articles of impeachment plus a guaranteed Senate impeachment trial—ignores first the

Supreme Court's expressed appreciation that, even in the midst of an investigation, the focus can

shift to "building a case" and then qualify as preliminarily to "any necessary enforcement

action." *Baggo*t, 463 U.S. at 482 n.6.  Nor is DOJ's requirement of a guarantee of a Senate

impeachment trial grounded in *Baggot*.  *Baggot* made clear that the requisite judicial proceeding

need not be subject to initiation by the party seeking disclosure or pending at the time of the

requested grand jury disclosure; the proceeding need only be "anticipated," *id.* at 480, or

"possible," *In re Grand Jury*, 490 F.3d at 986; *see Baggot*, 463 U.S. at 482–83 ("We also do not

hold that . . . a private party who anticipates a suit . . . may never obtain ([E])(i) disclosure of

grand jury materials any time the initiative for litigating lies elsewhere.  Nor do we hold that

such a party must always await the actual commencement of litigation before obtaining

disclosure.").  Thus, DOJ's proposed criteria to demonstrate a "primary purpose" for an

impeachment inquiry are rejected.

DOJ also reasons that HJC's proceedings *here* are not "preliminarily to" impeachment

because "the Committee's actions thus far . . . at most amount to an exploratory inquiry where

48

impeachment is one of many possible outcomes."  DOJ Resp. at 24.[33]  Even if DOJ were correct

that only some congressional committee investigations are "preliminarily to" an impeachment

trial, *see In re Uranium Grand Jury*, 1979 WL 1661, at *7 (determining that Rule 6(e) is not

satisfied where a House committee "makes a somewhat vague assertion that one of the reasons it

needs to examine the transcripts is that it might result in its recommendation to the House

Judiciary Committee that impeachment proceedings be initiated"), DOJ is wrong in this instance,

as detailed *infra* in Part III.B.2.C.

### b. No House "Impeachment Inquiry" Resolution is Required

Relatedly, Representative Collins asserts that HJC's investigation cannot be

"preliminarily to" an impeachment trial until the full House passes a resolution authorizing a

"formal impeachment proceeding."  Collins Mem. at 1.  DOJ equivocates on this proposed bright

line test to meet the "preliminarily to" requirement, Hr'g Tr. at 69:10–11, but seems to indicate

that the House must go at least that far, *see* DOJ Resp. at 28.  Like all bright-line rules, this

"House resolution" test is appealing in terms of being easy to apply.  Yet, the reasoning

supporting this proposed test is fatally flawed.  The precedential support cited for the "House

resolution" test is cherry-picked and incomplete, and more significantly, this test has no textual

support in the U.S. Constitution, the governing rules of the House, or Rule 6(e), as interpreted in

binding decisions.

---

[33]     Some of DOJ's arguments regarding whether HJC meets the "preliminarily to" test have been mooted due to developments in the possible impeachment of President Trump since the pending application was filed.  DOJ, for instance, initially argued that statements by the Speaker and the House Majority Leader showed that "the House Democratic caucus was 'not even close' to an 'impeachment inquiry.'"  DOJ Resp. at 27 (quoting *Rep. Nancy Pelosi (D-CA) Continues Resisting Impeachment Inquiry*, CNN (June 11, 2019), http://transcripts.cnn.com/TRANSCRI PTS/1906/11/cnr.04html).  That may have been true in June, but not now, after the Speaker herself announced in September that the full House is "moving forward with an official impeachment inquiry."  *Pelosi Remarks Announcing Impeachment Inquiry* (Sept. 24, 2019), https://perma.cc/6EQM-34PT [hereinafter Pelosi Tr.].

Turning first to the arguments that stem from precedent, DOJ and Representative Collins state that the "impeachments of Presidents Clinton and Andrew Johnson were investigated in multiple phases with each phase authorized by the House's adoption of resolutions." DOJ Resp. at 28; *see also* Collins Mem. at 9–12 (stating that for presidential impeachments, including the likely impeachment of President Nixon had he not resigned, "the full House voted to authorize impeachment proceedings"). Even were this statement accurate, which it is not, the manner in which the House has chosen to conduct impeachment inquiries encompasses more than past Presidents and no sound legal or constitutional reason has been presented to distinguish the House's exercise of impeachment authority for a President from the exercise of such authority more generally.[34]

Indisputably, the House has initiated impeachment inquiries of federal judges without a House resolution "authorizing" the inquiry. *See, e.g.*, H.R. Rep. No. 101-36, at 13–16 (1988) (describing proceedings with respect to Judge Walter Nixon leading up to HJC's recommendation of articles of impeachment, with no mention of an authorizing resolution); H. R. Res. 320, 100th Cong. (as passed by the House Dec. 2, 1987) (authorizing taking of affidavits and depositions during the impeachment investigation of Judge Hastings, without any formal House resolution for an "impeachment inquiry"); H.R. Rep. No. 99-688, at 3–7 (1986) (describing proceedings with respect to Judge Harry Claiborne leading up to HJC's

---

[34]     DOJ and Representative Collins offer only one argument for distinguishing presidential and judicial impeachments: that the House "has delegated initial investigatory authority for impeachment to the U.S. Judicial Conference through the passage of the Judicial Conduct and Disability Act of 1980." Collins Mem. at 10 n.12 (citing 28 U.S.C. § 355(b)); *see also* Hr'g Tr. at 83:21–84:23 (DOJ) (raising similar argument). Yet, during the investigations of Judge Porteous and Judge Hastings, HJC did not rely on the Judicial Conference to furnish relevant grand jury material but instead petitioned for and received relevant grand jury material directly from the courts supervising the grand jury investigations of the judges at issue. *See Hastings*, 833 F.2d 1438; Order, *In Re: Grand Jury Investigation of U.S. Dist. Judge G. Thomas Porteous, Jr.*, No. 2:09-mc-04346-CVSG. Moreover, the impeachment investigation of Justice Douglas, which went forward without a House Resolution, occurred in 1970, before the Judicial Conduct and Disability Act of 1980 was adopted. *See Final Report on Associate Justice William O. Douglas, Special Subcomm. on H.R. Res. 920 of the House Comm. on the Judiciary*, 91st Cong. (1970).

recommendation of articles of impeachment, with no mention of an authorizing resolution); 3
Deschler Ch. 14 § 5 ("In the case of Justice Douglas, the Committee on the Judiciary authorized
a special subcommittee to investigate the charges, without the adoption by the House of a
resolution specifically authorizing an investigation.").  Furthermore, federal judges have been
*impeached* by the House without a House resolution "authorizing" an inquiry.  *See* H.R. Res. 87,
101st Cong. (1989) (impeaching Judge Nixon); H.R. Res. 499 100th Cong. (1988) (impeaching
Judge Hastings); H.R. Res. 461, 99th Cong. (1986) (impeaching Judge Claiborne).  In the course
of an impeachment proceeding against a federal judge, the House has also obtained grand jury
material to assist in an impeachment inquiry that was not "authorized" by a specific House
impeachment resolution.  *See Hastings*, 833 F.2d at 1439 (releasing Hastings grand jury
information to HJC).

Even in cases of presidential impeachment, a House resolution has never, in fact, been
required to begin an impeachment inquiry.  In the case of President Johnson, a resolution
"authoriz[ing]" HJC "to inquire into the official conduct of Andrew Johnson" was passed *after*
HJC "was already considering the subject."  3 Hinds Ch. 75 § 2400.  In the case of President
Nixon, HJC started its investigation well before the House passed a resolution authorizing an
impeachment inquiry.  *See* 3 Deschler Ch. 14, § 15 (Parliamentarian's Note) (noting that even
before "the adoption of" the Nixon impeachment-inquiry resolution, "House Resolution 803,"
HJC "had been conducting an investigation into the charges of impeachment against President
Nixon," such as by "hir[ing] special counsel for the impeachment inquiry").[35]  In the case of
President Clinton, the D.C. Circuit authorized the disclosure of grand jury materials to Congress

---

[35]     DOJ and Representative Collins both agree that the events leading up to President Nixon's resignation are
relevant historical precedent for the purpose of the current inquiry, even though President Nixon left office before he
could be impeached.  *See* Hr'g Tr. at 71:13–19 (DOJ); Collins Mem. at 9–10.

on July 7, 1998, *see* HJC App., Ex. Q, Order, *In re Madison Guaranty Savings & Loan Assoc.*, Div. No. 94-1 (D.C. Cir. Spec. Div. July 7, 1998) (per curiam), ECF No. 1-18, even though no impeachment resolution had yet been adopted and was not adopted by the House until four months later, *see* H. R. Res. 525, 105th Cong. (1998) (authorizing, on October 8, 1998, HJC to "investigate fully and completely whether sufficient grounds exist for the House of Representatives to exercise its constitutional power to impeach" President Clinton).[36]

While close scrutiny of the historical record undercuts that justification for the "House resolution" test proposed by Representative Collins, the more significant flaw with this proposal is as follows: while this test may address political legitimacy concerns, which are best resolved in the political arena, no governing law requires this test—not the Constitution, not House Rules, and not Rule 6(e), and so imposing this test would be an impermissible intrusion on the House's constitutional authority both to "determine the rules of its proceedings" under the Rulemaking Clause, U.S. CONST., Art. I, § 5, cl. 2, and to exercise "the sole power of Impeachment" under the Impeachment Clause, *id.* § 2, cl. 5.  This Court "ha[s] no authority to impose," by judicial order, a particular structure on House proceedings.  *Mazars*, 2019 WL 5089748, at \*24.  In *Mazars*, for example, the D.C. Circuit rejected the position that enforcement of a House Oversight and Reform Committee subpoena of a third-party's records related to President Trump and his business associates was inappropriate until the "full House" granted the Committee "express authority to subpoena the President for his personal financial records."  *Id.* at \*24 (internal quotation marks omitted).  Citing the Constitution's Rulemaking Clause, the D.C.

---

[36]       DOJ dismisses the example of the House's impeachment of President Clinton, contending that the then-operative Independent Counsel Act provided independent authorization for disclosure of grand jury material to Congress.  DOJ Resp. at 22–23.  Putting aside whether DOJ correctly reads the now-lapsed independent counsel statute, this contention only confirms that full House impeachment resolutions have not been a necessary predicate for HJC to commence an impeachment investigation and obtain access to grand jury material to assist in that investigation.

Circuit explained that "unless and until Congress adopts a rule that offends the Constitution, the courts get no vote in how each chamber chooses to run its internal affairs." *Id*.; *see also Barker v. Conroy*, 921 F.3d 1118, 1130 (D.C. Cir. 2019) (noting that "'*making* the Rules . . . [is] a power that the Rulemaking Clause reserves to each House alone'" (quoting *United States v. Rostenkowski*, 59 F.3d 1291, 1306–07 (D.C. Cir. 1995)).  This Court likewise lacks authority to require the House to pass a resolution tasking a committee with conducting an impeachment inquiry.

Representative Collins shifts gears with an alternative challenge to HJC's petition, contending that, even if no House rule prohibits HJC from beginning an impeachment investigation without a House resolution, the House has not "delegate[d] such authority to the Committee," and HJC has no powers except those expressly granted to it.  Collins Mem. at 6. Pressing this point, he argues that the House has thus far delegated only "legislative and oversight authority to the Committee," not "impeachment authority," *id*. at 5, and, further, that the Speaker of the House may not "unilaterally delegate to the Committee the House's impeachment power," *id*. at 13–14.  These contentions are, at worst, red herrings and, at best, incorrect.

At the outset, the distinction drawn by Representative Collins between Congress's "legislative and oversight authority" and Congress's "impeachment authority," is not so rigid as he makes out.  Nothing "in the Constitution or case law . . . compels Congress to abandon its legislative role at the first scent of potential illegality and confine itself exclusively to the impeachment process." *Mazars*, 2019 WL 5089748, at *18.[37]  In any event, the House has

---

[37]  The distinction between Congress' legislative and impeachment authority, even if otherwise sound, has questionable relevance to the Rule 6(e) analysis.  The "preliminarily to" requirement depends on the "primary purpose" disclosure would serve, not the source of authority Congress acts under.

sufficiently delegated to HJC the authority to conduct an impeachment inquiry in at least two ways. *Jefferson's Manual*—which under House Rule XXI "'govern[s] the House in all cases to which [it is] applicable and in which [it is] not inconsistent with the Rules and orders of the House'"—provides that impeachment can be "set[] . . . in motion" by "a resolution introduced by a Member and referred to a committee" as well as "facts developed and reported by an investigating committee of the House." *Jefferson's Manual* § 603.[38]  Additionally, the full House has authorized, in Resolution 430, HJC to bring this suit and simultaneously granted HJC "*any* and *all* necessary authority under Article I of the Constitution." H.R. Res. 430, 116th Cong. (as passed by House June 11, 2019) (emphases added).[39]

As to Representative Collins' last point regarding the Speaker's statement, HJC never claims that the Speaker possesses the power to authorize an impeachment inquiry solely by saying so. Rather, HJC points to the Speaker's statement as evidence of the primary purpose of HJC's investigation. The Speaker's statement is, in fact, highly probative evidence on that score.[40]  Even DOJ does not dispute that statements made by the House Speaker may be

---

[38]     *Jefferson's Manual* is one of the "fundamental source material[s] for parliamentary procedure used in the House of Representatives." Thomas J. Wickham, *Constitution, Jefferson's Manual, and Rules of the House Representatives of the United States One Hundred Fifteenth Congress* at v (2017).

[39]     Challenge to a specific committee action on grounds that HJC's authority was in doubt would be unreviewable. "[U]nless and until Congress adopts a rule that offends the Constitution," judicial review of House rules is inappropriate. *Mazars*, 2019 WL 5089748, at *24. Here, neither DOJ nor Representative Collins complains that HJC's actions or authorizing House rules suffer from a "constitutional infirmity." *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1173 (D.C. Cir. 1983). That distinguishes this case from *Tobin v. United States*, 306 F.2d 270 (D.C. Cir. 1962), which Representative Collins heavily relies on; there the House resolution at issue raised "serious and difficult" constitutional issues. *Id.* at 275; *see also Mazars*, 2019 WL 5089748, at *24 (similarly distinguishing *Tobin*).

[40]     Citing Speaker Pelosi's September 2019 statement, Representative Collins also argues that HJC's investigation is not "preliminarily to" a Senate impeachment trial because the "impeachment inquiry" announced by the Speaker will "be handled by three other committees and focus 'narrowly on the Ukraine matter'" rather than on allegations in the Mueller Report. Collins Mem. at 14 (quoting Rachael Blade and Mike DeBonis, *Democrats Count on Schiff to Deliver Focused Impeachment Inquiry of Trump*, WASH. POST (Sept. 29, 2019), https://www.washington post.com/politics/pelosi-turns-to-schiff-to-lead-house-democrats-impeachment-inquiry-of-trump/2019/09/28/ed6c4608-e149-11e9-8dc8-498eabc129a0_story.html). This argument is misguided, first, because Speaker Pelosi made clear that "six [c]ommittees"—including HJC—would "proceed with their investigations under that umbrella of impeachment inquiry," Pelosi Tr., and thus HJC plainly remains engaged. Second, the current focus on President Trump's interactions with the foreign leader of Ukraine is pertinent, not to the "preliminarily to"

probative in evaluating the "primary purpose" of HJC inquiries, as DOJ too has relied on the

Speaker's statements in its arguments about satisfaction of the "preliminarily to" requirement.

*See* DOJ Resp. at 3, 26–27.

> **c.      The Record of House and HJC Impeachment Activities Here Meets the "Preliminarily To" Test**

Having dispatched DOJ's and Representative Collins' unsupported criteria for meeting

the "preliminarily to" test, examination of the record before the Court is essential to assess

whether HJC has satisfied the actual inquiry: *Baggot*'s "primary purpose" test.  As HJC explains,

the purpose of HJC's investigation and the requested disclosure is "to determine whether to

recommend articles of impeachment," HJC App. at 3, and the record evidence supports that

claim.  Determining whether to recommend articles of impeachment may not have been the

primary purpose of HJC's investigation initially, but that is of no moment.  "Congress's decision

whether, and if so how," to act "will necessarily depend on what information it discovers in the

course of an investigation, and its preferred path forward may shift as members educate

themselves on the relevant facts and circumstances."  *Mazars*, 2019 WL 5089748, at *13.  While

HJC is "pursuing a legitimate legislative objective [it] may . . . choose to move from legislative

investigation to impeachment," *id.* at *18, and that is precisely what occurred here, as a review of

the record evidence in chronological order demonstrates.

The beginnings of HJC's current investigation trace to January 3, 2019, when a resolution

calling for President Trump's impeachment was introduced, *see* H.R. Res. 13, 116th Cong.

(2019), and, in keeping with standard practice, then referred to HJC for consideration, 165 Cong.

Rec. H201, H211 (daily ed. Jan. 3, 2019) (referring H.R. Res. 13 to HJC).  This resolution

---

requirement, but to the issue of whether HJC has shown a "particularized need" for the redacted grand jury materials in the Mueller Report.  As to the "preliminarily to" requirement, the Ukrainian developments simply underscore that the investigations currently proceeding in the House may lead to a Senate impeachment trial.

remains under review before HJC.  *See* All Actions H.Res.13 — 116th Congress (2019-2020),

https://www.congress.gov/bill/116th-congress/house-resolution/13/all-actions.

HJC turned to the subject of impeachment in earnest after the release of the Mueller

Report.  On June 6, 2019, HJC issued a report that accompanied a resolution recommending that

AG Barr be held in contempt of Congress for failing to comply with a subpoena for production

of the unredacted Mueller Report and underlying materials.  *See* H.R. Rep. No. 116-105 (2019)

("Contempt Report").  That Contempt Report explained that among the "purposes" of HJC's

"investigation into the alleged obstruction of justice, public corruption, and other abuses of

power by President Donald Trump" was to "consider[] whether any of the conduct described in

the Special Counsel's Report warrants the Committee in taking any further steps under

Congress' Article I powers," "includ[ing] whether to approve articles of impeachment with

respect to the President."  *Id.* at 13.

Significantly, on June 11, 2019, the full House voted to ensure HJC possessed the

authority needed to continue this investigation.  The House approved, by a vote of 229 to 191, a

resolution allowing HJC "to petition for disclosure of information" related to the Mueller

Report—*i.e.*, to bring the instant action.  H.R. Res. 430, 116th Cong. (2019).  House Resolution

430 expressly authorized HJC to bring a petition pursuant to Rule 6(e)'s "'preliminarily to . . . a

judicial proceeding'" exception, *id.* (omission in original) (quoting FED. R. CRIM. P.

6(e)(3)(E)(i)), and, as noted above, granted HJC, in connection with that authorization, "*any* and

*all* necessary authority under Article I of the Constitution," *id.* (emphases added).

By July, HJC's investigation had become focused on the impeachment power, as

expressed in a July 11, 2019 memorandum issued by HJC Chairman Nadler explaining that HJC

is "determin[ing] whether the Committee should recommend articles of impeachment against the

President or any other Article I remedies, and if so, in what form."  HJC App., Ex. A, Jerrold

Nadler, Chairman, H. Comm. on the Judiciary, *Memorandum Re: Hearing on "Lessons from the*

*Mueller Report, Part III: 'Constitutional Processes for Addressing Presidential Misconduct'"* at

3 (July 11, 2019), ECF No. 1-2.  At a hearing held the next day, Chairman Nadler further stated

that HJC's "responsibility" was "to determine whether to recommend articles of impeachment

against the President," noting that "articles of impeachment are under consideration as part of the

Committee's investigation."  HJC App., Ex. T, *Lessons from the Mueller Report, Part III:*

*"Constitutional Processes for Addressing Presidential Misconduct": Hearing Before the H.*

*Comm. on the Judiciary* at 4 (July 12, 2019), ECF No. 1-21 (capitalization altered).  On

September 12, 2019, HJC adopted a resolution confirming that the purpose of its investigation is

"to determine whether to recommend articles of impeachment with respect to President Donald J.

Trump."  DOJ Resp., Ex. 11, Comm. on the Judiciary, Resolution for Investigative Procedures at

4 (Sept. 12, 2019), ECF No. 20-11.

   Finally, on September 24, 2019, House Speaker Nancy Pelosi announced that the full

House is "moving forward with an official impeachment inquiry."  Pelosi Tr.  "For the past

several months," Speaker Pelosi explained, the House had been "investigating in our Committees

and litigating in the courts so the House can gather all of the relevant facts and consider whether

to exercise its full Article I powers, including a constitutional power of the utmost gravity,

approval of articles of impeachment."  *Id.*  Thus, Speaker Pelosi "direct[ed]" the "six

Committees"—including HJC—to "proceed with their investigations under that umbrella of

impeachment inquiry" going forward.  *Id.*

   These indicia of HJC's purpose sufficiently demonstrate that the primary purpose of the

investigation for which the grand jury disclosure is sought is to determine whether to recommend

articles of impeachment against President Trump.  *Cf. Mazars*, 2019 WL 5089748, at \*10–11 (looking to statements a committee chairman made in a memorandum to his colleagues to assess the purpose of a congressional investigation); *see Jefferson's Manual* § 603 at 319 (stating that "[i]n the House various events have been credited with setting an impeachment in motion," such as "charges made on the floor on the responsibility of a Member or Delegate," "a resolution introduced by a Member and referred to a committee," "charges transmitted . . . from a grand jury," and "facts developed and reported by an investigating committee of the House"); 3 Deschler Ch. 14 § 5 ("In the majority of cases, impeachment proceedings in the House have been initiated either by introducing resolutions of impeachment by placing them in the hopper, or by offering charges on the floor of the House under a question of constitutional privilege.  Where such resolutions have directly impeached federal civil officers, they have been conferred by the Speaker to the Committee on the Judiciary, which has jurisdiction over federal judges and presidential succession . . . ."); Charles W. Johnson et al., *House Practice: A Guide to the Rules, Precedents, and Practice of the House*, Ch. 27 § 6, at 602 (2017) (confirming same).

Formulating a firm line on when, in the impeachment context, activities within the House meet the "preliminarily to" requirement to qualify for disclosure of grand jury material need not be drawn here, since this case is clear.  Collectively, the record shows an evolving and deliberate investigation by HJC that has become focused on determining whether to impeach the President and thus has crossed the "preliminarily to" threshold.

### 3. Requiring More Than the Current Showing by HJC, as DOJ Demands, Would Improperly Intrude on Article I Powers Granted to House of Representatives

DOJ urges this Court to second-guess a co-equal branch of government and find that the steps taken by the House fall short of showing a primary purpose of undertaking an impeachment inquiry that would meet the "preliminarily to" requirement in Rule 6(e)(3)(E)(i).  In so doing,

DOJ again invites an impermissible intrusion on the House's constitutional authority under the Rulemaking and Impeachment Clauses. These Article I grants of exclusive authority require a degree of deference to the House's position that the House and HJC are currently engaged in an investigation with the primary purpose of assessing whether to adopt articles of impeachment. *See Vander Jagt,* 699 F.2d at 1173 (concluding that the Rulemaking Clause "means that neither we nor the Executive Branch may tell Congress what rules it must adopt"); *Mazars*, 2019 WL 5089748, at *24 ("[U]nless and until Congress adopts a rule that offends the Constitution, the courts get no vote in how each chamber chooses to run its internal affairs."); *Nixon v. United States*, 506 U.S. 224, 238 (1993) (concluding that judicial review of Senate impeachment trial procedures would be inconsistent with the text and structure of the Constitution).

At the same time, HJC has argued that complete and absolute deference is due to the House and HJC not only in structuring but also in articulating the purpose of the current inquiry. Hearing Tr. at 25:23–26:4; *see also* HJC App. at 30–31. HJC's position goes too far, at least as to judicial review of HJC's "primary purpose." Rule 6(e), and the Supreme Court's cases interpreting it, grant this Court authority, and indeed a responsibility, to verify that HJC seeks disclosure of the grand jury material for use in an inquiry whose core aim is assessing possible articles of impeachment. The preceding review of the factual record and finding about HJC's "primary purpose" fulfill that responsibility of judicial review without intruding on the House's ability to write its own rules or to exercise its power of impeachment. *See Morgan v. United States*, 801 F.2d 445, 449 (D.C. Cir. 1986) (Scalia, J.) (noting that "no absolute prohibition of judicial review" of House Rules exists).[41]

---

[41] Although neither the Supreme Court nor the D.C. Circuit has considered the justiciability of, or the degree of deference due in, cases implicating the House's "sole power of Impeachment," U.S. CONST., Art. I, § 2, cl. 5, verifying that the factual record supports HJC's assertion about its "primary purpose" does not require direct judicial review of any actions by the House taken pursuant to the impeachment power.

Additionally, DOJ's position that no disclosure of grand jury information to a House impeachment inquiry is permitted under Rule 6(e), *see* DOJ Resp. at 13–19, would completely bar access to relevant grand jury materials. Such a blanket bar would have concrete repercussions on limiting the House's access to investigative materials and thereby impermissibly impede the House's ability to exercise its constitutional power of impeachment. The House, through the committees tasked with conducting an impeachment investigation, must develop a factual record supporting at least a good-faith basis for believing that the President has engaged in conduct meeting the constitutional requirement of a "high crime" or "misdemeanor" before voting in favor of articles of impeachment targeting such conduct. *Cf. Kaley v. United States*, 571 U.S. 320, 328 (2014) (noting that to issue an indictment, a grand jury must find probable cause to believe a defendant committed the charged offense); Dep't of Justice, *Justice Manual* § 9-27.220 (explaining that before commencing or recommending federal prosecution against an individual, a federal prosecutor must "believe[] that the person's conduct constitutes a federal offense, and that the admissible evidence will probably be sufficient to obtain and sustain a conviction"). Indeed, even a lawyer in a civil proceeding must "certif[y] that to the best of the [lawyer's] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the "factual contentions" presented to the court "have evidentiary support." FED. R. CIV. P. 11(b).

Blocking access to evidence collected by a grand jury relevant to an impeachment inquiry, as DOJ urges, undermines the House's ability to carry out its constitutional responsibility with due diligence. On the other hand, interpreting Rule 6(e) in a manner compatible with this constitutional responsibility avoids this conundrum, and ensures HJC has

access to the pertinent information *before* making an impeachment recommendation to the full House.

### 4.   DOJ's Remaining Objections are Unpersuasive

DOJ's remaining arguments are easily dispatched.  DOJ asserts that "the full House in the current Congress has already voted overwhelmingly *against* impeachment," DOJ Resp. at 25 (emphasis added), because House Resolution 498, which called for an impeachment inquiry based on "President Trump's racist comments," H.R. Res. 498, 116th Cong. (2019), was "defeated 332-95," DOJ Resp. at 25.  Yet, the fact that House Resolution 498 was tabled, *see* All Actions, H.Res.498 — 116th Congress (2019-2020), https://www.congress.gov/bill/116th-congress/house-resolution/498/all-actions?actionsSearchResultViewType=compact, has little relevance here since that resolution has nothing to do with the concerns of the current impeachment inquiry, which is focused on the President's possible criminal conduct described in the Mueller Report and in connection with Ukraine.

Next, DOJ claims that HJC's "primary purpose" is to decide among different possible actions to "pursue in response to the Mueller Report," such as "various legislative proposals, Constitutional amendments, and a Congressional referral to the Department of Justice for prosecution or civil enforcement."  DOJ Resp. at 26.  DOJ is correct that deciding whether to recommend articles of impeachment may not always have been—and still may not be—the only purpose of HJC's current investigation, but that is to be expected.  "As the Supreme Court has explained, '[t]he very nature of the investigative function—like any research—is that it takes the searchers up some "blind alleys" and into nonproductive enterprises.'"  *Mazars*, 2019 WL 5089748, at *21 (alteration in original) (quoting *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 509 (1975)).  Here, HJC began, appropriately, with a broad inquiry, but focused on impeachment as the investigation progressed.  This new focus does not necessitate that HJC

forgo its other aims.  *See Mazars*, 2019 WL 5089748, at \*18.  HJC's investigation to determine whether to impeach President Nixon, for example, contributed not only to President Nixon's resignation, but also to significant legislative reforms.  *See, e.g.*, *Tax Analysts v. IRS*, 117 F.3d 607, 611 (D.C. Cir. 1997) (Internal Revenue Code provision restricting public release of individual tax returns); *United States v. Rose*, 28 F.3d 181, 183 (D.C. Cir. 1994) (Ethics in Government Act of 1978).

Finally, DOJ cautions that if introduction of articles of impeachment by a single Member of Congress were sufficient to render an HJC investigation "preliminarily to" an impeachment trial, grand jury information would become "politicized."  Hr'g Tr. at 70:6; *see also* DOJ Resp. at 28.  That hypothetical situation is far removed from this case, where HJC is months into its investigation and both the Speaker of the House and HJC have confirmed that the current investigation's purpose is to determine whether to recommend articles of impeachment against President Trump.  Besides, this "slippery slope" may be less precipitous than DOJ suggests, for a congressional committee seeking to obtain grand jury information based solely on a single Member's introduction of articles of impeachment would have an uphill battle demonstrating a "particularized need" for the materials.

*     *     *

In sum, HJC has presented sufficient evidence that its investigation has the primary purpose of determining whether to recommend articles impeachment and thus has satisfied Rule 6(e)'s "preliminarily to . . . a judicial proceeding" requirement.

### C.      HJC Has a "Particularized Need" for the Requested Materials

Finally, to meet the last "independent prerequisite[] to ([E])(i) disclosure," HJC needs to "show particularized need for access to" the requested grand jury materials, *Baggot*, 463 U.S. at

62

480; *In re Sealed Case*, 801 F.2d 1379, 1381 (D.C. Cir. 1986).  As stated earlier, those materials

fall into three categories.  First, HCJ asks for "all portions of the Mueller Report that were

redacted pursuant to Rule 6(e)."  HJC App. at 25.  Second, HJC wants the material underlying

those redactions—that is, the portions of the grand jury "transcripts or exhibits" cited in the

Report.  *Id.*  Third, HJC requests "transcripts of any underlying grand jury testimony and any

grand jury exhibits that relate directly to" President Trump's knowledge of several topics as well

as to actions taken by former White House counsel Donald F. McGahn II during his service to

first-candidate and then-President Trump.  *Id.*[42]

The "particularized need" standard requires a showing that (1) the requested materials are

"needed to avoid a possible injustice in another judicial proceeding; (2) the need for disclosure is

greater than the need for continued secrecy; and (3) the request is structured to cover only

material so needed."  *In re Sealed Case*, 801 F.2d at 1381 (internal quotation marks omitted); *see

also Baggot*, 463 U.S. at 480 n.4 (citing *Douglas Oil*, 441 U.S. at 222).  The balancing aspect of

the test means that "as the considerations justifying secrecy become less relevant, a party

asserting a need for grand jury [material] will have a lesser burden."  *Douglas Oil*, 441 U.S. at

223.

Ultimately, determinations of "particularized need" are committed to the "considered

discretion of the district court."  *Douglas Oil*, 441 U.S. at 228; *see also In re Sealed Case*, 801

F.2d at 1381 (recognizing the "substantial discretion of the district court").  That discretion "to

---

[42]     To repeat, the topics in the third category of requested grand jury materials are: (A) "President Trump's
knowledge of efforts by Russia to interfere in the 2016 U.S. Presidential election;" (B) his "knowledge of any direct
or indirect links or contacts between individuals associated with his Presidential campaign and Russia, including
with respect to Russia's election interference efforts;" (C) his "knowledge of any potential criminal acts by him or
any members of his administration, his campaign, his personal associates, or anyone associated with his
administration or campaign;" and (D) "actions taken by McGahn during the campaign, the transition, or McGahn's
period of service as White House Counsel."  HJC App. at 25.  Material is related directly to President Trump's
knowledge, HJC says, if it reflects "what witnesses saw or heard President Trump do."  Hr'g Tr. at 7:5–7:6.

determine the proper response to requests for disclosure," *Douglas Oil*, 441 U.S. at 228, extends to structuring the "time," "manner," and "other conditions" of any release of material, FED. R. CRIM. P. 6(e)(3)(E); *see also Douglas Oil*, 441 U.S. at 223 (acknowledging the possibility of "protective limitations" on the release of the material).  HJC has proposed that the Court use this authority to "direct a focused and staged disclosure," starting with categories one and two of the requested grand jury information and, following HJC's review of that material, moving to category three.  HJC Reply at 25; *see also* Hr'g Tr. at 35:1–35:11.

Adopting that proposal, to which DOJ has not objected, the Court finds that HJC has demonstrated a "particularized need" for the material in the first and second categories.  DOJ must promptly produce to HJC the grand jury material redacted from and cited in the Mueller Report.  HJC may file further requests articulating its "particularized need" for any grand jury material in category three.

### 1. Disclosure is Necessary to Avoid Possible Injustice

HJC asserts that it needs the material to conduct a fair impeachment investigation based on all relevant facts.  *See* HJC App. at 34.  In authorizing disclosure of grand jury material for use in impeachment investigations of judges and of a President, courts have found this "interest in conducting a full and fair impeachment inquiry" to be sufficiently particularized.  *Hastings*, 833 F.2d at 1442; Order, *In Re: Grand Jury Investigation of U.S. Dist. Judge G. Thomas Porteous, Jr.*, No. 2:09-mc-04346-CVSG, at 3; *In re 1972 Grand Jury Report*, 370 F. Supp. at 1230 (applying the predecessor to the "particularized need" standard).  Chief Judge Sirica, in releasing the Watergate Roadmap to HJC, remarked that "[i]t would be difficult to conceive of a

more compelling need than that of this country for an unswervingly fair inquiry based on all the pertinent information." *In re 1972 Grand Jury Report*, 370 F. Supp. at 1230.[43]

Impeachment based on anything less than all relevant evidence would compromise the public's faith in the process. *See Hastings*, 833 F.2d at 1445 ("Public confidence in a procedure as political and public as impeachment is an important consideration justifying disclosure."). Further, as already discussed, denying HJC evidence relevant to an impeachment inquiry could pose constitutional problems. *See supra* Parts III.B.3; *see also Hastings*, 833 F.2d at 1445 (concluding that denying the House the full record available, including the grand jury material, for use in impeachment would "clearly violate separation of powers principles"). These principles may, on their own, justify disclosure. *See Hastings*, 833 F.2d at 1442; Order, *In Re: Grand Jury Investigation of U.S. Dist. Judge G. Thomas Porteous, Jr.*, No. 2:09-mc-04346-CVSG, at 3; *In re 1972 Grand Jury Report*, 370 F. Supp. at 1230. Features of the House's investigation and of the Mueller Report make HJC's need for the grand jury materials referenced and cited in the Report especially particularized and compelling.

First, several "portions of the Mueller Report" are of particular interest to HJC, including the Trump Tower Meeting, Carter Page's trip to Moscow, Paul Manafort's sharing of internal polling data with a Russian business associate, and the Seychelles meeting, as well as information about what candidate Trump knew in advance about Wikileaks' dissemination in July 2016 of stolen emails from democratic political organizations and the Clinton Campaign.

---

[43]     At the time, DOJ similarly recognized that "[t]he 'need' for the House to be able to make its profoundly important judgment on the basis of all available information is as compelling as any that could be conceived." HJC App., Ex. P, Mem. for the U.S. on behalf of the Grand Jury, *In re 1972 Grand Jury Report*, 370 F. Supp. 1219 (Mar. 5, 1974), ECF No. 1-17. DOJ now attempts to distinguish *In re 1972 Grand Jury Report* on the ground that the grand jury itself initiated the request to disclose the Watergate Roadmap to Congress, DOJ Resp. at 35, but Rule 6(e) does not give different treatment to disclosures by grand jurors, *see* FED. R. CRIM. P. 6(e)(2)(B)(i), and so, unsurprisingly, the grand jury's involvement featured not at all in the relevant portions of Chief Judge Sirica's analysis, *see In re 1972 Grand Jury Report*, 370 F. Supp. at 1229–31.

*See* HJC App. at 35–36. Rule 6(e) material was redacted from the descriptions of each of these events in the Mueller Report and access to this redacted information is necessary to complete the full story for HJC. In some instances, without access to the redacted material, HJC cannot understand what the Special Counsel already found about key events. For example, what appears to be a citation to grand jury material supports the investigative finding that then-candidate Trump asked Manafort for continued updates about WikiLeaks's plans to release hacked documents. *See* Mueller Report at II-18 n.27.

Second, numerous individuals have already testified before or given interviews with HJC or other House committees about the events noted above that are central to the impeachment inquiry and also described in the Mueller Report.[44] These witnesses include Donald Trump, Jr., Carter Page, Erik Prince, Steve Bannon, and Corey Lewandowski.[45] Of concern is that another witness who spoke to both the Special Counsel and to Congress, Michael Cohen, has already been convicted of making false statements to Congress, Mueller Report at I-195–96, and two other individuals have been convicted of making false statements to the FBI in connection with the Special Counsel's investigation, *see id.* at I-192 (Papadopoulos); *id.* at I-194 (Flynn). The record thus suggests that the grand jury material referenced or cited in the Mueller Report may be helpful in shedding light on inconsistencies or even falsities in the testimony of witnesses called in the House's impeachment inquiry. *See* HJC App. at 37 (seeking the materials "to

---

[44]     In particular, the activities of the House Permanent Select Committee on Intelligence ("HPSCI") are relevant here because HJC's protocols for handling the grand jury information, discussed *infra*, state that the information will be shared with Members of HPSCI. *See* HJC App., Ex. X, Jerrold Nadler, Chairman, HJC, [HJC] Procedures for Handling Grand Jury Information ("GJ Handling Protocols") ¶ 11, ECF No. 1-25. With HJC, HPSCI is one of the six committees conducting the impeachment inquiry. *See* Pelosi Tr.

[45]     *See* DOJ Resp. at 34 & n.23 (noting testimony by Trump Jr., Page, Bannon, and Prince and citing Minority Views, HPSCI Report, https://intelligence.house.gov/uploadedfiles/20180411_-_final_-_hpsci_minority_views_on_majority_report.pdf); Thursday: House Judiciary to Consider Procedures Regarding Whether to Recommend Impeachment, COMM. ON THE JUDICIARY (Sept. 9, 2019), https://judiciary.house.gov/news/press-releases/thursday-house-judiciary-consider-procedures-regarding-whether-recommend (Lewandowski).

refresh or challenge th[e] testimony" of witnesses before Congress and "to corroborate [witness] veracity"); *see also* Hr'g Tr. at 40:5–41:17 (HJC) (confirming that the grand jury material would be used to impeach or corroborate witnesses).[46]  Disclosure is thus necessary here to prevent witnesses from misleading the House during its investigative factfinding.  *See supra* Part III.B.3 (discussing the House's factfinding role).  As DOJ acknowledges, disclosure of grand jury information "when necessary to avoid misleading a trier of fact" is a paradigmatic showing of "particularized need."  DOJ Resp. at 18–19 (recognizing that requests under the "judicial proceedings exception typically arose" in this situation and quoting *Douglas Oil*); *Douglas Oil*, 441 U.S. at 222 n.12 ("The typical showing of particularized need arises when a litigant seeks to use 'the grand jury transcript at the trial to impeach a witness, to refresh his recollection, to test his credibility and the like.'" (quoting *Procter & Gamble Co.*, 356 U.S. at 683)).

Third, HJC needs the requested material not only to investigate fully but also to reach a final determination about conduct by the President described in the Mueller Report.  *See* HJC App. at 34 (requesting the material "to assess the meaning and implications of the Mueller Report").[47]  Given that the Special Counsel stopped short of a "traditional prosecutorial judgment" or any "ultimate conclusions about the President's conduct," Mueller Report at II-8, in part to avoid "preempt[ing] constitutional processes for addressing presidential misconduct," *id.* at II-1; *see also id.* at 2 ("[W]hile this report does not conclude that the President committed a crime, it also does not exonerate him."), "the House alone can hold the President accountable for the conduct described," HJC Reply at 19.  HJC cannot fairly and diligently carry out this responsibility without the grand jury material referenced and cited in the Mueller Report.  Put

---

[46]     In identifying this need, HJC's application focused on the example of Don McGahn, *see* HJC App. at 37, but DOJ has now confirmed that McGahn did not testify before the grand jury, *see* Revised ADAG Decl. ¶ 4.

[47]     As HJC confirmed at the hearing, the recent revelations related to Ukraine have not displaced HJC's focus on investigating the conduct described in the Mueller Report.  See Hr'g Tr. at 30:25–32:22.

another way, HJC requires the grand jury material to evaluate the bases for the conclusions reached by the Special Counsel.

Critically, for example, the Mueller Report states: "The evidence we obtained about the President's actions and intent presents difficult issues that prevent us from conclusively determining that no criminal conduct occurred."  Mueller Report at II-2.  The grand jury material relied on in Volume II is indispensable to interpreting the Special Counsel's evaluation of this evidence and to assessing the implications of any "difficult issues" for HJC's inquiry into obstruction of justice.  The same is true of the material redacted from Appendix C, which details the Special Counsel's unsuccessful efforts to interview the President directly, the Special Counsel's choice not to issue a grand jury subpoena for the President's testimony, and related information redacted for grand jury secrecy.  *See* Mueller Report App'x C-1–C-2.

Complete information about the evidence the Special Counsel gathered, from whom, and in what setting is indispensable to HJC.  The recent revelation that two individuals who figured prominently in events examined in the Mueller Report—Don McGahn and Donald Trump, Jr. — were not compelled to testify before the grand jury illustrates this point.  *See* Revised ADAG Decl. ¶ 4.  The choice not to compel their testimony may indicate, for example, that the Special Counsel intended to leave aggressive investigation of certain potential criminal conduct, such as obstruction of justice by the President, to Congress.  That intention should inform HJC's investigation of those same issues.  The grand jury material redacted from and cited in the Report may provide other significant insights into the Special Counsel's use of, or decisions not to use, the grand jury.  Those insights may be essential to HJC's decisions about witnesses who should be questioned and about investigatory routes left unpursued by the Special Counsel that should be pursued by HJC prior to a final determination about impeachment.

Similarly, disclosure is necessary to assist HJC in filling, or assessing the need to fill, acknowledged evidentiary "gaps" in the Special Counsel's investigation.  *See supra* Part I.A. The Report detailed or alluded to investigative choices by the Special Counsel about immunity, about privilege, about pursuit of hard-to-get evidence, and other matters.  As described earlier, these choices had an impact on the quantity and quality of evidence gathered about events of interest to HJC, including the Trump Tower Meeting, Carter Page's trip to Moscow, Erik Prince's Seychelles meeting, and potential tampering of Michael Cohen's testimony to Congress. *See supra* Part I.A.  The Special Counsel helpfully documented those impacts, identifying critical factual disputes his investigation left unresolved and pointing to potential criminal violations that went uncharged due at least in part to gaps in evidence.  *See supra* Part I.A.  HJC thus needs the grand jury material redacted from and cited in the Report to pursue evidence that the Special Counsel did not gather and to resolve questions—including the ultimate question whether the President committed an impeachable offense—that the Special Counsel simply left unanswered.

In a last gasp effort to deny HJC access to the requested grand jury information, DOJ argues that HJC cannot show "particularized need" because other sources, such as the public version of the Mueller Report, the other categories of material redacted from the Mueller Report, congressional testimony, and FBI Form 302 interview reports ("FBI-302s"), can supply the requisite information.  *See* DOJ Resp. at 31–34.  As the preceding discussion makes abundantly clear, this argument gets the basic relationship between HJC's and the Special Counsel's investigations backwards: the overlap between these investigations enhances, rather than detracts from, HJC's showing of "particularized need."  *Cf. In re Grand Jury Proceedings GJ-76-4 & GJ-75-3*, 800 F.2d 1293, 1302 (4th Cir. 1986) (explaining that "particularized need' standard

requires more than relatedness but that "[o]bviously, the materials must be 'rationally related' for otherwise there would be no reason at all to disclose").

Furthermore, the sources DOJ identifies cannot substitute for the requested grand jury materials. To insure most effectively against being misled, HJC must have access to all essential pieces of testimony by witnesses, including testimony given under oath to the grand jury. Additionally, for purposes of assessing and following up on the Mueller Report's conclusions, the full Report is needed: the grand jury material may offer unique insights, insights not contained in the rest of the Report, congressional testimony, or FBI-302 reports.

Finally, DOJ claims that "[a] finding of 'particularized need' is especially inappropriate" because HJC "has not yet exhausted its available discovery tools"—namely, waiting for DOJ to fulfill its promised production of FBI interview reports and using congressional subpoenas. DOJ Resp. at 32–33 (citing *In re Grand Jury 89-4-72*, 932 F.2d 481, 488 (6th Cir. 1991)). In particular, DOJ cites an agreement reached with HJC this summer for DOJ to provide to HJC the thirty-three FBI-302 reports cited in Volume II of the Report, contending that this agreement must preclude a finding of "particularized need." *See* DOJ Resp. at 32. These arguments smack of farce. The reality is that DOJ and the White House have been openly stonewalling the House's efforts to get information by subpoena and by agreement, and the White House has flatly stated that the Administration will not cooperate with congressional requests for information. *See* Letter from Pat A. Cipollone, Counsel to the President, to Representative Nancy Pelosi, Speaker of the House, et al. (Oct. 8, 2019) at 2.

Regarding DOJ's production of FBI-302s, "the bottom line," as HJC put it, is that some 302s have so far been produced by DOJ but not "the ones of most interest." HJC Resp. to DOJ

Second Supp. at 4, ECF No. 41.[48]  Although DOJ at first "anticipate[d] making the remaining

FBI-302s available," DOJ First Supp. at 3, DOJ now says it "may need to amend the . . .

agreement" because of a letter the White House sent to congressional leadership on October 8,

*see* DOJ Second Supp., Second Decl. of ADAG Bradley Weinsheimer ("Second ADAG Decl.")

¶ 6, stating that "President Trump and his Administration reject [the House's] baseless,

unconstitutional efforts to overturn the democratic process" and "cannot participate in [the

House's] partisan and unconstitutional inquiry," Letter from Pat A. Cipollone, Counsel to the

President, to Representative Nancy Pelosi, Speaker of the House, et al. (Oct. 8, 2019) at 2.  The

letter's announced refusal to cooperate extends to congressional subpoenas, which the President

himself had already vowed to "fight[]."  *Remarks by President Trump Before Marine One

Departure*, WHITE HOUSE (Apr. 24, 2019), https://www.whitehouse.gov/briefings-

statements/remarks-president-trump-marine-one-departure-39/ ("Well, we're fighting all the

subpoenas.").

 The White House's stated policy of non-cooperation with the impeachment inquiry

weighs heavily in favor of disclosure.  Congress's need to access grand jury material relevant to

potential impeachable conduct by a President is heightened when the Executive Branch willfully

obstructs channels for accessing other relevant evidence.

 **2.**  **The Need for Disclosure Outweighs the Need for Continued Secrecy**

 Any "considerations justifying" continued grand jury "secrecy bec[a]me less relevant"

once the Special Counsel's investigation, and attendant grand jury work, concluded.  *Douglas

Oil*, 441 U.S. at 223.  Once a grand jury has ended, interests in preventing flight by those who

might be indicted and in protecting sitting jurors and witnesses disappear, or lessen considerably.

---

[48] DOJ has produced redacted FBI-302s for only seventeen of the thirty-three individuals promised.  DOJ's
Supplemental Submission Regarding Accommodation Process ("DOJ First Supp.") at 3, ECF No. 37.

*See id.* at 222 (recognizing that "the interests in grand jury secrecy" are "reduced" once "the grand jury has ended its activities"); *Butterworth v. Smith*, 494 U.S. 624, 632–33 (1990) (identifying these as the considerations that no longer apply "[w]hen an investigation ends"); *In re 1972 Grand Jury Report*, 370 F. Supp. at 1229; 1 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 106 (4th ed. 2019).

Once a grand jury has ended, the primary purpose of secrecy is safeguarding future grand juries' ability to obtain "frank and full testimony." *Douglas Oil*, 441 U.S. at 222. Any risk of damage to this interest is slim here, for two reasons. First, as DOJ itself emphasizes in arguing that HJC cannot establish a need for the material, categories one and two of HJC's request are relatively "limited." DOJ Resp. at 6; *see also id.* at 31 (calling the redactions "minimal"); Revised ADAG Decl. ¶ 3. Disclosure of "limited" information, including excerpts of grand jury transcripts, to HJC is unlikely to deter potential future grand jury witnesses. Second, disclosure is to the House, not to the public, and "less risk of . . . leakage or improper use" of grand jury material is present when disclosure is made to "government movants." *Sells Eng'g, Inc.*, 463 U.S. at 445; *Hastings*, 833 F.2d at 1441 (considering factors "peculiar to the [HJC] as a government movant"). Here, HJC guarantees that "a high degree of 'continued secrecy' could in fact be maintained" under already-adopted Grand Jury Handling Procedures calling for storage of the material in a secure location and restriction of access to Members of HJC and HPSCI. *See* HJC App. at 38 (citing GJ Handling Protocols); *see also In re 1972 Grand Jury Report*, 370 F. Supp. at 1230 (observing that the relevant standard "might well justify even a public disclosure" but that there is "certainly ample basis for disclosure to a body" that "has taken elaborate precautions to insure against unnecessary and inappropriate disclosure of these materials"). DOJ discounts  these procedures as "entirely illusory" because they can be altered "on a simple

majority vote" by HJC, DOJ Resp. at 36, but offers "no basis on which to assume that the Committee's use of the [material] will be injudicious or that it will disregard" or change these procedures, *In re 1972 Grand Jury Report*, 370 F. Supp. at 1230. Such an assumption would be inappropriate. *See supra* Part II.B.3 (discussing deference due to Congress in this matter).

Certainly, a continued interest in protecting from "public ridicule" individuals investigated but not indicted by the grand jury persists even when a grand jury has ended. *Douglas Oil*, 441 U.S. at 219; *see also* Wright & Miller, *supra*, § 106. The risk of public reputational harm to such individuals is slim to none here, however, where disclosure is to HJC under special handling protocols. Further, any remaining interest in secrecy is diminished by widespread public knowledge about the details of the Special Counsel's investigation, which paralleled that of the grand jury's, and about the charging and declination decisions outlined in the Mueller Report. *See In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1138, 1140 (D.C. Cir. 2006) (recognizing that "when information is sufficiently widely known" it has no "character [of] Rule 6(e) material" (quoting *In re North*, 16 F.3d at 1245)).

DOJ argues that ongoing criminal matters referred by the Special Counsel's Office for investigation or prosecution are the chief reason for continued secrecy. *See* DOJ Resp. at 36–37 (citing, *inter alia*, Mueller Report App'x D ("Special Counsel's Office Transferred, Referred, and Completed Cases")). That DOJ has already disclosed to certain Members of the House the material redacted from the Mueller Report to prevent harm to ongoing matters, *see* DOJ Resp. at 8; *see also* Hr'g Tr. at 4:4–4:11, undercuts this claim that continued secrecy of the grand jury material is required to protect any ongoing investigations or cases. HJC has nevertheless made clear that it has "no interest whatsoever in undermining any ongoing criminal proceedings" and has expressed willingness to negotiate with DOJ about disclosure of any grand jury information

that DOJ believes could harm ongoing matters.  Hr'g Tr. at 45:2–45:11. The Court expects that any such negotiations between the parties would be limited to the six redactions for grand jury information in Volume I of the Report that DOJ has already identified as presenting potential harm to ongoing matters.  *See* Second ADAG Decl. ¶ 3.

*     *     *

The need for continued secrecy is minimal and thus easily outweighed by HJC's compelling need for the material.  Tipping the scale even further toward disclosure is the public's interest in a diligent and thorough investigation into, and in a final determination about, potentially impeachable conduct by the President described in the Mueller Report.  *See In re 1972 Grand Jury Report*, 370 F. Supp. at 1230; *see Illinois v. Abbott & Assocs., Inc.*, 460 U.S. 557, 567 n.15 (1983) ("[T]he district court may weigh the public interest, if any, served by disclosure to a governmental body.").

### 3.      Scope of Disclosure Authorized

HJC has shown that it needs the grand jury material referenced and cited in the Mueller Report to avoid a possible injustice in the impeachment inquiry, that this need for disclosure is greater than the need for continued secrecy, and that the "request is structured to cover only material so needed."  *Douglas Oil*, 441 U.S. at 222.[49]  DOJ is ordered to disclose that material to HJC promptly, by October 30, 2019.  HJC may file further requests with the Court articulating its particularized need for disclosure of any additional material requested in its initial application.

## IV.    CONCLUSION

For the foregoing reasons, HJC's application is granted.  Consequently, DOJ is ordered to provide promptly, by October 30, 2019, to HJC all portions of the Mueller Report that were

---

[49]    DOJ concedes that the requests for the material referenced or cited in the report are properly structured. *See* DOJ Resp. at 37–38 (challenging only the structure of HJC's request for material in category three).

redacted pursuant to Rule 6(e) and any underlying transcripts or exhibits referenced in the

portions of the Mueller Report that were redacted pursuant to Rule 6(e).  HJC is permitted to file

further requests articulating its particularized need for additional grand jury information

requested in the initial application.

An appropriate Order accompanies this Memorandum Opinion.

Date: October 25, 2019

_____
BERYL A. HOWELL
Chief District Judge